## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

| | |
|---|---|
| IT'S MY PARTY, INC.<br>6112 Lenox Road<br>Bethesda, Montgomery County, MD 20817 | Civil Action No. _____ |
| and | JURY TRIAL DEMANDED |
| IT'S MY AMPHITHEATRE, INC. d/b/a<br>Merriweather Post Pavilion<br>10475 Little Patuxent Parkway<br>Columbia, Howard County, MD 21044 | |
| *Plaintiffs,* | |
| v. | |
| LIVE NATION, INC.<br>9348 Civic Center Drive<br>Beverly Hills, California 90210 | |
| *Defendant.* | |

## COMPLAINT

Plaintiffs, It's My Party, Inc. ("I.M.P.") and It's My Amphitheatre, Inc. d/b/a  Merriweather Post Pavilion ("I.M.A.") (collectively, "plaintiffs"), based upon personal knowledge as to facts pertaining to themselves, and otherwise upon information and belief, hereby assert the following claims against defendant Live Nation, Inc. ("Live Nation").

## NATURE OF ACTION

1.      Plaintiffs assert claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, Section 4 of the Clayton Act, 15 U.S.C. § 15, and under the Maryland Antitrust Act.  They also assert

common law claims for tortious interference with prospective contractual relationships and unfair competition.

2.     Plaintiffs seek to recover compensatory, treble and punitive damages, reimbursement of their attorneys' fees and costs and to obtain injunctive relief to prohibit Live Nation, the world's largest promoter of live popular music concerts, from continuing its unlawful anticompetitive, predatory and exclusory practices.

3.     Live Nation has deliberately and unlawfully acquired monopoly power in the national market for the promotion of live popular music concerts. Live Nation has wielded this power to entice and coerce artists to appear only at amphitheatres and other venues it owns, operates or at which it controls the booking, and to obtain monopoly power within 19 of the top 25 regional markets in the United States for the provision of venues and venue services to major artists. Now that it has gained control of these markets, Live Nation is seeking to expand its empire into the management of artists, the remote sale of concert tickets, the licensing and sale of concert merchandise and other ancillary businesses.

4.     The ultimate object of Live Nation's scheme is to eliminate and prevent further competition, control all aspects of the music business, lower performance fees paid to artists and to charge super-competitive prices for concert tickets, remote ticket sales, concessions, parking, merchandise and other services.

**JURISDICTION AND VENUE**

5.     This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331 and §1337, since plaintiffs assert claims under Sections 1 and 2 of the Sherman Act and Section 4 of the Clayton Act. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C.

2

§ 1367, because the federal and state law claims arise from the same events and transactions, involve substantially identical issues of fact and law and are so related to each other that they form part of the same case or controversy under Article III of the United States Constitution.

6.      Subject matter jurisdiction is also vested in this Court pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship between the parties and the amount in controversy exceeds seventy-five thousand dollars ($75,000), exclusive of interest and costs.

7.      Venue is appropriate in this judicial district under 28 U.S.C. § 1391, because Live Nation has transacted business within the State of Maryland and many of the acts and events giving rise to this action occurred within this District.

## THE PARTIES

8.      I.M.A. is a corporation organized and existing under the laws of the State of Maryland and maintains its principal place of business at 10475 Little Patuxent Parkway, Columbia, MD 21044. I.M.A. is the management company for Merriweather Post Pavilion ("Merriweather"), which is an outdoor amphitheatre located in Columbia, Howard County, Maryland, that serves the Baltimore market, as hereinafter defined.  See ¶ 160.  Merriweather has a seating capacity of 19,316 persons.

9.      I.M.P. is a corporation organized and existing under the laws of the State of Maryland and maintains its principal place of business at 6112 Lenox Road, Bethesda, Montgomery County, MD 20817.  I.M.P. is a promoter of live popular music concerts, and has produced live music concerts at Merriweather, the 9:30 Club in Washington D.C. and other venues within the Baltimore and the Washington D.C. metropolitan markets.

10.     I.M.A. and I.M.P. are affiliated by common ownership.  Seth Hurwitz, a nationally recognized concert promoter, is one of the owners of I.M.P. and I.M.A.

3

11.     Live Nation is a corporation organized and existing under the laws of the State of Delaware, and maintains its principal place of business at 9348 Civic Center Drive, Beverly Hills, California 90210.  Live Nation owns and operates, among many others, the Nissan Pavilion, located in Bristow, Prince William County, Virginia.  The Nissan Pavilion has a seating capacity of 25,000 persons.

## INTERSTATE TRADE AND COMMERCE

12.     Live Nation is involved in interstate trade and commerce and its activities substantially and adversely affect interstate commerce.  Live Nation promotes national and international tours of popular music artists, otherwise promotes live music concerts throughout the country, and owns, operates and/or has exclusive booking rights at numerous venues throughout the United States.

13.     Live Nation, directly or indirectly, has used and uses the means and instrumentalities of interstate commerce in furtherance of the unlawful acts and communications alleged herein, including but not limited to, the United States postal system and nationwide telephone phone system, through and by means of which a substantial amount of the nation's communications, information exchanges and transportation take place.  Live Nation uses all of the instrumentalities of interstate commerce to sell and advertise tickets to performances and to contact and book performers at venues throughout the United States, including the Baltimore and Washington, D.C. markets.

4

## FACTS COMMON TO ALL COUNTS

A.    **The Development Of The Market for Promoting Live Music Concerts by Popular Artists**

14.    Prior to the late 1950s, live concerts by popular singers and musicians were generally only performed at night clubs, dance halls, restaurants or country fairs where consumers were served food and drink, could dance or could participate in other activities.

15.    During the 1950s, however, a consumer mass market for the sale of recorded music developed due to technological advances in recording and audio equipment. These advances facilitated the quality recording of musical performances and the ability to play those recordings on high fidelity equipment.

16.    During this period, the "rock" or "rock n' roll" style of music, which is a blend of rhythm and blues and country music, developed and became immensely popular, primarily among children, teenagers and young adults. In the 1960s, artists modernized the folk music genre - music imitating or incorporating the common style of music among a group of people and often featuring acoustic instrumentation - and folk music also became popular among teenagers and young adults.

17.    Record companies were created and signed new rock and folk artists to multi-record deals and assisted them in attracting an audience and gaining notoriety.

18.    Record companies encouraged artists to perform live concerts as a means of gaining popularity and thereby driving record sales. Record companies organized traveling shows of groups of their artists.

19.    By the late 1950s, many rock artists became so popular from the mass marketing of their recordings, coupled with the growing appeal of rock and roll and radio and television appearances that

5

they attracted substantial audiences for solo performances, without the necessity of other attractions, such as food, drink and dancing. By the 1960s, folk artists also developed immense popularity.

20.     At that point, popular rock and folk artists began to tour nationally or regionally.

21.     To obtain marketing and advertising assistance, artists engaged the services of local promoters. Throughout the country, numerous promotional companies were created and began to operate on a local or regional basis.

22.     Some of the notable promoters included Bill Graham Presents in Northern California, Fey Concerts in Colorado, Jules Belkin in Ohio, Don Law in Boston and Contemporary Productions in the Midwest, Cellar Door Productions in the Southeastern and Pace Concerts in the Southwestern, United States.

23.     Artists scheduled concert tours through a booking agent, who mapped out a schedule and solicited offers from local or regional promoters to promote the artist's concert. Booking agents solicited offers from several promoters in each area, who competed for the contract to promote the concert.

24.     Promoters shared the ticket revenues with the artists, often guaranteeing a minimum "take," and retaining the remainder of ticket sales as their revenue.

25.     Promoters typically provide promotional services to artists of all levels of popularity. However, promoting concerts by popular performers is the most profitable, and many promoters promote developing acts in order to build a foundation that would lead the artist to utilize the promoter when the act developed mass appeal.

26.     One of the primary means of advertising a concert was through radio advertisements and references on concert spotlights or calendars. Promoters also often directly involve radio stations in

6

concert promotion, by, for instance, providing a radio station free tickets to listeners and/or having the radio station broadcast from the concert.

27.     Radio stations are generally owned independently of promoters.

**B**.     **The Development of the Market for Providing Venues and Venue Services**

28.     Concerts by popular rock and folk artists were initially held in small theatres or other such facilities.  As rock and folk artists grew in popularity, concerts were held in indoor sports arenas with seating for up to 30,000 fans and, in some instances, in outdoor stadiums with seating capacities of in excess of 60,000 fans.

29.     With the growing popularity of live popular music concerts, facilities designed and intended for use solely as venues for live music concerts began to be constructed in many areas of the country.

30.     The most prevalent type of venue constructed for live popular music concerts is the outdoor amphitheatre, with a seating capacity of between 15,000 and 30,000 fans spread over designated seating areas (usually under cover) and large lawn areas.

31.     As a general matter, venues for live music concerts were typically owned and operated independently of promoters.  The construction of venues requires capital investment beyond what most promoters can undertake and the operation of venues involves skills and services different than concert promotion.  These skills and services include maintenance of the venue, staging and lighting shows, operating concessions, providing security and ticket sales.

32.     While venues may charge a license fee, their primary source of income is concessions, parking fees, charges added to the ticket price, concessions and merchandising.

