IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| IT'S MY PARTY, INC. and | * | |
| IT'S MY AMPHITHEATRE, INC., | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil No. JFM-09-547 |
| | * | |
| LIVE NATION, INC., | * | |
| Defendant. | * | |
| | * | |
| | * | |
| | ****** | |

## MEMORANDUM

Plaintiff It's My Party, Inc. ("IMP") is a concert promotion business, and plaintiff It's My

Amphitheatre, Inc. ("IMA") is a related venue management business, both of which are run by

Seth Hurwitz, who operates in and around the Baltimore/Washington, D.C. area.  (Def.'s Mot.

Summ. J. at 2, ECF No. 74.)  Defendant Live Nation is an international concert promoter.  (*Id*. at

5.)  IMP/IMA filed antitrust claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1

and 2, Section 4 of the Clayton Act, 15 U.S.C. § 15, and under the Maryland Antitrust Act, as

well as common law claims for tortious interference with contract and unfair competition.

Plaintiffs allege that Live Nation is engaged in unlawful tying arrangements, has unlawfully

gained a monopoly in the concert promotion business, and has tortiously interfered with

contracts and engaged in unfair competition.  According to plaintiffs, Live Nation has

deliberately and unlawfully acquired monopoly power in the concert promotion industry, thereby

entitling plaintiffs to compensatory, treble, and punitive damages, attorneys' fees, and injunctive

relief.  Live Nation has moved for summary judgment.

Now pending before the court are Live Nation's motion for summary judgment, Live

Nation's motion to strike Professor Einer Elhauge's declaration, Live Nation's objections to

plaintiffs' exhibits offered in opposition to summary judgment, and plaintiffs' objections to exhibits offered in support of Live Nation's motion for summary judgment.

The issues have been fully briefed, and no oral argument is necessary. *See* Local Rule 105.6. For the reasons that follow, Live Nation's motion for summary judgment and its motion to strike Elhauge's Declaration (ECF No. 138) are denied. Live Nation's motion to strike certain other exhibits (ECF No. 146) is denied in part and granted in part, and plaintiffs' motion[1] (ECF No. 109) is granted in part and denied in part.

I.      **Live Nation's Motion for Summary Judgment and Motion to Strike Einer Elhauge's Declaration**

In response to Live Nation's motion for summary judgment, plaintiffs have attached a declaration from a proposed expert, Einer Elhauge. Elhauge, a Harvard professor, provided a declaration regarding market definition and market power, alleged anticompetitive conduct and effects, and alleged barriers to entry. (Def.'s Mot. Strike at 4–5, ECF No. 138-1.) Live Nation has moved to strike Elhauge's Declaration pursuant to Federal Rules of Civil Procedure 16, 26, and 37. (*Id*. at 1.)

At an earlier stage of this litigation when I denied a motion to dismiss filed by Live Nation on the basis of a lack of specificity of allegations made by plaintiffs, I deferred expert discovery until after fact discovery had been completed and Live Nation had had an opportunity to file a motion for summary judgment on the basis of the factual record that had been developed. I did so in order to keep down the cost of litigation. It is extremely unfortunate that

---

[1] IMP filed a memorandum objecting to Live Nation's exhibits but did not file it as a motion to strike. (*See* IMP Mem. Objections to Ex., ECF No. 109.) For purposes of this ruling, I will consider the memorandum a motion to strike.

in opposing Live Nation's summary judgment motion, plaintiffs have, without filing a Rule 56 motion or otherwise requesting an opportunity to submit a declaration from their expert, simply attached a declaration from their expert to their memorandum.  In so doing they have effectively circumvented the ruling I previously made.  I have decided, however, that form should not prevail over substance and that Elhauge's declaration raises sufficient issues that expert discovery should be conducted.  Accordingly, Live Nation's motion for summary judgment is denied, without prejudice to being renewed after the completion of expert discovery, and its motion to strike Elhauge's declaration is denied.

## II.      Live Nation's Objections to Exhibits in Opposition to Summary Judgment
### A.  Jack Orbin Declaration

Live Nation objects to Jack Orbin's Declaration (ECF No. 115) in opposition to summary judgment because Orbin was not previously identified as a witness in plaintiffs' initial disclosures.  Federal Rule of Civil Procedure 26 requires that a party disclose names of individuals likely to have discoverable information and to supplement initial disclosures on an ongoing basis.  *See* Fed. R. Civ. P. 26.  Failure to so disclose may result in the exclusion of that witness unless the failure to disclose was substantially justified or harmless.  Fed. R. Civ. P. 37. The party facing potential exclusion bears the burden of proving that failure to disclose was justified or harmless.  *See Wilson v. Bradlees of New England, Inc.*, 250 F.3d 10, 21 (1st Cir. 2001).

Live Nation contends that plaintiffs' failure to disclose Orbin as a witness prevented them from deposing him or rebutting his testimony.  Plaintiffs admit that they inadvertently failed to identify Orbin as a witness in their Rule 26 disclosures but aver that Live Nation had sufficient

information to identify him as a percipient witness.  Plaintiffs' only real defense of their failure

to disclose Orbin comes in the form of a bald assertion that Live Nation was not prejudiced by

the failure because Live Nation would never have deposed Orbin even if he had been disclosed.

