ASPEN PUBLISHERS

**Phillip E. Areeda**
*Late Langdell Professor of Law*
Harvard University

**John L. Solow**
*Associate Professor of Economics*
University of Iowa

**Herbert Hovenkamp**
*Ben V. & Dorothy Willie*
*Professor of Law*
University of Iowa

**Volume IIB**
**Third Edition**

# Antitrust Law

## An Analysis of Antitrust Principles and Their Application

Wolters Kluwer
Law & Business

AUSTIN BOSTON CHICAGO NEW YORK THE NETHERLANDS

a relevant market. If the defendant *can* profit by charging pharmacies a price significantly over its cost, then the pharmacy sales are a relevant market and it does not matter one whit whether the broader grouping is a relevant market as well.[14]

**533e. Differentiated products.** Product differentiation presents two issues inviting "submarket" confusion. Products differing in brand name may be physically identical, as with aspirin; physical differences may be substantial, as with Rolls Royce and Ford, or almost trivial, as with canned peas. Brand recognition may be substantial, as with beer, or modest, as with retail sugar or salt. In all events, differentiated products are not perfectly interchangeable for consumers. Unlike a perfectly competitive firm, a producer of a successfully differentiated product can raise its price above that of its rivals without losing *all* of its sales and thus has greater power over price than the perfect competitor. The legal problem is immediately apparent: is the degree of power inherent in each differentiated product sufficient to make each brand a separate market for, say, monopolization purposes? The answer is almost uniformly negative, as we shall see later.[15] Nevertheless, "submarket" terminology may mislead a judge or jury into characterizing a product class as "the market," with "submarkets" for particular versions or brands.[16] This is often a confusing diversion

14. Cf. *Tenneco*, 98 F.T.C. 464, 580-581 (1981), rev'd on other grounds, 689 F.2d 346 (2d Cir. 1982). The FTC found that although original equipment shock absorbers, which are installed on new cars, and replacement shock absorbers are physically very similar or identical, sales of the latter required an elaborate distribution network while sales of the former did not. It therefore held that the two belonged in distinct submarkets within the larger market for shock absorbers. Given that the legal issue concerned the defendant's power over the replacement product, it would have been more straightforward to find that replacement shock absorbers were a relevant market, because a sole manufacturer (or cartel) of replacement shock absorbers could raise prices to impermissible levels without encouraging substantial new entry by firms currently manufacturing original equipment shock absorbers but lacking an expensive and risky distribution network. Whether shock absorbers as a whole also constituted a relevant market was irrelevant.

15. See ¶¶562-563.

16. Cases using submarket terminology to account for product differentiation include *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 713 (7th Cir. 1979), cert. denied, 445 U.S. 917 (1980) (drive-through and other photo-processing outlets); *Kaiser Alum. & Chem. Corp. v. FTC*, 652 F.2d 1324, 1329-1330 (7th Cir. 1981) (two kinds of brick refractory); *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1199 (2d Cir. 1981), cert. denied, 455 U.S. 1016 (1982) (plain-paper and other copiers); *RSR Corp. v. FTC*, 602 F.2d 1317, 1320-1322 (9th Cir. 1979), cert. denied, 445 U.S. 927 (1980) (primary and secondary lead); *Liggett & Myers, Inc. v. FTC*, 567 F.2d 1273, 1274 (4th Cir. 1977) (premium & economy dog food); *General Foods Corp. v. FTC*, 386 F.2d 936, 943 (3d Cir. 1967), cert. denied, 391 U.S. 919 (1968) (two kinds of scrubbing pads).

See also *HTI Health Serv., Inc. v. Quorum Health Group, Inc.*, 960 F. Supp. 1104 (S.D. Miss. 1997) (merger case; no relevant submarket of "physician services purchased by managed care" providers, when these seemed quite interchangeable with physician services generally — that is, court is using general market criteria); *Yeager's Fuel, Inc. v. Pa. Power & Light Co.*, 953 F. Supp. 617 (E.D. Pa. 1997) (could be a relevant submarket of heating

a secondary manufacturer to produce for it using dies, production machinery, or other technical inputs supplied by the former. The tooling clause then specifies that this equipment may be used only to make parts for the primary manufacturer. The secondary manufacturer may or may not be free to copy the dies or other equipment, or copying may not even be necessary. Before a device such as a tooling clause is sufficient to attribute the market share to the purchasing party it must give that party the ability to keep the actual manufacturer out of the market. The same analysis applies to the "engineering" and "proprietary" agreements. Many parts manufacturers make parts for a variety of buyers. For some, it may use buyer-supplied dies or other machinery or design specifications, but it may make virtually the same part for a more general market using its own dies, machinery, or engineering designs.