7

33.    Even though promoters often contracted with the venue owner or operator for the use of the concert venue, they did so on behalf of the artist and demand for the leasing or licensing of venues and for the provision of venue services is separate and distinct from the demand for promotional services. Artists expect promotional services and venue services to be provided independently, and deal directly with the venue in connection with lighting and staging their shows.

34.    Artists also lease or license venues and acquire venue services separately from the promotional services. Other entities, such as producers of children's shows and Disney (or its licensees), lease or license venues and acquire venue services without involving promoters. Further, arenas, stadiums and other venues are used for other purposes, such as sporting events and ice shows.

35.    Artists expect the most appropriate venue for their performance to be utilized. Some venues provide better staging, acoustics, sight lines or other amenities and savvy artists recognize that these factors contribute to their fans' enjoyment, which in turn colors the fans' perception of how well the artist performed. Artists not only avoid appearing in venues too small for the expected attendance, but also avoid appearing in venues with seating capacities in excess of their draw because playing in a sparsely filled venue casts a pale of failure over the concert. Many artists furthermore seek to alternate between venues that may service overlapping markets in order to enhance exposure to the most fans.

36.    Promoters have traditionally had equal access to venues. Even where promoters owned smaller venues, they would agree to lease or license the venue to other promoters. Promoters could accordingly provide artists with the venue most appropriate for their performance.

8

C.    **The Growth of the Live Music Concert Industry**

37.    As the music industry matured, rock music has splintered into different genres from classic rock (of the style from the 1960s through 1970s), soft rock (music with a less edgy sound), "hard" rock (less melodic) and alternative rock.  The audience for rock music has expanded as children, teenagers and young adults from the 1950s and 1960s continued to enjoy this style of music as they aged while new generations were attracted to rock music as well.

38.    Country music has become increasingly popular and extended its fan base beyond the South where it was traditionally popular.

39.    The hip-hop and rap genre of music developed and, together with rhythm and blues, are popular among teens and young adults.

40.    The different styles of rock music, country, hip-hop, rap and rhythm and blues now attract wide audiences and are hereafter collectively referred to as "popular" music, as distinct from jazz, classical, gospel and other genres with a distinct following or a more limited or niche appeal.

41.    As the industry matured, various types and sizes of facilities were constructed or converted to use as a venue for live music concerts.

42.    Outdoor amphitheatres previously utilized for classical music summer concerts or newly constructed became the most popular venue for popular music concerts by artists drawing between approximately 8,000 and 25,000 fans because:  (a) they have sufficient seating capacities;  (b) they are constructed primarily for live concert performances and have good sight lines, acoustics and staging;  (c) fans enjoy attending concerts outdoors;  (d) lawn seating allows amphitheatres to approach the seating capacity of indoor sports arenas while providing better acoustics and sight lines;  (e) fans in the lawn section can mingle before and during the concert;  (f) fans in the lawn area may obtain a good vantage

9

point at a reduced price if they arrive early; (g) fans are not assigned undesirable seats; and    (h) even less popular shows appear to have a significant attendance because fans spread out in the lawn areas. Further, as most of the facility is outdoors, amphitheatres are cheaper to construct and maintain than large indoor facilities.

43.    There are few indoor facilities competing with amphitheatres to host concerts by artists capable of drawing between 8,000 and 25,000 fans.

44.    As the weather in most parts of the country permits the use of amphitheatres only from spring through fall, a concert season of April through early October has developed, during which a significant percentage of all concerts are held.

45.    Outdoor stadiums and indoor sports arenas continue to be utilized for popular music concerts. However, over the last five to seven years the number of stadium and arena concerts has steadily decreased.

46.    Midsized venues with seating capacities of between 1,500 to 6,500 fans and small clubs (often also used for comedy acts) and integrated dining and music clubs with seating capacities of between 1,000 to 1,500 fans have also been constructed or converted for concert use.

47.    As artists can generally only appear in a venue appropriately sized for their draw, the product market for venue services is segmented into markets or submarkets for stadiums/arenas, amphitheatres and a few similarly sized indoor facilities, mid-sized venues and clubs and integrated music and dining clubs. While some artists' popularity is such that they draw on the borderline of the seating capacity of different types of venues (for instance some artists are sufficiently popular to sell out most amphitheatres or to fill an arena to near capacity), most artists will only appear at either stadiums/arenas, amphitheatres, midsized venues or clubs and integrated music and dining clubs.

10

48.     Specifically, only "superstar" artists - those artists capable of filling larger venues to capacity and with an affluent fan base able to afford tickets in the luxury boxes and suites commonly constructed in modern sports arenas and stadiums – can generally appear in stadiums and arenas. These facilities are also utilized for festivals or other multi-artist concerts.

49.     The vast majority of the popular music artists with a significant draw, capable of drawing between 8,000 and 20,000 fans, can only select from amphitheatres and a select number of indoor venues to host their concerts. (Artists capable of drawing more than 8,000 fans per concert, but who do not have the popularity to fill a sports arena or stadium, are hereinafter referred to as "major artists").

50.     Developing and niche acts can only appear at mid-sized venues, clubs or integrated music and dining clubs.

51.     Further, fans will not generally travel more than an hour for a concert. As such, major artists can only select from among venues within a specific metropolitan area or region and the geographic markets for providing venues and venue services is local.

52.     Given the cost of construction, the limited number of performing artists and the extent of demand for live music concerts, there is often only one, or no more than a few, amphitheatres or other such facilities within each geographic market.

53.     There are presently less than one hundred artists worldwide capable of drawing more than 8,000 fans per concert. In its World Industry Report, *Promoters of Performing Arts, Sports and Similar Events with Facilities in the US*, IBISWorld states that, in 2005, the top 100 tours comprised 67% of the total domestic concert revenues.

54.     Not all major artists tour each year and, as such, at any given time, there are even fewer artists performing who are capable of drawing more than eight thousand fans per concert.

11

55.     Historically, ticket sales could only be purchased at the concert venue. Over the years, third-party ticket agents, such as Ticketmaster, began contracting with venues to sell concert tickets at remote locations, and thereafter over the telephone and Internet. Ticket agents charge the customer a service fee for the convenience of purchasing the tickets without being required to travel to the venue.

**D.      The Market for Live Music Concerts by Popular Artists Expands into National Market**

56.     In or about 1997, SFX Entertainment, Inc. ("SFX") began acquiring competitive major independent promoters of popular music in order to develop a promotional company of national scope. For example, SFX acquired Bill Graham Presents, Fey Concerts, Pace Concerts, Cellar Door and the promotional companies of Jules Belkin and Don Law.

57.     As it expanded nationally, SFX introduced a fundamental change in the market for concert promotion by offering to promote all or a significant part of an artist's tour, rather than only promoting the artist's appearance in one market or region.

58.     SFX transformed the promotion of live music concerts by popular artists from a local or regional, to a national, market.

59.     AEG Live and HOB Entertainment, Inc. ("House of Blues") developed as competitors of SFX for the promotion of concerts on a national basis.

60.     AEG Live focuses primarily upon promoting tours of superstar performers at stadiums and arenas it owns, leases or operates and generally in the western part of the country.

61.     House of Blues promoted concerts at numerous amphitheatres and at "House of Blues" themed integrated music and dining clubs it owned and operated.

12

E.     **Live Nation Establishes Dominance of the Promotion of Live Popular Music Concerts**

62.     In 2000, Clear Channel Communications, Inc. ("Clear Channel"), a publicly held corporation, which owns and operates numerous radio stations nationwide, acquired SFX and operated it under the name of Clear Channel Entertainment.

63.     Through various subsidiaries and affiliates, Clear Channel owns or operates approximately 1,200 radio stations and reaches about 110 million listeners weekly in the United States, broadcasts across all fifty states, and operates radio stations in every top ten market and in 47 of the top fifty markets. In many markets, Clear Channel exercised monopoly power in the market for rock, hip-hop/rap and/or country radio stations, or operated the only rock, hip-hop/rap and/or country radio station in the market.

64.     While owned by Clear Channel, Clear Channel Entertainment substantially increased its share of the concert promotion business and purchased or leased, or acquired exclusive booking rights at, numerous amphitheatres and other venues across the county. Clear Channel Entertainment acquired many of the most prestigious amphitheatres and other venues in the United States.

65.     In December 2005, in the wake of several antitrust actions, Clear Channel divested Clear Channel Entertainment, by creating Live Nation as a separate publicly held company.

66.     At the time it was spun-off from Clear Channel, Live Nation was the largest promoter of live popular music concerts in the United States. Live Nation dominated the market, and was the promoter for approximately 70% of the live music tickets sold nationwide in 2005. Live Nation exercised monopoly, or at least market power in the numerous local markets for providing venues and venue services for live popular music concerts.

13

67.     Live Nation's dominance of the market for promoting live popular music concerts and for providing venues and venue services for live popular music concerts at the time it was formed was the direct, intended and proximate result of Clear Channel's anticompetitive, predatory and exclusory conduct.