Plaintiffs confidently assert this defense on the basis of Live Nation's choice not to depose other

disclosed witnesses.  Live Nation did, however, request and receive additional time to file its

reply brief, in part for the express purpose of analyzing Orbin's Declaration.  As a result, Live

Nation had from January 27, 2012, the date plaintiffs filed their opposition (which included

Orbin's Declaration), to May 11, 2012, the date Live Nation filed its reply brief, to depose Orbin.

Thus, while plaintiffs' failure to initially disclose Orbin is not justified, it does not appear to have

been harmful either.  Orbin's Declaration is therefore not stricken despite plaintiffs' failure to

disclose him on the witness list as Rule 26 requires.  If Live Nation wants to depose him while

expert discovery is conducted, it may do so.

### B.  Relevance Objections Regarding Orbin, Mickelson, and Robbins Declarations and Armor Testimony

To prevail on their claims, plaintiffs must show that Live Nation undertook unlawful

conduct that caused harm in a relevant antitrust market.  Live Nation contends that the relevant

market in this case is Baltimore/DC/Northern Virginia, rather than the national market, as

plaintiffs assert.  Live Nation therefore objects to plaintiffs' exhibits and affidavits in support of

their definition of the relevant market and exhibits and declarations describing conduct occurring

outside of the Baltimore/DC/Northern Virginia area.[2]  Because I have decided to allow expert

---

[2] Specifically, Live Nation objects to the Declarations of Orbin (ECF No. 115) and Mickelson (ECF No. 116), the deposition testimony of Dori Armor (ECF No. 118-1 at 46), and the Robbins Declaration (ECF No. 117), Exhibits U, 1U, and 2U (ECF No. 118-1 at 166–88) as discussing matters outside of the relevant market.

discovery and renewed briefing prior to considering Live Nation's request for summary judgment, Live Nation's objections on this ground will be denied without prejudice to be renewed at a later stage in these proceedings.

Live Nation also avers that plaintiffs have submitted evidence, through the Hurwitz Declaration, of actions that took place in 2010 and 2011, after the filing of the lawsuit in March 2009.  Live Nation contends that plaintiffs may not submit such evidence without leave of the court to file supplemental pleading per Rule 15(d).  However, plaintiffs have alleged an ongoing antitrust violation, which necessarily includes the time period both before and after the filing of the complaint.  To the extent that plaintiffs seek to introduce post-complaint facts in support of allegations detailed in their complaint, it would be time-consuming and unnecessary to require amendment with regard to Live Nation's alleged continued antitrust conduct.  Accordingly, plaintiffs need not seek leave to amend the complaint to introduce post-complaint activities relevant to their claim of ongoing antitrust violations.  *See Potomac Riverkeeper, Inc. v. Nat'l Capital Skeet & Trap Club, Inc.*, 388 F. Supp. 2d 582, 585–86 (D. Md. 2005) (stating that evidence of post-complaint behavior is relevant to proving an ongoing violation of the Clean Water Act); *United States v. Int'l Bus. Machs. Corp.*, 66 F.R.D. 180, 185 (S.D.N.Y. 1974) (stating that, when the complaint charged a continuing violation, which by definition encompassed the post-complaint time period, both pre- and post-complaint activities were relevant).

### C.  Personal Knowledge Objections

Federal Rule of Civil Procedure 56(c) requires that declarations submitted at summary judgment be made on the basis of personal knowledge.  Fed. R. Civ. P. 56(c).  Live Nation objects to several of plaintiffs' declarations for failure to comply with this requirement.

   i.      Hurwitz Declaration

Live Nation objects to ¶¶60–61, 63–64 of Hurwitz's Declaration (ECF No. 135) regarding the differences between amphitheaters and arenas and whether artists and fans prefer one venue type over the other.  Live Nation contends that Hurwitz, having never owned or operated an arena, is not qualified to offer testimony based on his personal knowledge.  This objection is overruled.  Hurwitz either has personal knowledge or is qualified to testify as to his perception, based on thirty years of experience in the concert promotion industry, of the differences between amphitheaters and arenas.

Live Nation asserts that Hurwitz also testifies to Live Nation's business practices, including alleged promotion agreements for artists and tours and specific details of the offers.  Live Nation's characterization of Hurwitz's testimony is misleading.  Hurwitz merely testifies to his perception of the circumstances in working with artists as they decided whether or not to pursue or continue relationships with IMP as opposed to other promoters.  Therefore, this objection is also overruled.

   ii.     Canfield and Parker Declarations

Live Nation objects to the Canfield (ECF No. 113) and Parker (ECF No. 114) Declarations because they speak to the business practices and plans of SFX, a subsidiary of Clear

Channel Communications, Inc.  Canfield has personal knowledge, based on working for Merriweather for over thirty years, sufficient to testify as to his perception of SFX's actions and the effect those alleged actions had on Merriweather.  Similarly, Parker has sufficient personal knowledge to testify as to her perceptions of SFX's alleged actions and their impact.  However, the statement in ¶ 10 starting with "it was widely believed that" is not based on personal knowledge and will therefore be stricken.

iii.    Mickelson Declaration

Live Nation objects to portions of Mickelson's Declaration (ECF No. 116) because he has never worked for Live Nation and operates out of Chicago, which Live Nation contends is outside of the relevant market.  That objection is overruled without prejudice to be renewed later.