By the same token, a dominant firm may have goods manufactured on its behalf using the dominant firm's own brand name. But the licensed manufacturer may produce the same product under its own brand or the brand names of others. As a result, when the dominant firm withdraws its agreement with the licensed manufacturer, the output is very likely not removed from the market at all. If prices rise in response to the dominant firm's output reduction, the licensed manufacturer will continue to produce under a different brand name.

In all events, the critical question is the defendant's power to keep third-party manufacture off the market when it undertakes an output reduction and either reduces or ends its purchase from these third parties. To the extent the third parties can continue to purchase and sell to others, their output cannot be attributed to the defendant.

## ¶536. Hypothetical Price Increase Methodology to Define Market

A given product in a given region is a market of its own if a hypothetical firm controlling all its output ("hypothetical monopolist") could maximize profits at prices significantly above the competitive level. What prevents the hypothetical monopolist (or cartel, or oligopoly) of product *A* from doing so is:

(A) the ability of customers to shift to

(A1) substitute product *B*, or

it using dies, production
pplied by the former. The
uipment may be used only
urer. The secondary manu-
the dies or other equip-
ssary. Before a device such
te the market share to the
the ability to keep the
The same analysis applies
agreements. Many parts
buyers. For some, it may
nery or design specifica-
part for a more general
engineering designs.
may have goods manu-
firm's own brand name.
duce the same product
of others. As a result,
agreement with the
likely not removed from
to the dominant firm's
er will continue to pro-

defendant's power to
ket when it undertakes
nds its purchase from
parties can continue to
not be attributed to the

**ology to Define**

of its own if a hypo-
thetical monopolist")
above the competi-
nopolist (or cartel, or



(A2) more geographically remote producers of product *A*; or

(B) the ability of firms

(B1) currently making other products to shift some of their resources to producing product *A*; or
(B2) currently producing *A* elsewhere to ship it into the defendant's region.

If such shifts would make supracompetitive pricing by the hypothetical monopolist unprofitable, then the *B* firms are part of the market in which to measure the shares of the *A* firms. The rationale is that competition from the *B* firms would either prevent the hypothesized price increase from occurring or restore prices to pre-increase levels. Thus, antitrust economists sometimes undertake a highly technical "critical loss analysis" to determine whether the loss of sales that would occur in response to a given hypothetical price increase is so large that the price increase could not be sustained.[1]

These indisputable propositions suggest the following methodology for defining the market, which has also been adopted by the government's 1992 Guidelines for horizontal mergers.[2] Begin by characterizing product *A* as a "provisional market. Then ask whether a "significant" price increase by a hypothetical *A* monopolist — assuming everything else remains constant — would maximize its profits. If so, *A* is the market. If not, the reason is presumably too many shifts to or by the *B* firms. Therefore, we then ask whether a hypothetical monopolist controlling the entire output of both *A* and *B* could profit from a significant price

**¶536.** n.1. E.g., *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 120 & n.7 (D.D.C. 2004), dismissed, 2004 WL 2066879 (D.C. Cir. Sept. 15, 2004). See H.E. Frech III, James Langenfeld, & R. Forrest McCluer, Elzinga-Hogarty Tests and Alternative Approaches for Market Share Calculations in Hospital Markets, 71 Antitrust L.J. 921, 933 (2004) ("The critical sales loss is defined as the decrease in sales resulting from a hypothetical price increase that is just large enough to make the price increase unprofitable."); David Scheffman, Malcolm Coate, & Louis Silvia, Twenty Years of Merger Guidelines Enforcement at the FTC: An Economic Perspective, 71 Antitrust L.J. 277, 284 (2003); Daniel P. O'Brien & Abraham L. Wickelgren, A Critical Analysis of Critical Loss Analysis, 71 Antitrust L.J. 161 (2003); James Langefeld & Wenqing Li, Critical Loss Analysis in Evaluating Mergers, 46 Antitrust Bull. 299 (2001).