68.     After the acquisition of SFX, Clear Channel exploited its dominance of the market for radio broadcasts of popular music to entice or coerce artists to use Clear Channel Entertainment's promotional services and to deny competing promoters with access to artists by:

        a.      Refusing to advertise, or charging excess fees to advertise concerts promoted by Clear Channel Entertainment's competitors on Clear Channel Radio stations;

        b.      Denying promotional air-time to concerts promoted by competitors;

        c.      Denying promotional air-time to artists who worked with competing promoters; and/or

        d.      Limiting radio airplay of artists who refused to use Clear Channel's concert promotion services or who also used the services of rival promoters.

69.     As a direct and proximate result of these anticompetitive, predatory and exclusory actions, artists were compelled to use Live Nation to promote their concerts for fear that their records would not obtain radio play and/or their concerts would not be adequately marketed and advertised.

70.     Where artists had sufficient popularity to resist Clear Channel's coercive conduct, Clear Channel used its enormous resources to outbid any competitors for the right to promote the artist.

71.     After it was spun-off into a separate company, and without the continuing benefit of Clear Channel's domination of the radio station market, Live Nation devised new anticompetitive, predatory and exclusory means to maintain and extend its illicit monopoly over the promotion of live

14

popular music concerts.  Live Nation used its dominance of the market for the promotion of live popular music concerts and increasing control of amphitheatres and other venues to force artists to use its promotional services.

72.     First focusing on the most profitable segment of the market, Live Nation offered to promote popular artists' entire tour during a season and coerced these artists to accept tour offers by:

a)     Offering super-competitive shares of concert revenues to the popular artists, often guaranteeing the artist more than the expected gross ticket sales;

b)     Refusing to negotiate the scope or duration of the tour; and/or

c)     Threatening to reduce disproportionately artists' share of the tour proceeds if they do not agree to have Live Nation promote their entire tour for a season, or if they use local promoters or play non-Live Nation controlled venues during the tour.

73.     As a direct, intended and proximate result of Live Nation's abuse of its dominant position in the market, increasing numbers of major artists began engaging Live Nation to promote their entire tour for a season.  For example, in 2007, Live Nation promoted national tours, *inter alia*, of Gwen Stefani, Nine Inch Nails, Roger Waters, Kelly Clarkson, Depeche Mode and Coldplay.  In an April 24, 2008 press release, Live Nation claimed that it was scheduled to produce tours of, *inter alia*, 311, Brad Paisley with Jewel, Chuck Wicks and Julianne Hough, Brooks and Dunn with ZZ Top, Rodney Atkins and James Otto, Chicago and the Doobie Brothers, The Dave Matthews Band, James Taylor, Eric Clapton, Rascal Flatts, Counting Crows and Maroon 5, Martina McBride with Jack Ingram and Chris Young, Pearl Jam, Radiohead, Rod Stewart, The Police, Journey, and the Jonas Brothers.

74.     Even where Live Nation does not promote a major artist's tour, it has offered super-competitive shares of the concert revenues to artists to induce them to utilize its promotional services.

15

75.     Further, after it was spun-off from Clear Channel, Live Nation continued to acquire ownership, management contracts and/or exclusive booking rights at amphitheatres and indoor venues with similar seating capacities.  It obtained many highly prestigious venues, including *The Fillmore* in San Francisco and the Hollywood Palladium, acquired the only or a monopoly of the amphitheatres and indoor venues with similar seating capacities in a metropolitan or regional market.

76.     As Live Nation acquired the most prestigious, the only or a monopoly over the amphitheatres or venues with similar seating capacities in a metropolitan or regional market, it threatened to deny popular artists access to those venues if the artist rejected Live Nation's tour offer or promotional services.

77.     At the same time, Live Nation refused to promote any artist who refused also to  utilize its venues and venue services.  It did so because Live Nation uses the revenues from venue operations, such as concessions, parking and merchandising, to assist in funding the super-competitive shares of the total ticket revenues it offers artists.

78.     Live Nation furthermore used its national platform to obtain national corporate sponsorships from numerous corporate entities.

79.     As a direct, intended and proximate result of the above-stated anticompetitive, predatory and exclusory conduct, Live Nation promotes over ninety percent (90%) of the major artists touring at any given time and dominates the spring through fall concert season.

80.     Live Nation has also extended its anticompetitive, predatory and exclusory conduct to the promotion of concerts by superstar, developing and niche artists, including by offering super-competitive shares of the concert proceeds to these artists.  Live Nation has also obtained ownership, management contracts or exclusive booking privileges at music theatres, clubs and integrated music and

dining clubs and used its developing control of these facilities to induce artists to utilize its promotional services. As of December 31, 2008, Live Nation owned, leased or had exclusive booking rights at 112 venues throughout the United States, and in the midst of negotiations to acquire 3 more. Live Nation has extended its anticompetitive, exclusory and predatory conduct by using control of these venues to induce artists to utilize its promotional services and venue services by refusing to provide artists access to its prestigious venue or venues in areas where it operates the only or a  monopoly of venues.

81.     As a direct, intended and proximate result of the above-stated anticompetitive, predatory and exclusory conduct, Live Nation's North American Music segment grew to approximately $2.2 billion in revenues in 2008 through "the promotion of over 10,000 North American live music events in 2008." (Live Nation 2008 Annual Report on Securities Exchange Commission Form 10K, p. 4.)

82.     According to Live Nation's public disclosures, in a recessionary economy, Live Nation increased the number of concerts promoted in 2008 by thirty-two percent (32%), and its revenues by eleven percent (11%). Based upon these reports, Live Nation currently controls more than eighty percent (80%) of the national market for the promotion of concerts.

F.     **Live Nation Extends Its Monopoly to the Market for Venues and Venue Services**

83.     Live Nation also insists that artists it promotes appear only at its venues in order to deny competing venue owners and operators of access to artists. By engaging in this conduct, Live Nation locks artists into venues they would not otherwise play, or prevents them from playing venues at which they otherwise would appear.

84.     Live Nation generally refuses to permit artists it promotes to appear at venues at which it does not control the bookings. Live Nation even refuses to permit artists it promotes to appear at non-

Live Nation venues whose territories overlap with a Live Nation venue and does so even where the artist has sufficient popularity to draw significant crowds at both venues.

85.     In defending Live Nation's then exclusive booking arrangement with the New York State Fair, James Koplik, Chairman of Live Nation's Northeast Region, stated that artists on Live Nation promoted national tours, who appeared at the New York State Fair, would not have done so if Live Nation did not have exclusive booking rights there.  (See Jim Koplik, *Live Nation is Committed to Successful State Fair*, available at http://blog.syracuse.com (posted August 26, 2008)).

86.     It is inconsistent with Live Nation's rational economic interests as a promoter to limit the number of venues at which an artist appears.  Promoters only profit if the revenues generated by the tour or concerts they promote exceed the amounts they have guaranteed to the artist and other promotional costs.  As Live Nation pays a single fee to the artist for a tour, it is in its interests for the artist to give as many concert performances as possible during a tour to increase revenues.  For this reason, Live Nation promoted artists appear at Live Nation controlled venues with overlapping markets or that are otherwise in close proximity.

87.     This unlawful conduct has prevented owners of competing venues from effectively competing for shows and damaged their businesses, leaving them ripe for Live Nation to acquire, lease or obtain exclusive booking contracts.

88.     Live Nation has furthermore obtained leases or exclusive booking rights at venues by promising venue owners to utilize its control of the market for promoting live popular music concerts and artists' desire to appear at its venues in other geographic regions to induce artists to appear at their venues.  Live Nation advises venue owners that it will deny them access to Live Nation artists if they do not grant it exclusive booking rights.

18

89.    As an example, when Live Nation lost the contract to promote concerts at the New York

State Fair for the 2009 season, a Live Nation representative was quoted as stating that "it will not allow

any of the acts it promotes to appear at the Syracuse-based fair." Jim Koplik, Northeast regional

chairman of Live Nation, furthermore stated that "I am very disappointed in the decision made by New

York State, and I believe the real loser is the people who attend the fair as the talent package that will be

offered to the fans will be less attractive. I worked with AEG in holding a Kenny Chesney date at the

Fair but will obviously not assist putting any more shows at the fair." (Jane Cohen & Bob Grossweiner,

*Live Nation Out as New York State Fair Promoter in 2009, available at*

http://www.ticketnews.com/Live-Nation-out-as-New-York-State-Fair-Promoter128293 (Dec. 29,

2008)).

90.    Where Live Nation does not have an available venue, or is unsuccessful in forcing an

artist to appear at a venue it controls, it utilizes access to its venues in other areas as leverage to induce

artists to force competing promoters or venues to pay a percentage of their profits from the artist's

concert to Live Nation even though it, at most, has minimal involvement with the concert.

91.    As a direct, intended and proximate result of the above-stated anticompetitive, predatory

and exclusory conduct, Live Nation has obtained control of 52 amphitheatres in North America,

including 40 of the 48 in excess of 15,000 fan capacity amphitheatres in the United States that stage live

music concerts by major artists. Live Nation furthermore owns, operates or has exclusive booking rights

at the amphitheatres serving 19 of the top 25 markets in this country.

### G.    Live Nation Solidifies and Extends Its Monopoly Power

92.    In or about November, 2006, in an effort to increase its market domination and eliminate

a significant competitor, Live Nation acquired House of Blues. In this acquisition, Live Nation acquired

19

eighteen concert sites, including premier amphitheatres, such as the Gibson Amphitheatre in Los Angeles and the Coors Amphitheatres in San Diego and Denver, and closed routing gaps in its amphitheatre itineraries.  By acquiring House of Blues, Live Nation eliminated one of the two significant entities competing against it on a national basis.