As it did with the Hurwitz, Canfield, and Parker Declarations, Live Nation seeks to exclude portions of Mickelson's Declaration dealing with Live Nation's business practices.  Paragraph 17 of Mickelson's Declaration appears to be based on inadmissible hearsay and speculation, and it is not clear why Mickelson has the personal knowledge to testify, as he does in ¶ 19, that Live Nation guarantees artists more than 100% of ticket sales in order to obtain certain concerts, or that Live Nation forces artists on amphitheater tours into its buildings, as he says in ¶ 20.  Therefore, that testimony will be stricken.  Finally, while Mickelson is entitled to testify in ¶ 21 as to his perception of JAM's alleged foreclosure from the market, I will not consider the legal conclusion he asserts in ¶ 25 that Live Nation acquired its position as a result of anticompetitive business practices.

iv.     Orbin Declaration

Live Nation objects to portions of Orbin's Declaration as lacking foundation to testify to

Live Nation's business practices.  Orbin's statements in ¶ 5 regarding promoter Raul Rezendes

appear to be based on speculation rather than personal knowledge and will therefore be stricken.

To the extent that they constitute impermissible legal conclusions, Orbin's statements in ¶ 6

regarding Live Nation's "predatory practice" and in ¶ 20 regarding alleged violations of the DOJ

Consent Decree will not be considered.  Finally, while Orbin does have personal knowledge

regarding Live Nation's access to Ticketmaster reports for shows Orbin promoted, I will not

consider the conclusions, in ¶¶ 18–19, that Live Nation is "exploiting" Ticketmaster information

to "unfairly compete" or "gain a competitive advantage."

## D.  Hearsay Objections

Live Nation objects to a number of plaintiffs' exhibits on the ground that they contain

inadmissible hearsay.  IMP/IMA contends that the exhibits are either (1) not hearsay because

they are not offered for their truth, or (2) admissible under Federal Rule of Evidence 803(3) to

show the declarant's then-existing state of mind.

i.     Robbins Declaration Exhibit 7A

Live Nation objects on hearsay grounds to Exhibit 7A to the Robbins Declaration (ECF

No. 117-1), a confidential memorandum from the Elevation Partners' proposed plan regarding

Project Hawaii.  Plaintiffs contend that Elevation Partners is a venture capital firm with which

Live Nation executives consulted to develop and implement certain portions of this plan as part

of Live Nation's corporate development strategy.  According to plaintiffs, the Project Hawaii

documents indicate a plan to use anticompetitive measures to monopolize the promotional and

8

venue services market.  Plaintiffs contend that this document is admissible under Rule 803(3) as showing Live Nation's intent, plan, or motive.  Because the document was prepared by an entity other than Live Nation, it is not admissible to show that Live Nation adopted its contents as its own intent or plan.

ii.      Robbins Declaration Exhibit E

Exhibit E (ECF No. 118) is a selection of deposition testimony from Marc Geiger, the agent for Nine Inch Nails and John Mayer.  In his deposition, Geiger was asked to explain portions of emails he purportedly wrote.  The statements lifted from Geiger's emails are hearsay not within any exception and will therefore be excluded.  However, Geiger's deposition testimony regarding his perception at the time he wrote the emails is admissible.

iii.     Robbins Declaration Exhibit G & 2G

Live Nation objects to portions of Exhibit G (ECF No. 118 at 104), Larry Magrid's deposition testimony, because it references quotes from an email he neither wrote nor received.  Exhibit 2G (ECF No. 118 at 123) is the email itself.  The deposition testimony to which Live Nation objects merely references the email as a means of refreshing Magrid's recollection as to the conversation he personally had with the Jonas Brothers' management.  The email itself may not be admissible via Magrid, as he did not write or receive it, but it is authenticated per the Stipulation of Authentication because it was written by Hurwitz.  Presumably, the email is offered as evidence that Magrid in fact called Jonas Brothers' management, which Magrid confirmed in deposition testimony after his recollection was refreshed.  Admitting the email would therefore be unnecessary.  To the extent that the email is offered for the truth of its

contents as to other matters, however, it is inadmissible hearsay unless it can be said to fall within the exception for Business Records in Rule 803(6).

Courts are in disagreement on whether emails can and should fall under the business records hearsay exception.  The business records exception assumes that records containing information necessary in the regular running of a business will be accurate and reliable.  *See Certain Underwriters at Lloyd's London v. Sinkovich*, 232 F.3d 200, 204–05 (4th Cir. 2000). Email, however, is typically a more casual form of communication than other records usually kept in the course of business, such that it may not be appropriate to assume the same degree of accuracy and reliability.  As email is more commonly used to communicate business matters both internally and externally, however, more formal paper records are becoming more unusual. Nevertheless, I decline to accept a blanket rule that emails constitute business records; more specificity is required regarding the party's recordkeeping practices to show that a particular email in fact constitutes a reliable business record.  *See Lorraine v. Market Am. Ins. Co.*, 241 F.R.D. 534, 545–46 (D. Md. 2007).  Plaintiffs have not provided any specificity regarding their recordkeeping practices.  Therefore, they have not carried their burden in establishing that this email falls within the business records exception.  The Hurwitz email attached as Robbins Exhibit 2G will be excluded as inadmissible hearsay.