2. The complete text of the Guidelines appears in Appendix A of the Supplement. See 1992 Horizontal Merger Guidelines, §1.1 (product market), §1.2 (geographic market). See also the Commentary on the Horizontal Merger Guidelines, issued by the Agencies in March 2006, and available at *http://www.ftc.gov/os/2006/03/CommentaryontheHorizontalMergerGuidelinesMarch2006.pdf*.

increase. If so, the market includes both *A* and *B*. If not, the provisional market is broadened further to include the next best substitute until we identify that group of firms that could profit from a significant price increase.[3] The market is the smallest grouping that satisfies this test.

Although this methodology often speaks of a "profitable" price increase, the question is not whether a price increase of a given magnitude is profitable, but whether it is profit-maximizing. To illustrate, suppose the hypothetical monopolist could increase profit by raising price a significant 20 percent, but that it could profit even more by raising prices only by an insignificant one percent. Because such a firm would not rationally make the larger move, it lacks the realistic power to raise prices significantly. Alternatively, suppose that raising an *A* price by a significant 10 percent would be unprofitable because too many customers would shift to product *B*, but that a 20 percent increase would be highly profitable because the incremental revenue from nonshifting customers would more than offset that lost from the shifters. Obviously, the *A* market should not be broadened to include product *B*. Hence, the unprofitability of a significant price increase does not end the inquiry when an even greater price increase might maximize profits. However, as the hypothesized price increase departs further from current prices, estimates about customer responses become increasingly speculative.[4] The true question is whether the defendant's profit-maximizing price exceeds the threshold by the requisite percentage.

To apply the price-increase methodology, we must (1) resolve what goes into the initial provisional market *A*, (2) define the magnitude of a "significant" price increase, (3) assess the likely reactions of *A* customers and *B* firms, and (4) avoid the overly broad market definition that would result when current *A* prices are already supracompetitive. We consider the second and third issues in ¶¶537-538 and explain and analyze the fourth in ¶539. Here we pause briefly on the provisional market. On each issue, we compare and contrast the government's 1992 Guidelines for horizontal mergers.

3. 1992 Horizontal Merger Guidelines §1.11 n.9 defines the "next best substitute" as "the alternative which, if available in unlimited quantities at constant prices, would account for the greatest value of diversion of demand" in response to the significant price increase.

4. Measurements of demand elasticities are most reliable in the range of observed or historical prices for which data are available. Measuring demand elasticity at a purely hypothetical price 20 percent above current levels could be highly speculative.

The most obvious provisional market is a given product in a given region.[5] Of course, if transport costs are trivial, then the relevant region can be the whole country. Similarly, established shipping patterns and close price correlations often indicate that products or regions are in the same market.[6] Moreover, two products are provisionally part of the same market when they employ similar technologies and similar costs and customers use them interchangeably.[7] Also in the same market is the relevant output of firms that use similar technology and commonly bid against each other for the same sales.

In cases of doubt, output should generally be excluded from the provisional market, for incorrect exclusions will ultimately be brought into the market via the price increase methodology.

That the government Guidelines adopt this approach is important. Although they do not bind the courts,[8] the Guidelines influence many judges, for they state the policy of the antimerger statute, a mode of analysis indicating the questions to be considered, the sequence of the inquiry, and possible solutions. Furthermore, the economic and business expertness of the Antitrust Division and the Federal Trade Commission itself commands some deference.[9] In practice, moreover, the government's position often determines whether a merger will be consummated in the first place. Because most mergers have few immediate effects on price, private challenges are relatively few. Litigating with the government is expensive, so firms contemplating mergers often abandon those that the government is likely to challenge. In any event, numerous decisions have adopted some variation of the "hypothetical cartel or monopolist" approach.[10]

5. The merger guidelines start with the product of the merging firms. 1992 Horizontal Merger Guidelines §§1.0-1.1.

6. See 552. Moreover, the producers in region *B* are presumptively part of the *A* market when goods move from *B* to *A*, but *A* firms are not part of the *B* market if no goods move in that direction.