93.     As it has gained control of venues, in order to solidify its domination of the market for promoting live popular music concerts, Live Nation has refused to license or lease the venues it controls to other promoters.  This conduct has impeded other promoters from promoting an artist's tour.

94.     Through the House of Blues acquisition and other transactions, Live Nation has extended its control of venues to midsized venues, small clubs and integrated music and dining clubs.  In this manner, Live Nation is extending its reach, *inter alia*, to new and developing artists.  It is doing so to assure control of artists if they become popular and to solidify and extend its monopoly of the market for promoting live popular music concerts and its control of the venue and venue services market.

95.     Live Nation has extended its reach to provide promotional services, venues and venue services globally.  Live Nation has promoted artists and concert tours in Europe and, as of the end of 2007, owned or controlled approximately 160 venues worldwide.  In addition, on August 21, 2008, the *Wall Street Journal* Online reported that Live Nation formed a partnership with Corporación Interamericana de Entretenimiento SAB de C.V. ("CIE"), the largest concert promoter in Latin America.  CIE owns nearly all the major concert halls and arenas in Mexico, and a large percentage of those in Brazil and other large South American markets.  The *Wall Street Journal* reports that the partnership gives Live Nation the exclusive right to book world tours into CIE venues and competitors with acts on world tours will not be able to use CIE venues.  See Ethan Smith, *Live Nation Reaches Deal with Big Concert Promoter*, WALL ST. J., Aug. 21, 2008, available at http://online.wsj.com.

96.     Live Nation leverages its control of venues in other countries to compel artists to use its promotional services and appear only at Live Nation venues in the United States.

97.     Live Nation has also begun to implement a strategy of entering into multi-year agreements to manage every aspect of an artist's career, capture all revenue streams associated therewith and control every market comprising or ancillary to the live music concert industry.  Acknowledging this strategy, Live Nation Chief Executive Officer Michael Rapino stated that Live Nation was "acquiring more rights for a longer time period with locked-in pricing, cross-collateralized for risk reduction." (Live Nation Q1 2008 Earnings Call Transcript).

98.     In accordance with this strategy, Live Nation has entered into what has been referred to as "360° degree management contracts" with superstar and major artists, such as Madonna, U2, Jay-Z, Nickelback and Shakira, pursuant to which it makes a large lump sum payment to the artist in return for an exclusive services agreement over a number of years.  As part of these agreements, Live Nation assumes the management of artists' careers and controls whatever revenues they generate and essentially locks up the artist for a number of years.

99.     Live Nation developed a database of all fans attending Live Nation promoted concerts which it utilizes to market fans for future performances.

100.    Live Nation formed a company to engage in the remote sale of concert tickets.  Live Nation's control of remote ticket sales at a venue inhibits promoters from promoting a concert at that location because ticket agents have access to the promoters' confidential business information that it would never share with a competitor.

101.    Within the last month, Live Nation announced a merger with Ticketmaster, the one entity capable of competing with Live Nation in the market for remote ticket sales and a potential viable competitor in the promotion of concerts on a national scale.

### H.    The Anticompetitive Effects and Injury to Competition Resulting from Live Nation's Unlawful Conduct

102.    Independent promoters have been unable to compete against Live Nation because they could not match its tour offers, are at a significant disadvantage in competing to promote major artists' concerts during the spring through fall concert season and lack access to Live Nation amphitheatres or a network of venues.  Notably, during the recent Senate Judiciary Committee Hearing on the Live Nation-Ticketmaster merger, Live Nation stated that it lost eighty million dollars on ticket sales in 2008 and profited only on venue operations.

103.    As a result, numerous independent concert promoters have been forced out of business or to sell out to Live Nation (or its predecessor entities).

104.    Live Nation has also raised the barriers to entry into the concert promotion market through its control of virtually all of the major artists and approximately ninety percent (90%) of the amphitheatres in the United States.  It would require the construction of a nationwide network of amphitheatres and other venues to compete given that Live Nation will not make its venues available to rival promoters.

105.    Independently owned and controlled amphitheatres and other venues have similarly been unable to compete against Live Nation as it has forced artists whose concerts it promotes to appear at Live Nation venues and links its willingness to permit artists to appear at venues in those markets it controls to their agreeing to appear at other Live Nation venues.

22

106.   As a direct, intended and proximate result of being denied access to artists, independent venue operators have failed, sold to Live Nation or granted it exclusive booking privileges and competition within the markets for providing venues and venue services for live popular music concerts has been substantially decreased.

107.   At the present time, Live Nation faces no meaningful competition in the market for promoting live popular music concerts by major artists or in the market for promoting in the United States. The only other national promoter, AEG Live, focuses upon superstar performers and promotion of concerts at stadiums and arenas.

108.   It is now recognized within the industry that the concert business is now owned almost exclusively by one giant corporation and it is now virtually impossible to mount a national tour without making a deal with Live Nation. More and more often, Live Nation simply purchases a tour, buying a band out for one big lump sum and tells the band where they're going to play and when.

109.   As it has extended its monopoly power, Live Nation has obtained control of every service artists require to give a live popular music concert other than remote sales of tickets and it will obtain control of the remote sales of tickets if it merges with Ticketmaster.

110.   A few independent promoters and venue owners and operators, including plaintiffs, have been able to remain competitive by signing promotional deals with artists just as they "break" into popularity. However, the ability of even these entities to compete has been threatened as Live Nation has extended its control of the live popular music industry to new and developing artists through its increasing control (through ownership, lease or exclusive booking arrangements) of mid-sized venues, clubs and integrated dining and music clubs.

111.   As a direct, intended and proximate result of Live Nation's above-stated anti-competitive, predatory and exclusory conduct, ticket prices have increased to super-competitive levels as Live Nation bid up artists' share of ticket revenues and dictated ticket prices in the absence of competition. According to Pollstar data, from the time SFX first began promoting tours on a national basis, average ticket prices for the top 100 tours each year increased by approximately 160%, from $25.81 to $67.33 per ticket, substantially greater than the rate of inflation.  Prices for the most expensive seats in the venue have increased at even higher rates.  In its Annual Report on United States Securities and Exchange Commission Form 10-K for Fiscal Year 2008 (p. 3), Live Nation admitted that its gross concert related revenue increased at annual compounded rate of 10% in 2008 "primary due to increasing ticket prices for top grossing acts."  At the same time, according to Live Nation's own data, on average, forty percent of the available seats to every concert remain unsold.

112.   Without competition from venues offering concerts by major and popular artists, Live Nation has been able to charge super-competitive rates for food, beverage and merchandise and other souvenirs, with prices at Live Nation venues double that charged at non-Live Nation controlled venues.

113.   As a direct, intended and proximate result of the above-stated anticompetitive, predatory and exclusory conduct, fans living within geographic regions, including the Baltimore market, where Live Nation does not control an amphitheatre or similar venue, have been denied the opportunity to attend, at least in their local areas, live popular music concerts.  As a general matter fans living in the Baltimore market have been forced to travel to northern Virginia or Camden, New Jersey where Live Nation operates amphitheatres in order to attend concerts by major artists.

114.   To date, Live Nation has incurred operating losses in its promotion business.  Live Nation has been willing to incur these losses even though it has increased ticket prices to super-competitive

24

levels to eliminate competition and cement its domination of the live music concert industry, at which point it will reap the rewards of its anticompetitive, predatory and exclusory conduct by using its dominant market position to reduce the amounts paid to artists, and extend its monopoly power to other geographic markets within the live music concert industry.

115.    Evidence that Live Nation's scheme is working is found in its 2008 results of operation, which reflects a decrease in the amounts Live Nation paid for talent and other direct operating costs.

I.    **Injury to Plaintiffs from the Competitive Harm Live Nation Caused**

116.    I.M.P. has promoted live popular music concerts for nearly thirty years.

117.    I.M.P. is a sister company to Sledge, Inc. ("Sledge"), which owns and operates The 9:30 Club, a well known club in Washington D.C., at which I.M.P. regularly promotes new and developing artists.  Working with Sledge, I.M.P. has successfully pursued a strategy of developing strong relationships with artists in the early stages of their careers and building on these relationships to promote artists once they have gained notoriety.  Artists I.M.P. promoted early in their careers and after they became major acts include Nickelback, Gwen Stefani, Nine Inch Nails, Maroon 5, Counting Crows and Coldplay.

118.    In 2004, I.M.A. entered into an agreement pursuant to which it leased and assumed responsibility for managing Merriweather.  I.M.P. has promoted numerous concerts at Merriweather.

119.    For many years, Merriweather was considered a premier venue in the United States.  311, The Allman Brothers Band, R.E.M., The Goo Goo Dolls, Maroon 5, Bonnie Raitt, Counting Crows, James Taylor, Crosby, Stills & Nash, Stevie Nicks, Tom Petty and the Heartbreakers, Nickelback, Jack Johnson, Rascal Flatts, Jimmy Buffet, Kenny Chesney, John Mayer and Tim McGraw have all appeared at Merriweather.