iv.     Robbins Declaration Exhibit O

Exhibit O (ECF No. 118-1) is an email from Geiger to Perry Lavoisne (of Live Nation) in which Geiger says "You sure I can't do this…cmon buddy."  Plaintiffs offer this email not for its truth but to show that Geiger, a powerful agent, was, in plaintiffs' words, "begging" Live Nation to change its mind.  The email is therefore not offered as an assertion for its truth but as evidence

of the alleged dynamic between agents and Live Nation.  Because this out of court statement is not offered for its truth, it is not hearsay and is admissible.

     v.      Robbins Declaration Exhibit S

Exhibit S (ECF No. 118-1) is Merriweather's Daily Ticket Count Reports, which are presumed authentic under the Stipulation but challenged as inadmissible hearsay.  Jean Parker's Declaration in support of plaintiffs' response to Live Nation's objections (ECF No. 157) is sufficient to lay the foundation for these reports as a business record falling within Rule 803(6).  Parker testifies that the ticket reports were created as part of IMA's ordinary and regular practice and were prepared at her direction at or near the time of the occurrence of the events when she was General Manager at Merriweather.  The Ticket Count Reports are therefore authenticated and admissible as a business record.

     vi.     Robbins Declaration Exhibit 4V

Exhibit 4V (ECF No. 118-2) is an email from Ken Fermaglich, Creed's agent, to Richard Franks, a Live Nation executive, stating "I'm watching Nickelback count at Nissan and thinking that people don't want to go to that venue . . . ."  The email also contains Franks' response to Fermaglich, which was "Call Seth [Hurwitz], see if he will give you 9M for twenty dates?  If the answer is no please quit whining."  Plaintiffs cite this email exchange as evidence of Fermaglich's relative lack of power as compared to Live Nation.  I will reserve ruling on the question of its admissibility.

vii.     Robbins Declaration Exhibit 7V

Exhibit 7V (ECF No. 118-2) is an email from Brad Roosa of Union Entertainment Group to Steve Kaul, Nickelback's agent, in which Roosa asks "What bout a date at Merrwether [sic]?" Plaintiffs assert that this email is evidence of Nickelback's stated preference to play at Merriweather and is an example of a time that Live Nation "throttle[d]" any discussion of playing Merriweather instead of Nissan." Without evidence of any prior or subsequent communications between Roosa and Kaul, Exhibit 7V does not show such a preference. It is therefore not admissible.

viii.    Robbins Declaration Exhibit 8V

Exhibit 8V (ECF No. 118-2) is an email from Steve Kaul to Seth Hurwitz in which Kaul says "Sorry but I did try and make this happen for you for a 3rd time" and explains that he meant he "wanted to have them play for [Hurwitz] in the market and will keep trying to find a way to get them to play [Hurwitz's] venue at some point in the future. Even with their overall deal with Live [N]ation." In response to Live Nation's objections, plaintiffs do not offer any explanation as to how they intend to use this email, though it is clear from plaintiffs' opposition that Exhibit 8V is intended to support the contention that Live Nation denied Nickelback's request three times. Live Nation objects that Exhibit 8V is inadmissible hearsay because it is offered for the truth of the matter asserted, which is that on three occasions Kaul tried to get Nickelback booked at Merriweather but could not because of an overarching deal with Live Nation. The email is therefore offered for its truth and is inadmissible hearsay.

ix.     Robbins Declaration Exhibit W

Exhibit W (ECF No. 118-2) is another email from Kaul, this time to Mark Norman, CC'ing Craig Sneiderman, Ryan McElrath, and Brad Roosa.  Plaintiffs provide the email as evidence that Kaul offered to have Nickelback start its tour early to fit Merriweather into its route in order to show that Nickelback's "electing to acquiesce to Live Nation's position cannot reasonably be characterized as a voluntary decision."  (Pls.' Opp'n Summ. J. at 36, ECF No. 110.)  To the extent that the email is offered as proof that Kaul mentioned July 8th as a possible date for playing Merriweather, indicating some flexibility and willingness to shift dates to make an appearance at Merriweather possible, the email is offered for Nickelback's state of mind under Rule 803(3), not for the truth of the matter asserted.  The objection is overruled.

x.     Hurwitz Declaration

Live Nation objects to a number of specific Hurwitz statements on hearsay grounds.  The statements to which Live Nation objects generally fall within two categories: those allegedly made by agents and those allegedly made by artists.  Statements regarding artists' opinions of Merriweather are admissible non-hearsay because they are not offered to prove that those statements were true but that the artists expressed certain preferences.  For example, when a sound engineer says (in Hurwitz's Declaration at ¶ 70), "Merriweather's sound system is better than any other facility's," that statement is not offered to prove that, in fact, Merriweather is superior but that the sound engineer prefers it.  The same is true for ¶ 72, in which Bare Naked Ladies was said to have shared praise of Merriweather.  Bare Naked Ladies' comments that it built its fan base by playing at Merriweather and the 930 Club in D.C., or that Merriweather has more personality than "that other place in Virginia" are not meant to prove that Bare Naked

Ladies in fact built its fan base in those venues or that Merriweather in fact has more personality than other venues.  Rather, the statements are offered as evidence that artists express praise for Merriweather.