7. See ¶561.

8. See *United States v. Atlantic Richfield Co.*, 297 F. Supp. 1061, 1073 (S.D.N.Y. 1966), aff'd mem. sub nom., *Bartlett v. United States*, 401 U.S. 986 (1971).

9. See *Allis-Chalmers Mfg. Co. v. White Consol. Indus.*, 414 F.2d 506, 524 (3d Cir. 1969), cert. denied, 396 U.S. 1009 (1970).

10. *Nilavar v. Mercy Health System-Western Ohio*, 2005 WL 1630881, 2005-2 Trade Cas. ¶74,941 at *4 (S.D. Ohio) ("The relevant product market is a product or service, or the smallest group of products or services, for which a hypothetical monopolist could profitably charge more than the competitive price for a significant period of time"); *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1111 (N.D. Cal. 2004); *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 120 & n.7 (D.D.C. 2004), dismissed, 2004 WL 2066879 (D.C. Cir. Sept. 15, 2004).

For a complete listing of cases adopting some variation of the "hypothetical cartel or monopolist" formulation through its date of publication, see Gregory J. Werden, The 1982 Merger Guidelines and the Ascent of the Hypothetical Monopolist Paradigm, 71 Antitrust

Note one important caveat, however. The price increase methodology may seriously overstate the size of the market, and thus understate a firm's power, when prices are already at monopoly levels at the time the price increase methodology is applied. This fact can affect merger analysis, although it has much larger implications for the measurement of single-firm monopoly power, as in Sherman §2 cases. These problems will be taken up in a subsequent Paragraph.[11]

---

L.J. 253, 270-274 (2003). The most important decisions include *Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 197-198 (1st Cir. 1996) ("The touchstone of market definition is whether a hypothetical monopolist could raise prices," quoting ¶533b in previous edition); *Home Placement Serv., Inc. v. Providence Journal Co.*, 682 F.2d 274, 280 (1st Cir. 1982); *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001) (quoting ¶533 in previous edition); *AD/SAT v. Associated Press*, 181 F.3d 216, 228-229 (2d Cir. 1999) (same); *United States v. Eastman Kodak Co.*, 63 F.3d 95, 106-107 (2d Cir. 1995); *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 335-338 (S.D.N.Y. 2001), aff'd, 344 F.3d 229 (2d Cir. 2003), cert. denied, 543 U.S. 811 (2004) ("a market is properly defined when a hypothetical profit-maximizing firm selling all of the product in that market could charge significantly more than a competitive price, i.e., without losing too many sales to other products to make its price unprofitable"); *PepsiCo, Inc. v. Coca-Cola Co.*, 1998-2 Trade Cas. ¶72,257, at 82,642 (S.D.N.Y.), 114 F. Supp. 2d 243 (S.D.N.Y. 1998), aff'd, 315 F.3d 101 (2d Cir. 2002); *Ansell Inc. v. Schmid Labs.*, Inc., 757 F. Supp. 467, 475 & n.4 (D.N.J.), aff'd mem., 941 F.2d 1200 (3d Cir. 1991); *International Wood Processors v. Power Dry, Inc.*, 792 F.2d 416, 430 (4th Cir. 1986); *Satellite Television & Associated Res., Inc. v. Continental Cablevision of Va., Inc.*, 714 F.2d 351, 356 (4th Cir. 1983); *Dimmitt Agri Indus., Inc. v. CPC Intl. Inc.*, 679 F.2d 516, 526 n.7 (5th Cir. 1982); *Virtual Maint., Inc. v. Prime Computer, Inc.*, 957 F.2d 1318, 1325 (6th Cir. 1992); *Elliott v. United Center*, 126 F.3d 1003, 1005 (7th Cir. 1997); *Israel Travel Advisory Serv. v. Israel Identity Tours*, 61 F.3d 1250, 1252 (7th Cir. 1995); *Ball Mem. Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1336 (7th Cir. 1986); *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1053-1054 & n.11 (8th Cir. 1999); *H.J., Inc. v. International Tel. & Tel. Corp.*, 867 F.2d 1531, 1537-1538 (8th Cir. 1989); *United States v. Archer-Daniels-Midland Co.*, 866 F.2d 242 (8th Cir. 1988); *General Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 805 (8th Cir. 1987); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1203-1204 (9th Cir. 1997), cert. denied, 523 U.S. 1094 (1998); *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *Olin Corp. v. FTC*, 986 F.2d 1295, 1299-1300 (9th Cir. 1993); *SCFC ILC, Inc. v. Visa USA*, Inc., 36 F.3d 958, 966 (10th Cir. 1994), cert. denied, 515 U.S. 1152 (1995); *Westman Commn. Co. v. Hobart Intl., Inc.*, 796 F.2d 1216, 1222 (10th Cir. 1986); *United States v. Engelhard Corp.*, 126 F.3d 1302, 1304-1308 (11th Cir. 1997); *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 995-996 (11th Cir. 1993); *Consol. Gas Co. of Fla. v. City Gas Co. of Fla.*, 665 F. Supp. 1493, 1517 (S.D. Fla. 1987), aff'd, 880 F.2d 297 (11th Cir. 1989), vacated, 889 F.2d 264 (11th Cir. 1989), reinstated en banc, 912 F.2d 1262 (11th Cir. 1990), vacated as moot, 499 U.S. 915, dismissed as moot, 931 F.2d 710 (11th Cir. 1991); *United States v. Microsoft Corp.*, 253 F.3d 34, 81 (D.C. Cir. 2001) ("To establish a dangerous probability of success, plaintiffs must as a threshold matter show that the browser market can be monopolized, i.e., that a hypothetical monopolist in that market could enjoy market power."); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986); *Superior Ct. Trial Lawyers Assn. v. FTC*, 856 F.2d 226, 250 & n.33 (D.C. Cir. 1988), rev'd on other grounds, 493 U.S. 411 (1990); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1076-1077 & n.8 (D.D.C. 1997); *California v. Sutter Health Sys.*, 130 F. Supp. 2d 1109, 1120, 1128-1132 (C.D. Cal. 2001); *Anti-Monopoly, Inc. v. Hasbro, Inc.*, 958 F. Supp. 895, 902 (S.D.N.Y. 1997); *New York v. Kraft Gen. Foods, Inc.*, 926 F. Supp. 321, 359-361 (S.D.N.Y. 1995).