25

120.   To some extent, Merriweather competes for artists and fans with the Nissan Pavilion ("Nissan"), an outdoor amphitheatre with a seating capacity of 25,000 persons, situated in Bristow, Virginia, a southern suburb of Washington D.C., which Live Nation owns and operates.  These amphitheatres are located within sixty-eight miles of each other.  Each amphitheatre draws fans from Washington D.C. and its immediately surrounding suburbs.

121.   Before Live Nation required artists to appear only at Live Nation venues on tours and used its monopoly power in numerous regional markets for providing venues and venue services to coerce artists to appear at other venues it owns, operates or at which it has exclusive booking rights, Merriweather successfully competed against Nissan.  A significant portion of the attendees at Merriweather concerts live in areas, including Baltimore and its northern suburbs, from which they would not regularly travel to Nissan for a concert.  Many popular artists accordingly drew a sufficient number of fans to appear at both Merriweather and Nissan in the same tour.

122.   Artists also appeared at Merriweather rather than Nissan because it is a better venue and/or of their existing relationships with I.M.P., or would elect to appear at Merriweather and Nissan in alternating tours so as to gain exposure to as many fans and as many markets as possible.

123.   In the last three seasons, Live Nation has denied I.M.P. and I.M.A. access to artists, particularly major artists, by promoting national tours, insisting that artists it promotes only play Nissan, and leveraging its control of other geographic markets for venues and venue operations to force artists to appear at Nissan.

124.   In at least one instance in 2008 (the Jonas Brothers), where an artist appeared at Nissan and made a Baltimore appearance, Live Nation demanded that the Baltimore appearance be at a venue other than Merriweather.  In compliance with this demand, the artist appeared at 1st Mariner Arena.

125.    As a direct, intended and proximate result of the above-stated anti-competitive, exclusory and predatory conduct, I.M.P. and I.M.A. have otherwise been deprived of access to major artists to promote and appear at Merriweather respectively, and I.M.A.'s ability to obtain any popular artists to appear at Merriweather has been threatened.

126.    Major artists having a long standing relationship with I.M.P. and previously appearing at Merriweather, including Maroon 5, Nine Inch Nails, Counting Crows, Pearl Jam and Depeche Mode, ceased appearing at Merriweather and discontinued their relationship with I.M.P. after signing a tour deal with Live Nation because Live Nation forced them to utilize its promotional service and appear exclusively at Nissan.

127.    By the 2008 season, the number of major artists appearing at Merriweather had declined significantly. No artist appeared at both Merriweather and Nissan in 2008 even though there were numerous artists appearing at Nissan who could have successfully played both amphitheatres. Only five popular music shows at Merriweather exceeded ten thousand fans and I.M.A. was required to pay Live Nation a percentage of its profits on two of those shows and two other shows involved multiple performers. The only country acts to appear at Merriweather did so as part of a festival sponsored by an influential radio station in the Baltimore area.

128.    Live Nation refused to permit major artists to play both Nissan and Merriweather even though those artists played Live Nation venues located approximately as close together as Merriweather and Nissan and in metropolitan markets smaller than the combined Baltimore/Washington D.C. markets.

129.    Over the last three years, including for three shows in 2008, in instances where Live Nation did not promote an artist or the artist could not, or refused to, appear at Nissan, Live Nation forced the artist to require I.M.P. and I.M.A. to pay a minimum of 25% of their profits from an

27

appearance at Merriweather to Live Nation, even though Live Nation had minimal, at best, involvement in the concert.

## COUNT I
## I.M.A. v. Live Nation

### (Per Se Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 – Anticompetitive Tying Arrangement)

130.   I.M.A. incorporates by reference, as if fully set forth herein, paragraphs 1 through 129 of this Complaint.

131.   The market for venues and venue services is separate and distinct from the market for promotional services to artists in that:

   a)   There is a separate demand for these services, and promotional services are different from venue services;

   b)   Artists do not expect promoters to provide venues or venues services;

   c)   Artists seek to utilize the venue best suited to their performance and popularity;

   d)   Venues and venue services are purchased separately from promotional services; and/or

   e)   Artists deal directly with the venue operator to produce and stage their concerts, and the quality of the venue and venue services have a direct impact on the success of a concert.

132.   Live Nation exercises monopoly, or at least market, power over the provision of promotional services for live popular music concerts in the United States and dominates the promotion of concerts by major artists sufficient to restrain trade in the separate market for the provision of venues and venue services.

28

133.     By refusing to provide promotional services to artists unless they also appear at Live Nation controlled venues and purchased its venue services, Live Nation ties the purchase of its promotional services to the purchase of its venues and venue services.  This conduct is *per se* unlawful under Section 1 of the Sherman Act.

134.     Through the unlawful acts and practices described above, Live Nation has caused competitive harm to I.M.A., and other competing venue operators, as well as the ticket buying public who attend live music concerts, and I.M.A. has been denied the ability to compete to provide its venue and venue services to artists.

135.     The restraint of trade and damages caused by Live Nation's unlawful acts as described above are adversely affecting a not insubstantial amount of interstate commerce.

136.     As a direct, intended and proximate result of Live Nation's unlawful tying arrangement, artists who previously appeared at Merriweather and/or who would have otherwise appeared at Merriweather, instead appeared only at Nissan, and Merriweather has otherwise sustained a loss of profits.

137.     As a direct, intended and proximate result of Live Nation's unlawful tying arrangement, I.M.A. has sustained damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

138.     The foregoing acts and conduct of Live Nation have prevented or suppressed competition, and will continue to prevent or suppress competition, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1, and unless enjoined, are likely to cause irreparable future injury to the public and to Live Nation's competitors within these markets, including I.M.A.

WHEREFORE, plaintiff, It's My Amphitheatre, Inc. d/b/a  Merriweather Post Pavilion, demands judgment in its favor and against defendant, Live Nation, Inc., for an award of the following relief:

    A.    A declaration that Live Nation's practice of tying the purchase of its promotional services to the use of its venues and purchase of its venue operation services is illegal and unenforceable;

    B.    A permanent injunction prohibiting Live Nation from continuing to engage in the above-referenced unlawful tying arrangement;

    C.    An award of damages in an amount consistent with the proofs submitted at trial for the losses I.M.A. has incurred due to Live Nation's wrongful conduct, trebled as provided by law;

    D.    An award of I.M.A.'s attorneys' fees and costs in pursuing this action; and/or

    E.    An award of such other legal and equitable relief as is just and appropriate.

## COUNT II
### I.M.A. v. Live Nation

### (Violation of Section 1 of the Sherman Antitrust Act,
### 15 U.S.C. § 1 – Anticompetitive Tying Arrangement)

139.    I.M.A. incorporates by reference, as if fully set forth herein, paragraphs 1 through 138 of this Complaint.

140.    Live Nation's tying the purchase of its promotional services to the use of its venues and purchase of its venue services alternatively violates of Section 1 of the Sherman Act under a rule of reason analysis.

141.    There are no or minimal efficiencies or other pro-competitive benefits to tying the purchase of Live Nation's promotional services to the use of its venues and purchase of its venue

services, and, in doing so, Live Nation acts inconsistently with its rational economic interests.
Conversely, this conduct has significant anti-competitive effects and has caused competitive harm to
I.M.A., and other competing venue operators, as well as the ticket buying public who attend live popular
music concerts, and I.M.A. has been denied the ability to compete to provide its venue and venue
services to artists.

142.    The restraint of trade and damages caused by Live Nation's unlawful acts as described
above are adversely affecting a not insubstantial amount of interstate commerce.

143.    As a direct, intended and proximate result of Live Nation's unlawful tying arrangement,
artists who previously had appeared at Merriweather and/or who would have otherwise appeared at
Merriweather instead appeared only at Nissan.

144.    As a direct, intended and proximate result of Live Nation's unlawful tying arrangement,
I.M.A. has sustained damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000),
exclusive of interest and costs.

145.    The foregoing acts and conduct of Live Nation have prevented or suppressed
competition, and will continue to prevent or suppress competition, in violation of Section 1 of the
Sherman Act, 15 U.S.C. §1, and unless enjoined, are likely to cause irreparable future injury to the
public, the relevant markets and to Live Nation's competitors within these markets, including I.M.A.

WHEREFORE, plaintiff, It's My Amphitheatre, Inc. d/b/a Merriweather Post Pavilion, demands
judgment in its favor and against defendant, Live Nation, Inc., for an award of the following relief:

A.    A declaration that Live Nation's practice of tying the purchase of its promotional
services to the use of its venues and purchase of its venue operation services is illegal and
unenforceable;

B.     A permanent injunction prohibiting Live Nation from continuing to engage in the above-referenced unlawful tying arrangement;

C.     An award of damages in an amount consistent with the proofs submitted at trial for the losses I.M.A. has incurred as a result of Live Nation's wrongful conduct,  trebled as provided by law;

D.     An award of I.M.A.'s attorneys' fees and costs in bringing this action pursuant to law; and/or

E.     An award of such other legal and equitable relief as is just and appropriate.

## COUNT III
## I.M.A. and I.M.P. v. Live Nation

### (Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2
### (Monopoly)

146.    Plaintiffs incorporate by reference, as if fully set forth herein, paragraphs 1 through 145 of this Complaint.

147.    Live Nation has wrongfully and intentionally acquired, maintained and extended monopoly power over the national market for the promotion of live popular music concerts and, to the extent Live Nation claims that the promotion and staging of concerts are part of the same market, over the provision of venues and venue services.  In any event, Live Nation presently exercises monopoly power in 19 of the 25 largest markets in the United States for the provision of venues and venue services to major artists.