Similarly, statements in Hurwitz's Declaration regarding agents' cancelling negotiations because of perceived conditional offers or threats to guarantees are not offered for their truth but rather as evidence of the agents' understanding of the circumstances.  For example, Charlie Walker's comments in ¶ 94 regarding conditional offers, and statements such as those in ¶¶ 83 and 88 that booking artists terminated negotiations because Clear Channel threatened to cancel tours if the artist did not appear at Nissan, will not be considered for the truth of the alleged tour cancellation or conditional offers but rather for the fact that the agents feared such potential consequences.  Plaintiffs offer those statements as evidence that, but for the agents' perception that Live Nation would cancel bookings, negotiations about Merriweather would have proceeded.  Statements to that effect in ¶¶ 83, 88, 94, 97, 97(b), 97(f), 97(l), as noted in Live Nation's brief, are therefore not considered evidence that there were in fact threats to cancel but rather evidence of agents' concerns.  Alternatively, the agents' statements are admissible under Rule 803(3) as indicating their then-existing state of mind with regard to negotiations with plaintiffs.  Live Nation's objections are overruled.

xi.     Exhibits to the Hurwitz Declaration

Live Nation objects to Exhibits 1 and 2 to the Hurwitz Declaration (ECF No. 112-1), which are purportedly fan comments regarding Nissan and Merriweather.  As with the artists' preferences noted above, these fan comments are offered as evidence of fans' opinions, not for the truth of the opinions therein expressed.  They are admissible non-hearsay.

Exhibit 3 (ECF No. 112-1) is an email between Hurwitz and Michael Rapino in which Hurwitz expresses his intentions regarding a proposal to work with Live Nation.  Paragraphs 92, 95, and 125 of the Hurwitz Declaration also address this point.  Live Nation contends that the email and Hurwitz's statements in ¶¶ 92, 95, and 125 are offered for their truth.  Plaintiffs counter that neither is offered as an oral assertion but rather as prior consistent statements tending to show that, contrary to Live Nation's contentions, Hurwitz was not attempting to eliminate Live Nation as a competitor through a joint venture agreement.  That is, Hurwitz was open to discussing more collaborative practices with Live Nation, presumably because both parties stood to gain from collaboration.

Rule 801(d) provides that prior consistent statements can qualify as non-hearsay if offered to rebut a charge of recent fabrication or improper motive.  Fed. R. Evid. 801(d).  The rule does not, however, allow admission of hearsay statements merely to bolster veracity of a witness's story or because the witness has been discredited by another party's characterization of events.  *See Tome v. United States*, 513 U.S. 150, 157 (1995); *see also Smith v. Potter*, 445 F.3d 1000, 1008 n.23 (7th Cir. 2006).  Here, plaintiffs seek to admit the email and several of Hurwitz's statements as evidence that Hurwitz had benign intentions in pursuing the joint venture.  The statements are not offered to bolster Hurwitz's credibility following allegations of improper motive in testifying or allegations of fabricated testimony.  Rule 801(d) simply does not cover the purpose for which plaintiffs seek to use it.  Exhibit 3 and the portions of ¶¶ 92, 94, 95 and 125 relevant to this issue will therefore be excluded.

Live Nation also objects to certain excerpts of Hurwitz's Declaration in which he recounts agents' statements regarding negotiations or tour promotion decisions.  The portions of Exhibits 4–8, 10, 12, and 14–19 (ECF No. 112-1) containing statements suggesting that Live

Nation threatened to cancel or change terms of tour deals will be treated the same as the similar statements in Hurwitz's Declaration.  They are admissible to show the state of mind of the agents with whom Hurwitz was dealing, not for the truth of the agents' perceptions.

    xii.    Mickelson Declaration

As discussed above, Mickelson's recounting, in ¶ 17, of artists' reports that Live Nation threatened them is offered for its truth and is therefore inadmissible hearsay.

    xiii.    Orbin Declaration

Live Nation objects to ¶¶ 8–12 of Orbin's Declaration in which Orbin recounts a conversation he had with Steve Martin at the Agency Group in which Martin said Orbin was "rolling the dice" by not agreeing to split a concert date with Live Nation.  They also object to ¶ 17 in which Judas Priest's agent is said to have told Orbin that he could not have a specific date because the agent had given the whole tour to Live Nation and sharing a date with Orbin would significantly reduce the tour guarantee.  Plaintiffs offer both statements as evidence of the agents' beliefs as to the potential consequences of negotiating with Orbin, whether or not those were in fact the consequences that would follow.  As such, the statements are not offered for their truth and are admissible.

### E.  Authentication Objections

Though the parties have an Authentication Stipulation, Live Nation objects to several exhibits because they do not fall within the Stipulation, and Live Nation claims they are not otherwise properly authenticated.  Rule 901(a) indicates that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to

support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a).

"A party seeking to admit an exhibit need only make a prima facie showing that it is what he or

she claims it to be.  This is not a particularly high barrier to overcome." *Lorraine v. Markel Am.*

*Ins. Co.*, 241 F.R.D. 534, 542 (D. Md. 2007).

i.      Hurwitz Declaration, Exhibits 1 and 2

Exhibits 1 and 2 to the Hurwitz Declaration (ECF No. 112-1) purport to be web pages.