11. See ¶539.

price. In *Brown Shoe*, the Supreme Court refused to narrow shoe markets by price categories (in which the combined market shares of the merging defendants would appear smaller).[12] As to the second, the Court thought it obviously unrealistic to hold "that, for example, men's shoes selling below $8.99 are in a different product market from those selling above $9.00."[13]

That any dividing line is necessarily arbitrary does not dispose of the issue, although price categories are not appropriate when producers can readily shift between categories[14] or when consumers are so numerous at every dividing line that prices on lower-priced shoes strongly constrain prices on higher-priced shoes, and vice versa. Close correspondence in price movements might so suggest, although they might merely reflect parallel changes in costs.

**563d. Single-brand or differentiated product within a product class.** A single brand or differentiated product within a product class is presumptively not a separate market, unless its maker is the only producer in a relevant category — for example, a single hospital relatively distant from the alternatives.[15] — or unless a substantial group of customers can be significantly exploited via price discrimination.[16] Or, in some cases, patent or copyright protection might render a product sufficiently unique and make duplication or reverse engineering sufficiently difficult to warrant a conclusion of a single-brand market. Of course, the scope of the product class may itself be disputed, as ¶e considers.

A single brand is never a relevant market when the underlying product is fungible — for example, if identical bananas are sold under the "Chiquita" and "Del Monte" brands, it is inconceivable that one could be sold at monopoly prices while the other is sold at the competitive price. Different brands may be in different relevant markets when the brand differences are accompanied by significant product differentiation — such as BMW and Chevrolet automobiles. But in that case it is virtually always the structural or design differences between the two products, rather than branding, that produces the different markets.

12. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325-326 (1962). The Court also rejected markets based on the age of consumers as immaterial because it did not alter market shares significantly.

13. Id. at 326.

14. See ¶561.

15. See, e.g., *Smith v. Underwood Mem. Hosp.*, 1987-1 Trade Cas. ¶67,538 (D.N.J.). See also *Woods Exploration & Producing Co. v. Aluminum Co. of Am.* 438 F.2d 1286, 1307 (5th Cir. 1971), cert. denied, 404 U.S. 1047 (1972) (single isolated natural gas field).

16. See ¶534d.