148.    The foregoing acts and conduct of Live Nation have prevented or suppressed competition, and will continue to prevent or suppress competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.

149.    The restraint of trade and damages caused by Live Nation's unlawful acts as described above are adversely affecting a not insubstantial amount of interstate commerce.

150.    Live Nation's anticompetitive conduct has included coercing artists who previously appeared at Merriweather and/or who would have otherwise appeared at Merriweather:  (i) not to appear anywhere in Maryland, northern Virginia or Washington D.C. other than at Nissan; (ii) to force I.M.A. to pay Live Nation a percentage of its profits on concerts held at Merriweather; and/or (iii) to hold their Baltimore area appearance at venues other than Merriweather.

151.    As a direct, intended and proximate result of Live Nation's anticompetitive, exclusory and predatory conduct, I.M.A. has been denied access to major artists and other popular music artists who previously utilized, and/or or would have utilized, its venue and venue services, but who appeared exclusively at Nissan or other venues. I.M.A. has also been forced to pay a percentage of its profits to Live Nation for concerts for which it otherwise would have had no involvement.

152.    As a direct, intended and proximate result of Live Nation's abuse of its monopoly power, artists who previously utilized I.M.P.'s promotional services have discontinued their relationships with it, and other artists who would otherwise have utilized I.M.P.'s promotional services have, instead, utilized Live Nation's services.

153.    As a direct, intended and proximate result of Live Nation's wrongful exercise of monopoly power, plaintiffs have sustained damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

154.    The foregoing acts and conduct of Live Nation will continue to prevent or suppress competition unless enjoined, and are likely to cause irreparable future injury to the public, the relevant market and to Live Nation's competitors within this market, including plaintiffs.

WHEREFORE, plaintiffs, It's My Amphitheatre, Inc. d/b/a Merriweather Post Pavilion, and It's My Party, Inc., demands judgment in their favor and against defendant, Live Nation, Inc., for an award of the following relief:

A.    An order declaring illegal and unenforceable Live Nation's refusal to negotiate the length and duration of artists' tours, requiring artists it promotes to appear only in Live Nation controlled venues, refusal to license or lease its venues to competing promoters, using its monopoly over venues and venue services to coerce artists to appear in other Live Nation

controlled venues and requiring competing venue owners or operators to pay a percentage of their profits to it;

B.     A permanent injunction prohibiting Live Nation from continuing to engage in the above-referenced practices;

C.     An award of damages in an amount consistent with the proofs submitted at trial for those losses plaintiffs have incurred as a result of Live Nation's wrongful conduct, trebled as provided by law;

D.     An award of plaintiffs' attorneys' fees and costs in pursuing this action pursuant to law; and/or

E.     An award of such other legal and equitable relief as is just and appropriate.

## COUNT IV
## I.M.A. v. Live Nation

### (Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2 – Attempted Monopolization of The Market For Leasing or Licensing Amphitheatres For Use In Venue Operations)

155.    I.M.A. incorporates by reference, as if fully set forth herein, paragraphs 1 through 154 of this Complaint.

156.    There is a distinct product market or submarket for the provision of venue and venue services to major artists. Only amphitheatres or a few similarly sized indoor facilities provide the appropriate seating capacity and adequate staging and lighting to meet the needs of these artists. Further, amphitheatres are the preferred venues for concerts, particularly during the spring through fall concert season.

35

157.    For most major artists, there is not a cross-elasticity of demand between amphitheatres and sports arenas or stadiums because those artists are not popular enough to fill arenas or stadiums to a sufficient capacity for the concert to be economically feasible and/or their fans will not utilize luxury boxes or suites. A cross-elasticity of demand is also lacking with mid-sized theatres, clubs or integrated music and dining clubs because those facilities lack adequate seating capacity, lighting and staging.

158.    Live Nation is attempting to dominate or obtain monopoly power in every significant geographic market over the product/service market for providing venue and venue services to major artists.

159.    Live Nation utilizes its monopoly power in the national market for providing promotional services to popular music artists and leverages its monopoly power in other local markets for providing venues and venue services to force major artists to appear only at its amphitheatres or similarly sized indoor facilities so as, *inter alia*, to deprive competing amphitheatres of the major artists necessary to operate their facilities. Without access to major artists, competing amphitheatres cannot continue to operate.

160.    The Baltimore market consists of Adams and York counties in Pennsylvania, New Castle and Kent counties in Delaware, Caroline, Talbot, Queen Anne's, Kent, Cecil, Harford, Baltimore, Howard, Carrol, Anne Arunde, Prince George's, Washington, Montgomery and Frederick counties in Maryland and the District of Columbia.

161.    At the present time, Merriweather is the only amphitheater located in and serving the entire Baltimore market. The only other venue capable of seating more than 8,000 fans that serves the entire Baltimore market is 1st Mariner Arena, a minor league sports arena, with a seating capacity of fourteen thousand, which is not an effective competitor in the market for providing venues and venue

services to major artists.  Nissan also competes in part of the Baltimore market as it draws fans from the southern portion of that market.

162.    The Baltimore metropolitan area is one of the few metropolitan markets where Live Nation does not own, lease or control the booking at an amphitheatre or other similarly sized indoor facility that is actually located in that market.

163.    As part of its coordinated effort to dominate the market for providing venues and venue services to major artists in every significant region in the United States, Live Nation has sought to gain complete control of the Baltimore metropolitan markets through the aforementioned anti-competitive, predatory and exclusory acts, designed, *inter alia*, to destroy its only other significant competitor and either knock Merriweather out of business or force the owners of Merriweather to engage Live Nation to manage this venue, including:

a.    Requiring major artists to appear only in Live Nation venues as part of  tours;

b.    Refusing to negotiate the scope of tours with major artists to allow them to appear at Merriweather;

c.    Threatening to disproportionately reduce or disproportionately reducing the amounts artists receive from tour deals if they appear at Merriweather or 1st Mariner Arena;

d.    Entering into agreements with artists to refuse to deal with non-Live Nation controlled venues, including Merriweather;

e.    Prohibiting major artists from appearing at both Nissan and Merriweather in the same season or on the same tour;

f.    To the extent that artists appear in Baltimore, demanding that they appear at venues other than Merriweather;

37

g.     Using its monopoly power over venues in other markets to coerce artists to appear at Nissan;

h.     Using its monopoly power over venues in other markets to coerce artists to condition their appearance at Merriweather or other non-Live Nation venues in the Baltimore metropolitan area upon the owner or operator of the venue splitting their profits with Live Nation even though Live Nation had no more than minimal involvement in the concert; and/or

i.     Advising venue owners that it will use its dominant position in the market to persuade the artists to appear at their venues if they give Live Nation exclusive booking rights, and conversely threatening to withhold artists they promote from the owner's venue if the owner does not give Live Nation exclusive booking rights.

164.    Live Nation's anticompetitive conduct has included coercing or inducing artists, who previously had appeared at Merriweather and/or who would have otherwise appeared at Merriweather, not to appear anywhere in Maryland, northern Virginia or Washington D.C. other than at Nissan, to force I.M.A. to pay Live Nation a percentage of its profits on concerts held at Merriweather and/or to hold their Baltimore area appearance at venues other than Merriweather.

165.    Live Nation has demonstrated a dangerous probability of achieving monopoly power in the market for providing venues and venue services for live popular music concerts in the Baltimore market through its unlawful conduct, to the detriment of I.M.A. and other competitors.

166.    The restraint of trade and damages caused by Live Nation's unlawful acts as described above are adversely affecting a not insubstantial amount of interstate commerce.

167.    As a direct, intended and proximate result of Live Nation's anticompetitive conduct, I.M.A. has been denied access to major artists, and artists who previously performed, and/or would

otherwise have performed, at Merriweather, appeared exclusively at Nissan or other venues.  I.M.A. has also been forced to pay a percentage of its profits to Live Nation for concerts that Live Nation neither promoted nor had any significant involvement.

168.   As a direct, intended and proximate result of Live Nation's attempt to monopolize the market for venues and venue services for live popular music concerts by major artists in the Baltimore geographic market, I.M.A. has sustained damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

169.   The foregoing acts and conduct of Live Nation will continue to prevent or suppress competition unless enjoined and are likely to cause irreparable injury to the public, the relevant market and Live Nation's competitors therein.