Live Nation objects that Exhibit 1 is not properly authenticated because it does not include the

web address on its face, nor does it include the date, both of which are required by the

Authentication Stipulation.  Live Nation also contends that Exhibit 2 has only a partial address

and that therefore neither document falls within the requirements of the Stipulation.  The first

part of Exhibit 2, however, includes both a date and a complete web address on "Nissan

Nightmares," which, when entered into a web browser, takes you directly to the page.  The

second part of Exhibit 2, the comments entitled "Nissan Headaches," includes a date and a long,

but partial, web address.  Accordingly, the Nightmares portion of Exhibit 2 is authenticated per

the Stipulation, but the Headaches portion is not.  Further analysis is, however, required.

Rule 901 indicates that evidence can be authenticated through testimony of someone with

knowledge that an item is what it is claimed to be.  Hurwitz provided sworn testimony that these

exhibits are copies of online review forums reflecting testimonials of Merriweather and Nissan

patrons.  Moreover, under Rule 901(b)(4), the online review forums may be authenticated by

reference to their "appearance, contents, substance, internal patterns, or other distinctive

characteristics, taken in conjunction with the circumstances." Fed. R. Evid. 901(b)(4).  The

distinctive formatting of both the Yelp review website and the Washington Post comments

indicate that the two exhibits are in fact authentic.  On that basis, and without any indication from Live Nation that these are not true and correct copies of online reviews, both exhibits are properly authenticated.

ii.     Hurwitz Declaration, Exhibits 24–26

Exhibit 24 (ECF No. 112-1) is purported to be a copy of marketing materials sent to plaintiffs by Vans Warped Tour.  In the bottom right corner of the document is an address block suggesting that it came from 4Fini/Vans Warped Tour at a particular street address in South Pasadena, California.  The address block also includes a phone number, fax number, and email address.  These features satisfy Rule 901(b)(4).  Along with Hurtwiz's sworn testimony that the document is a copy of the marketing strategy prepared by the band's agent, this is sufficient to authenticate Exhibit 24.

Exhibits 25 and 26 are emails from Wilco and Katy Perry's agents respectively, both reflecting marketing strategy.  The authors of the emails are displayed, along with the date the email was sent, on the face of each exhibit.  In addition, Exhibits 25 and 26 indicate that they were sent to individuals who were employed by the plaintiff at the time of receipt.  Accordingly, Exhibits 25 and 26 are covered by the Stipulation of Authenticity and have been properly authenticated.

F.   Contradictory Evidence

Live Nation objects to four specific statements in Hurwitz's Declaration that allegedly contradict his deposition testimony.  As Live Nation indicates, a party may not create a triable issue of fact at summary judgment by contradicting deposition testimony with a subsequent affidavit.  *See Hernandez v. Trawler Miss Vertie Mae, Inc.*, 187 F.3d 432, 438 (4th Cir. 1999).

18

As a preliminary note, none of the four alleged contradictions appear truly contradictory. Where declarations do not contradict deposition testimony, the court may properly consider both together at summary judgment. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 186 n.7 (4th Cir. 2001). I will defer considering the allegations of contradictory testimony until evaluating the full summary judgment record following time for expert discovery.

G. Mischaracterization of Evidence

Live Nation objects to alleged mischaracterization of evidence and respectfully requests that I review the exhibits for accuracy. I will, of course, do so.

**III.     Plaintiffs' Objections to Exhibits in Support of Summary Judgment**

Also pending before the court are plaintiffs' objections to several exhibits filed in conjunction with Live Nation's motion for summary judgment.

A. Authentication Objections to the Rogers, Garner, and Mankin Declarations and
   Exhibits Attached Thereto

Plaintiffs object to the Rogers, Garner, and Mankin Declarations because they have not been authenticated according to Rule 56(c), which requires that affidavits be made on the basis of personal knowledge. These Declarations, plaintiffs assert, do not meet this standard because the declarants only stated that the information was "true and correct to the best of [their] knowledge and belief." Because there is no way to tell which portions of the Declaration are based on personal knowledge as opposed to mere information and belief, plaintiffs contend that the Declarations are insufficient to support Live Nation's motion for summary judgment. In addition, plaintiffs object to the exhibits attached to the Declarations. Rogers, for example, says

that Exhibits A through D "appear" to be true and correct copies of the Pollstar Boxoffice summaries, but Rogers does not purport to have prepared the information himself, nor does he provide any indication of how the data was sorted and organized.  Similarly, plaintiffs assert that exhibits attached to the Garner and Mankin Declarations are insufficient under Rule 56 because the declarants merely state that the information provided is true and correct to the best of their knowledge and belief.  To the extent that I sustain plaintiffs' objections on these grounds, Live Nation objects to the declarations of Hurwitz, Canfield, Parker, Orbin, and Mickelson because they too lack attestations of personal knowledge.  (Def.'s Reply Pls.' Objections Exs. at 1 n.1, ECF No. 147.)