WHEREFORE, plaintiff, It's My Amphitheatre, Inc. d/b/a Merriweather Post Pavilion, demands judgment in its favor and against defendant, Live Nation, Inc., for an award of the following relief:

A.   An order declaring illegal and unenforceable Live Nation's refusal to negotiate the length and duration of artists' tours, requiring artists it promotes to appear only in Live Nation controlled venues, refusal to license or lease its venues to competing promoters, using its monopoly over venues and venue services to coerce artists to appear in other Live Nation controlled venues and requiring competing venue owners or operators to pay a percentage of their profits to it;

B.   A permanent injunction prohibiting Live Nation from continuing to engage in the above-referenced conduct;

C.     An award of damages in an amount consistent with the proofs submitted at trial for those losses I.M.A. has incurred due as a result of Live Nation's wrongful conduct, trebled as provided by law;

D.     An award of I.M.A.'s attorneys' fees and costs in pursuing this action pursuant to law; and/or

E.     An award of such other legal and equitable relief as is just and appropriate.

## COUNT V
## I.M.P. v. Live Nation

### (Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2
### Monopolization of the National Market for Promoting Live Music Concerts)

170.     I.M.P. incorporates by reference, as if fully set forth herein, paragraphs 1 through 169 of this Complaint.

171.     Live Nation's acquisition of monopoly power in the national market for the promotion of live popular music concerts and anticompetitive acts to solidify and expand this position, extend it to other markets and raise the barrier to entry into this market violate Section 2 of the Sherman Act.

172.     Through the unlawful acts and practices described above, Live Nation has harmed I.M.P. and competing promoters, as well as the ticket buying public who attend live music concerts, and I.M.P. has been denied the opportunity to compete to provide promotional services to popular music artists.

173.     The restraint of trade and damages caused by Live Nation's unlawful acts as described above are adversely affecting a not insubstantial amount of interstate commerce.

174.     As a direct, intended and proximate result of Live Nation's abuse of its monopoly power, artists previously utilizing I.M.P.'s promotional service, have discontinued their relationships with it,

and other artists who would otherwise have utilized I.M.P.'s promotional services have, instead, utilized Live Nation's competing services and I.M.P. has incurred other competitive harm.

175.   As a direct, intended and proximate result of Live Nation's unlawful exercise of its monopoly power, I.M.P. has sustained damages in an amount exceeding Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

176.   The foregoing acts and conduct of Live Nation will continue to prevent or suppress competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. §2, and unless enjoined, are likely to cause irreparable future injury to the public, the relevant markets and to Live Nation's competitors within these markets, including I.M.P.

WHEREFORE, plaintiff, It's My Party, Inc., demands judgment in its favor and against defendant, Live Nation, Inc., for an award of the following relief:

A.   A declaration that Live Nation had unlawfully monopolized the national market for promoting live popular music concerts;

B.   A permanent injunction prohibiting Live Nation from continuing to engage in the above-referenced unlawful practices;

C.   An award of damages in an amount consistent with the proofs submitted at trial for the damages I.M.P. incurred as a result of Live Nation's violation of the Sherman Act, trebled as provided by law;

D.   An award of the attorneys' fees and costs I.M.P. incurred in bringing this action pursuant to law; and

E.   An award of such other legal and equitable relief as is appropriate.

41

## COUNT VI
### Plaintiffs vs. Live Nation

### (Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2 –
### Monopolization Over Critical Input)

177.    Plaintiffs incorporate by reference, as if fully set forth herein, paragraphs 1 through 176 of this Complaint.

178.    Live Nation has utilized its monopoly in the promotion of live popular music concerts and over the ownership, operation and/or exclusive booking of venues in nineteen of the largest markets in the United States to obtain and maintain an unlawful monopoly over major popular music artists.

179.    Through this unlawful conduct, Live Nation has denied competing promoters and amphitheatre owners and operators of input critical to their business -- access to major popular music artists.

180.    Through the unlawful acts and practices described above, Live Nation has caused competitive harm to I.M.A. and other competing venue operators by depriving them of access to the artists at the level of popularity capable of drawing the number of fans these venues were constructed to service, and necessary to operate them on an economically feasible basis.

181.    As a direct, intended and proximate result of Live Nation's unlawful exercise of its monopoly power, it has become increasingly difficult for I.M.A. to schedule major artists to appear at Merriweather, I.M.A. has been denied access to artists who would otherwise have performed at Merriweather and Merriweather has fallen from a top ranking amphitheatre to 30th in 2008. I.M.A. was also forced to pay a percentage of its profits to Live Nation for the only three major artists that appeared at Merriweather in the 2008 season.

42

182.    As a direct, intended and proximate result of Live Nation's unlawful exercise of its monopoly power, artists who previously utilized I.M.P. to promote their concerts in the Baltimore and Washington D.C. markets have discontinued their relationships with it, and other artists who would otherwise have utilized I.M.P.'s promotional services have, instead, utilized Live Nation.

183.    The restraint of trade and damages caused by Live Nation's unlawful acts as described above are adversely affecting a not insubstantial amount of interstate commerce.

184.    As a direct, intended and proximate result of Live Nation's abuse of its monopoly power, I.M.A. and I.M.P. have sustained damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

185.    The foregoing acts and conduct of Live Nation will continue to prevent or suppress competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. §2, and unless enjoined, are likely to cause irreparable future injury to the public, the relevant markets and to Live Nation's competitors within these markets, including plaintiffs.

WHEREFORE, plaintiffs, It's My Amphitheatre, Inc. d/b/a Merriweather Post Pavilion and It's My Party, Inc., demand judgment in their favor and against defendant, Live Nation, Inc. for an award of the following relief:

A.    A declaration that Live Nation has unlawfully gained control of input critical to the operation of amphitheatres and the promotion of live popular music concerts by major artists;

B.    A permanent injunction sufficient to break Live Nation's control of the promotion of live popular music concerts and major popular music artists;

43

C.  An award of damages in an amount consistent with the proofs submitted at trial

for the losses plaintiffs have incurred as a result of Live Nation's violation of the Sherman Act,

trebled as provided by law;

D.  An award of plaintiffs' attorneys fees and costs in bringing this action pursuant to

law; and

E.  An award of such other legal and equitable relief as is appropriate.

## COUNT VII

### Plaintiffs v. Live Nation

### (Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2 – Attempted Monopolization Over Critical Input)

186.  Plaintiffs incorporate by reference, as if fully set forth herein, paragraphs 1 through 185

of this Complaint.

187.  Through its exclusionary, anticompetitive conduct, as described herein, Live Nation is

willfully attempting to acquire and maintain monopoly power over an essential input – major popular

music artists -- to the detriment of competing independent promoters and amphitheatre owners or

operators, and the public, alike.

188.  Live Nation has engaged in a concerted and consistent pattern of anti-competitive,

predatory and exclusory acts in an effort to establish control over major popular music artists, including:

a.  Requiring major artists to appear only in Live Nation amphitheatres for concert or

concert tours it promotes;

b.  Refusing to negotiate the scope and duration of concert tours it promotes;

44

      c.      Threatening to disproportionately reduce or disproportionately reducing the amounts artist receive from tour deals for any non-Live Nation controlled venues, including Merriweather, at which they appear;

      d.      Giving a guaranteed, super-competitive portion of concert proceeds to artists;

      e.      Promising venue owners that it will use its monopoly power in the market for promoting live popular music concerts and its control over the market for providing venues and venue services in numerous geographic markets to force artists to appear at their venues if they lease or give Live Nation exclusive booking rights at their facilities;

      f.      Advising venue owners that it will use its monopoly power in the market for promoting live popular music concerts and its control over the market for providing venues and venue services in numerous geographic markets to prevent artists from appearing at these venues if they do not give Live Nation exclusive booking rights;

      g.      Entering into agreements with major artists to refuse to appear at non-Live Nation controlled venues, including Merriweather;

      h.      Prohibiting major artists from appearing at any non-Live Nation controlled venues including that draws fans from a territory overlapping that of a Live Nation controlled venue, Nissan and Merriweather, in the same season or on the same tour;

      i.      To the extent that artists appear in Baltimore, demanding that they appear at venues other than Merriweather;

      j.      Using its monopoly over venues in other markets to coerce artists to appear at Live Nation controlled venues; and/or

k.     Using its monopoly over venues in other markets to coerce artists to condition
their appearance at Merriweather or other non-Live Nation venues in the Baltimore/Washington
D.C. areas upon the owner or operator of the venue splitting their profits with Live Nation even
though Live Nation did not promote or co-promote the concert.

189.   Live Nation has demonstrated a dangerous probability of achieving monopoly power
over major popular music artists.

190.   Through the unlawful acts and practices described above, Live Nation has caused
competitive harm to plaintiffs, and other competing promoters and venue owners and operators, as well
as the ticket buying public who attend live music concerts, I.M.P. has been denied the opportunity to
compete for the promotion of live popular music concerts and I.M.A. has been denied the ability to
compete to provide its venue and venue services to artists.

191.   As a direct, intended and proximate result Live Nation's unlawful exercise of its
monopoly power, it has become increasingly difficult for I.M.A. to schedule major artists to appear at
Merriweather, I.M.A. has been denied access to artists who would otherwise have performed at
Merriweather, and I.M.A. was forced to pay a percentage of its profits to Live Nation for the only three
major artists to appear at Merriweather in the 2008 season.

192.   As a direct, intended and proximate result Live Nation's unlawful exercise of its
monopoly power, artists previously utilizing I.M.P.'s promotional service in the Baltimore and
Washington D.C. markets have discontinued their relationships with it and other artists who would
otherwise have utilized I.M.P.'s promotional services have, instead, utilized Live Nation's services.

193.   The restraint of trade and damages caused by Live Nation's unlawful acts as described
above are adversely affecting a not insubstantial amount of interstate commerce.