Rule 56 provides that when affidavits are used in conjunction with a summary judgment motion, they must be made on the basis of personal knowledge, setting forth facts as would be admissible in evidence on issues about which the affiant is competent to testify.  *See* Fed. R. Civ. P. 56.  Indeed, courts have held that affidavits submitted on the basis of knowledge and belief do not satisfy the personal knowledge requirement of Rule 56.  *Hamilton v. Mayor of Baltimore*, 807 F. Supp. 2d 331, 353 n.32 (D. Md. 2011).  However, where such an affidavit or declaration is submitted, and the face of the affidavit demonstrates personal knowledge of the declarant, the entire affidavit need not be stricken, and the court may consider those portions that are not deficient.  *See Copiers Typewriters Calculators, Inc. v. Toshiba Corp.*, 576 F. Supp. 312, 316 (D. Md. 1983); *see also Carey v. Beans*, 500 F. Supp. 580, 583 (E.D. Pa. 1980) (striking paragraphs prefaced with "I believe" and paragraphs containing legal conclusions, speculation, or mere opinions); *Mellen v. Hirsch*, 8. F.R.D. 248, 249–50 (D. Md. 1948) (holding that an affiant's statements sworn to be true to the best of his knowledge and belief were admissible and clearly distinguishable from an affidavit made merely on information and belief).

The Rogers Declaration states that Rogers is employed by Pollstar, which is an organization that summarizes and publishes self-reported performance information regarding live performances.  As the Custodian of Records of Pollstar, Rogers is plainly qualified to attest to what Pollstar does, and his statements in that regard are based on personal knowledge.  Likewise, Rogers has personal knowledge that Live Nation contacted him to request licensing of Pollstar summaries and that Rogers provided Live Nation with the requested information.  The only remaining statement in Rogers' Declaration is that the attached exhibits "appear to be true and correct copies" of the Pollstar summaries Live Nation requested.  It is immaterial that Rogers was not the person who personally sorted and organized the Pollstar data; as the Custodian of Records, he has sufficient personal knowledge to testify that the exhibits appear to be true and correct copies.  *See Nader v. Blair*, 549 F.3d 953, 963 (4th Cir. 2008) (finding that a custodian of records, while not necessarily personally involved in the creation of business records, is competent to speak from personal knowledge as to whether particular documents are admissible business records for purposes of summary judgment).  Therefore, Rogers' Declaration and attached exhibits are sufficiently based on personal knowledge and may be considered upon summary judgment according to Rule 56.

Similarly, with a few exceptions, the Garner Declaration contains statements about which Garner has personal knowledge and is competent to testify.  However, when Garner says in ¶¶ 37 and 42–43 that "[he] understands" that the Jonas Brothers or John Mayer made a decision for certain reasons, he does not appear to have sufficient personal knowledge to attest to that fact.  Accordingly, ¶¶ 37 and 42–43 are stricken.  Exhibit A is an email exchange between Garner and The Fray.  Beyond the objections to the Garner Declaration, there has been no further objection to this exhibit.  Because it was an email written by a party and produced in discovery, and there

are no further objections, it falls within the Authentication Stipulation and is admissible for summary judgment purposes.  (*See* Stipulation of Authenticity, ECF No. 68; Marginal Order Approving Stipulation of Authenticity, ECF No. 69.)

As with the Garner and Rogers Declarations, the Mankin Declaration is sworn under penalty of perjury and contains information about which it is clear that Mankin has personal knowledge.  In Mankin's case, none of the paragraphs appear to be based on speculation or another person's opinion.  Therefore, the Mankin Declaration is admissible in its entirety. Mankin's Exhibit A, like Garner's Exhibit A, is an email exchange that falls within the Authentication Stipulation and is therefore admissible, barring further objections.

B.  Objections to Exhibits to Yen Declaration

Plaintiffs also object to several exhibits to the Yen Declaration (ECF No. 104).  Exhibits 1 (ECF No. 104-2) and 2 (ECF No. 104-3) are objectionable, plaintiffs contend, because the documents were not properly authenticated according to Federal Rule of Evidence 901(b), do not meet the accuracy requirements of Federal Rule of Evidence 1006, and cannot fall within the Authentication Stipulation because they were not produced in discovery.  Exhibits 3 (ECF No. 104-4) and 15 (ECF No. 105-5), purported market share calculations, do not identify who prepared them.  Plaintiffs assume Live Nation litigation counsel prepared the calculations and therefore object on grounds of competency and lack of foundation.  Exhibit 16 (ECF No. 105-6), a calculation of average ticket prices, is objectionable on the same grounds.  Exhibit 32 (ECF No. 106-7) states that it is a true and correct copy of an exhibit in the Fermaglich deposition, which plaintiffs contend is insufficient to authenticate it.  Plaintiffs allege that Exhibits 3, 15, and 16 do not comply with Federal Rule of Evidence 1006 because they consist of charts Live Nation

did not produce to IMP prior to filing its motion for summary judgment.  According to plaintiffs,

Exhibit 5 is objectionable because it seeks to rely on a statement made (and objected to) during

Hurwitz's deposition in which he allegedly admits that Live Nation lacks monopoly power.  The

statement, they contend, is inadmissible because it seeks a legal conclusion from a fact witness

not competent to provide one.  Finally, plaintiffs object to Exhibits 14, 22, and 57 because they

are inaccurate and contain inadmissible hearsay and/or speculation.