46

194.    As a direct and proximate result of Live Nation's abuse of its monopoly power, I.M.A. and I.M.P. have sustained damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

195.    The foregoing acts and conduct of Live Nation will continue to prevent or suppress competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. §2, and unless enjoined, are likely to cause irreparable future injury to the public, the relevant markets and to Live Nation's competitors within these markets, including I.M.A. and I.M.P.

WHEREFORE, Plaintiffs, It's My Amphitheatre, Inc. d/b/a Merriweather Post Pavilion and It's My Party, Inc., demand judgment in their favor and against defendant, Live Nation, Inc., for an award for the following relief:

A.    A declaration that Live Nation has demonstrated a dangerous probability of gaining control of input critical to the operation of amphitheatres and the promotion of live popular music concerts;

B.    A permanent injunction sufficient to prevent Live Nation from gaining control of the promotion of live popular music concerts and major popular music artists;

C.    An award of damages in an amount consistent with the proofs submitted at trial for those losses plaintiffs have incurred as a result of Live Nation's violation of the Sherman Act, trebled as provided by law;

D.    An award of plaintiffs' attorneys fees and costs in bringing this action pursuant to law; and

E.    An award of such other legal and equitable relief as is appropriate.

## COUNT VIII

### Plaintiffs v. Live Nation
### (Violation of Maryland Antitrust Act)

196.    Plaintiffs incorporate by reference, as if fully set forth herein, paragraphs 1 through 195 of this Complaint.

197.    The Maryland Antitrust Act prohibits contracts, combinations or conspiracies that unreasonably restrain trade or commerce, and monopolization or attempts or conspiracies to monopolize any part of trade or commerce within the State, for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce.  See Md. Com Law Code Ann. § 11-204.

198.    The unlawful actions by Live Nation, as described above, violate the Maryland Antitrust Act, Md. Com. Law Code Ann. §§ 11-201, et seq.

199.    As a direct, intended and proximate result of the above-stated unlawful actions by Live Nation, as described above, competition within the State of Maryland has been eliminated or curtailed, including the ability of businesses located within this state to compete for the promotion of live popular music concerts and to provide venues and venue service to popular music artists, there has been a substantial decrease in the number of live popular music concerts held in Maryland and the performance by major popular music artists in this State has been virtually eliminated.

200.    As a direct, intended and proximate result Live Nation's unlawful exercise of its monopoly power, it has become increasingly difficult for I.M.A. to schedule major artists to appear at Merriweather, I.M.A. has been denied access to artists who would otherwise have performed at Merriweather and it has fallen from a top ranking amphitheatre to 30th in 2008, and I.M.A. was forced to

48

pay a percentage of its profits to Live Nation for the only three major artists to appear at Merriweather in the 2008 season.

201.    As a direct, intended and proximate result Live Nation's unlawful exercise of its monopoly power, artists who previously utilized I.M.P. to promote their concerts in the Baltimore and Washington D.C. markets have discontinued their relationships with it and other artists who would otherwise have utilized I.M.P's promotional services have, instead, utilized Live Nation's services.

202.    As a direct and proximate result of Live Nation's abuse of its monopoly power, I.M.A. and I.M.P. have sustained damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

203.    The foregoing acts and conduct of Live Nation will continue to prevent or suppress competition and unless enjoined, are likely to cause irreparable future injury to the public, the relevant markets and to Live Nation's competitors within these markets, including I.M.A.

WHEREFORE, plaintiffs, It's My Amphitheatre, Inc. d/b/a Merriweather Post Pavilion and It's My Party, Inc., demand judgment in their favor and against defendant, Live Nation, Inc, for an award for the following relief:

A.    A declaration that the practices of which plaintiffs complain are illegal and unenforceable under the Maryland Antitrust Act;

B.    A permanent injunction prohibiting Live Nation from continuing to engage in the above-referenced unlawful business practices;

C.    An award of damages in an amount consistent with the proofs submitted at trial for the losses plaintiffs have incurred due to Live Nation's violation of the Maryland Antitrust Act;

49

   D. An award of plaintiffs' attorneys' fees and costs in bringing this action pursuant to law; and

   E. An award of such other legal and equitable relief as is appropriate.

## COUNT X

### Plaintiffs v. Live Nation
### (Tortious Interference with Prospective Contractual Relationships)

  204. Plaintiffs incorporate by reference, as if fully set forth herein, paragraphs 1 through 203 of this Complaint.

  205. As a direct, intended and proximate result of the aforesaid anti-competitive, predatory and exclusory conduct, it has become increasingly difficult for I.M.A. to schedule major artists to appear at Merriweather, I.M.A. has been denied access to artists who would otherwise have performed at Merriweather and/or artists with whom I.M.A. had relationships (directly and/or through their booking agents and/or management) have declined to appear at Merriweather or appeared at Merriweather only if I.M.A. agreed to share its profits with Live Nation.

  206. As a direct, intended and proximate result Live Nation's unlawful exercise of its monopoly power, artists who previously utilized I.M.P. to promote their concerts in the Baltimore and Washington D.C. markets have discontinued their relationships with it, and other artists who would otherwise have utilized I.M.P.'s promotional services have, instead, utilized Live Nation's services.

  207. Live Nation acted without justification.

  208. As a direct, intended and proximate result of Live Nation's wrongful conduct, I.M.A. and I.M.P. have sustained damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

209.    The foregoing acts and conduct of Live Nation have caused I.M.A. and I.M.P. to suffer a loss of goodwill and other irreparable harm and will continue unabated unless enjoined by this Court.

210.    Live Nation has acted willfully, maliciously and/or with the specific intent to harm I.M.P. and I.M.A. or with callous disregard as to the potential harm to plaintiffs.

WHEREFORE, plaintiffs, It's My Amphitheatre, Inc. d/b/a Merriweather Post Pavilion and It's My Party, Inc., demand judgment in their favor and against defendant, Live Nation, Inc., for an award for the following relief:

A.    A permanent injunction prohibiting Live Nation from continuing to engage in the above-referenced unlawful practices;

B.    An award of damages in an amount consistent with the proofs submitted at trial for those losses plaintiffs have incurred due to Live Nation's wrongful conduct;

C.    An award of punitive damages; and

D.    An award of such other legal and equitable relief as is appropriate.

## COUNT XI

### Plaintiffs v. Live Nation
### (Unfair Competition)

211.    Plaintiffs incorporate by reference, as if fully set forth herein, paragraphs 1 through 210 of this Complaint.

212.    By using its monopoly power in the market for promoting live popular music concerts and monopoly of the market for providing venues and venue services in nineteen of the largest geographic markets in the United States to coerce artists to utilize its promotional services, to appear

51

only at Nissan, to decline to appear at Merriweather and/or to decline to appear at Merriweather unless I.M.A. shared its profits with Live Nation, Live Nation has unfairly competed with plaintiffs.

213.   Live Nation acted without justification.

214.   As a direct, intended and proximate result Live Nation's unfair competition, it has become increasingly difficult for I.M.A. to schedule major artists to appear at Merriweather, I.M.A. has been denied access to artists who would otherwise have performed at Merriweather, it has fallen from a top ranking amphitheatre to 30th in 2008 and I.M.A. was forced to pay a percentage of its profits to Live Nation on concerts with which Live Nation has no or minimal involvement.

215.   As a direct, intended and proximate result Live Nation's unfair competition, artists who previously utilized I.M.P. to promote their concerts in the Baltimore and Washington D.C. markets have discontinued their relationships with it and other artists who would otherwise have utilized I.M.P.'s promotional services have, instead, utilized Live Nation's services.

216.   As a direct, intended and proximate result of Live Nation's unfair competition, I.M.A. and I.M.P. have sustained damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

217.   The foregoing acts and conduct of Live Nation have caused I.M.A. and I.M.P. to suffer a loss of goodwill and other irreparable harm and will continue unabated unless enjoined by this Court.

218.   Live Nation has acted willfully, maliciously and/or with the specific intent to harm I.M.P. and I.M.A. or with callous disregard as to the potential harm to plaintiffs.

WHEREFORE, plaintiffs, It's My Amphitheatre, Inc. d/b/a Merriweather Post Pavilion and It's My Party, Inc., demand judgment in their favor and against defendant, Live Nation, Inc., for an award for the following relief:

A.    A permanent injunction prohibiting Live Nation from continuing to engage in the above-referenced unlawful practices;

B.    An award of damages in an amount consistent with the proofs submitted at trial for those losses plaintiffs have incurred due to Live Nation's wrongful conduct;

C.    An award of punitive damages; and

D.    An award of such other legal and equitable relief as is appropriate.

COZEN O'CONNOR

By:_____

L. Barrett Boss (Maryland Bar No. 04404)
Cozen O'Connor
1627 Eye Street, NW
Suite 1100
Washington D.C. 20006
Tel:  (202) 912-4818
Fax:  (866) 413-0172
Bboss@cozen.com

OF COUNSEL:

COZEN O'CONNOR
Robert W. Hayes
Rachel H. Robbins
Abby Sacunas
1900 Market Street
The Atrium
Philadelphia, PA 19103
(215) 665-2094

Attorneys for Plaintiffs

Dated:  March 5, 2009