Exhibits 1 and 2 to the Yen Declaration are purported copies of Billboard rankings for

2009 and 2010.  They do not come within the categories of documents described in the

Authenticity Stipulation, and Live Nation offers only their assertion that the documents are what

they are purported to be.  The documents are admittedly "compiled from Boxscores" and

"ranked by gross," indicating that they have been edited and possibly reorganized from the

original formatting.  Without any indication on the rankings that they appear to come directly

from Billboard or from Boxscores, the documents are not yet properly authenticated in

satisfaction of Federal Rule of Evidence 901.  Live Nation must submit a declaration of a person

with knowledge who can attest to the authenticity of the 2009 and 2010 Billboard rankings in

order to authenticate these documents.[3]

Exhibits 3, 15, and 16 to the Yen Declaration involve calculations of market share and

average ticket price prepared by litigation counsel.  Plaintiffs object to these calculations on the

basis of lack of competency and lack of foundation.  Yen made these calculations on the basis of

decisions regarding what constitutes the relevant market and whether certain performances

---

[3] Even if they are not admissible, these two exhibits (and perhaps some others discussed in this Memorandum) may, perhaps, be properly relied upon by an expert under Federal Rule of Evidence 703.

should be included in the calculations.  While counsel's simple arithmetic on undisputed data may be admissible, the basis for Yen's decisions regarding the underlying data is unclear. Moreover, it is true that the relevant market and market share are elements of substantive proof in an antitrust action, and they may not be conclusively offered by litigation counsel for either side.  I will therefore sustain plaintiffs' objections to Exhibits 3, 15, and 16.  Pursuant to this memorandum, however, Live Nation will have an opportunity to obtain expert testimony regarding calculation of market share and the relevant market.

Plaintiffs also object to Hurwitz's supposed admission during deposition in response to the question "So long as there is competition from Wolf Trap and indoors and stadiums there can't be a monopoly, can there?"  The series of questions at 48:5 to 49:3 of Hurwitz's deposition (Yen Decl., Ex. 5, ECF No. 80-6) seeks to elicit Hurwitz's legal conclusion as to what could constitute a monopoly.  Plaintiffs objected to the form of the question at the time of the deposition, and they renew their objection now.  Because Hurwitz is asked for a legal conclusion regarding monopoly power, or the answer to a mixed question of law and economic analysis, as plaintiffs characterize it, it is arguably inadmissible.  On the other hand, in light of the context of the testimony and Hurwitz's sophistication and experience, it may well be admissible.  I will defer ruling upon that question.

Exhibit 14 to Yen's Declaration (ECF No. 105-4) is a copy of a portion of AEG's website offered to support the statement that "AEG Live . . . is a global concert promoter and venue operator, with 20 of the top 66 Pollstar ranked venues in 2009."  (Mot. Summ. J. at 6–7, ECF No. 76.)  Publicly available webpages including the web address and date fall within the Stipulation of Authenticity.  The stipulation, however, extends "only to the fact that it was a document at the specified web address at the specified time" noted on the print out.  (Stipulation of Authenticity

at 5.)  Therefore, while the webpage is authenticated per the stipulation, the parties may still object on other grounds.

If offered to prove the truth of the contents of the website, plaintiffs contend that Exhibit 14 is inadmissible because it contains hearsay.  Live Nation argues that the webpage is offered to demonstrate that AEG holds itself out as a global concert promoter and venue operator, rather than for the truth of the specific numbers and rankings AEG mentions on the webpage.  Live Nation's motion for summary judgment did contain the specific number of venues and their rankings as reported on AEG's website, but to the extent that Live Nation seeks only to admit the website as evidence that AEG holds itself out as a global concert promoter and venue operator, the exhibit will not be stricken.

Exhibit 57 to the Yen Declaration (ECF No. 107-17) is another page from AEG's website, noting that AEG represented Kenny Chesney, Justin Bieber, and Taylor Swift. Plaintiffs contend that Exhibit 57, like Exhibit 14, is authenticated under the Authentication Stipulation but is inadmissible because it contains inadmissible hearsay.  To the extent that Live Nation seeks to admit this exhibit as evidence that AEG holds itself out as representing Kenny Chesney, Justin Bieber, and Taylor Swift, the motion to strike the exhibit is denied.  I will not, however, consider the exhibit as evidence of specific tours or particular dates of AEG's representation.

Exhibit 22 to the Yen Declaration (ECF No. 105-12) is the deposition transcript of Dori Armor, which purportedly supports the contention that artists dislike Hurwitz.  Armor's deposition testimony in fact was just a "yes" response to a question from Live Nation's counsel asking whether Armor knew of artists that dislike or "would never touch" Hurwitz.  Armor

responded in the affirmative but couldn't say for sure which artists because she "just know[s] anecdotally." (Armor Dep. at 79:11–22.) Armor also testified that there are artists who will only work with Hurwitz. (*Id*. at 80: 2–5.) As a result, Armor's testimony is merely a general reflection on her experience working with artists as a booker for many years in the D.C. area and will only be considered to the extent that it reflects Armor's understanding that there are artists who like Hurwitz and others who do not.

A separate order effecting the rulings made in this Memorandum is being entered herewith.

August 23, 2012
Date

/s/
J. Frederick Motz
United States District Judge