ASPEN PUBLISHERS

**Phillip E. Areeda**
*Late Langdell Professor of Law*
Harvard University

**Herbert Hovenkamp**
*Ben V. & Dorothy Willie*
*Professor of Law*
University of Iowa College
of Law

**Volume IX**
**Third Edition**

# Antitrust Law

## An Analysis of Antitrust Principles and Their Application



Wolters Kluwer
Law & Business

Without overruling the per se rule against ties once separate products and tying product power are found, the Supreme Court's *Illinois Tool Works* decision declared that "tying arrangements involving patented products should be evaluated under the standards applied in cases like *Fortner II* and *Jefferson Parish* rather than under the *per se* rule applied in *Morton Salt* and *Loew's*."[60] The *Illinois Tool Works* opinion did not purport to overturn a general rule of per se illegality for tying arrangements, but rather a rule that tying involving a patented tying product is unlawful per se. The Court did not discuss a rule of reason alternative, as it had in *Jefferson Parish*.

**1701d.   The future?**   Tying law remains in a confused state. Although some examples of tying may indeed have been anticompetitive, the Supreme Court over-generalized about the purposes and effects of all tie-ins. The Court believed that "tying arrangements serve hardly any purpose beyond the suppression of competition"[61] and that a per se rule "avoids the necessity for an incredibly complicated and prolonged economic investigation . . . in an effort to determine . . . whether a particular restraint has been unreasonable."[62] Seeing the absence of "any redeeming virtue,"[63] the Court believed that total condemnation would benefit the business and legal community with clarity and guidance without sacrificing any contributions to competition. To the extent that any neutral or procompetitive uses of tying were brought to the Court's attention, it believed that such conceivable benefits could be achieved through less restrictive means.

There are two obvious problems with such broad "per se" condemnation. *First*, tie-ins are omnipresent when broadly defined. Shoes are sold with shoelaces, trousers with jackets, cars with windshield wipers, bicycles with brakes and tires, opera tickets in a season subscription, one part of a newspaper with the rest, golf clubs in sets, and the like. They cannot all be condemned without disrupting ordinary and useful arrangements that threaten no harm. Indeed, the emphasis on two products, while ignoring real effects, led the Third Circuit to express concern "that the law of tying is becoming a kind of semantic shell game, resting more on key words than on careful analysis."[64]

Most litigated a[...]
either neutral in their [...]
petitive. Extensive leg[...]
in the current doctrine[...]
Many commentators a[...]
reason analysis without [...]
ined or how that analys[...]

*Second*, the peculiar [...]
or ease of administration[...]
nor litigation. Identifying [...]
tying product are complex [...]
the lower courts have app[...]
goals that could not be ach[...]
and equally effective alter[...]
weighing such justifications [...]
the easiest way to bring adm[...]
litigated in the last few dec[...]
single most obvious feature [...]
any arguable impairment of [...]
the second product. Accord[...]
attention to the presence or [...]
both the reason for any anti[...]
element to disprove.

This is not to say tying [...]
tion. Were there some way t[...]
the kind of hard-core cases t[...]
balance of harms and benefit[...]
tive condemnation. Business[...]
from clear legal rules that b[...]
competitive effects in each ca[...]
no limited and sharply defin[...]
fied as probably detrimental [...]
The range of practices that [...]
become too broad for presum[...]
The tying concept has simply [...]

---

60.   *Illinois Tool Works, Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 42 (2006), citing ¶1737a.
61.   *Standard Oil Co. (Cal.) v. United States*, 337 U.S. 293, 305-306 (1949). The statement was dictum, for the only practice before the Court was exclusive dealing.
62.   *Northern Pacific Ry. v. United States*, 356 U.S. 1, 5 (1958).
63.   Id.
64.   *Ungar v. Dunkin Donuts of America*, 531 F.2d 1211, 1222 (3d Cir.), cert. denied, 429 U.S. 823 (1976).

65.   E.g., Herbert Hovenkamp, Feder[...] Its Practice ch. 10 (4th ed. 2011); Erik [...] Arrangements and Competitive Harm, [...] papers.ssrn.com/sol3/papers.cfm?abstract_id=[...]
66.   But see Robert Bork, The Antitru[...] any prohibition of tie-ins.

Most litigated arrangements that could be described as ties are either neutral in their competitive implications or even procompetitive. Extensive legal and economic literature points out defects in the current doctrine[65] without formulating alternative rules.[66] Many commentators reject per se approaches in favor of rule of reason analysis without specifying which factors should be examined or how that analysis should be conducted.

*Second*, the peculiar "per se" rule for ties brings little guidance or ease of administration. It simplifies neither business planning nor litigation. Identifying two products and proving power in the tying product are complex and often uncertain efforts. Moreover, the lower courts have approved tie-ins achieving procompetitive goals that could not be achieved through obviously less restrictive and equally effective alternatives. Identifying, appraising, and weighing such justifications adds to the complexity. Paradoxically, the easiest way to bring administrative simplicity to most tie-ins litigated in the last few decades is to focus on their effects. The single most obvious feature in most cases has been the absence of any arguable impairment of competition in the alleged market for the second product. Accordingly, it seems perverse to exclude attention to the presence or absence of harmful effects, which are both the reason for any antitrust concern and often the simplest element to disprove.

This is not to say tying arrangements never impair competition. Were there some way to confine the definition of "tie-in" to the kind of hard-core cases that originally generated concern, the balance of harms and benefits might possibly support a presumptive condemnation. Business firms and the legal system benefit from clear legal rules that bypass more detailed assessments of competitive effects in each case. We will see, however, that there is no limited and sharply defined set of practices that can be identified as probably detrimental rather than beneficial to the market. The range of practices that could be described as tie-ins has become too broad for presumptive or categorical condemnation. The tying concept has simply become too protean.

65.  E.g., Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and Its Practice ch. 10 (4th ed. 2011); Erik N. Hovenkamp & Herbert Hovenkamp, Tying Arrangements and Competitive Harm, 52 Ariz. L. Rev. 925 (2010), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1443284.

66.  But see Robert Bork, The Antitrust Paradox 365-381 (1978), which would abolish any prohibition of tie-ins.

While other concerns for competition may be present, the single best way to judge potentially adverse effects is by the severity of the foreclosure in a market, whether or not that foreclosure was brought about by power over a different product. Thus, this chapter will largely side with the four concurring Supreme Court Justices in *Jefferson Parish*, who demanded proof of harmful effects in the market for the tied product.[67] Those Justices would ask whether, for example, a contract requiring a buyer to take its needs of a product from one seller unreasonably foreclosed the marketing opportunities of rival sellers of that product. If so, that contract would be prima facie unlawful, regardless of whether the inducement to the contract was a buyer's desire for access to or favorable terms on a different "tying" product. For those four Justices, tying would largely, although not entirely, disappear as a separate subject. Without unreasonable foreclosure, the arrangement would be lawful even if it involved a tie-in; with unreasonable foreclosure, the arrangement would be prima facie unlawful even if not a tie.

Finally, we cannot help noting that the rise of modern electronic networks, particularly for computers and telecommunications, and the participation of numerous firms as sellers, has produced a new generation of tying claims, many of which are quite complex. The delivery of services via large networks under competitive conditions requires interconnection and compatibility, and both produce situations in which firms either explicitly or implicitly tie products and services together. These ties range over the various services bundled by telecommunications companies, hardware and software, or networks and the devices that are attached to them. An increasing proportion of these ties are "technological" rather than contractual. That is to say, the "tie" results from compatibility or interconnection requirements that force a customer to take two products or services from the same supplier, rather than the standard tying contract. As such, many of these ties fall outside the scope of §1 of the Sherman Act or §3 of the Clayton Act, and are more appropriately analyzed as exclusionary practices by dominant firms. While the line between these "unilateral" and contractual ties is hardly clear, to the extent they are treated by courts as raising concerns under §2 of the Sherman Act they are treated in Chapter 7 or, less frequently, Chapter 8 on attempt to monopolize.[68]

**1701e. Preview.** [...] is mainly destined [...] output contracts [...] fully examines all the [...] thing, the coalescence [...] event, it will be impor[...] doctrine with respect [...] affirmative defense, the [...] uct, and the necessary [...] cence, moreover, the pre[...] of possible justifications [...] sure. In all events, the [...] trust injury of purchasers [...] damages on paying the [...] allegedly tied product. [...] relevant to the patent misuse [...]

In all events, we canno[...] ests at stake without examin[...] dients of tying as it has actual[...] in the next Paragraph as a pr[...]

**¶1702. Introduction III: Bla[...]**

The courts repeat that tying [...] that formula is not very help[...] arrangement" and because it [...] se rule. To be more explicit, [...] "illegal tie-in." (Some decision[...] because they have combined t[...] tomary jargon terms are printe[...] regular type. Editorial commen[...] distinctions are made betwee[...] sales and leases.

    *1.*   Two products.[1]

---

67. See Ch. 17B-3.

68. See ¶749 (bundled discounts), ¶¶767, 768 (vertically integrated monopolist's practices toward non-integrated rivals), ¶¶775-777 (technological ties by monopolist), ¶787 (regulated monopolist). See also ¶806e3 (tying as attempt to monopolize).

¶1702. n.1. See Ch. 17D-1. As sum[...]

A plaintiff may bring a private antitrust [...] under §1 of the Sherman Act if he can a [...] nomic power' in the tying product mar[...] stantial volume of commerce in the t[...] plaintiff allege: (1) the seller of the tying [...]

the meter. These costs might be prohibitive when the meter is unreliable, or difficult to maintain,[21] or requires visits to read that are unduly expensive in relation to value. For example, it is quite cheap for a car rental company to "meter" the car by reading the odometer, because the car comes equipped with this device anyway, and the odometer is read when the driver returns the car; so the incremental cost of reading the meter is very low. However, metering a home use printer or camera could impose significant additional costs in relation to the value of the product.

Similarly, revenue-based royalties require difficult and costly monitoring of the franchisee's accounts. Such costs can be larger or smaller than the costs of buying or producing and handling the tied supplies and monitoring the customer to detect its purchases of the tied product from other sources. In some instances, there may be no effective alternative at all.

Consider, for example, the defendant manufacturer who requires franchised dealers to use only its "genuine" repair parts.[22] Although the manufacturer insists that only those parts guarantee proper functioning of the machine and thereby protect the manufacturer's reputation, price discrimination may be the object when its price exceeds any real quality premium over rival repair parts. In that event, those who need more repair parts because they use the machine more intensively — for example, drive a car farther or over more years — presumably value it more highly and effectively pay more for it than those who use it less. Without inducing the dealers performing a substantial portion of those repairs to use "genuine" parts, the defendant may have great difficulty in obtaining the postulated premium on those parts.

**1711c. No shift from higher-value to lower-value customers.** Nonforeclosing ties, which are tying arrangements that do not cause harm by excluding rivals, may extract higher prices from some customers, but the case for condemning them on that ground is very weak.[23] The means of extraction is usually a form of price discrimination, and the typical result is that, while some consumers are harmed, others will benefit. While some instances

of price discrim[...] sumer prices in the [...] sets is extremely [...] tered in antitrust [...] broad rule condemn[...] be true if a tying a[...] product, where the [...] portion of the monop[...] majority of variable-[...]

While the econo[...] tying focuses on mono[...] kets where the defend[...] ally results from produ[...] ties, which are variable [...] product-differentiated [...] a substantial price redu[...] number of tying-produc[...] chisor may offer a ver[...] reducing franchisee risk [...] invest, but then tie variou[...] by the franchisee in propor[...] is the rare, but hardly unh[...]

One unfortunate cons[...] against ties[25] is that quest[...] works in tying arrangement[...] the impact of the tie on out[...] not made records on these [...] them than we should. Howe[...] a price reduction in the [...] increases consumer access to [...] that involve reduced tying-p[...] two things. First, they change[...] ing it lower fixed costs but h[...] the purchaser the printer is a [...] cost. A printer/cartridge tie t[...]

21.   See, e.g., Mid-America ICEE v. John E. Mitchell Co., 1973-2 Trade Cas. ¶74,681, at 94,987 n.23 (D. Or.) (the meter did not work effectively with all products passing through the machine; servicing triggered it, and its delicacy meant frequent maladjustment).

22.   See ¶1716c.

23.   For a contrary view, see Einer Elhauge, Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory, 123 Harv. L. Rev. 397 (2009); Joseph F. Bradley, The Economic Goals of Antitrust: Efficiency, Consumer Welfare, and Technological Progress, 62 N.Y.U. L. Rev. 1020, 1036 (1987).

24.   See, e.g., Siegel v. Chicken D[...] chicken; tying of spices and supplies [...] 1982) (fast food; hamburgers and related [...] Pizza v. Domino's Pizza, 124 F.3d 430 (3d C[...] tying of pizza dough, a commodity made [...] Inc. v. Smith, 34 F. Supp. 2d 459 (E.D. Mi[...] products bearing franchisor's logo).

25.   See ¶1720.

the meter is unre-
to read that are
ple, it is quite
by reading the
this device any-
urns the car; so
low. However,
pose significant
duct.

icult and costly
can be larger or
d handling the
ct its purchases
nstances, there

ufacturer who
repair parts.[22]
parts guarantee
tect the manu-
the object when
val repair parts.
because they use
a car farther or
ighly and effec-
ithout inducing
se repairs to use
iculty in obtain-

wer-value cus-
rangements that
ct higher prices
g them on that
usually a form
that, while some
some instances

Trade Cas. ¶74,681, at
ucts passing through
maladjustment).

counts, and the Death
oseph F. Brodley, The
nological Progress, 62

of price discrimination reduce welfare or result in higher con-
sumer prices in the aggregate, most do not and segregating the two
sets is extremely difficult. Most variable-proportion ties encoun-
tered in antitrust cases probably increase output, which makes a
broad rule condemning them unwise. This is particularly likely to
be true if a tying arrangement involves a lower price in the tying
product, where the dominant firm has power, and a transfer of a
portion of the monopoly overcharge to the tied product. The great
majority of variable-proportion ties fall into this class.

While the economic literature on price discrimination and
tying focuses on monopolists, many challenged ties occur in mar-
kets where the defendant has no more market power than gener-
ally results from product differentiation. Indeed, most franchise
ties, which are variable proportion, occur in competitive albeit
product-differentiated markets.[24] In those cases, a tie that includes
a substantial price reduction in the tying product can increase the
number of tying-product sales significantly. For example, a fran-
chisor may offer a very low entry price for its franchise, thus
reducing franchisee risk and inducing many more franchisees to
invest, but then tie various commodities or products that are used
by the franchisee in proportion to its sales. The true monopoly case
is the rare, but hardly unheard of, worst-case scenario.

One unfortunate consequence of the historical per se rule
against ties[25] is that questions about how price discrimination
works in tying arrangements are irrelevant, as are questions about
the impact of the tie on output. As a result, antitrust litigation has
not made records on these issues and we know much less about
them than we should. However, a nonforeclosing tie that involves
a price reduction in the tying product, as most probably do,
increases consumer access to that product. Variable-proportion ties
that involve reduced tying-product prices generally serve to do
two things. First, they change the *purchaser's* cost structure by giv-
ing it lower fixed costs but higher variable costs. For example, to
the purchaser the printer is a fixed cost but the ink is a variable
cost. A printer/cartridge tie that involves lower printer prices but

24.  See, e.g., *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43 (9th Cir. 1971) (fast-food fried
chicken; tying of spices and supplies); *Kypta v. McDonald's Corp.*, 671 F.2d 1282 (11th Cir.
1982) (fast food; hamburgers and related products; tying of lease of location); *Queen City
Pizza v. Domino's Pizza*, 124 F.3d 430 (3d Cir. 1997), cert. denied, 523 U.S. 1059 (1998) (pizza;
tying of pizza dough, a commodity made of flour, oil, salt, and water); *Little Caesar Enters.,
Inc. v. Smith*, 34 F. Supp. 2d 459 (E.D. Mich. 1998) (pizza; tying of paper plates and other
products bearing franchisor's logo).
25.  See ¶1720.

higher ink prices serves to bring more printer customers into the market, although it also distorts usage decisions at the margin, because the ink price is higher. In addition, the increase in the seller's output of printers can reduce production costs substantially if a significant proportion of printer design and production costs are fixed.

Variable-proportion ties have been attacked on the premise that they "reallocat[e] output from high-value buyers to low-value buyers." But the argument is based on the premise that they are a form of third-degree price discrimination or that the difference between second- and third-degree price discrimination is merely "semantics."[26] That premise can then lead to the hypothesis that variable-proportion reduce consumer welfare even if they increase output, because the increased output accrues to consumers who place a lower value on the tied product (or the tying-tied combination), while higher prices and possible reduced output accrues to other higher-value consumers.

As noted above, however, the argument has no application to second-degree price discrimination, which covers all ties in which tying and tied product are offered at the same nominal price to all customers.[27] To be sure, some ties may also contain attributes of third-degree price discrimination, but they would have to be more complex than the ordinary tie. For example, a manufacturer of printers and ink might tie printers and ink but also charge a higher price for either or both products to commercial users than to home users. In that case the printer/ink tie would be an instance of second-degree price discrimination, while the differential price to commercial and home users would be an instance of third-degree price discrimination.

To be sure, second-degree price discrimination creates its own distortions from perfect competition, but they are much different distortions than third-degree price discrimination encounters, and there is at least as much reason for thinking that they "distort" the dominant firm's output back toward the competitive level rather than vice versa. The one problem second-degree price discrimination does *not* typically encounter is the discontinuities in marginal

substitution that are char[...]
For example, if first-class f[...]
get as she does it more f[...]
or all of her purchases to [...]
tions in a second-degree [...]
the scheme comes close[...]
fect," price discrimination [...]
pays his or her reservati[...]
competitive level.[28] In pr[...]
anything close to that le[...]
proportion ties theoretic[...]
depending on the number[...]

At the same time, m[...]
tute first-degree price [...]
printer/ink tie could ac[...]
number of *copies* a perse[...]
that different purchasers [...]
copy. For example, both a[...]
rities offerings and a pr[...]
print 1,000 pages weekly [...]
same tying arrangement[...]
print. But given what is [...]
printouts at many dollars[...]
ues them at only a few [...]
capture these differences [...]
some consumers to reta[...]
printer maker would ad[...]
discrimination as betw[...]

Most variable-pr[...]
edly benign without e[...]
cost savings, including [...]
quality control that u[...]
variable-proportion tie[...]

---

26.   Elhauge, *Tying, Bundled Discounts*, 123 Harv. L. Rev. at 431 & n.89.
27.   Note that the argument might apply to other types of vertical restraints, such as vertical customer division or field-of-use restrictions in IP. For example, a supplier who segregates dealers serving businesses from those that serve homeowners may be engaging in third-degree price discrimination. In general, this has not been a rationale for condemning either vertical restraints or field-of-use restrictions.

28.   Pigou, Economics [...]

It is readily seen that the c[...]
approximate towards those[...]
number of different p[...]
increases; just as the area[...]
of the circle as the numbe[...]

substitution that are characteristic of third-degree discrimination. For example, if first-class flying is too straining on a person's budget as she does it more frequently, she is always free to shift part or all of her purchases to coach class. As the number of classifications in a second-degree price discrimination scheme is increased, the scheme comes closer to approximating first-degree, or "perfect," price discrimination, under which each individual customer pays his or her reservation price and output increases toward the competitive level.[28] In practice, few second-degree schemes reach anything close to that level of classification. However, variable-proportion ties theoretically permit an infinite number of degrees depending on the number of tied units a purchaser buys.

At the same time, most variable-proportion ties do not constitute first-degree price discrimination. While a well-executed printer/ink tie could accurately make prices proportional to the number of *copies* a person prints, it could not control for the fact that different purchasers place different values on each individual copy. For example, both a law firm drafting legal opinions on securities offerings and a printer of handbills about garage sales might print 1,000 pages weekly. As a result, if they purchased under the same tying arrangement they would pay the same amount per print. But given what is at stake, the law firm might value the printouts at many dollars per page, while the handbill printer values them at only a few cents. The variable-proportion tie will not capture these differences in valuation and will thus permit at least some consumers to retain surpluses. In order to capture more, the printer maker would additionally have to engage in third-degree discrimination as between the law firm and the handbill printer.

Most variable-proportion tying arrangements are undoubtedly benign without even considering production or distribution cost savings, including economies of joint provision or improved quality control that independently justify ties. Further, even a variable-proportion tie that reduces output cannot be shown to

---

28.   Pigou, Economics of Welfare at II.17.11:

It is readily seen that the effects of monopoly *plus* discrimination of the second degree approximate towards those of monopoly *plus* discrimination of the first degree, as the number of different prices, which it is possible for the monopolist to charge, increases; just as the area of a polygon inscribed in a circle approximates to the area of the circle as the number of its sides increases. . . .

reduce welfare except in the unusual case where no customer benefits from the tie.[29]

Finally, the economies that can result from such ties are pervasive and can be substantial, thus explaining the wide variety of ties that exist in competitively structured markets, including those for franchises and computer printers.[30] For example, the higher output that results from lower tying-product prices can also produce lower costs if a significant portion of tying-product production costs are fixed. As a result, the core concern of exclusive dealing and tying-arrangement analysis is not leverage. Rather, it remains concerned principally with the unreasonable exclusion of rivals, which is also the core concern of §2 of the Sherman Act. That statute does not reach simple output-reducing practices. But market exclusion is unlikely to result from practices imposed by a single firm unless it meets the market-share standards ordinarily required for unlawful monopolization.

**1711d. Package pricing under differential customer demand.**[31] Ties might be used in yet other ways to aid price discrimination. For example, a package price might enable a supplier to maximize revenues when it cannot practicably discriminate in price but its customers place differential values on the components in the package.[32] This type of price discrimination applies even to fixed-proportion ties. However, it does not offer an independent ground for antitrust condemnation (although a tie that discriminates in this way might incidentally cause anticompetitive foreclosure). Indeed, such a practice can be output increasing and improve consumer welfare, depending on the nature of customer demand.

To illustrate, suppose a monopolist has two products, Alpha and Beta and that their costs of production are zero. Two customers want both products and are willing to pay more than cost, but

---

their willingness to pu...
following schedule:

Customer 1
Customer 2

In this case the optimal...
age the two products to...
ucts to both customers...
surplus is 1; customer 2...

Now suppose that t...
den, which means that...
Beta individually. One c...
of 10 for Alpha and 11 for...
purchase Alpha and on...
the seller's surplus woul...
be 0.

Alternatively, the sell...
5 for Beta. In this case bo...
ucts. The seller's surplus...
consumer surplus of 7 an...
surplus of 6. Total consum...

But the important thing...
not an option a rational se...
giving itself returns of 21 an...
dling were permitted, thou...
to 28, and consumers' surpl...
That is to say, not only wou...
welfare, it would also inc...
comes can vary, however, w...
tion of the buyers' preferen...

To be sure, we might p...
in which the monopolist m...
prices to both customers. B...
would not do that, and we o...
only forbade tying but also...

---

29. See Erik N. Hovenkamp & Herbert Hovenkamp, Tying Arrangements and Competitive Harm, 52 Ariz. L. Rev. 925 (2010), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1443284.

30. On the sources of cost savings and product improvement that result from ties, see ¶¶1712-1718.

31. See also ¶1717e on average pricing.

32. See George J. Stigler, The Organization of Industry 165-166 (1968); George J. Stigler, United States v. Loew's, Inc.: A Note on Block-Booking, 1963 Sup. Ct. Rev. 152 (1963). Such packaging is sometimes referred to as "simulated" price discrimination because it does not involve true price discrimination at all, but only the sale of a package to two different buyers at the same price where the buyers place different values on different elements of the package. See Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and Its Practice §10.6e (4th ed. 2011); William James Adams & Janet L. Yellen, Commodity Bundling and the Burden of Monopoly, 90 Q.J. Econ. 475 (1976).

33. Professor Elhauge gives an...
Einer Elhauge, Tying, Bundled Dis...
Theory, 123 Harv. L. Rev. 397, 406 (20...

(not lessees or licensees)[45] pay different prices[46] for "commodities"[47] (not land or services or intangibles) of "like grade and quality"[48] where at least one sale crosses a state boundary.[49] In fact, the tying product is often land, services, or an intangible and thus not a "commodity" within the meaning of the Robinson-Patman Act. Moreover, the customer is often a lessee or licensee and thus not a "purchaser" under that statute. Furthermore, tying does not typically result in any "discrimination" within that Act's technical meaning. When sold only with a tie, the tying product itself bears a uniform price, as does the tied product. For each product separately, there is no difference in price to trigger the Robinson-Patman Act.

## ¶1712.    Double marginalization; other price or output effects in secondary markets

**1712a. Introduction and summary.** Tying can often be explained as a control device addressing imperfections or irregularities in a secondary market, which is usually the market for the tied product. Most but not all of these explanations are competitively benign. First, ¶b shows that tying can benefit consumers by eliminating or reducing the impact of double marginalization. Then ¶c examines the related problem of ties that limit the substitution of "inefficient" or inferior inputs for the tying product. While the double-marginalization problem is common and serves to justify a wide variety of ties, the input-substitution problem is too rare and the effects are too ambiguous to determine the general legal status of tie-ins. As a result, input substitution should be ignored as a ground to condemn an otherwise lawful tie or to save an otherwise unlawful one except in the very rare case of clear net effects. After that, ¶d considers tie-ins that evade state or federal maximum-price controls. Although such evasion does not prevent or limit competition, antitrust law should not undermine regulation by blessing such ties. Nor as a general matter should antitrust law take up the regulatory mission by condemning such ties for the regulation-evasion reason alone. Antitrust has little reason for

45.  See ¶2312.
46.  See ¶2320a.
47.  See ¶2314.
48.  See ¶2315.
49.  See ¶267c, d.

concern when tying evades formal or informal private price ceilings, as examined in ¶e. The same mechanism that allows tying to attempt evasion of price ceilings might also deceive consumers, as ¶f shows, by understating the true price of the tying product. Any offense here is akin to false advertising, which is generally ignored by antitrust law, unless deception significantly supports a monopoly. Finally, ¶g suggests a prima facie justification for the tie-in that is genuinely needed to reward a "combination" patent of separately marketable components.

Whether proof, generally or in specific cases, of incremental exploitation of preexisting power should itself suffice to condemn tying has already been discussed.[1] Here, we ask how such exploitation — other than through price discrimination[2] — can be aided by a tie, whether the exploitation exceeds that which would occur without the tie, and whether any such incremental exploitation is accompanied by other anti- or procompetitive features. Often ties that a defendant develops in order to exploit irregularities in a second market produce profits, not from monopoly, but from higher output and lower prices, benefitting consumers as well.

**1712b. Elimination of double marginalization; "reverse leveraging."** Many "classic" tying cases involved tied products that were common staples such as button fasteners, canned ink, dry ice, or salt. These products were sold in competitive markets, presumably at prices very close to cost. For most of them the most likely explanations for the tie were quality control or price discrimination, both with competitively benign results in the great majority of situations. When the tied good is sold in a noncompetitive market, however, an additional consumer-welfare-enhancing result is likely to obtain — namely, the elimination of double marginalization, which occurs when separate sellers of complementary products each has market power. The double-marginalization result — sometimes named the "Cournot effect" after its discoverer — occurs only when both products are sold at prices above the competitive level. It can apply in both the vertical context, such as when a monopoly manufacturer must distribute through a retailer market that is subject to monopoly, oligopoly, or

¶1712.  n.1.  See ¶1710c.
2.  See ¶1711.

informal private price ceil-
...ism that allows tying to
...also deceive consumers, as
...of the tying product. Any
..., which is generally ig-
...significantly supports a
...acie justification for the
...a "combination" patent

...cases, of incremental
...self suffice to condemn
..., we ask how such
...crimination² — can be
...eeds that which would
...incremental exploita-
...competitive features.
...to exploit irregulari-
...from monopoly, but
...ting consumers as

...lization; "reverse
...ved tied products
...eners, canned ink,
...petitive markets,
...of them the most
...rol or price dis-
...ults in the great
...d in a noncom-
...sumer-welfare-
...elimination of
...rate sellers of
...The double-
...ournot effect"
...ts are sold at
...th the vertical
...st distribute
...oligopoly, or

collusion,[3] but it also occurs in situations involving complements, such as printers and ink cartridges, or hospitals and physicians, or many medical devices that include both durable and reusable components. Indeed, the problem is generally more serious in the complementary situations, because often firms offering complementary products are not in a good position to negotiate with one another, while the participants in a vertical chain of distribution bargain with each other all the time.[4]

In cases where both tying and tied products are subject to some market power, the profit-maximizing price of a seller who offers both products in a bundle is typically lower than the sum of the individual profit-maximizing prices of two sellers, each of which sells only one of the products. Outside the franchise context, which still involves commodity tying, most ties today involve manufactured tied products subject to at least some product differentiation, and typically nontrivial fixed costs. In all such cases the double-marginalization argument presumptively applies and suggests another reason why ties should not be condemned except after a full rule of reason analysis. The typical result of eliminating double marginalization is that output of both the tying and the tied

3.   See ¶758, which develops the theory and provides a graphic illustration, mainly in the vertical integration context. In general, as each separate monopolist of complementary goods reduces output to its profit-maximizing level, market output for the complementary package goes down further and prices rise further. See W. Kip Viscusi, Joseph E. Harrington, Jr., & John M. Vernon, Economics of Regulation and Antitrust 238-241 (4th ed. 2005); William F. Baxter & Daniel P. Kessler, Toward a Consistent Theory of the Welfare Analysis of Agreements, 47 Stan. L. Rev. 615, 625 (1995).

In the context of complementary products rather than vertical integration the phenomenon is sometimes referred to as the "Cournot complements" problem because it is derived from Cournot's analysis of pricing by firms that produce complements rather than substitutes. See Augustin A. Cournot, Researches into the Mathematical Principles of the Theory of Wealth 99-116 (Nathaniel T. Bacon trans., Macmillan 1897) (1897); and see Daniel A. Crane, Mixed Bundling, Profit Sacrifice and Consumer Welfare, 55 Emory L.J. 423, 434-436 (2006); Patrick Rey & Jean Tirole, A Primer on Foreclosure, in 3 Handbook of Industrial Organization ch. 33 (Mark Armstrong & Robert H. Porter eds., 2007); Giuseppe Dari-Mattiacci & Francesco Parisi, Substituting Complements, 2 J. Competition L. & Econ. 333 (2006); Francesco Parisi & Ben Depoorter, The Market for Intellectual Property: The Case of Complementary Oligopoly, in The Economics of Copyright: Developments in Research and Analysis 162 (Wendy J. Gordon & Richard Watts eds., 2003); James M. Buchanan & Yong J. Yoon, Symmetric Tragedies: Commons and Anticommons, 43 J.L. & Econ. 1 (2000); Herbert Hovenkamp, Harvard, Chicago and Transaction Cost Economics in Antitrust Analysis, 55 Antitrust Bull. 613 (2010), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1592476.

4.   The problem is particularly prevalent in high-technology markets where the degree of interaction between products is significant and compatibility concerns limit the range of complementary choices. See Christina Bohannan & Herbert Hovenkamp, Creation Without Restraint: Promoting Liberty and Rivalry in Innovation ch. 2 (2011).

good increase and consumers pay lower prices. The result is a welfare improvement under both the total welfare and consumer welfare tests for competitive harm.

Consider the monopolist (or cartel) of one product that is used with a second, complementary product that is monopolized by a different firm (or subject to a cartel or oligopoly). If the producers of these two products are unable to coordinate their output, the result is likely to be "double marginalization," which generally results in lower output and higher prices than if the first firm monopolized both products. For example, some critics of a proposed divesture of Microsoft's Internet Explorer browser from its Windows operating system[5] argued that if the two products were sold by different firms, each having significant market power, then the combined price of the two would be higher than if they were offered together by a single firm.[6] The basic theory has also been applied both in the United States and Europe in analyzing mergers between manufacturers of complementary products. The usual result is that the post-merger firm selling the two products together charges a lower price than the separate firms did prior to the merger.[7]

Because power is required in both markets, double marginalization is unlikely to be of particular concern if the tied product is a commodity such as dry ice or salt. However, it may produce

potent savings
or innovation or
result in prices
occur both when
and when it is
result from elim

To illustrate,
dictionary and a
petitive markets
make, a thesauru
price of a bundle
would each try to
nary maker might
maker would char
$10 on the assum
as well. That out
is suboptimal for
those that did wo
nary maker and th
maximizing" level
if a single firm sol
package price of $
maximizing level.
at a price of $20, or
$10, respectively, b
$20.[10]

When a monop
the effects of a pri
the lower price ag
number of sales. Fo
example might cha

---

5. See *United States v. Microsoft Corp.*, 87 F. Supp. 2d 30 (D.D.C. 2000), aff'd in part, rev'd in part, 253 F3d 34 (D.C. Cir.), cert. denied, 534 U.S. 952 (2001). The government proposed this divestiture and the district court accepted the proposal, but the remedy was vacated by the D.C. Circuit. (To the extent it is relevant, H.H. was consulted by the federal and some state agencies.)

6. See Richard J. Gilbert & Michael L. Katz, *An Economist's Guide to U.S. v. Microsoft*, 15 J. Econ. Persp. 25 (2001) ("the sum of the operating system and application prices set by an integrated monopolist will be lower than the sum of those prices when set separately by two independent firms each with significant market power"); Stan J. Liebowitz, An Expensive Pig in a Poke: Estimating the Cost of the District Court's Proposed Breakup of Microsoft, 9 Geo. Mason L. Rev. 727 (2001); Linda R. Cohen & Roger G. Noll, Intellectual Property, Antitrust and the New Economy, 62 U. Pitt. L. Rev. 453, 457 (2001); John E. Lopatka & William H. Page, Monopolization, Innovation, and Consumer Welfare, 69 Geo. Wash. L. Rev. 367 (2001). And see R. Venkatesh & W. Kamakura, Optimal Bundling and Pricing Under a Monopoly: Contrasting Complements and Substitutes from Independently Valued Products, 76 J. Bus. 211 (2003). On double marginalization in a vertical setting, see Roger D. Blair & David L. Kaserman, Law and Economics of Vertical Integration and Control 31-34 (1983); Frederick R. Warren-Boulton, Vertical Control of Markets (1978); Meyer Burstein, A Theory of Full-Line Forcing, 55 Nw. U. L. Rev. 62 (1960).

7. See, e.g., Nicolas Economides & Steven C. Salop, Competition and Integration Among Complements, and Network Market Structure, 40 J. Indus. Econ. 105, 106 (1992). See also Barry J. Nalebuff, Bundling: GE-Honeywell, in The Antitrust Revolution: Economics, Competition, and Policy 388, 392 (John E. Kwoka & Lawrence J. White eds., 4th ed. 2004); Jay Pil Choi, A Theory of Mixed Bundling Applied to the GE-Honeywell Merger, 16 Antitrust (2001).

8. For example, if
formed a cartel and are e
benefit both itself and co
amounts of gasoline. See
and Vertical Integration
581-584 (1996); Michael
92 Econ. J. 129 (1982).

9. For useful gra
Market for Intellectual P

10. See Joseph J. Sp
(1950); Bruce H. Kobay
modity Bundling by Fra
(2005).

ices. The result is a elfare and consumer

product that is used is monopolized by a oly). If the producers ate their output, the on," which generally han if the first firm ome critics of a pro- er browser from its e two products were market power, then er than if they were heory has also been e in analyzing merg- products. The usual the two products e firms did prior to

double marginal- the tied product is er, it may produce

DC. 2000), aff'd in part, The government pro- but the remedy was onsulted by the federal

ce to U.S. v. Microsoft, plication prices set by hen set separately by Liebowitz, An Expan- Proposed Breakup of G. Noll, Intellectual (2001); John E. Lopatka are, 69 Geo. Wash. L. undling and Pricing Independently Valued setting, see Roger D. on and Control 31-34 Meyer Burstein, A

on and Integration 105, 106 (1992). See olution: Economics, eds, 4th ed. 2004); ell Merger, 16 Anti-

potent savings via tying if the tied product is subject to fixed costs or innovation or manufacturing economics of scale that typically result in prices above short-run costs. Double marginalization can occur both when the proportion of sales in the two markets is fixed and when it is variable,[8] so the consumer welfare savings that result from elimination of double marginalization applies to both.

To illustrate, suppose that most authors prefer to have both a dictionary and a thesaurus, and both are sold in imperfectly competitive markets, such as an oligopoly. A dictionary costs $10 to make, a thesaurus costs $8 to make, and the profit-maximizing price of a bundle is $20. Different firms selling the two products would each try to capture the overcharge. For example, the dictionary maker might charge $12 on the theory that the thesaurus maker would charge $8. But the thesaurus maker would charge $10 on the assumption that the dictionary maker would charge $10 as well. That outcome, which would yield a package price of $22, is suboptimal for everyone.[9] Fewer consumers would buy and those that did would pay too much. Output for both the dictionary maker and the thesaurus maker would fall below the "joint-maximizing" level. In this case consumer welfare would increase if a single firm sold both the dictionary and the thesaurus for a package price of $20, which would also be that firm's profit-maximizing level. The firm could either package the two together at a price of $20, or it could sell each separately at prices of $12 and $10, respectively, but also bundle them at a discounted price of $20.[10]

When a monopolist or oligopolist in one market contemplates the effects of a price cut, it calculates the decreased revenue from the lower price against the increased net revenue from a higher number of sales. For instance, the dictionary maker in the above example might charge $12, and calculate that a $2 price cut would

8. For example, if a monopoly gasoline refiner is selling to gasoline stations that have formed a cartel and are extracting a high markup, the refiner can eliminate the markup and benefit both itself and consumers, even though different members of the cartel sell different amounts of gasoline. See James L. Hamilton & Ibrahim Mqasqas, Double Marginalization and Vertical Integration: New Lessons from Extensions of the Classic Case, 62 S. Econ. J. 567, 581-584 (1996); Michael Waterson, Vertical Integration, Variable Proportions and Oligopoly, 92 Econ. J. 129 (1982).

9. For useful graphical and mathematical elaborations, see Parisi & Depoorter, The Market for Intellectual Property, note 3.

10. See Joseph J. Spengler, Vertical Integration and Antitrust Policy, 58 J. Pol. Econ. 347 (1950); Bruce H. Kobayashi, Does Economics Provide a Reliable Guide to Regulating Commodity Bundling by Firms? A Survey of the Economic Literature, 1 J. Comp. L. & Econ. 707 (2005).

¶1712    Tying Arrangements and Related Practices

yield 1,000 additional dictionary sales. However, if the dictionary maker operated in both markets and tied the dictionary to the thesaurus, complementary products both sold at above cost, then a $2 price cut might yield 1,000 additional dictionary sales plus 1,000 additional thesaurus sales. That is to say, the profit-maximizing price would be lower when a single firm controlled both products and could tie them together. This result could also come about if the sellers of the two products were separate but were able to coordinate their behavior. They would jointly maximize by sharing both the output increase and the price reduction, as in the vertical integration context. Note, however, that the gains accrue only by tying. The seller does not profit simply because he makes both dictionaries and thesauruses, but rather because the output increase in dictionaries attaches to thesauruses as well.

A rule condemning tying in this situation would reduce both producer and consumers' surplus unless the court also forced the firms to charge less than their individual profit-maximizing prices. One might assume that the dictionary maker could charge $12 for the dictionary and separately sell the thesaurus at the marginal cost price of $8. But that result would be no better than bundling, and the seller could not be expected to do it, because some buyers would purchase its thesaurus at the competitive price and then go elsewhere for their $12 dictionary. That is to say, the lower price on the thesaurus is profitable only on the premise that the seller is obtaining the dictionary sell as well, and vice versa.

This result very likely explains many bundled discounts that occur in markets where the rival is operating in an oligopoly market and enjoying fairly high markups — a common characteristic of even modestly concentrated American markets.[11] The firm making the two products sells them individually at the single-product oligopoly price, but bundles them at a profit-maximizing price that is lower than the sum of the individual profit-maximizing prices when offered by different firms.[12]

11.  See Robert E. Hall, The Relation Between Price and Marginal Cost in U.S. Industry, 96 J. Pol. Econ. 921 (1988).

12.  See, e.g., Masimo Corp. v. Tyco Health Care Group, L.P., No. CV 02-4770 MRP, 2004 U.S. Dist. LEXIS 26916, at *27 (C.D. Cal. June 9, 2004) (plaintiff challenging defendant's discount practices that included bundled discounts had profit margins of between 45% and 83% during the period of claimed exclusion). The Ninth Circuit eventually entered an order finding liability on some claims but not others. Masimo Corp. v. Tyco Health Care Group, L.P., 350 Fed. Appx. 95, 2009 WL 3451725 (9th Cir. Oct. 28, 2009).

Or consider a hypothetical situation resembling the one in *Jefferson Parish*, where the Supreme Court approved a hospital-anesthesiologist tie.[13] Suppose a dominant hospital required surgical services from anesthesiologists, a complementary product that was locally sold under conditions of oligopoly. Absent coordination, both the hospital and the anesthesiologists would charge too high a price, the output of surgery would accordingly be reduced, and consumers would be harmed. The hospital could negotiate a lower rate for anesthesiology services, however, if it promised a particular anesthesiologist to use its services exclusively. Output would then rise to the "single monopoly" level, prices would fall, and the hospital, the anesthesiologist, and its patients would all benefit. In such cases of "reverse" leveraging, tying causes a lower rather than higher price.

Results similar to this are reasonably likely whenever both the tying and tied markets are subject to pricing above the competitive level and sufficient coordination between producers of the two products is unlikely — although even coordination would very likely take the form of tying.[14] The markets need not be monopolized. As a result, the savings from elimination of double marginalization can apply to almost any market in which the tied product is not a commodity sold at the competitive price.[15]

Ties that at first glance appear to be accompanied by price increases in the tying product can also be used to control double marginalization, although such arrangements appear to be far less common. Such ties are in fact two-part tariffs, in which the seller charges a fixed price for one component and then sells a linked component at a competitive price. For example, suppose a firm has significant market power in its fuel-efficient car, which is best distributed by independent dealers, many of which have power in their local markets. If the seller charges its monopoly price to the dealers, the dealers will assess a second markup to their customers, producing double marginalization, reduced output, and higher prices. Suppose, however, that the manufacturer builds the monopoly upcharge into a fixed franchise fee and then sells the

---

13. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984).

14. For example, a dictionary maker and a thesaurus maker could sell packages jointly, agreeing on how to divide the surplus.

15. See Herbert Hovenkamp, Harvard, Chicago and Transaction Cost Economics in Antitrust Analysis, 55 Antitrust Bull. 613 (2010), available at *http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1592476*; Erik N. Hovenkamp & Herbert Hovenkamp, Tying Arrangements and Competitive Harm, 52 Ariz. L. Rev. 925 (2010), available at *http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1443284*.

cars to the dealers at the competitive price. In this case the dealer will still take its markup, but that will reflect only its own power and not that of the manufacturer. Further, because the franchise fee is a fixed cost to the dealer, the dealer can earn more by increasing the volume of cars sold in the time period covered by the fee. The term "tying" is apt because the manufacturer will not sell the cars at this price to those who have not paid the fee. That is to say, the competitively priced *cars* are the tying product while the franchise fee is the tied product, which is the reverse of the usual claim in the franchise context. The impact of tying in this case is higher output and lower car prices than would occur if the manufacturer simply sold the cars at wholesale at its profit-maximizing price.

While the theory of double marginalization is generally thought to be robust,[16] actual output effects in particular cases are generally impossible to measure. As a general proposition, however, the theory shows that "linking" two monopolized markets by tying typically does not result in increased consumer or economic harm. Indeed, it is much more likely to be beneficial. Given the present state of empirical analysis, we would not favor elimination of double marginalization as a defense to a tie that is objectionable on other grounds unless there is specific evidence that the tie results in greater output and that its results could not be duplicated in some less objectionable manner.

**1712c. Limiting substitution of inefficient inputs.** Substitutes, including imperfect ones, limit the ability of a defendant to restrict output and to exploit customers. As it raises price above the competitive level, even the sole supplier of an important product will induce some users to shift to the substitute; at some point, additional price increases would sacrifice profits rather than increase them. Thus, such shifts, even to an inferior substitute, limit the detrimental price-output effects of the defendant's monopoly. At the same time, however, such shifts waste society's resources by increasing the production of goods that might not be produced at all when competitive prices prevail.

16. See Jean Tirole, The Theory of Industrial Organization 174-176 (1988), who notes that the theory is very general. See also David Gilo, Retail Competition Percolating Through to Suppliers and the Use of Vertical Integration, Tying and Vertical Restraints to Stop It, 20 Yale J. Reg. 25, 54 (2003) (use of tying to limit double marginalization); Sreya Kolay & Greg Shaffer, Bundling and Menus of Two-Part Tariffs, 51 J. Indus. Econ. 383 (2003) (comparing bundling and two-part tariffs). Microsoft uses such a strategy to keep computer makers from assessing too high a markup on its Windows operating system. See Michael P. Akemann, Microsoft's Licensing Agreements: Theory and Evidence on the Sale of MS-DOS and Windows, 24 J. Corp. L. 553, 561 (1999).

this case the dealer
only its own power
...e the franchise fee
...more by increasing
...ered by the fee. The
...ill not sell the cars
...That is to say, the
...while the franchise
...the usual claim in
...case is higher out-
...the manufacturer
...aximizing price.
...tion is generally
...articular cases are
...proposition, how-
...olized markets by
...umer or economic
...ficial. Given the
...ot favor elimina-
...a tie that is objec-
...evidence that the
...uld not be dupli-

...inputs. Substi-
...of a defendant to
...ises price above
...important prod-
...; at some point,
...ts rather than
...rior substitute,
...the defendant's
...waste society's
...might not be

Some ties can prevent these shifts and thus harmfully remove a constraint on monopoly pricing or beneficially eliminate a wasteful misallocation of resources. Unable to know whether society generally suffers or benefits from ties limiting input substitution, this function does not support general illegality or legality for tying. Because the net balance between these harmful and beneficial tendencies is not likely to be resolved confidently in particular cases, limiting input substitution should presumptively be ignored as a reason to condemn a tie that is otherwise lawful or to save one that is otherwise unlawful.

To illustrate, suppose that in a competitive market a certain type of glue is made up of 50 percent $D$, a drying agent, and 50 percent $B$, a bonding agent. Different proportions work somewhat less well, and in a competitive market $B$ costs more than $D$, so the glue makers optimize with the 50-50 mix. But now suppose that $D$ is monopolized, and the price is doubled. As a result, the glue makers would now prefer to make a glue that consists of 70 percent $B$ and 30 percent $D$. This mix (1) would not be the consumers' first choice in a competitive market; and (2) represents an inefficient allocation of resources in that it does not reflect the relative demand for these two products in a competitive market.

At the same time, the altered mix reduces the demand for $D$, reducing the $D$ monopolist's profits. That firm might then respond by (1) pre-mixing $B$ and $D$ in the original 50-50 mix and selling it only in that form — a form of "technological tie";[17] or (2) refusing to sell $D$ unless buyers agreed to take all of their $B$ requirements from the seller as well at a monopoly price designed to restore the attractiveness of the 50-50 mix.[18]

The two practices just described have the harmful effect of forcing buyers to take the full 50 percent of the monopolized drying agent, thus expanding the sales of the monopolized product; but they also have the socially beneficial effect of restoring the product mix to that which it would be when both $B$ and $D$ were sold competitively.[19]

---

...76 (1988), who notes
...ercolating Through
...raints to Stop It, 20
...roya Kolay & Greg
...(2003) (comparing
...computer makers
...Michael P. Ake-
...e of MS-DOS and

17. See ¶1757. A technological tie occurs when the tying vehicle is not a contract but rather a manufacturer-produced physical combination of the two products. For example, a computer manufacturer wishing to tie its hardware to its software could either (1) use a contract to require each purchaser of one of its computers to buy a specified set of its programs; or (2) pre-load the software on the computers' hard drives, set a package price, and refuse to sell computers without the pre-installed package.

18. This would actually be a combination of tying and exclusive dealing.

19. For the relevant mathematics and diagrams, see Roger D. Blair & David L. Kaserman, Law and Economics of Vertical Integration and Control (1983).

But known instances of tying for this purpose are extremely rare. Further, determining whether the offsetting economic effects are on balance a gain or a loss requires precise knowledge of the demand curves facing both products and the effects of substitution on the demand for other products. No procedure for assessing net welfare effects is within the competence of the antitrust tribunal. This rationale thus serves neither to condemn ties that are otherwise lawful nor to save those that are otherwise unlawful, except perhaps in a very rare case in which the net effects are very clear.

**1712d.  Evade government price ceiling.**[20]  1. *The mechanism.*  In two common situations, governments put a ceiling on prices to protect some customers from natural shortages in competitive markets and from contrived shortages in monopolistic markets. When demand suddenly explodes or when normal supplies are interrupted by strikes, boycotts, or war, market prices will rise until demand retreats to meet the available supply. To prevent suppliers from obtaining a windfall and ostensibly to protect buyers, the government may insist that pre-shortage prices be maintained. In the other common case, a monopolist is fully capable of supplying demand at competitive-level prices but chooses to restrict supply in order to drive the price up to the monopoly level. When the government imposes a lower ceiling, the demand will exceed the supply offered at the previous monopoly price. Once it can no longer elevate the price by limiting supply, the monopolist will maximize profits by producing all that the market will demand at the ceiling price.

When a seller is unable to "exploit" its product's full revenue potential through open price increases, the seller may seek indirect means of charging more for that product. One way of doing so is to sell a controlled tying product only as part of a package with a tied product. This will be profitable to the seller when the tie enables it to charge more for the second product or to sell a greater volume.

During World War II, for example, the prices of consumer goods were limited by federal price controls. Many products were in short supply, especially imported products, such as Scotch whiskey. Although wholesalers and retailers could not legally raise Scotch prices to market-clearing levels, they profited from the

---

20.  The issues are very different when a tie is used to escape a *minimum* price floor set by a regulatory agency, a cartel, or a tacit coordination among oligopolists. See ¶1715b-c.

shortage by selling a bottle of Scotch only to those who also purchased a bottle of inferior whiskey. The package price was the sum of the lawful price of each of its components and was therefore nominally lawful. Nevertheless, suppliers of Scotch thereby increased their sales volume for the inferior product and thus received profits they would not otherwise have earned.[21]

*1712d2. Assessment.* Evading government price ceilings is surely not a social benefit of tying. Even if a particular set of price controls seems misguided, legislators or regulators acting within their lawful domains should not be undermined by other legal regimes. Accordingly, an otherwise unlawful tie cannot be justified as a corrective to what the defendants or the antitrust court may regard as unwise government price ceilings.

Because price ceilings are rare in our economy, the mere possibility that ties might be used to evade such ceilings does not support general or even presumptive condemnation of all ties.[22] Nor should antitrust tribunals test a regulated firm's particular tie for the evasion of a price ceiling. Such tribunals are no better able than the regulatory authorities to examine a particular evasion. If the regulators choose not to reach it, they have introduced some indirect flexibility in their regime. If they cannot reach it, then the underlying legislation or appropriation has created such flexibility, perhaps consciously as wise public policy or as a political compromise in the enactment.

These reasons against appraising such evasion in the particular case apply, though with less force, in formulating general antitrust rules to govern ties in regulated markets. For example, an earlier chapter suggested that some vertical integration by a regulated monopolist might be enjoined by antitrust law in order to forestall certain evasions of the regulatory regime.[23] One of the reasons was that integration allowed the regulated monopolist (but not monopolists generally) to depress production and exploit consumers in ways that they could not otherwise accomplish and that

---

21. Cf. *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998), in which a telephone company used an exclusive deal with an equipment removal firm at a public price but with secret kickbacks in order to avoid a maximum phone rate. The arrangement was challenged by a rival as an antitrust "boycott," but it could just as easily have been challenged as a tie. See ¶¶1902d, 2201b, 2203c, 2205.

22. The exception is in the public utility area, where many retail prices are regulated, such as for electricity, gas, or local phone service. In these cases the utility may be tempted to tie unregulated services at a supracompetitive price — such as added on phone services, in-house maintenance, and the like. Whether such ties should be permitted is a problem of regulatory design, not of antitrust.

23. See ¶787.

¶1712    Tying Arrangements and Related Practices

regulators may not normally address through divestiture. Somewhat similarly, it might be argued that firms subject to ceiling price regulation should be enjoined generally from tying. Nevertheless, the special remedy of treble damages was not created by Congress to enforce state or federal price ceilings. The appropriate damage and criminal remedies for violating a regulation are determined by the regulatory statute alone.[24]

**1712e.   Evade private price ceiling.**   We have just seen that an enhanced price on tied product B could be a premium on tying product A in order to evade a government regulatory price ceiling on the tying product. In the same way, a tie might evade a privately arranged price ceiling. Suppose, for example, that a dealer enjoying a local monopoly wishes to charge the monopoly price for product A to maximize its own profits. Because the resulting decline in volume injures the manufacturer who supplies that product, it stipulates the maximum price that the dealer may charge — a practice that is governed by the rule of reason and is generally lawful.[25] To evade that control, the dealer may resell A at a nominally low price but only to those who purchase product B at an enhanced price. The resulting tie thus exploits consumers.

However, this exploitation does not ordinarily call for condemning the tie. The usual tying danger of foreclosure has not been shown to be present. Further, the manufacturer itself is the best police officer of its own distribution system, and antitrust is not suitable as a contract enforcement device.

Nor, however, does such evasion justify a tie that is otherwise unlawful. Enabling the dealer to exploit consumers in violation of its maximum resale price maintenance agreement is surely not procompetitive.

**1712f.   Deceptively understate price.**   Instead of misleading regulators or upstream suppliers, a tie might obscure the height of the tying product price from the defendant's own customers. Suppose, for example, that the defendant manufacturer sells a luxury

---

24.   In a footnote in *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 28 n.47 (1984), the Supreme Court noted the lack of any evidence that the defendant "increased the social costs of its market power," and pointed out that the challenged tie was not used "to evade price control in the tying product through clandestine transfer of the profit to the tied product." The last clause was quoted from Justice White's somewhat ambiguous dissenting opinion in *Fortner Enterprises v. United States Steel Corp.*, 394 U.S. 495, 513 (1969) (White, J., dissenting, though not on this point). Justice White had listed evasion of price control as a possible detriment of tying. See also *Casey v. Diet Ctr.*, 590 F. Supp. 1561, 1570 (N.D. Cal. 1984) (commenting that the arrangement it approved was "not a device to evade price control").

25.   See Ch. 16C.

automobile for $40,000 in competition with several others, that it requires dealers to use only the defendant's repair parts, that these parts are priced higher than rival parts supplied by others, and that most consumers rely on these dealers for repairs. Perhaps the premium price on the defendant's parts reflect a superior quality needed for proper functioning of the car.[26] If not, the supracompetitive price for parts may be a form of price discrimination against consumers who are willing to pay more for the car because they drive greater distances and thus need more replacement parts.[27] However, price discrimination cannot be the full explanation when the greatest premium seems to be charged for post-accident body parts — so-called crash parts — which may not reflect intensity of use. The remaining explanation is that supracompetitive prices for repair parts are a hidden premium on the car itself. The defendant invites consumers to compare its car with rival cars in the $40,000 price range while actually charging them more than that through the premium on repair parts. The Supreme Court's *Kodak* decision may also reflect such a practice — by effectively tying aftermarket parts to the original machine and thus making higher returns on goods whose prices are not readily capable of comparison.[28]

Such a strategy could be successful when purchasers cannot readily make interbrand comparisons of the total price for buying, maintaining, and repairing the product over its useful life. Consumers will seldom know in advance the volume or type of repairs they will need. While they might keep track of their own aggregate repair payments to inform their next auto purchase, they will seldom have learned the price of maintaining other brands. Sophisticated business purchasers of technologically advanced and complex equipment are presumably more sensitive to future maintenance and repair prices. They would surely want to compare brands on the basis of performance relative to the total price of keeping the vehicle in operation. But they, too, may be relatively ignorant about the vehicle's reliability and the extent of future improvements that can be incorporated into it. Even later, they may not know what their experience would have been with a different brand. At the same time, however, many organizations,

26. See ¶1716.
27. See ¶1711.
28. *Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451 (1992); see ¶1740.

such as Consumers Union (the publisher of *Consumer Reports*), produce and disseminate data on aftermarket costs, and such information on many products is even more widely available to business purchasers.

Deceiving consumers and impairing their ability to make intelligent market choices is socially harmful and thus cannot justify the tie that is independently unlawful. At the same time, there is no reason to suppose that such tie-based deception is frequent or serious enough to support a broad, per se proscription of ties.

But if a particular tie were otherwise lawful, should proved deception in a particular case make it unlawful? An affirmative answer would be given by those who see a significant danger to competition here and who believe that satisfactory proofs would show whether the tied product is overpriced, whether the tie is quality related, and whether market rivalry was actually affected. We are somewhat skeptical about the quality of such proofs and think the threat to competition resembles that of false advertising, which antitrust law usually ignores unless it contributes significantly to achieving or maintaining monopoly.

In describing the possible effects of tie-ins, the Supreme Court observed that the consumer's

> freedom to select the best bargain in the second market is impaired by his need to purchase the tying product, and perhaps by an inability to evaluate the true cost of either product when they are available only as a package.[29]

The Court was thus aware of a tie-in's potential for disguising price. However, the quoted language seems too tentative either to compel categorical condemnation of all tie-ins or, if legality were to depend upon the effects in particular cases, to condemn an otherwise harmless tie not involving near-monopoly power over the tying product.

In all events, the problem is most typically one of fraud or deception, and only by happenstance of monopoly. A firm does not need monopoly power in its tying product in order to rely on information shortfalls to charge high tied-product prices. One of the difficulties of the *Kodak* decision, to be discussed later,[30] is not

29. *Jefferson Parish*, 466 U.S. at 15.
30. See ¶1740.

that it found market power on the basis of a controversial "lock-in" theory,[31] but that the Court simply assumed that market power had something to do with the practice in question. Relying on information failures to charge high aftermarket prices is roughly akin to selling a sick horse for the price of a healthy one. To be sure, the price might seem "monopolistic" considering the horse's actual condition, but that price is a result of deception, not of monopoly.

**1712g.    Reward from useful "combination" patent (as tying product).**    The title of this Subparagraph seems odd because owners of a product can presumably always receive *some* reward for their products simply by selling them rather than by giving them away. Holders of so-called combination patents, however, have maintained that tying was necessary to permit them to receive any reward for use of their patents.

A new arrangement of old elements may be a patentable invention. In one sense, of course, nearly every machine merely rearranges well-known elements to produce a new result. But the elements of the combination may also be self-contained units that have been operated independently. In one well-known case a patent was granted on a heating system consisting of three old and therefore unpatentable elements: a motor-driven stoker feeding coal to a furnace, a room thermostat activating the stoker in response to low room temperature, and another thermostatic switch activating the stoker in response to low furnace temperature in order to maintain the furnace fire even though the room thermostat did not call for heat.[32] The latter switch was not itself patented but apparently had no use to a purchaser except to complete the patented assembly.

Although an unlicensed assembly infringes the combination patent, the plaintiff patentee could not readily monitor infringements by numerous furnace owners. Accordingly, it attempted to control sales of the switch and licensing only those installers (and householders) who purchased the switch from its licensee. Another supplier of the switch, which had no other use, must know that its customers were assembling an unlicensed combination and that it contributed to that infringement; it thus became a contributory infringer itself.

31.  See ¶564.
32.  *Mercoid Corp. v. Mid-Continent Investment Co.*, 320 U.S. 661 (1944).

When the patentee sued the unlicensed switch supplier for contributory infringement, the Supreme Court saw a tie-in: the patentee would sell a license to use the combination patent only to those who purchased their unpatented switches from it or its licensee. Observe that the "tie" does not disappear when the patentee sells licenses to all switch suppliers and thereby indirectly licenses all householders buying switches to practice the combination. It would still be licensing use of the combination only by those who purchase unpatented switches from it or its licensees.

If it is impractical to monitor household use of the combination, the patentee would receive no return on its useful patent unless it is allowed (1) to "tie" patent-use licenses to the purchase of switches from authorized and royalty-paying sources and (2) to sue unauthorized switch suppliers for contributory infringement. Like the other situations in ¶¶1711-1712, the tie brings the seller incremental revenues from supplying the tying product (here, the patent license); unlike those other situations, revenues without the tie would approximate zero. Thus, whether one counts incremental profit as socially beneficial, neutral, or detrimental in other cases, the legislative judgment that inventors of combinations deserve patents entails the further conclusion that the patentees are justified in using reasonable means to earn some return from use of the patent. When the practical alternative is zero reward from use of the patent, a tie seems justified by the patent grant.[33]

## ¶1713.  Tying by New Entrant or Weak Firm

**1713a.  Introduction and summary.**    Judicial enthusiasm for new entry might stimulate defendants to claim that a challenged tie-in facilitates entry and thereby improves competition. Facilitating entry is procompetitive, although incumbents may object that entry or expansion via tying gives the defendant an unfair advantage and may even raise the entry barriers of others. Nevertheless, we should encourage entry into the tied market, even when the tying seller holds a monopoly in the tying product, and especially when it does not (¶c). Of course, entry-facilitating ties would always be initially lawful if the law presumptively tolerated ties foreclosing only a minor share of the tied market. In the meantime, an affirmative defense for temporary ties accompanying new

33. These matters are explored further in ¶¶1781-1782.

themselves discourage
examinations and studies.
be genuine and yet be
users are numerous, per-
sample) of them to the
by a reasonable product
ous, an adequate sample
Although collection of
services would be even
less flexible and more
portion of the users to


ovements


ring two items together
customers, or both.
windshield wipers to
bly line undoubtedly
them after the con-
costs include not only
multiple management
costs of dealers and
em, and the like. Sav-
nonexploitation expla-
should be noted that
ussed in ¶1712b also
a cost savings that
different firm in a
The topic of this
gs that arise when
than separate pro-
competition in the


gs, including cus-
on. We will also see
in terms of cost
ce risk and thus
be explained as a

In ¶c we see that cost savings are often recognized by treating many customary combinations — such as wipers and automobiles or right and left shoes — as a single product or, if two, as an untied and voluntary preference by customers.[1] Moreover, when a tie-in is found and would be condemned prima facie, most courts approve cost savings as legitimate, for reducing costs saves society's resources and normally leads to new entry[2] or other expansions of output toward more competitive levels. These are undeniably procompetitive effects. Possible exceptions to this principle and problems of proof are then considered.

Next, ¶d examines the "customer option" as a less restrictive way to please customers or lower costs. When the combination reduces the costs to customers or improves their convenience or utility, the customers will take the combination voluntarily without any price inducement or tying compulsion. However, customers who prefer otherwise will demand the products separately, though simultaneously producing or distributing both separate and combined versions may increase the defendant's costs. In that event, it could simply charge more for the products separately than for the combination. The Supreme Court has approved package discounts that do not exceed the cost savings. On occasion, however, the cost savings for the package relative to producing and handling the components separately will be so great that the price for one component will approximate the package price for both, or the option approach may otherwise be impractical.

Paragraph e then shows that average pricing within a mandatory package can reduce aggregate search and information costs in limited circumstances. Finally, ¶f elaborates some of the previous topics with additional discussion of bundled product or service in vertical integration, turnkey franchise, package license of patents or copyrights, and sale of a condominium subject to a management contract.

We will see the difficulty in identifying real savings of significant magnitude that cannot be adequately realized by the less restrictive alternative of selling each item individually at its own price while also selling both items combined at a discount from the

¶1717.  n.1.  Cf. United States v. Microsoft Corp., 253 F.3d 34, 90-92 (D.C. Cir.), cert. denied, 534 U.S. 952 (2001), which concluded that the case for efficiencies in software bundling sufficed to take such ties out of the per se rule, and subject them to rule of reason analysis. (To the extent it is relevant, H.H. was consulted by the federal and some state governments.); Jack Walters & Sons Corp. v. Morton Bldg., 737 F.2d 698, 703 (7th Cir. 1984) (single product if there are "rather obvious economies of joint provision").

2.  For the connections between new entry and cost reduction, see ¶1713.

sum of their individual prices to reflect costs saved. Identifying the costs to be considered, measuring them, and assessing the practicability of customer options turn out to be quite puzzling. The problem with all claims of cost savings, customer convenience, and undue cost for the customer-option alternative is the tribunal's difficulty in learning the true facts. As a result, it bears emphasis once again that the need for an inquiry into the substantiality of a claimed efficiency and the necessity of tying to achieve it properly arises only after the tie has been proven to be objectionable on other grounds. The discussion in this Paragraph assumes that an alleged tie is prima facie illegal because foreclosure is substantial, and then considers whether cost savings count toward its redemption.

To simplify the exposition, this Paragraph calls the second item a "tied product" and the supplier a "tying seller," even though the existence of a tie may be in issue, the second item may be a service, or the supplier may be renting rather than selling. We also call the tying firm "the defendant" even though no one has sued or though the tying claim arises as a counterclaim or defense in a suit initiated by the tying firm.

**1717b.  The many forms of cost savings.**  Cost reductions explain numerous tie-ins. Even expanded sales volume of the tied product might bring scale or scope economies, and enhanced revenue resulting from even an anticompetitive tie might lower risk and capital costs. Indeed, the search for less restrictive alternatives makes every potential justification a matter of costs. Whether or not the seller's costs fall, moreover, a tie might be convenient for customers, reducing their costs or otherwise improving their utility.

*1717b1.  Supplier savings.*

*(A)  Generally.*  A defendant seller might use a tie to reduce its costs in at least four ways. *First,* and most obvious though often difficult to quantify, are savings in so-called transaction costs — for example, contracting and accounting for two items at once rather than for each separately or maintaining inventories of pairs of shoes rather than right and left shoes separately. More complex varieties of transaction costs are illustrated later in this Paragraph. *Second,* assembling or packaging two items together may reduce the amount of labor per unit, as when windshield wipers are attached to every car on the assembly line rather than later in response to special orders. *Third,* tying might lead to greater output and thereby allow the defendant to achieve economies of scale

...ved. Identifying the
...assessing the practi-
...quite puzzling. The
...er convenience, and
...e is the tribunal's dif-
...bears emphasis once
...substantiality of a
...o achieve it properly
...be objectionable on
...graph assumes that
...closure is substan-
...count toward its

...h calls the second
...ving seller," even
...second item may
...er than selling. We
...though no one has
...erclaim or defense

... Cost reductions
...volume of the tied
...and enhanced rev-
...might lower risk
...ictive alternatives
...costs. Whether or
...ht be convenient
...improving their

...e a tie to reduce
...us though often
...ction costs — for
...ms at once rather
...ories of pairs of
...More complex
...this Paragraph.
...her may reduce
...eld wipers are
...r than later in
...d to greater out-
...omies of scale

in making or selling the tying product, the tied product, or both. *Fourth*, tying might reduce the defendant's risks for which investors and lenders demand compensation, thereby reducing its capital costs.

(B) *Economies of scale or scope.* Although the phenomenon of scale economies needs no elaboration here, it is helpful to recognize the different ways in which tying could expand output of the tying or tied product and thereby bring the defendant economies of scale in production and distribution that were otherwise unobtainable. Without attempting to revisit all prior topics, recall *first* that discriminatory prices through tying will often lead to higher output than uniform prices. This is highly likely to be true of variable-proportion ties involving manufactured products with significant fixed costs.[3] *Second*, a tie can protect product quality and thereby maintain or increase sales volume.[4] *Third*, a tie might lower nonscale production or transaction costs and thereby allow lower prices and expanded volumes. *Fourth*, a tie presumably brings the defendant a greater volume of sales of the tied product, perhaps up to the level at which significant economies of scale on the tied product can be obtained.[5] Increased tied-product volume can, in turn, generate scale economies for the tying product when both are produced in common facilities or have other costs in common — such as when the tied and tying products are simply different motion pictures that are partially produced and distributed in common.[6]

In contrast to economies of scale, economies of scope occur when it is cheaper for a producer to do different things together rather than separately. This occurs if mounting windshield wipers on cars passing down the assembly line is cheaper than subsequent individual dealer installation. And it is certainly cheaper for

3. See ¶1711.
4. See ¶1716.
5. Few defendants have explained their tie-ins as reducing costs on the tied product. In the ¶1716a illustrations, no claims of cost reduction on punch cards, cable installation or service, or the like were made. A noteworthy exception is the "full-line force" by which a manufacturer of a product line encourages dealers to represent the whole line, especially a new addition (the tied product) to the line. Many courts have declined to find a tie or an agreement in the full-line force. See ¶¶1713 and 1725c.
6. In addition, expansively defined ties may bring the related saving of shared expense. For example, a plaintiff claimed that an airline ticket including the right to rent a car at a discount amounted to a tie-in. In any event, the arrangement allowed the airline and rental companies to share advertising, thus reducing costs to each. See *Robert's Waikiki U-Drive v. Budget Rent-A-Car*, 732 F.2d 1403 (9th Cir. 1984) (no tie).

¶1717    Tying Arrangements and Related Practices

the sellers of electric appliances to attach a power cord at the factory, rather than require each individual purchaser to purchase the appliance and then arrange separately for power cord installation.

(C) *Risk reduction.* Most of the topics in this Subchapter could also reappear here as capital cost savings resulting from the reduction of risk. Virtually every activity improving a firm's prospects reduces the risk premium that must be paid investors and lenders. A tie might help maintain or increase the defendant's profits by increasing its own — and market — volume in all of the ways just noted: price discrimination, quality control, lowering production or transaction costs, or achieving scale economies. Moreover, a tie might enhance revenue without increasing market output by discriminating in price, limiting product substitution, or inducing (at little cost to the defendant) tied-product purchases by customers who are relatively indifferent to the source when all suppliers charge the same supracompetitive price; it might even help rivals reduce competition among themselves and thereby lessen their risks. Obviously, the last kind of cost reduction is not legitimate.[7]

(D) *Less restrictive alternatives.* There is yet another way in which "cost savings" might describe the discussion in most of the preceding Paragraphs. Most ties can be explained as costing less than some alternative means of achieving the tie's objective. For example, a tie might cost less than administering compulsory specifications in order to protect the quality of the tying product.[8] Similarly, if tying were deemed a legitimate method of charging users according to the intensity of their use of the tying product, it may be less costly to implement or to prevent customer "cheating" than other means of so charging.[9]

Without attempting to isolate only those costs that have not been touched on previously, the present Paragraph focuses on reducing transaction and production costs, as well as buyer costs, which are illustrated next.

(E) *Competitive conditions.* When a market is moderately competitively structured and all or most firms tie, then the inference is strong that a cost savings exists and that competition rather

7. See ¶1707.
8. See ¶1716d4.
9. See, e.g., *Casey v. Diet Center,* 590 F. Supp. 1561, 1570, and n.13 (N.D. Cal. 1984) ("Tying arrangements may, for example, enable a franchisor to obtain more efficient accounting of the volume of its franchisees' business" than "a variable royalty based on a percentage of revenue"). See ¶1711b3.

218

...ord at the fac-
...to purchase the
...ed installation.
...is Subchapter
...ulting from the
...g a firm's pros-
...d investors and
...fendant's prof-
...e in all of the
...ntrol, lowering
...ale economies.
...creasing market
...substitution, or
...t purchases by
...source when all
...it might even
...es and thereby
...reduction is not

...another way in
...in most of the
...d as costing less
...'s objective. For
...ing compulsory
...tying product.[8]
...hod of charging
...ving product, it
...mer "cheating"

...ts that have not
...aph focuses on
...as buyer costs,

...is moderately
...then the infer-
...mpetition rather

...3 (N.D. Cal. 1984)
...been more efficient
...royalty based on a

than monopoly explains the tie. For example, computers are sold in highly competitive markets with pre-installed hard drives, automobiles with their tires, and saucepans with fitting lids because customer preference is strong and sellers who do so make more sales than sellers who do not. In general, either cost savings or consumer desirability can be inferred from a tying practice that occurs widely in a competitively structured market.

*1717b2.  Customer convenience, preference, cost, and utility.*  A customary combination can reflect consumer preference as well as cost savings for a supplier who, for example, sells shoes only in pairs. Although a right shoe alone might not seem to be a separate product because it has no market, such a market may not have appeared simply because manufacturers insist on selling pairs. Some consumers wear out one shoe faster than the other, lose a shoe, have only one leg, or have feet of different sizes. As a result, there is at least a potential market for unpaired shoes.

While our familiarity with shoes sold as pairs should not blind our analysis,[10] familiarity may reflect what is feasible. When the vast majority of consumers buy shoes only in pairs, it might be unduly expensive for manufacturers and retailers to maintain inventories of right and left shoes separately or even to provide arrangements for special-ordering, manufacturing, and delivery. The incremental cost of doing so might exceed the cost saved to a consumer who did not buy the second shoe. To accommodate extra inventories or burdens, moreover, dealers might stock fewer sizes or styles, to the detriment of consumers generally. Requiring manufacturers and dealers to shift entirely to single-shoe sales could also make shoe buying more burdensome to most consumers, who may prefer the simplicity of dealing in shoe pairs.

By contrast, there is clearly a second market in small replaceable batteries, although some consumer electronics — such as cameras, tape players, toys, and flashlights — include batteries and some do not. Why? *First*, a camera maker might buy batteries more cheaply than consumers can. If that gross saving exceeds any incremental packaging and handling costs, the camera maker may either pocket the net savings after increasing the battery-included camera price by the amount that consumers pay for batteries alone or pass along some of the net savings to consumers and thereby increase camera volume. *Second*, the camera maker may believe

10.  Of course, even if we called the shoe pair a tie, has any competing seller been foreclosed, given that virtually all rivals also sell shoes only in pairs?

that purchasers prefer a camera that can be operated immediately after opening the box, without bothering to search out and enter a separate transaction for batteries.

Although including batteries can have both effects, let us isolate "pure" consumer preference by assuming that the camera maker pays the same amount for batteries as consumers do and that there are no incremental handling costs. If the combination price equals the sum of previous prices for camera and battery, such a camera manufacturer must believe that consumers prefer the package, for nothing else explains its combination. If that belief is accurate, the combination either reduces consumers' transaction costs or increases their utility. Another way of expressing the same point is that consumers now receive greater value for the same expenditure as before the tie. This benefit is just as real and legitimate as the more measurable savings of avoiding separate inventories of left and right shoes or of attaching wipers on the auto assembly line.[11]

This brief discussion of consumer preference suggests, *first*, that such preferences might be an illusion based on what suppliers choose to offer. If not, a general consumer preference for two items together may suggest that they really constitute a single product rather than two products that are tied together. *Second*, although a combination of two products will not appear as a tie-in to customers preferring to take both products together, other customers are coerced by the forced combination. *Third*, consumer preference for a "tie" arrangement implies that different arrangements would "cost" customers more by requiring more time or transactions or by reducing utility. Consumer preference is thus a particular manifestation of cost savings, highlighting burdens on the customer rather than those borne by the supplier and reflected in the supplier's prices. *Fourth*, it may be very difficult to quantify or even to assess the validity of a consumer preference explanation for a tie. Notwithstanding such uncertain magnitudes, customer convenience deserves recognition, especially under current doctrine that condemns ties foreclosing only trivial shares of the second market.

---

11. The Eighth Circuit erred in dicta rejecting a defense of customer convenience in principle. See *Northern v. McGraw-Edison*, 542 F.2d 1336, 1347 (8th Cir. 1976), cert. denied, 429 U.S. 1097 (1977). The court also believed that customer convenience had not been established in fact. Although it did not explain its dicta, the court labeled a license of the "Arnold Palmer" trademark in conjunction with an equipped dry-cleaning shop "anticompetitive."

Further, when the tying market is competitive and we cannot infer collusion, then a general practice of packaging must be cost-justified. For example, shoes are manufactured by dozens of firms and in most cities are sold by hundreds of retailers. Absent an agreement restraining single-shoe sales, one would naturally expect the emergence of a market for single shoes if enough customers wanted them and were willing to pay all the incremental costs associated with unbundled sales. The fact that such a market has not emerged suggests that it is not desired.[12]

**1717c. Legitimacy of cost savings generally.** Reducing costs typically saves society's resources and stimulates greater production and lower prices. Hence, cost savings are desirable, as recognized both in defining tie-ins and in justifying them. However, we must consider whether some kinds of cost savings should be excluded from this general approval and how to deal with ubiquitous but hard-to-prove claims.

*1717c1. Recognition of cost savings in finding or defending tie.* The sweeping nature of "cost savings" explained in ¶b is, of course, no reason to revisit the rest of this Subchapter under a different name. Nor is this the place to elaborate such later topics as defining the subject matter of a challenged arrangement as a single product rather than two separate products — a process in which cost savings often play a role. For example, the savings apparently arising from making, distributing, and stocking only shoe pairs or autos with wipers attached would probably lead the courts to classify each combination as a single product. Were they deemed separate products capable of being tied together, moreover, selling the combination may be seen not as a tie but as a response to consumer preference, especially in the absence of widespread customer insistence upon single shoes or unwipered cars. Once again, therefore, the several tying issues are interdependent: a cost-savings defense is more imperative as each product is defined more narrowly or as the notion of tying them together is more expansive. Nor would we have to face these troubling issues very often if tying doctrine addressed only those ties bringing about substantial foreclosures. But so long as the doctrine condemns ties without regard to the share of the tied market foreclosed, a prima

---

12. In such cases tying law almost invariably concludes that the two items are a "single product" — so there is no tie. See ¶¶1744-1745.

Case 1:09-cv-00547-JFM    Document 205-39    Filed 03/21/14    Page 33 of 91

facie illegal tie could be found, for example, when a camera monopolist included a "free" battery.[13]

Cost savings were blessed by the Supreme Court in the *Loew's* case.[14] Notwithstanding the presence of an illegal tie, the Court approved a decree allowing cost savings to redeem conduct that was otherwise condemned. That case involved so-called block-booking by which distributors of motion picture films made films available to each exhibitor not film by film but in groups. In the early days of the industry, the practice was used by major producers to deny new producers access to the exhibitors.[15] Block-booking may also have facilitated the subsequent integration of production and distribution.[16] The practice reappeared in the licensing of old movie libraries for television exhibition. For example, Loew's effectively refused to license exhibition of individual movies; it insisted on booking a block of films.[17] As the Court noted, the defendant forced "a television station wanting 'Gone with the Wind' to take 'Getting Gertie's Garter.'"[18] Although the Supreme Court did not indicate whether this practice actually made any difference to the health of rival suppliers, it condemned the tie and focused on relief. The Court required the defendant to price each film separately but permitted a package price to be less than the sum of individual prices by the amount of "all legitimate cost savings."

*1717c2. Which costs?* The *Loew's* Court did not define "legitimate cost savings," but it did deny the government's request "to make distribution costs the only savings which can legitimately be the basis of a discount."[19] Savings in production cost are surely legitimate. For example, if a discounted price for advertising in morning and evening newspapers were deemed a tie, a discount reflecting a single setting of type for both newspapers would

13.  See ¶1721b.
14.  *United States v. Loew's*, 371 U.S. 38, 45 (1962).
15.  See, e.g., Michael Conant, Antitrust in the Motion Picture Industry 77-80 (1960). See also *United States v. Paramount Pictures*, 334 U.S. 131, 156-159 (1948).
16.  The more recent literature suggests significant transaction cost savings from block-booking. See, e.g., F. Andrew Hanssen, The Block Booking of Films Reexamined, 43 J.L. & Econ. 395 (2000); Roy Kenney & Benjamin Klein, How Block Booking Facilitated Self-Enforcing Film Contracts, 43 J.L. & Econ. 427 (2000).
17.  *Loew's*, 371 U.S. at 45.
18.  Id. at 48 n.6.
19.  Id. at 54. Note that the Court did not hold that any discount greater than legitimate cost savings created a tie. See Id. Rather, the Court held that constraining package discounts was appropriate relief after clear evidence of prior refusals to license films separately.

be justified.[20] Similarly legitimate are distribution cost savings, which were approved even by the government (which then strongly opposed all tie-ins) in *Loew's*. Licensing a package presumably saves the time of sales personnel; accounting, billing, and paying costs; and perhaps delivery and insurance charges. Bundling items together can also require less shelf space, making it possible for a retailer to display a larger variety of different items.[21] In such cases the retailer weighs the savings from reduced demand for shelf space against any loss of sales that results from customers' strong preference for unbundled alternatives. Further, as explained elsewhere, many package licenses of intellectual property rights involve significant savings in monitoring costs.[22]

While distribution appears to be the main cost of licensing the large existing stock of movies involved in *Loew's*, the picture becomes more complex when dealing with ongoing production and distribution of new films. Licensing a package of films, including some not yet completed, might reduce (1) the risks and thus the financing costs of making movies or (2) allow producers to achieve economies of scale. Even if films are regarded as separate products because they are not fungible, their financing, production, and distribution have common costs that might be more economically provided across a larger base of films. Indeed, revenue enhancement and guaranteed markets can reduce risks and thereby lower capital costs. If so, the conventional result of lower

20. See *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594 (1953) (no tie). In such a case, however, the newspaper's practice would probably be not to offer a discount for advertising in both newspapers, but to refuse to place ads in only one.

See also *United States v. Microsoft Corp.*, 253 F.3d 34, 87 (D.C. Cir.), cert. denied, 534 U.S. 952 (2001). The Court observed that certain "shared" library files in the Windows operating system (OS) and the Internet Explorer browser performed the same functions with the same lines of computer code, thus installing them once "may save drive space from the clutter of redundant routines and memory when consumers use both the OS and browser simultaneously." However, the observation appears to presume that in an aftermarket installation of the browser the same file, or at least the relevant lines of code, would be placed on the hard drive a second time. This is neither necessary nor likely. Most aftermarket installations would invoke any file existing on the hard drive that is already usable, modify an existing file, or replace an existing file with a new one. As a result, the aftermarket installation need not be less space-efficient or more cumbersome than installation by the supplier would have been.

21. See David Evans & Michael Salinger, Why Do Firms Bundle and Tie? Evidence from Competitive Markets and Implications for Tying Law, 22 Yale J. Reg. 37 (2005) (giving example of Radio Shack's bundling of plug adapters in brick-and-motor stores where shelf space is scarce, but offering them separately via online sales). See also Dennis W. Carlton & Michael Waldman, Tying, in 3 Issues in Competition Law and Policy 1859 (ABA 2008).

22. See ¶1782a; and see Herbert Hovenkamp, Mark D. Janis, Mark A. Lemley, & Christopher R. Leslie, IP and Antitrust: An Analysis of Antitrust Principles Applied to Intellectual Property Law ch. 22 (2d ed. 2009).

costs would be greater output, perhaps with lower prices and new entry.

*1717c3.   Exception for enhanced revenue or guaranteed markets?* As noted earlier, a tie might bring the defendant guaranteed volume in the tied market and thereby attain economies of scale.[23] The issue is essentially that discussed in connection with facilitating new entry into the tied market or maintaining a weak firm there.[24]

We must also consider whether the revenue-enhancing functions already considered — such as price discrimination — become less harmful or more beneficial in the light of potential reductions in risk and capital costs. Diminished harm is, of course, immaterial to those who accept our earlier conclusion that such functions are not independent grounds for condemning tie-ins generally (because they are not typically harmful) or in particular cases (because harm is either absent or not identifiable).

The benefit side of the equation, however, is more complex. We do not count price discrimination as an affirmative benefit of an otherwise unlawful tie for two reasons: (1) the absence of assurance that price discrimination generally or in particular cases increased output and (2) the likely availability of lawful non-tying means of discrimination. The second reason is equally applicable here, while the first is not. Although we cannot be sure that discrimination will increase output, we can presume that it will increase the defendant's profit, or else it would not be employed. Nevertheless, it remains highly uncertain whether the tie would increase profit beyond that achievable by other means of price discrimination and whether any such increments would cut risks enough to reduce capital costs significantly. That uncertainty, both generally and in particular cases, counsels against accepting increased revenue as a cost-reduction defense to a prima facie illegal tie-in.

*1717c4.   Proving savings.*   A recurring dilemma emerges from this discussion. On one side, we see that some kind of cost savings might appear plausible in virtually every package transaction. Even apart from the more expansive savings related to scale and risk, the cost per unit of negotiating, contract-writing, boxing (for

23.  See ¶b1B. If the tying product shares common resources, the savings may occur there as well.
24.  See ¶1713.

tangibles), bookkeeping, billing, and collection would often fall when several units are dealt with simultaneously. Illustrations are licensing several patents at once, including a battery within a camera, perhaps delivering tires along with gasoline to service stations, and bundling delivery service into a newspaper or magazine subscription.

To measure a saving, we need to know costs with and without the tie, and these numbers may be obscure. Recall the potential savings in distributing movies to broadcasters in *Loew's*.[25] The costs of package licensing relative to film-by-film licensing would vary with the readiness with which broadcasters took smaller packages or the degree of sales resistance to each film in the group. Perhaps over a long period, a distributor might develop enough information to assign an "average" cost of licensing one film, although such an average would overstate the "salesmanship" cost of licensing more popular films. These uncertainties in applying a potentially ubiquitous cost-saving defense make customer options seem attractive, as we next explore.

**1717d. Customer choice as a less restrictive alternative.** *1. Explanation and appeal.* A tie-in is unnecessary to meet customer convenience if customers voluntarily take both products from a single source when they prefer. The *Data General* case illustrates such a feasible and less restrictive alternative that defeated a customer-convenience defense.[26] The defendant had licensed its allegedly attractive software for use only with its own computers, explaining that customers preferred to obtain an entire computer system from a single source, which would be responsible for its proper functioning. In systems mixing elements from multiple suppliers, customers were said to fear that each supplier would blame the other for a malfunction rather than fix it. The court responded simply that customers with such fears could choose a single source without being compelled by a tie to do so.

When the seller's cost savings are offered to justify a tie, the obvious less restrictive alternative is two-tier pricing: allow the customer to choose between buying either product separately or buying the combination at a discount from the sum of the individual prices. Such an arrangement is clearly lawful, especially when the discount does not exceed the costs saved through the

25.  See ¶c2.
26.  *Data General Corp. Antitrust Litig.*, 490 F. Supp. 1089, 1122-1123 (N.D. Cal. 1980). The tie was ultimately condemned, 734 F.2d 1336 (9th Cir. 1984), cert. denied, 473 U.S. 908 (1985).

¶1717   Tying Arrangements and Related Practices

package, either because the arrangement is not deemed a tie[27] or because it is a justified less restrictive alternative. Customers remain free to take the tying product from the defendant and the tied product from the defendant's rival, albeit at a combined price higher than the defendant's package price. This may stimulate rival suppliers to lower their prices on either product separately. In any event, customers may prefer other suppliers, notwithstanding the defendant's package discount. Hence, the customer option makes a cost saving available to those who want it without depriving customers of the option to turn elsewhere or depriving rivals of the opportunity to win customer patronage by competing in price and quality. The customer option thus appears so attractive as grounds for rejecting a compulsory cost-saving package that some courts have failed to consider its difficulties or practicability, as we see next and in later illustrations, especially that of turnkey franchises in ¶f2.

*1717d2. Practicality.* Return to the example of a camera monopolist who includes a battery in the camera. Assume that a prima facie illegal tie is present. Suppose further that the package provided batteries more cheaply than the consumer could obtain them and reduced consumers' transaction costs as well. Should we condemn the package, as in *Data General*, because the tie is unnecessary to achieve cost savings? Give consumers the choice of taking cameras packaged with or without batteries, and they will choose that which serves them best. In many circumstances, however, the defendant cannot afford to provide such a choice to each customer and must itself choose to supply all customers either with the package (with cost savings, passed on or not) or without the package (with cost savings forsaken).

The hypothetical camera monopolist might feasibly supply the camera with or without batteries but not some of each. To supply some cameras with batteries and some without requires separate handling, boxing, storing, shipping, billing, and maintaining an efficient flow to dealers of each version. Not only would the two-version option consume resources, but the resulting costs may exceed any savings from the package. In short, requiring the manufacturer to offer the option of a camera with or without batteries may so increase costs as to induce the manufacturer to avoid the legal problem altogether by selling the camera only without batteries and thereby remaining safely outside the realm of tie-ins.

27.  See ¶1758.

In that event, consumers and the economy lose the cost savings otherwise available. Hence, the less restrictive alternative is not really available at all in these circumstances.

As for the combinations of left and right shoes or of automobiles and windshield wipers, if deemed prima facie unlawful ties, insisting upon an option alternative would not force producers to abandon the combination that appeals to most consumers. The unwipered car would bear the same price as wipered car or, conceivably, even a higher price (because the increased transaction costs would exceed the savings from omitting wipers). Neither consumers nor rivals would benefit when the package price is thus well below the sum of each component separately. Indeed, in that circumstance, the customer option is no less restrictive though fully as cost-justified as the no-option "tying" package. So long as non-tied purchasers bear the full cost of the option, suppliers and other customers would not be injured, but antitrust law should hesitate to require creation of an expensive option, as in the shoe or wiper case, when it seems doubtful that the costs will be recovered at all.

*1717d3. Package discount versus amount of cost savings.* A package of "bundled" discount occurs when the seller offers a lower price to a customer who takes two or more goods together. We consider the possible anticompetitive effects of such discounts elsewhere.[28] This discussion assumes that such a discount is objectionable on other grounds and considers the extent to which cost savings might serve to justify it. To understand the problem we must consider the relationship of the discount and the cost savings. Assume a case in which a customer option — taking either product separately at one price or the combination at a discount below the sum of individual prices — appears practical and effective as a less restrictive alternative to a cost-saving but prima facie illegal tie. Let us further assume that we know that the discount either exceeds or falls short of the cost savings.

We shall see immediately below that (A) an excessive discount might be as restrictive as the conventional tie and could itself be an unlawful tie that needs the less restrictive alternative of a lesser discount; (B) the defendant need not pass along to customers its full savings from the package; and (C) the otherwise practicable option defeats a cost justification even if it fails to attract

28. On package discounts generally, see ¶749 (as exclusionary practice under §2); ¶1758 (as tying).

sufficient patronage for the package to realize the savings. In practice, of course, we may not know the true size of the savings relative to the discount.

(A) *Discount exceeds savings.* A discount exceeding the savings tends to induce customers to take the second product from the defendant to a greater extent than is warranted by the savings. At some point, moreover, such a discount can be just as foreclosing as a conventional tie.[29] Though "excessive," a discount falling short of that identical effect is, of course, less restrictive and therefore must be offered instead of the conventional tie.[30] In all events, even when the discount exceeds the savings the arrangement does not foreclose more than a simple contractual tying requirement.

(B) *Savings exceed discount.* An optional package is justified even though the discount is less than costs saved. Though such a discount does not reward customers with all they save the seller by taking the two products, supracompetitive pricing by a single firm is not itself a violation of the antitrust laws.[31] Moreover, such a discount forecloses less of the second market than the larger lawful discount that passed on all cost savings to customers. A discount smaller than the savings is thus less objectionable to tying law because it forecloses less of the tied market; the defendant will supply fewer combinations than it would supply with the larger discount that the law permits to reflect the full cost savings achieved through the combination. For example, suppose the cost of separate production of a cough capsule and a congestion capsule is $1.00 each, but that the two remedies can be placed into a single capsule for $1.50. Suppose further that the seller cuts the price from $1.00 each to $1.60 for the two-symptom capsule. In that case the seller is passing on the second remedy at a price that is lower than the incremental cost it incurs. Such behavior is socially beneficial and should not be condemned as either tying or anticompetitive pricing.[32]

29. For example, suppose that the defendant separately sells monopolized *A* at $8 and its needed accompaniment *B* at its $3 cost (including a reasonable profit). Because rivals cannot long sell *B* at $2, the defendant's optional *AB* package at $10 will be just as exclusionary in this example as a refusal to offer *A* separately, selling it only in a compulsory *AB* package. Though just as foreclosing, the discounted package is nevertheless justified when it reduces costs by $1.

30. When such a discount is itself regarded as a prima facie unlawful tie, it too will need a justification, and cost savings would justify only a smaller discount. Whether and when discounts count as tie-ins are considered in ¶1758.

31. See ¶¶720 and 1710.

32. See Erik N. Hovenkamp & Herbert Hovenkamp, Exclusionary Bundled Discounts and the Antitrust Modernization Commission, 53 Antitrust Bull. 517 (2008), available at

(C) *Discount insufficient to generate savings.* Suppose that the defendant offers two products individually at separate prices and in combination at a discount that fully reflects its cost savings resulting from the package. Suppose further that the option is entirely feasible in that the defendant can profitably offer consumers the choice but that the discount fails to attract sufficient patronage for the package to realize the available savings. The defendant might then argue that the option is not a less restrictive vehicle for cost savings because the savings are not in fact being realized and then correctly point out that forbidding the tie deprives society of otherwise obtainable savings. However, this amounts to the unpersuasive assertion that we should permit an otherwise illegal tie on the ground that it would achieve cost savings that consumers do not value over purchasing elsewhere.

In rejecting a defendant's discounted package that embodies the seller's full cost savings, the customer obviously values the discount less than the freedom to purchase the tied product elsewhere. The cost savings reflected in the package discount are thus more than offset by the incremental burdens or diminished value for the customer and therefore are not a net social benefit. That such savings are disfavored by a customer does not therefore justify compelled bundling, or, which may be the same thing, offering a discount exceeding those savings.

The conclusion just stated is equally valid when the discount falls short of the seller's full cost savings, notwithstanding a superficial conflict with the ¶d3B conclusion that a customer option constitutes a lawful and desirable alternative to the tie even though the seller fails to pass along all of its savings. The earlier point was that tying law, with its concern about foreclosures in the tied market, cannot object to small discounts that foreclose less than a lawfully larger discount. The present point is that a seller cannot justify a prima facie unlawful tie with unrealized cost savings that it could achieve through a discount that more fully reflects such savings. If the seller wants to benefit society with those savings, it can offer them fully to customers to test whether those savings exceed the value of the customer's freedom to buy the second product elsewhere.

http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1126723; David S. Evans & Michael Salinger, Why Do Firms Bundle and Tie? Evidence from Competitive Markets and Implications for Tying Law, 22 Yale J. on Reg. 37, 54 (2005).

(D) *Magnitudes uncertain.* While these conclusions seem clear when the defendant knows the savings clearly enough to be sure what an antitrust jury will find, less certainty creates this paradox: passing on too little of a combination's savings is legally safe, while passing on too much may be legally risky. To that extent, the law instructs suppliers perversely to err in the direction of passing on too little of the cost savings that result from a combination.

As a general proposition, an otherwise practicable option is preferable to a prima facie illegal tie when any discount for the combination does not unreasonably exceed the cost savings. An excess is more likely to be deemed "unreasonable" in the rare cases in which the savings can be measured fairly accurately.

**1717e. Transaction and search cost savings from block-booking and related practices.** When the items within a desired class vary significantly in value, selling and buying a package might reduce transaction costs. If traders can determine the value of the package more readily than the value of its constituent items, trading in the package could lower administrative and search costs for the economy. Such efficiencies allegedly explained package selling of new films to theaters and of old films to television stations.[33] They also explain package licensing of patents and blanket licensing of copyrighted recordings.[34]

*1717e1. Block-booking of newly released films.* The five defendant distributors in the *Paramount* case accounted for 73 percent of domestic film rentals.[35] They typically rented films only in blocks of their own composition, contracting even before the films were completed.[36] For the most valuable first-run films, which were exhibited in those days at very large downtown movie palaces, the rental fee was a percentage of the theater's gross revenue.[37] For

subseque[...]
rental [...]
based on [...]
contained [...]
the prod[...]
for the [...]
within the [...]
more val[...]
esized pr[...]

Such [...]
not be m[...]
for the first [...]
to rent," [...]
turns out [...]
value of b[...]
must redu[...]
less than [...]
average pr[...]
films within [...]
block-book[...]
important [...]

The rol[...]
subsequent [...]
vidual pri[...]
value of each [...]
subsequent-r[...]
impractical b[...]
runs was [...]
films in thou[...]
tracting for [...]
runs — nam[...]

---

33.   See Roy W. Kenney & Benjamin Klein, The Economics of Block Booking, 26 J.L. & Econ. 497 (1983); George J. Stigler, *United States v. Loew's, Inc.:* A Note on Block-Booking, 1963 Sup. Ct. Rev. 152 (1963); Richard Markovits, Tie-ins, Reciprocity, and the Leverage Theory, 76 Yale L.J. 1397, 1454-1458 (1967).

34.   For further exploration, see Herbert Hovenkamp, Mark D. Janis, Mark A. Lemley, & Christopher R. Leslie, IP and Antitrust: An Analysis of Antitrust Principles Applied to Intellectual Property Law ch. 22 (2d ed. 2009).

35.   *United States v. Paramount Pictures,* 371 U.S. 38 (1948).

36.   See Kenney & Klein, note 33, 26 J.L. & Econ. at 518. See also F. Andrew Hanssen, The Block Booking of Films Reexamined, 43 J.L. & Econ. 395 (2000) (supporting the defendant's offered defense that block-booking was in fact a discount reflecting lower transaction costs of block-licensing).

37.   For the contention that block-booking of first runs minimized each distributor's costs of scheduling its films into many theaters over sequential runs, see Kenney & Klein, note 33, at 521.

38.   Id. at 5[...]
39.   The re[...]
"liquidated dam[...]
example, it was m[...]
Id. at 523. The ex[...]
actually exhibited [...]
40.   If theate[...]
first run, they wo[...]
each film's value [...]
increasing the tot[...]
estimation.
41.   Kenney & [...]

...clusions seem
...y enough to be
...y creates this
...ings is legally
... risky. To that
...n the direction
...result from a

...able option is
...count for the
...t savings. An
...n the rare cases
...ately.

...from block-
...thin a desired
...ing a package
...mine the value
...stituent items,
...and search costs
...package sell-
...elevision sta-
...ts and blanket

...he five defen-
...73 percent of
...only in blocks
...the films were
...which were
...palaces, the
...venue.[37] For

...Booking, 26 J.L. &
...Block-Booking,
...d the Leverage

...Mark A. Lemley,
...ples Applied to

...ndrew Hanssen,
...ing the defen-
...transaction

...ch distributor's
...ney & Klein,

subsequent runs in smaller, lower-grossing theaters, however, the rental contracts provided a lump-sum rental for a block of films based on the average value of films within the block.[38] Each block contained films of similar expected value, based on such factors as the producer's track record and the production budget. The price for the block was then based on the average value of past films within the same class. Although each new film turned out to be more valuable or less valuable than that past average, the hypothesized price per film may have been just right on average.

Such an average pricing mechanism for subsequent runs cannot be maintained without block-booking. If exhibitors can wait for the first runs to determine a film's value before choosing which to rent,[39] they will choose only those films whose actual value turns out to exceed the average, thus paying less than the true value of better films.[40] To unload the remaining films, a distributor must reduce their prices. Because a distributor would thus receive less than the average value of these films, it would not continue average pricing while allowing theaters to pick and choose among films within a package. Thus, we can readily see the necessity for block-booking to implement average pricing; it performed an important risk-sharing function.

The relevant antitrust issue is whether average pricing for subsequent runs reduces distribution costs as compared with individual pricing, either before or after a first run reveals the actual value of each film to both distributors and exhibitors. Postponing subsequent-run contracts until after the first run was said to be impractical because the few-week period between first and second runs was insufficient to schedule and contract for hundreds of films in thousands of theaters across the country.[41] Pre-release contracting for subsequent runs on the same basis as for first runs — namely, a percentage of a theater's gross — was said to be

---

38.  Id. at 525.

39.  The rental contracts prevented an exhibitor from doing so by requiring it to pay "liquidated damages" for refusing to accept a particular film. In a ten-film contract, for example, it was required to pay one-tenth the contract price for each film it did not accept. Id. at 523. The exhibitor thus had to pay the average price for each film whether or not it actually exhibited the film.

40.  If theaters had to select rentals before films were completed and exhibited in the first run, they would have an incentive to expend — "waste" (?) — resources to estimate each film's value in the effort to out-guess or monitor the distributors' estimates, thus increasing the total (distributors' plus exhibitors') resources devoted to pre-exhibition estimation.

41.  Kenney & Klein, note 33, 26 J.L. & Econ. at 521.

inefficient in two respects. *First*, requiring a theater to share its revenues would reduce the optimal incentive for marginal expenditures that would increase patronage.[42] *Second*, percentage-of-gross rentals require distributors to monitor patronage, lest exhibitors succumb to the temptation to understate their revenues, or to enhance their profits by cheating the distributors. While equally true of first runs, the cost of monitoring the efforts and ticket sales of the fewer first-run exhibitors was a minor share of the distributors' first-run revenues. By contrast, the cost of monitoring the numerous, relatively small, and low-grossing subsequent-run theaters would have accounted for an uneconomical share of the distributors' revenues from those theaters.[43]

Assuming, then, that pre-release lump-sum pricing for subsequent runs saves costs, average pricing saves the distributors the cost and delay of attempting to price each film individually on the basis of pre-release test exhibitions, market surveys, or other costly methods of determining value before release.[44] Moreover, average pricing and block-booking save society the additional costs that exhibitors would incur to search out values if they were allowed to pick and choose among films. If all this is true, then average pricing implemented by block-booking reduces transaction costs and, to that extent, benefits sellers, buyers, and society. Of course, a separate question is whether block-booking by distributors accounting for three-quarters of film rentals weakened competition by depriving independent distributors and producers of access to needed exhibition.

*1717e2.  Block-booking of previously released films for television.* During the 1950s, the owners of large libraries of old films began to license them in packages for television broadcast. Six of these owners became defendants in the *Loew's* case.[45] A package generally contained 20 to 60 films, representative of particular subdivisions within an owner's library, with one defendant using a block of 126 films or even more.[46] The average value of a film in what

---

42.  Id. at 524. Under lump-sum rentals, for example, a theater would invest $1 more in promotion to generate incremental revenues of $1.01. That marginal investment would not be made when paying, say, 10 percent of such incremental revenues to the distributor would leave the theater with a net gain of only 90 cents from its $1 expenditure.

43.  Ibid. See also Ricard Gil, Revenue Sharing Distortions and Vertical Integration in the Movie Industry, 25 J.L. Econ. Org. 579 (2009) (noting advantages that vertically integrated theaters had, some of which could be addressed by contractual controls).

44.  Kenney & Klein, note 33, at 539.

45.  *United States v. Loew's*, 371 U.S. 38 (1962).

46.  Brief for United States at 7–11, *Loew's*.

was said to be a representative block was $200.[47] This modest value may imply that the packages at issue included only minor films for largely fungible local broadcast rather than premier films or network exhibition.[48]

Pricing each film separately was said to be impractical.[49] Theater patronage years ago does not accurately predict current popularity on television, yet prior popularity can be adjusted for changes in public taste to certain stories, actors, or styles.[50] Assembling a test audience before licensing or surveying actual viewership in selected localities and adjusting it for station quality could be too costly relative to the modest average value of each film.

Average pricing of a block of films avoided those costs and, when coupled with block-booking, also avoided the search costs that broadcasters would otherwise undertake in order to rent only those films whose value exceeded the average, leaving the libraries with the less valuable films unrented. As before, average pricing can be practiced only when buyers are prevented from selecting films individually.

Of course, we may wonder why only half the distributors' contracts covered film blocks notwithstanding the alleged efficiencies of block-booking, how the distributors accurately decided which films to license separately and which to assign to almost random blocks, how blocks saved search costs for broadcasters who regarded films so fungibly as to program them at random, or how distributors priced subsequent packages without allegedly burdensome follow-up surveys of actual audiences. If applicable at all, moreover, the efficiency claim cannot fully explain the tie in *Loew's*, where some packages contained films that were in foreign languages without subtitles and thus were known to be of zero value.[51]

In any event, the efficiency of average pricing was not addressed by the Supreme Court, which condemned the packages

47. Roy W. Kenney & Benjamin Klein, The Economics of Block Booking, 26 J.L. & Econ. 497, 536 (1983), citing *Loew's* record 803-806 (average rental prices over three years for films in a block from National Telefilm Associates (NTA); in some markets the average rental price for NTA blocks was less than $20).

48. Ibid. To program the film to be broadcast at a particular time, stations often selected one at random from a block of rented films. Id. at 537.

49. Id. at 537-538.

50. For example, extravagant color musicals of the 1930s might be less appealing on small black-and-white television screens and to contemporary tastes than when shown in theaters. Similarly, gangster films of that period might seem to have little modern value, although some of them and their stars (e.g., Bogart or Cagney) have reached cult status.

51. Brief for United States at 17, *Loew's*.

simply because of their nontrivial dollar volume of foreclosure. Beyond that, the Justice Department had argued that this block-booking impaired competition both among television stations and among film owners. Smaller or less prosperous stations could not afford the full blocks purchased by their rivals. Moreover, broadcasters forced to rent blocks of films would have less occasion to rent other films, even superior ones and especially the largely fungible lower-quality films.[52]

*1717e3. Related search cost issues.* In appropriate circumstances, average pricing within a package might be more efficient than individual pricing. The first condition is that the aggregate search and administration costs of sellers and buyers be lower for determining the average value of the product than for determining the individual value of each item. Second, buyers must have the incentive and ability to incur the costs of selecting only those items whose value exceeds the average price. The first condition means that significant costs can be saved by average pricing; the second condition means that sellers cannot afford to use average pricing so long as buyers are free to pick and choose their purchases. When these two conditions are satisfied, a mandatory package reduces costs and benefits consumers.

To illustrate by simplifying an actual practice, suppose that there are 2,000 classes of diamonds; that substantial variations exist within each class; that a random barrel of each class contains an equal number of each variation, so that a random cupful from each barrel approximates the barrel's average value; and that all buyers are dealers or manufacturers who need at least a cup of any class purchased. In this model, selling diamonds only in such random cups at the average price for each diamond within a class saves the costs of sorting and valuing each individual diamond within a class. To be sure, the buyer may have to bear the costs of sorting in using or reselling individual diamonds, but society saves the resources that would be consumed if the original seller had also searched and sorted. Obviously, this saving cannot be realized without the package. If diamonds within a class were priced at their average value, customers free to pick and choose would select only those diamonds exceeding the average quality. To avoid that adverse selection, suppliers would have to sort and

---

52.  Brief for United States at 5, *Loew's.*

price each diamond individually, thus increasing social costs, which would ultimately be borne by consumers.[53]

**1717f. Cost savings from quasi-vertical integration and package licensing.** As before, the remainder of the present Paragraph assumes a prima facie illegal tie and asks whether significant evidence of cost savings (including customer convenience) might save the arrangement. Assuming an affirmative answer when the evidence makes clear that the savings are substantial and cannot be obtained as well through less restrictive means, should the defendant also be excused when the evidence is not so clear? Because cost savings may be easy to claim but hard to prove, we are repeatedly in danger of excusing too much or too little. Again, however, that dilemma would not be confronted so often if foreclosing a substantial share of the alleged second market were a prerequisite (or its absence were a rebuttal) to prima facie illegality.[54]

*1717f1. Bundled products or services in vertical integration.* As noted previously, ties are ubiquitous in modern product-differentiated markets characterized by product differentiation and asset specificity.[55] The word "tying" often encompasses bundled products or services provided by the integrated firm that engages in further processing or otherwise performs internally a service that customers might have purchased from others. Customers do not purchase elsewhere when a needed first product is available only in conjunction with the second, or the price of the first includes the second, or would-be rivals cannot obtain needed supplies or access from the defendant. For example, a hospital provides anesthesiology, radiology, nursing, food, and laundry service, denying independent purveyors access to the premises.[56] A manufacturer delivers its automobiles to dealers, inherently excluding any other deliverer.[57] A seller bundles installation

53. See Kenney & Klein, note 47, 26 J.L. & Econ. at 503-516, who describe the diamond trade as similar to the block-booking model.

54. For example, in *MCA Television Limited v. Public Interest Corp.*, 171 F.3d 1265 (11th Cir. 1999), the court condemned block-booking of television shows without testing foreclosure in any properly defined relevant market.

55. See ¶1716; and Herbert Hovenkamp, Harvard, Chicago and Transaction Cost Economics in Antitrust Analysis, 55 Antitrust Bull. 613 (2010), available at *http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1592476.*

56. Cf. *Hyde v. Jefferson Parish Hosp. Dist. No. 2*, 686 F.2d 286 (5th Cir. 1982), rev'd on other grounds, 466 U.S. 2 (1984) (unjustified tie where anesthesiology was provided by one group of outside physicians exclusively).

57. *Anderson Foreign Motors v. New England Toyota Distrib.*, 475 F. Supp. 973 (D. Mass. 1979).

charges into the price of the product[58] or a university provides and requires its students to live in the school's on-campus housing,[59] thereby dissuading customers from buying installation services or housing from anyone else. Or a manufacturer declines to sell unique repair parts for its machine to independent repairers, thus excluding them from offering repair service or parts to purchasers of that machine,[60] or declines to sell the operating software for its own computers to other computer makers.[61] Assuming such ties are exclusionary on other grounds, should cost savings be accepted in principle? And if so, should defendants be required to prove specific cost savings in order to justify them?

To pause on one of these examples, consider a hospital's claim that anesthesiology would be provided more efficiently by employee-physicians than by independent contractors selected by each patient (or surgeon). Employees would rotate night and holiday availability and could be scheduled to begin operations promptly and thus free up scarce operating rooms for the next patient. Moreover, the sum of employee compensation might well be less than the total sums paid anesthesiologists hired by each patient for each operation.[62] Most important, employees would be responsible for developing the department and recruiting and training physicians, nurses, and technicians managing equipment and supplies — all in a way that occasional users of the operating room would not. If an individual anesthesiologist is compensated

solely on the [...]
tive to make [...]
cating other [...]
provide eme[...]
portion of s[...]
obtain a free [...]

In a case [...]
of physicians [...]
not arise, bu[...]
group said th[...]
sivity, and the [...]
delayed or len[...]
supervised sta[...]
the hospital co[...]
tor the quality [...]
dents who wish[...]

A court ad[...]
provision of the[...]
permissible inte[...]
that internal p[...]
vices was superi[...]
dents provide s[...]
"normally" integ[...]
fee-for-service me[...]
ence for such fe[...]
employees?

If such integr[...]
arises: allowing [...]
would excuse mo[...]
tional ties), while [...]
gration tends to [...]
product or service [...]

*1717f2. Cost s[...]*
extreme in contrac[...]
key" franchise, wh[...]
license and fully eq[...]
ness method. Witho[...]
acquiring land, cons[...]

58.  United States v. Jerrold Elecs. Corp., 187 F. Supp. 545 (E.D. Pa. 1960), aff'd per curiam, 365 U.S. 567 (1961).

59.  Hack v. President & Fellows of Yale College, 16 F. Supp. 2d 183 (D. Conn. 1998), aff'd, 237 F.3d 81 (2d Cir. 2000) (prior to admission decision Yale was in competition with other elite colleges; further, students knew already at that time of Yale's policy of requiring matriculants to live in housing provided by the defendant; no "lock in" and thus no power); Gonzalez v. St. Margaret's Housing Dev. Fund Corp., 880 F.2d 1514 (2d Cir. 1989) (bundling of meal charges in price of rooms for elderly; remanded for assessment of competitive effects). See ¶1718).

60.  E.g., Eastman Kodak Co. v. Image Technical Service, 504 U.S. 451 (1992); Warriner Hermetics v. Copeland Refrigeration Corp., 463 F.2d 1002 (5th Cir.), cert. denied, 409 U.S. 1086 (1972).

61.  See Data General Corp. Antitrust Litig., 490 F. Supp. 1089, 1122-1123 (N.D. Cal. 1980). The tie was ultimately condemned, 734 F.2d 1336 (9th Cir. 1984), cert. denied, 473 U.S. 908 (1985).

62.  Are such reduced payments less of a redeeming virtue if they (1) result from hospital monopsony power (which seems unlikely in the long run if doctors are mobile) rather than from better information, more careful purchasing by hospitals than by patients or their surgeons, or more efficient utilization of a smaller number of anesthesiologists; or (2) are not passed on directly to patients in the form of a separate billing for these services at lower rates than independents previously charged?

63.  See William J. Lyn[...]
Econ. 399, 404 (1987).

64.  Hyde v. Jefferson [...]
other grounds, 456 U.S. 2[...]

solely on the basis of each operation, she would have little incentive to make uncompensated investments in training the staff, educating other doctors, maintaining the equipment, or standing by to provide emergency service. Such an individual would reap only a portion of such investments, while other anesthesiologists would obtain a free ride on those efforts.[63]

In a case involving a hospital's exclusive contract with a group of physicians to provide these services, the compensation point did not arise, but the others were rejected by the Fifth Circuit.[64] The group said that it would provide 24-hour coverage without exclusivity, and the court saw no demonstration that independents had delayed or lengthened use of operating rooms or had monitored or supervised staff and equipment in an inferior manner. Moreover, the hospital could manage and develop the department and monitor the quality of doctors without excluding qualified independents who wished to use its operating rooms.

A court adopting such an approach toward a hospital's self-provision of these services effectively makes itself the arbiter of permissible integration, demanding that the hospital demonstrate that internal provision of food, laundry, nursing, or medical services was superior to operating a medical hotel in which independents provide such services. While one might distinguish such "normally" integrated services from the normally unintegrated fee-for-service medicine, what antitrust purpose compels a preference for such fee-for-service practice over doctors as hospital employees?

If such integration is regarded as a tie, the usual dilemma arises: allowing a defense with plausible but unclear evidence would excuse most vertical integration (and many more traditional ties), while demanding demonstrated superiority of the integration tends to forbid a defendant from integrating into any product or service that a nonemployee would like to provide.

*1717f2. Cost savings from provision of turnkey franchise.* The extreme in contractual vertical integration with ties is the "turnkey" franchise, which provides a franchisee with a trademark license and fully equipped premises as well as a product and business method. Without the delays of selecting a productive site, acquiring land, constructing a building, installing equipment, and

63.  See William J. Lynk & Michael A. Morrisey, The Economic Basis of *Hyde*, 30 J.L. & Econ. 399, 404 (1987).

64.  *Hyde v. Jefferson Parish Hosp. Dist. No. 2*, 685 F.2d 286, 292 (5th Cir. 1982), rev'd on other grounds, 466 U.S. 2 (1984).

237

settling on products and business method, the turnkey franchisee begins operation immediately. Moreover, the franchisor's greater experience on these matters may occasion fewer errors and lower costs in site selection, leasing, building, and equipping.

Although it is hard to see any substantial foreclosure of the land, building, or equipment markets and although franchisees usually accept turnkeys voluntarily, some courts have found an illegal tie.[65] In any event, cost savings affect the legitimacy of the arrangement — as recognized by those courts finding no tie in selling a going business, including numerous elements that could be sold separately,[66] or in combining a franchise with a land and building lease.[67] The courts have recognized cost savings, convenience, and utility as legitimate when they either refused to characterize an occasional turnkey package as a tie (presumably because disposing of each component individually would sacrifice the value of the going enterprise and increase transaction costs) or when they explicitly approved the reasonableness of site selection, leasing, and building by the franchisor. Such implicit or explicit approvals would presumably be expressed as defenses if those courts felt obliged to characterize the turnkey package as a tie-in.

If recognized in principle as legitimate, how precisely must lower costs (or greater utility) be proved? To require close measurement would largely eliminate any defense because the parties seldom have reliable cost data for the franchisor's package relative to that for an "average" franchisee's own provision of each component.

As a less restrictive alternative, franchisors might offer franchisees a trademark license either alone or as part of an optional turnkey package. While suppliers can sometimes manipulate the package and component prices so as to eliminate any real choice, such manipulation is impossible when the trademark license rate is priced uniformly and separately from any accompanying lease

---

65. E.g., *Northern v. McGraw-Edison*, 542 F.2d 1336, 1347 (8th Cir. 1976), cert. denied, 429 U.S. 1097 (1977) (rejecting defense of customer convenience). Cf. *Beefy Trail v. Beefy King Int'l.*, 348 F. Supp. 799, 807 (M.D. Fla. 1972) (no tie if isolated transaction; would be otherwise if general practice designed to circumvent tying prohibition — not elaborated).

66. E.g., *Beefy Trail v. Beefy King Int'l.*, 348 F. Supp. 799, 807 (M.D. Fla. 1972) (franchisor could require prospective franchisee to purchase its restaurant equipment from the franchisor).

67. See *Principe v. McDonald's Corp.*, 631 F.2d 303, 308 (4th Cir. 1980), cert. denied, 451 U.S. 970 (1981); *Kypta v. McDonald's Corp.*, 1980-1 Trade Cas. ¶63,267, at 78,370 (S.D. Fla.), aff'd on other grounds, 671 F.2d 1282 (11th Cir.), cert. denied, 459 U.S. 857 (1982) (authorization to operate specific McDonald's-built restaurant is single product rather than tie of franchise name and facility).

of premises and equipment.[68] To the defendant who attempts to justify the package solely in terms of the franchisee's convenience, the court will likely reply that the defendant could have offered a complete package without conditioning the franchise on the leasing arrangement, allowing franchisees to accept the package when convenient for themselves.[69]

In at least three situations, however, the defendant should be able to show that the option alternative will sacrifice value, raise transaction costs, or otherwise be impractical or ineffective. *First*, a defendant franchising an operation previously conducted by its own employees reduces transaction costs and increases value by selling the going business as a package.[70]

*Second*, site selection may be crucial for prosperity — neither too close to nor too far from existing licensees or competitors relative to an area's potential patronage, rents, zoning, and the like. The franchisor probably has more experience than franchisees in gathering and interpreting the relevant demographic and business data and more incentive to consider the impact on existing franchisees in order to build the aggregate patronage for the trademark. Although the franchisor might select a block and let the franchisee shop around for a specific lease there, this procedure may be slower and more expensive in land acquisition and would deprive the franchisor of the benefits of its research and knowledge in site selection if the franchisee later shifts to a different trademark. If it is reasonable for the franchisor to choose the site in the first instance, it should be able to acquire and to lease the site as a package with the trademark license.[71]

*Third*, an option may not be practical for smaller franchisors who lack an inventory of both turnkey franchises and mere licenses. Even with such an inventory, a prospective franchisee may lack a choice in its own community, where it has the best

68. See, e.g., *Principe*, 631 F.2d at 307 (license and lease priced individually within the package).

69. E.g., *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 725 (7th Cir. 1979), cert. denied, 445 U.S. 917 (1980).

70. *Beefy Trail*, 348 F. Supp. at 806, recognized this but denied summary judgment for the defendant because of the possibility that "the franchisor by an intentional course of conduct seeks to circumvent antitrust laws concerning tying arrangements . . . ." Though conceivable that a franchisor would build and operate restaurants for a nominal period in order to force later franchisees to buy equipment (etc.) from it, this possibility does not itself support denying summary judgment for defendant in the absence of evidence pointing in that direction — evidence notably absent in the disposition of several operations by a relatively local franchisor in *Beefy Trail*. See id. at 807.

71. For these reasons, among others, *Principe*, 631 F.2d at 310-311, found the package reasonable.

Case 1:09-cv-00547-JFM    Document 205-39    Filed 03/21/14    Page 51 of 91

chance to develop the business. Although a franchisor might choose an approximate site and then negotiate with prospective franchisees as to whether franchisor or franchisee would acquire the land and build and equip the premises, several practical and legal questions arise. When an opportunity to acquire promising land appears, must a franchisor first appoint a franchisee for the area and then negotiate over who makes the acquisition? By what criteria would an antitrust tribunal test the franchisor's selection of an apparently energetic franchisee with little capital who preferred a turnkey franchise rather than an applicant who had more capital but who seemed to underestimate the cost of arranging these matters for itself or who displayed a less entrepreneurial or more corner-cutting temperament that would jeopardize quality? In these respects and in others, the option alternative to a package transaction may be substantially less effective or more costly.

*1717f3.   Cost savings from package licensing of patents or blanket copyright license.*   A package license of patents, especially those that are used in combination or as alternatives, highlights legitimate savings in transaction costs. For example, the administrative costs per patent of negotiating, licensing, and bookkeeping are less for a transaction covering several patents. This kind of saving can be expressed in the form of lower prices for the package than the sum of royalties for the individual patents. Second, the value of a package to licensees might be more readily ascertainable than the value of each patent individually.[72] A customer option does not meet this interest of the patentee. Third, a package might reduce the cost of detecting infringements. For example, inspecting the finished product may reveal whether one key patent was used (because the product cannot be made without it) but not whether a second patent was used (because the product can be made, though inefficiently, without it). This saving might be captured by a discount on the key patent when packaged with the others, although quantifying the savings in monitoring infringement of other patents may be difficult.

---

72.   Indeed, additional patents may add little or nothing to the value of the dominant patent within the package such that the license fee would not be appreciably less for licensing the dominant patent alone. In that event, perhaps licensing that patent alone or with others for the same price should not be regarded as a tie-in at all. See ¶1718h and ¶1782a. For fuller elaboration of the cost saving from intellectual property packages generally, see Herbert Hovenkamp, Mark D. Janis, Mark A. Lemley, & Christopher R. Leslie, IP and Antitrust: An Analysis of Antitrust Principles Applied to Intellectual Property Law ch. 22 (2d ed. 2009 & Supp.).

A copyright pool, such as ASCAP or BMI, has typically licensed performance rights for all the music in the pool (for some occasion or period of time) in return for a specified fee that is related to the licensee's prospective revenues. Thus, a dance band might pay $50 per night while a television network might pay $5 million per year. Such a "blanket license" might be seen as a tie in the sense that the customer desiring to license one song must take a license of thousands of compositions.

Forcing a licensee to take a thousand songs, however, may not describe the transaction's essence. From among the many songs licensed, a band could not physically play more than a few in the course of an evening. Although the band might have included some uncopyrighted music in the absence of the blanket license, the value of one copyrighted song is not necessarily less than the hypothetical $50 charged for all. Similarly, if a network needs one piece of music during a certain program, the value of the license depends upon the music's contribution to network revenues, not on the number of songs played. One might therefore doubt that the fee structure should be deemed a tie at all.

For a different reason, the lower court found no tie in the *ASCAP* case.[73] Although ASCAP gave only blanket licenses, individual licenses could still be sought from individual copyright holders. "Bundling" occurred only to the extent that it was cheaper to purchase a blanket license than to negotiate with each right holder individually.

In any event, there are obvious economies in blanket licensing — primarily the cost saved in monitoring infringement — that have been favorably recognized in several cases. In one, the Catholic Church in Chicago charged a flat fee to license any or all of its liturgical music for a year.[74] Reversing judgment for the challenger, the court concluded that blanket licenses reduced transaction costs because licenses for individual compositions would be more costly and would require more monitoring to assure that only the licensed work was copied.[75]

73. *CBS v. ASCAP*, 562 F.2d 130 (2d Cir. 1977), rev'd on other grounds sub nom. *BMI v. CBS*, 441 U.S. 1 (1979).

74. *F.E.L. Publications v. Catholic Bishop of Chicago*, 1982-1 Trade Cas. ¶64,632 (7th Cir.), cert. denied, 459 U.S. 859 (1982).

75. The court also observed, without elaboration, that the blanket license better deals with the "unique problems associated with the Roman Catholic liturgical music market." Id. at 73,465. On blanket licenses as saving monitoring costs, see ¶2132c.

Case 1:09-cv-00547-JFM   Document 205-39   Filed 03/21/14   Page 53 of 91

Another challenge involved blanket licenses for bars and similar establishments.[76] The court approved the blanket license to BMI's full repertory of a million songs; the license fee was based on the user's total expenditures for entertainment rather than on the number of songs used. A lesser grouping could not be insisted upon, for there was no consensus on how to categorize music and thus any grouping would be of uncertain legality. The court also concluded that basing prices on the actual music used would fail to compensate BMI for giving advance freedom to use any composition and would also have unduly high sampling, monitoring, accounting, and other transaction costs. Finally, the court understood that it was no less expensive for BMI to provide access to a more limited repertory of songs than to its full repertory, that the value of the license to licensees or to BMI did not depend upon the number of songs used, and that users were, in effect, asking the court to set the price for licenses — an unsuitable judicial task — on some basis other than the one that BMI employed.[77]

Viewing the issue as a defense for cost savings raises the usual question of how much proof of such savings should be required. But perhaps the true issue is not so much one of defense as one of the legality of a pricing scheme that rests on the licensee's nature or revenues rather than the number of items used.

*1717f4. Condominium with management or amenities contract.* In the course of preparing to sell condominium properties, a developer or other property owner naturally contracted with someone (often an affiliated firm) to manage the property or to supply related services such as a swimming pool or health club. When the contract terms later appeared onerous after service charges escalated in the course of inflation or other developments, the condo purchasers saw themselves as victims of a tie of the contract to the condominium.[78] In response, the developer argued either that condominium and contract comprised a single product or that any combination was justified by customer convenience because most purchasers want professional management and many will want to

---

76.   *Broadcast Music v. Moor-Law,* 527 F. Supp. 758 (D. Del. 1981), aff'd mem., 691 F.2d 490 (3d Cir. 1982).

77.   For further elaboration of these and related issues pertaining to blanket licenses of musical compositions, see Hovenkamp, Janis, Lemley, & Leslie, note 72, ch. 22.

78.   E.g., *Miller v. Granados,* 529 F.2d 393 (5th Cir. 1976) (reversing dismissal because all justifications legally irrelevant but remanding to determine if management contract constitutes a tie at all). For further development of the issue, see Herbert Hovenkamp, Tying Arrangements in the Real Estate Market: Federal Antitrust and Local Land Development Policy, 33 Hastings L.J. 325 (1981).

know its identity, reputation, and charges.[79] That response seems persuasive, especially in the present context, where only a single firm would ever supply the "tied" product during any given period. Consider, however, whether the defendant's persuasiveness depends on the "reasonableness" of the contract's pricing, duration, and other terms.

Several courts have thought so, without explaining why which terms need to be "reasonable" or in what sense.[80] Assuming that we see two products, the claimed justification can extend no farther than the customer convenience it invokes. Purchasers may want or need in-place management without wanting or needing a perpetual one. Apart from a rare contract that locks in very advantageous terms for the residents, a contract of undue duration is a more restrictive foreclosure than needed to serve customer convenience. The price term of the management contract is relevant, if at all, in a different way. An exploitative price in this context is not a restraint. A "sweetheart" deal between the developer and its affiliated management arm amounts to an incremental price for the condominium that is paid in installments over the life of the management contract and thus does not itself restrain competition or limit the competitive opportunities of rival suppliers of the tied or tying product. To be sure, disguising the property price in a continuing management fee may mislead inattentive customers, which means that customer convenience does not *wholly* motivate a tie that has been found prima facie illegal on other grounds. Nevertheless, antitrust courts do not insist that the legitimate functions of challenged conduct motivate it exclusively.

An excessive price for management service standing alone does not negate a customer-convenience defense, while excessive duration does do so. As usual, of course, we would usually not have to face these questions, much less to measure duration or prices if foreclosure of a substantial share of the tied market became a prerequisite for prima facie illegality.

79. E.g., *Johnson v. Nationwide Indus.*, 715 F.2d 1233 (7th Cir. 1983) (affirming refusal to dismiss; facts concerning tie's existence or claimed justification not clear enough for pretrial resolution). The same point was expressed by the *Miller* developer as protection of its own goodwill so long as it had a substantial number of unsold units.

80. E.g., id.; *Foster v. West Alexandria Properties*, 1980-1 Trade Cas. ¶63,223 (E.D. Va. 1980) (one product when contract duration short); *Jones v. 247 East Chestnut Properties*, 1975-2 Trade Cas. ¶60,491 (N.D. Ill. 1974) (jury to decide reasonableness of contract, which continued five years after sale of last unit).

## ¶1718.    Miscellaneous Additional Functions or Effects

**1718a.    Introduction and summary.**    This Paragraph catalogs a miscellany of tying purposes or effects not considered previously. Significantly, all are nonleverage functions that do not depend on the defendant's achieving power in the tied market. Many turn out to implicate or restate earlier portions of this chapter. Others include highly particular explanations of conventional business practices that would be captured by a broadly inclusive tying dragnet, and some should probably not be deemed tie-ins at all. In each case we consider whether the stated function counts toward condemning an otherwise lawful tie or toward saving one that is otherwise unlawful either because of a per se rule or because a substantial foreclosure or other detriment has actually been proved. As usual, conditioning illegality on such proof would moot many vexing problems in identifying or appraising tie-ins.

Quite unpersuasive in judging tie-ins are general arguments that tie-ins promote the defendant's profits or efficiency (¶b), interfere with customer choices (¶c), or equalize customers' competition inter se (¶d). The profit-efficiency claim is inadequate until challengers or defenders explain it — for example, does the tie bring the defendant greater profits by obstructing entry or by increasing production and use? As that question illustrates, the profit-efficiency claim is mainly another label for the more specific topics already covered in this Subchapter and does not provide additional grounds for judging tie-ins affirmatively or negatively.

Interference with customer choice largely restates earlier discussions of diminished product variety or incremental exploitation of customers and is not the rationale for appraising ties, as the Supreme Court has recognized.[1] Similarly, a would-be customer's inability to obtain a tying or tied product that the defendant sells in combination to that customer's rivals does not reflect tying concerns.[2] Such situations are largely covered by the Chapter 16E analysis of a manufacturer that limits the distribution of its product to one dealer or a few dealers in each area or customer class. Finally in this group, a tie might force all customers to pay the same price for the tied product rather than searching out the best price or price-quality mix. This function is neither bad enough to

---

¶1718.    n.1.   See also ¶1706c (reduced product variety) and ¶¶1710-1712 (possible incremental exploitation of customers).

2.   See ¶1708.

condemn an otherwise lawful tie nor good enough to save one that is otherwise illegal.

Undesirable but insufficient to support a general condemnation of tying or even to help judge particular tie-ins are those that cheat an upstream supplier (¶e) or interfere with rival manufacturers' ability to examine and copy the tying product (¶f). Mainly idiosyncratic and perhaps outside the tying category altogether are combinations of overlapping items that duplicate rather than increase value (¶g) and combinations that increase value (¶h).[3]

**1718b. Greater profit or efficiency.** To explain a tie-in, the candid defendant may simply cite greater profit as the objective. That explanation is inadequate — not because profit is illegitimate but because the explanation is incomplete until the defendant explains how a tie increases profits more than do alternative means. For example, the value of the tying product can ordinarily be realized by charging whatever it is worth, without regard to any second product.[4] The defendant who claims that a tie is necessary to realize the value of the tying product must therefore claim that some peculiarity of its product or situation interferes with such a direct charge — perhaps that alternative methods of charging according to intensity of use of the tying product are inefficient[5] or

---

3. A few cases involve tying-like arrangements that defy classification. See, e.g., *Gonzalez v. St. Margaret's Housing Dev. Fund Corp.*, 880 F.2d 1514 (2d Cir. 1989), in which a charitable halfway house included a meal plan in its residency program, which was bundled in at a price less than the charity's cost. The Second Circuit remanded, seeing some basis for an unlawful tie. But foreclosure of the prepared food market (or some similar market) was not conceivable, and the activity appears not to involve "commerce" in any event. See ¶262.

Or consider *Reisner v. General Motors Corp.*, 511 F. Supp. 1167 (S.D.N.Y. 1981), aff'd on nonantitrust grounds, 671 F.2d 91 (2d Cir.), cert. denied, 459 U.S. 858 (1982). The plaintiff and defendant GM were involved in a joint venture for the production of performance automobiles; the plaintiff built them, using GM's engine and drivetrain. When the plaintiff switched to Ford engines GM withdrew its participation in the venture, which the plaintiff characterized as a tie of the engines and drivetrains. The court found that, assuming a tie existed, the joint venture was intended by GM to promote its engines and drivetrains via their inclusion in a performance car and that when the plaintiff switched to Ford engines this intention was frustrated. No firm — certainly one who is not a monopolist — has an obligation to enter into a joint venture with another. See ¶772c3. For example, suppose that speedboats require hulls, engines, electronics, and furnishings. Two firms negotiate to produce boats jointly, but the negotiations founder when the second firm insists on supplying both the engines and the electronics, and not the engines alone. Characterizing this refusal as unlawful tying of engines and electronics effectively requires the venture to proceed. Indeed, if the two firms are disputing about who should supply the electronics, *both* could be seen as insisting on a tie. In any event, it is not antitrust's purpose to manage the terms of joint ventures.

4. See ¶1706b.

5. See ¶1711e.

the one type of tying arrangement in which significant competitive harm was likely. Furthermore, the court crafted its rule of reason so narrowly that few firms other than Microsoft itself could ever qualify for it.[108]

**1720c. Conclusion and summary: the compelling case against tying's per se rule.** The preceding history of the development of the per se rule against tying raises some question about *Jefferson Parish*'s 1984 statement that "[i]t is far too late in the history of our antitrust jurisprudence to question" the per se illegality of tying.[109] That rule dates only from the 1947 *International Salt* decision, which rested on an "obvious" creeping tendency to monopoly that did not exist in that case. Moreover, even that rule was substantially modified when in 1977 *Fortner II* required genuine proof of power over the tying product.

The precursors in the patent infringement and misuse cases were themselves mixed. Although *Motion Picture Patents* involved industry domination of both the tying and tied products, its exclusion of sale or use of unpatented products from the definition of "patent infringement" became in *Morton Salt* a "patent misuse" that denied the patentee protection from undoubted infringements. By then, ties were feared as an "extension" of a patent monopoly into the market for unpatented products, notwithstanding the absence of any proof that any monopoly of the latter market had or could result.

Domination of the tied market occurred in the early tying cases — in fact, in *United Shoe* and in the Court's perception in *IBM* — as well as in the instances cited by the Clayton Act legislative history on which *Jefferson Parish* relied and in the later *Paramount* case. Where actual or prospective power in that market was absent, as in *Gratz* and *Sinclair*, no violation was found.

Nevertheless, since *International Salt*, the courts have regularly condemned ties that did not foreclose a significant share of the market for the tied product, even when it seemed obvious that any foreclosure share would be very small indeed. The reasons for doing so seem to include the language of the patent cases, the general belief that any "nonanticompetitive" functions of ties can be achieved in ways "much less inimical to competition," and the

---

108. A few other OS platforms might also qualify if they were found to have significant market power in a market defined in terms of the particular processor chip that they served. Two possibilities are the Apple Mac OS and the Palm OS. See Herbert Hovenkamp, IP Ties and *Microsoft*'s Rule of Reason, 47 Antitrust Bull. 369 (2002).

109. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 9 (1984).

unanalyzed perception that the remaining functions of tying severely threaten the health of competition in the tied market. The soundness of those beliefs and perceptions can be tested by the analysis of Chapter 17A and will be reviewed in the course of suggesting reforms in ¶¶1729-1730.

In any event, at this writing some 35 years have passed since *Fortner II*[110] and more than 25 years since *Jefferson Parish*.[111] That seems long enough to endure recognition that an antitrust rule is no longer serving its purpose. When the concern is foreclosure, application of the rule of reason is clearly called for. Assessment of foreclosure requires determining the extent of any exclusion, and this requires a market definition.[112] The appropriate foreclosure analysis in tying cases is not materially different than in exclusive-dealing cases. In exclusive dealing the complaint is that rivals are excluded from access to a particular dealer or set of dealers. In tying the complaint is most typically that rivals in the tied market are foreclosed from tied-product sales within that market. The Supreme Court recognized the need for market analysis already in its *Tampa*[113] decision, and the courts have always applied a full rule of reason inquiry into exclusive dealing.[114]

Recent attempts in the scholarly literature to defend a per se rule have been based almost exclusively on concerns about leverage, or extraction of higher profits from consumers aside from any foreclosure possibility. The arguments for per se, or quasi per se, illegality rest on some subset of the following propositions, which were discussed in greater detail earlier: *first*, that there are instances in which a firm can extract additional profits from the customer by tying two products together;[115] *second*, that output is rarely increased by tying, mainly because the tying-product price is not reduced or may even be increased, or alternatively, that output effects are unimportant and in any event are offset by the fact that ties reallocate "some output to buyers who put less value on it";[116] *third*, that double marginalization does not occur or can be

---

110.   *United States Steel Corp. v. Fortner Enters.*, 429 U.S. 610 (1977).
111.   *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984).
112.   See ¶1704.
113.   *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961). See ¶1801i; on *Tampa's* relevance to tying foreclosure, see ¶1709c3.
114.   See ¶1820.
115.   See ¶¶1700d1, 1710. See also ¶1701b. While the *Motion Picture Patents* case discussed in ¶1701b spoke of leverage, the real concern in that decision was foreclosure. And see ¶1706 (leveraging of sequential monopolies).
116.   Einer Elhauge, Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory, 123 Harv. L. Rev. 397, 405 (2009). See also id. at 430-434. And see Nicholas

safely ignored;[117] and *fourth*, that cost savings or product or service improvement are not primary motives for tying, and are thus best considered only as a defense.

On the first proposition, while the critique of the tying "leverage" theory remains robust,[118] some instances of tying do have the result that some customers pay higher prices. This is particularly true of variable-proportion ties in which high-intensity users of the tied product pay more for the combination as a result of the redistribution of prices that the tying involves.[119] However, in most of these cases the tying arrangement brings many new customers into the market and results in lower prices for the lower-use customers. Further, in the great majority of cases the gains experienced by the gainers are greater than the losses suffered by the losers.[120] Even in these cases, the proposition that some customers suffer losses depends on an assumption that neither the elimination of double marginalization, discussed below, nor the creation of production scale economies is sufficient to offset the higher prices.

Second, output effects strongly weigh in favor of presumptive legality and rule of reason treatment. One unfortunate consequence of the per se rule, however, is that price changes and output effects that result from a tie have not been relevant to questions of legality. As a result the decisions typically do not mention them. Occasional decisions do, however, and with no exceptions of which we are aware these cases state that as a consequence of the tie the defendant reduced the price of the tying product from its standalone profit-maximizing level, often dramatically, sometimes to below cost, and sometimes even to zero.[121] The result is that more of the tying product is sold, and in some cases much more, depending on the elasticities of demand. When a customer is brought into this market who was not in it under separate sales,

---

Economides, Tying, Bundling, and Loyalty/Requirement Rebates, in Research Handbook on the Economics of Antitrust Law (Einer Elhauge ed., 2011).

117. For example, neither Elhauge, id., nor Economides, id., discuss double marginalization as a benign rationale for tying or bundling. For further development, see ¶¶1704c4, 1712; and Erik N. Hovenkamp & Herbert Hovenkamp, Tying Arrangements and Competitive Harm, 52 Ariz. L. Rev. 925, 958-963 (2010), available at *http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1443284*. In the context of vertical integration by the monopolist, see ¶758; in the context of vertical mergers, see ¶1022.

118. See ¶1711.

119. Ibid.

120. Ibid.; and see Erik Hovenkamp & Herbert Hovenkamp article, note 117, 52 Ariz. L. Rev. at 928-945.

121. The cases are collected and discussed in ¶1711b1. See also Erik Hovenkamp & Herbert Hovenkamp article, 52 Ariz. L. Rev. at 939-944 & notes.

its purchases are a pure consumer gain, even at a higher price for the tied product.[122] Further, some lower-intensity customers gain even if they had purchased previously, because the price cut in the tying product is more than enough to offset the price increase in the tied product.[123] Some of the courts have recognized this by denying damages to tying customers who cannot show that the *sum* of the two prices they paid under tying is greater than the separate product prices.[124]

To illustrate these effects, imagine that a franchisor could maximize its profits by charging a $20,000 annual fixed franchise fee and permitting all consumables to be sold at the market price, which we presume to be competitive.[125] In that case 50 franchisees would sign up. The franchisor could also charge a $10,000 annual franchise fee but sell one or more consumables at a higher-than-market price. The lower fee would induce 50 additional franchisees, or a total of 100, to sign up. Among these franchisees, some of the 50 original ones ("high volume" franchisees) end up paying more because their annual use of the consumables exceeds $10,000. Others of the 50 original franchisees ("medium volume") pay less, however, because the increment in consumable prices is less than $10,000 and they are thus better off as a result of the tying-product price reduction. The 50 "new" franchisees ("low volume") would not have been in the market at all under the single-monopoly price. Their gains are a pure consumer welfare improvement. In sum, two groups of franchisees (low volume and medium volume) gain, while a third group (high volume) is worse off. The franchisor profits from the high- and low-volume franchisees, but loses on the medium-volume franchisees. Under most realistic assumptions both economic welfare and consumer welfare are increased.

Such arrangements exist across the full range of market structures, from absolutely monopolized to highly competitive.[126] Both

122. Erik Hovenkamp & Herbert Hovenkamp, id.

123. Ibid.

124. E.g., *Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1285 (11th Cir. 1982) (injury must be shown by reference to overcharge in sum of tying and tied product, not by overcharge in tied product alone).

125. This assumption avoids concerns about double marginalization, which do not generally apply if one of the two goods is sold under competition. See ¶1712.

126. See, e.g., *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43 (9th Cir. 1971) (competitively structured fast-food market in which defendant franchisor was a minor player). On the necessity of market power in the tying product, see Ch. 17C.

dominant and nondominant firms use ties. As a result monopolizing cannot be the only explanation of such tying and is not very likely an important explanation in most cases. Further, when a practice increases output the inference of consumer benefit must be regarded as very strong.

To be sure, one cannot rule out the possibility that some ties reduce output, most likely because they are accompanied by price increases in the tying product, or at least by prices that are not changed. The literature on bundled discounts does hypothesize situations in which bundling is accompanied by a price increase in the primary product. But in those cases the cause of the harm is foreclosure, or exclusion, rather than monopoly.[127] In any event, contractual ties do not have an analogue.

One argument against some types of price discrimination is that it can reallocate output from higher-value to lower-value consumers, and this would constitute a form of injury. This type of redistribution occurs when a seller segregates two or more groups of customers a priori and sells to them at different prices. For example, suppose that the seller segregates commercial and residential users, charging the first $100 and the second $60 per unit.[128] A commercial buyer willing to pay $99 will be turned away, while a residential purchaser willing to pay $61 will be served. This characteristic of "third degree" price discrimination entails that such discrimination schemes cannot increase welfare unless they also increase output.[129] Tying arrangements, however, are an instance of "second degree" price discrimination in which a common set of prices and terms are announced in advance and customers select how much they want to purchase.[130] Such arrangement do cause a deviation from perfect competition to the extent that all buyers pay less than the standalone price for one product and more for a different one; but there is no transfer from

127. See, e.g., Patrick Greenlee, David Reitman, & David S. Sibley, An Antitrust Analysis of Bundled Loyalty Discounts, 26 Intl. J. Indus. Org. 1132, 1137 (2008); Barry Nalebuff, Exclusionary Bundling, 50 Antitrust Bull. 321, 324-327 (2005); and see ¶749d7 in the Supplement, which concludes that the ordinary tests for exclusionary bundling will work in such cases.

128. General Talking Pictures Corp. v. Western Elec. Co., 305 U.S. 124 (1938) (licensing of technology to produce sound amplifiers at different rates to producers for commercial use and for home use); ProCD, Inc. v. Zeidenberg, 86 F.3d 1447 (7th Cir. 1996) (licensing of database to commercial and residential users at different rates). See Christina Bohannan, Copyright Preemption of Contracts, 67 Md. L. Rev. 616 (2008).

129. See Erik Hovenkamp & Herbert Hovenkamp article, note 117, 52 Ariz. L. Rev. at 934.

130. Other common examples are quantity discounts or price gradations by customer-chosen classes of service. See id.

higher-value to lower-value purchasers. For example, if a printer manufacturer ties by dropping the price of a printer by $100 and increasing the price of cartridges by $10 to a price of $25, then each customer will purchase cartridges until the value she places on the next cartridge falls to $25. At the margin each customer will obtain the same value.

*Third*, the probability of double marginalization must be taken into account anytime a tie joins two markets in which prices are above costs. Some tying cases have involved tied commodities, such as ink or salt, that were sold in highly competitive markets. In these cases tying is not likely to produce significant savings from the avoidance of market power in the secondary market. But many other cases, often in higher-technology markets, cannot be so characterized. Further, the price discrimination explanation for tying does not depend on the existence of double marginalization.

In the tying context, double marginalization occurs when two firms make complementary goods (such as a printer and ink cartridge, or a stereo and speaker set) and each of them has some power over price. The markets need not be monopolized, but they must exhibit prices above the competitive level such as characterize an oligopoly. In that case each firm selling only one of the two goods will set a price that is "too high" in relation to the price being set by the complementary good. If the two firms were able to bargain with each other, they would each increase output and offer a lower joint price, but only if each could be assured of selling the companion to the sale that the other made at the lower price.[131]

To take a simplified illustration, ¶758 showed the impact of double marginalization in vertical distribution when the upstream firm ("manufacturer") is a monopolist. As a variation, suppose that a manufacturer of stereos sells them at $300 each to a dealer who adds speakers and sells them to customers. The competitive markup for adding speakers and retailing the units is $100, but in this case the dealer charges $200. At that price the stereo manufacturer is losing money because its output is too low. The example illustrates the high degree of artificiality in our distinction between vertical and complementary relationships: if the stereo manufacturer sells to the dealer, who adds speakers and resells to customers, we describe this relationship as "vertical." By contrast, if the first firm makes stereos and the second firm makes speakers and

131. See ¶1712.

each sells to customers who use them in pairs, then the relationship is regarded as complementary. The economic analysis does not differ significantly, however. In this case, the stereo manufacturer maximizes its output and profits when the speaker markup is competitive. Faced with excessive markups in speakers, the stereo maker would have an incentive to make and add its own speakers, increasing output to the single-monopoly level and reducing prices. Alternatively, the stereo maker and speaker maker might agree on the single-monopoly price and output, which would be a lower price for consumers and a higher output for each of them.

However, in both the case where the stereo maker entered the speaker market and the case in which it reached an agreement with an independent speaker maker, the profitability of the arrangement would depend on the sales of stereo-plus-speaker as a package. Just as in the purely vertical arrangement, joint maximization and the lower prices that result occur only when a single firm sells in both markets itself or the two firms coordinate their output and sell together. A bundled discount typically achieves this result; by selling the bundle in a single transaction the seller eliminates double marginalization and thus maximizes its profits at a lower price.[132]

Finally, the importance of cost savings or improved product or services cannot be underestimated. Indeed, this is an important reason that tying is so ubiquitous in competitive as well as noncompetitive markets. The fact is that most of the litigated ties over the past century have not involved monopolists, and many have involved firms in quite competitive markets. The lengthy Paragraphs on defenses in this book offer a survey of the cases, with the explanations of joint cost savings and quality control tending to dominate.[133]

In sum, tying is not even arguably in the range of "naked" practices whose profitability depends on market power.[134] Even in the case of a tying monopolist, the tie most typically serves to increase output via price discrimination. Otherwise it is used to control the double marginalization that occurs when firms in the secondary market have power as well. And the defenses of production or distribution cost savings or product improvement

---

132.  See ¶¶749, 758.
133.  See ¶¶1716-1717 (on the rationales); and ¶¶1761-1762 (raised as defenses).
134.  See ¶1906.

apply just as much to monopolists as to competitors. When the tying firm is not a monopolist, as has been true in most cases, the rationales for presuming harm are even weaker.

## ¶1721.   Defining "Not Insubstantial" Volume of Tied Commerce

**1721a.   Introduction and preview.**   As seen in the last Paragraph, tying is unlawful under a special "per se rule" that requires both power over the tying product and coverage of a "not insubstantial" volume of commerce in the tied product. In ¶b, we will see that the volume in question is merely the dollar value of tied sales rather than the share of any defined market. Because this effects test is so easily satisfied in most tying cases and seems to have so little connection with any antitrust policy, we ask why the courts departed from the usual per se concept to require any effect at all in the particular case. We then consider whether this amount must be adjusted for inflation, multiyear ties, intrastate elements, or value added. Then ¶c shows that in most cases multiple transactions and purchasers have been required and, if present, have been counted even when the plaintiff is a single purchaser. However, purchases from other tying sellers are not aggregated. Finally, ¶d shows that nonforeclosing tied sales are not included.

**1721b.   Meaning and measurement.**   *1.   Dollar coverage, not share of defined market.*   In announcing the per se rule and giving summary judgment for the government, *International Salt* thought it "obvious" that competition in the tied market was impaired but pointed to no evidence of any such effect.[1] It was not obvious in the sense of the earlier *United Shoe* or *IBM* cases, where the defendant dominated the market for the tied and tying products.[2] The only fact bearing on effects in the *Salt* opinion was the tie's coverage of some $500,000 in annual sales of the tied product,[3] which the Court described as not "insignificant or insubstantial."[4]

*Northern Pacific* phrased the effects required as a "not insubstantial" amount of commerce affected by the tie.[5] It pointed to the

¶1721.   n.1.   *International Salt Co. v. United States*, 332 U.S. 392, 396 (1947).
2.   *United Shoe Mach. Corp. v. United States*, 258 U.S. 451, 458 (1922); *IBM v. United States*, 298 U.S. 131, 136 (1936). See ¶1720b2.
3.   *International Salt Co.*, 332 U.S. at 395.
4.   Id. at 396.
5.   *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 6 (1958).

Case 1:09-cv-00547-JFM    Document 205-39    Filed 03/21/14    Page 65 of 81

## ¶1729.  Proving Unreasonable Effects Under the Rule of Reason

**1729a.  Introduction and summary.**  Building on the detailed analysis of possible evils in Chapter 17A,[1] this Paragraph proposes criteria for proving or rebutting a substantial threat to competition under the rule of reason. Under these rules tying is usually lawful unless it forecloses a substantial share of a tied market that is highly concentrated or is likely to become so. This conclusion emerges from an examination of the core objection to tying, which has always been that it might so concentrate the tied market as to bring monopoly or oligopoly pricing or to inhibit entry into the tied or tying market. As is the case in most rule of reason applications,[2] the plaintiff has the burden of showing market characteristics and a practice indicating a detriment to competition. At that time, the burden shifts to the defendant to show justifications, which a plaintiff might rebut by showing that similar benefits could have been obtained via a less restrictive alternative.

When all tied purchases cover a small share of total purchases in the tied market, other suppliers in that market retain enough patronage to continue efficient operation. Whatever the pre-tie number of efficient rivals in the tied market, small-foreclosure tying cannot create monopoly or oligopoly. Had these rivals been numerous and highly competitive in price and quality before the tie, they would remain so. Had they been few enough to achieve supracompetitive prices in the tied market before the tie, concentration would not increase. Nor would a small-foreclosure tie increase their ability to raise prices by removing large buyers from the arena of price rivalry — by speeding dissemination of information about price changes or by making it easier for fellow oligopolists to monitor each other's prices. And whatever the barriers to entry into either market had been, the small-foreclosure tie neither reduces the number of potential entrants into either market nor raises barriers to their entering. Finally, when the risk is that a tie will weaken a partial substitute for the tying product, that is not possible without substantial foreclosure of the market for the substitute product. The possible but narrow exceptions are noted below.[3]

¶1729.   n.1.   For a summary, see ¶1703d-f.
2.   See ¶1507.
3.   See ¶c and ¶f3.

When foreclosure is too small to portend any of the evils just described, we ordinarily need not examine concentration at all. Danger arises when substantial foreclosure occurs in a market that is, or will become, concentrated. When the perceived danger of a tie is that a new entrant into the tying market would also have to make a burdensome entry into the tied market, that is unlikely unless there are very few suppliers of the tied product. When the danger feared is that a tie will somehow weaken a substitute for the tying product or bring monopoly or oligopoly pricing to the tied market, a necessary premise is that the market is, or will become, concentrated.

As usual, specifying levels of concentration and foreclosure is difficult and inevitably arbitrary. Unlike most antitrust problems, however, even the lowest arguable magnitudes will simplify planning and litigation by summarily screening out the legion of broadly defined tie-ins that have no capacity to weaken rivalry in the tied or tying markets.

Of course, other cases cannot be disposed of so readily. For them, we need to set a threshold of dangerous foreclosure, at least presumptively for a "typical" market. If that threshold level is set relatively low — say, 10 or 15 percent — in order to catch potentially dangerous ties without having to inquire whether other sellers in the market also practice tying, the structure of the tied market serves as a supplementary test to screen out harmless ties. Similarly, if tied sales by tying sellers are counted even though the defendant merely purchases and resells the tied product, rather than making it, the absence of concentration among the producers of that product with ample distribution channels would continue to serve non-tied purchasers competitively. In general, we believe that foreclosure should be presumed unreasonable when it reaches 30 percent for an individual seller or a total of 50 percent for five or fewer sellers. Presumptively dangerous levels of concentration would correspond roughly to those useful for testing horizontal mergers.[4]

First, this Paragraph summarizes the several possible ways in which tying might impair the structure or performance of the tying or tied market and the necessary conditions for such evils: obstruct entry into the tying market (¶b), weaken a partial substitute for the tying product (¶c), create monopoly in the tied market (¶d), create or intensify high concentration in the tied market (¶e), or worsen

---

4.  On these standards, see ¶932.

the performance of a preexisting oligopoly in the tied market (¶f). We then offer several guides to defining the market (¶g) and measuring the foreclosure (¶h).

Then ¶i recalls the other arguable evils of tying that are independent of the degree of concentration, foreclosure, or entry barriers. The most significant arise from discriminating in price, limiting input substitution, or evading government price ceilings. Except in rare cases, however, it will be too difficult to prove that the first two practices actually increase the social cost of preexisting power over the tying product, and the third belongs in the regulatory rather than the antitrust domain, as does the evasion of price floors. Evading private price floors or ceilings or cheating one's suppliers is even less reason for antitrust intervention. Although tying might deceive customers as to the true price of the tying product or occasionally impede its copying, competition would be significantly impaired only when the defendant has a monopoly of the tying market. Finally, restraining customer choice is not significant in the absence of substantial foreclosure. In practice, therefore, and apart from rare cases, these other possible detriments of tying have little role to play in judging the reasonability of a particular tie.

As is always true under the rule of reason, the antitrust evaluation depends on the challenged conduct's anticompetitive tendencies in the light of its procompetitive functions and alternative ways of achieving them.[5] As usually applied, the plaintiff demonstrates a restraint, offers a theory explaining how competition can be impaired, shows that the theory fits the instant case, and proves that the threat to competition is substantial. If the plaintiff succeeds in persuading the tribunal of those claims, notwithstanding any rebuttals offered by the defendant, the restraint is prima facie unreasonable. That part of the inquiry is the subject of this Paragraph, though prima facie illegality does not end the inquiry when the defendant offers proof that the challenged restraint actually serves a legitimate function. The plaintiff may in turn rebut by showing that the claimed function is not legitimate in principle, is served poorly by the restraint, or is adequately attainable by substantially less restrictive means. When both detriment and benefit are established prima facie, the tribunal must somehow judge the net balance, with the plaintiff bearing the burden of persuasion.

---

5. See ¶¶1502-1507.

As is well recognized, the results are often uncertain, impeding effective planning by business firms and, when litigation occurs, burdening both the parties and the tribunal. To some extent, we can reduce those burdens and uncertainties by adopting various working presumptions, subject to rebuttal, that certain relatively readily observed facts either prove or disprove a relevant harm, benefit, or net conclusion.

**1729b.  Obstruct entry into tying market.**[6]  Reducing the likelihood of entry into the tying market is anticompetitive whenever existing competition in that market is inadequate. A tie-creating monopoly — or perhaps a very tight oligopoly — in the tied market for a complementary product reduces the likelihood of entry into the tying market when independent producers of the tied product are the most likely entrants. Entry into the tying market is also impaired (1) if producers of the tied product do not sell it to a new producer of the tying product or to its customers, (2) unless a new entrant into the tying market can readily enter both markets simultaneously or others enter the tied market contemporaneously with its new entry into the tying market.

Proof or rebuttal of these conditions involves the following:

*Tying market noncompetitive.* When a market is already competitive in structure or performance, we do not need entry to bring or preserve competition. Entry barriers are therefore of concern when the tying market is not competitive. This condition is met in the paradigm case of a monopolist of the tying product and, at the opposite extreme, not met when there are already a substantial number of significant producers in the tying market.[7] Although intermediate cases are less clear, we should assume that entry is important when the tying market is highly concentrated.[8]

*Tied-market monopoly; oligopoly.* The proof that a tie creates, or threatens to create, a monopoly or oligopoly in the tied market is examined in ¶¶d-e. Although oligopoly in the tied market is much less likely to satisfy all of the remaining conditions for impairing entry into the tying market, presumptive concern seems warranted if only three significant firms survive in the tied market.

---

6.  See ¶1705c-e.
7.  In the latter event, the defendant seller presumably lacks power over the tying product, as examined in Chapter 17C.
8.  See ¶e1.

*Complementary products.* "Complementarity" for this purpose is defined by the remaining conditions, which remind us that a tie cannot inhibit entry into the tying market unless the two products are connected in the ways about to be described.

*Eliminates most likely entrants.* The tie that eliminates all of the most likely entrants into the tying market necessarily reduces the likelihood of entry. However, that proposition does not tell us whether the firms eliminated were actually more likely than other firms — or how much more likely — to enter the tying market. After all, many tying cases have involved rather simple tied products whose production involved few of the resources, talents, or interests needed to produce the tying product. Hence, even if independent firms in the tied market are far more likely to enter than anyone else, a half-dozen or even three such firms probably provide an adequate pool of "most likely" entrants. Accordingly, oligopoly in the tied market is not likely to reduce the likelihood of entry into the tying market unless the oligopolists are very few in number.

*Forces burdensome two-level entry.* Presumptively, a monopolist of the tied product would deny the product to new entrants into the tying market (or their customers) if the monopolist could thereby prevent such entry and preserve its power in the tying market. However, nonintegrated oligopolists in the tied market would very likely sell the tied product to a new producer of the tying product (or its customers). If the same oligopolists inhabit both markets, they have an incentive to obstruct new entry, but each may doubt that all the others would refuse to supply the newcomer. In that event, refusing to sell would sacrifice profit without impeding entry. Hence, oligopoly in the tied market is not likely to force two-level entry unless the firms are both integrated into the tying market and very few in number.

Two-level entry is not likely to be burdensome in the absence of significant barriers, other than tying, to entering the tied market.[9] Suppose, for example, that a newspaper monopolist provides the only newspaper delivery service. A new entrant into publication would have little difficulty in entering the delivery business simultaneously. Apart from such a clear case, however, proving such barriers and their magnitude is usually difficult. We might

9.  See ¶1011.

infer significant entry barriers from the absence of significant entry over the past five years.[10] Going even further, we might presume that entry into the tying market has been inhibited by ties that apparently require a newcomer to enter on both levels. Such a presumption would simplify the rare cases to which it applies. However, proof of significant new entry into either market over the preceding five years would rebut such a presumption.

**1729c. Weaken partial substitute for tying product.**[11]   A tie might be used to weaken a partial substitute. To illustrate, suppose that users of tying product $A$ can substitute product $S$ for some of their needs. If the monopolist of the former requires users to purchase their requirements of the latter from the monopolist, this monopolist can set a high enough price for $S$ to discourage all substitution. Whether this tie worsens the structure or performance of the $S$ market depends on the same factors affecting the impact in any other tied market.[12]

**1729d. Create monopoly in tied market.**[13]   *1. Generally.* The simplest example is a monopolist of tying-product $A$, whose users account for all purchases of product $B$. In that event, the defendant who sells the former only to those who purchase their requirements of the latter from the defendant forecloses 100 percent of the $B$ market and becomes its sole supplier. The foreclosure is necessarily smaller when some buyers of $B$ do not need product $A$ and thus are not subject to the tie. Nevertheless, there will be a monopoly unless non-tied purchasers buy enough to support efficient production by someone in addition to the defendant.

*Inferences based on structure of tied market.* If tying has long been practiced in a market, its effects should be visible. The appearance of a monopoly after large-foreclosure tying may be attributed presumptively to the tie. Similarly, the absence of monopoly indicates that a large foreclosure was not large enough to destroy significant rivalry. Of course, each inference is presumptive rather than absolute. A monopoly might be attributable to other forces, or its absence might merely mean that high-cost rivals operating at less than minimum efficient scale survive under a monopolistic price umbrella maintained by the defendant.

10.   Cf. ¶1011 in the context of vertical mergers.
11.   See ¶1705f.
12.   See ¶¶d-e.
13.   See ¶1704.

*Inferences based on foreclosure share.* To assess a monopoly potential before tying has been in effect long enough to reveal its threat to the number of efficient rivals, we need to look at the foreclosure share. Monopoly seems unlikely to result from a foreclosure of 50 percent or less, which leaves at least as much patronage to a rival as the defendant preempts for itself.[14] Whether a greater foreclosure is large enough to bring about monopoly depends on its magnitude relative to the minimum efficient scale in the tied market and the severity of the cost disadvantage suffered when operating below that scale. Unfortunately, those factors differ for every market and will not be readily knowable to judges or juries. To administer the proposition that monopoly may reasonably be feared when the foreclosure by a tying seller is "very large," we need a presumptive threshold. We tentatively suggest 75 percent of the tied market. Such a threshold will not often be critical because foreclosure approaching any threshold for monopoly will exceed the lower thresholds designed to protect against oligopoly.[15]

An inference of competitive harm that might otherwise be drawn from 75, 90, or even 100 percent foreclosure is subject to some rebuttals. The minimum efficient scale in the tied market might be very small, such as in many service markets. Moreover, small-scale entry from adjacent segments may be very easy. Indeed, if a tied market were narrowly defined as service for a particular brand,[16] a very large foreclosure of that narrow market would not endanger non-tied purchasers who can be serviced on a small scale by those who service other brands. Finally, monopoly in the tied market might not be harmful at all when two-level entry into tying and tied markets is easy, although that rebuttal should not be entertained unless it is quite clear and would normally be precluded when significant power over the tying product has been found.

*When no non-tied purchasers in tied market.* Finally, let us relax the assumption of non-tied purchasers and assume instead that the

---

14. We say "unlikely" to reserve the possibility that the defendant's product might appeal especially to some purchasers who, when added to the tied purchasers, account for so much of the tied market that efficient rivals cannot survive there. This possible qualification would disappear if the relevant foreclosure included all of a tying seller's sales and not merely its tied sales, but that approach would overstate the tie-based foreclosure in every case and would be misleading in most cases.

15. Ordinarily, we need to identify a monopoly-creating tie only when the particular defendant claims a justification that is strong enough to offset potential oligopoly but not strong enough to overcome potential monopoly in the tied market or greater barriers to entering the tying market.

16. Such a narrow market definition is likely to be erroneous. See ¶g; and ¶563.

only buyers in the tied market are the tied customers, who are already subject to the power of the tying seller. They need not suffer any incremental injury from a new monopoly in the tied market. For example, their total payments and use would remain the same when the two products are used in fixed proportions, even if the tie creates a new monopoly in the tied product.[17] Even with variable proportions and price discrimination, the overall impact on tied customers need not be detrimental at all or, if detrimental, need be no worse than other means of price discrimination.[18] Nevertheless, a new monopoly in the tied market has the usual long-run dangers. It may create a barrier to entry into the tying market.[19] In any event, moreover, it removes the spur of rivalry to cut costs, improve quality, and innovate. Thus, monopoly in the tied market remains presumptively dangerous even when all purchasers in that market were already subject to the power of the tying seller.

*1729d2. Monopolizing successive technologies.* A significant threat of competitive harm occurs when the monopolist in technology *A* uses tying to retain a monopoly in successor technology *B*, which might otherwise have the potential to become competitive. Consider this purely hypothetical illustration. The current technology for optical storage devices is CD-ROM, while the successor technology just under development is DVD, which is faster and has a greater capacity per square inch of storage space. The CD-ROM technology is monopolized by firm *X*, which has enjoyed monopoly profits in that technology for many years. However, DVD is being developed competitively by several firms, including *X*, and a variety of formats are possible. The purchasers of DVD will be the same as those who purchase CD-ROM. *X* then bundles its current CD-ROM technology to its own proprietary DVD technology by (1) requiring purchasing manufacturers using its CD-ROM technology to use its DVD technology as well; and (2) technologically bundling the two together during a transition phase when the market uses both.[20] The result is that the firm is able to use its strong position in the outgoing CD-ROM technology to "lever" a monopoly in the incoming DVD technology, perhaps thereby preventing the new technology from being developed and sold in a competitive market.

17. See ¶1706b1.
18. See ¶1711b4 & e.
19. See ¶b.
20. On technology ties, see ¶1757.

Once again, the strategy requires a relatively dominant position in the first market (CD-ROM in the illustration) and a "dangerous probability" that the tie will induce a significant commitment of resources to the defendant's version of the incoming (DVD) technology so as to create a dominant position there as well. Further, competitive harm results only if the successor technology is capable of being delivered competitively rather than by a monopolist. Competitive injury may not occur if the two technologies are not closely related, if transfer from one technology to the next is abrupt, or if the transfer does not require significant commitments by manufacturers who purchase it. For example, it seems unlikely that a slide rule monopolist could guarantee a monopoly position for itself in electronic calculators once the latter displaced the former. The technologies are not related at all, and the facilities needed to sell either slide rules or calculators are quite generalized retail facilities. Thus, it would be very difficult for the current slide rule monopolist to "lock in" resellers in such a fashion as to guarantee itself a monopoly in the successor market for calculators.

By contrast, computer software applications may be readily adaptable to such strategies. For example, the monopolist in a computer operating system called OS1 might fear competitive development of a superior OS2 technology, and then use bundling to ensure that captured users of its OS1 also employ its version of OS2, thus ensuring that as the market evolves from OS1 to OS2, the monopolist will be able to retain its dominant position.[21] Competitive losses would be the difference between price, output, and innovation when OS2 is developed and delivered competitively and when it is delivered by a monopolist.

Finally, where the tie genuinely threatens monopoly in the tied market, a monopolization or attempt claim under §2 of the Sherman Act could be appropriate.[22]

**1729e. Concentrate tied market.** Tying can severely concentrate the structure of the tied market without bringing monopoly. A single tying seller might foreclose so much of the tied market that the remaining patronage would support only a few efficient producers. Or a few tying sellers might foreclose the entire market so that they alone produce the tied product. Alternatively, the

---

21. Cf. *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir.), cert. denied, 534 U.S. 952 (2001) (to the extent it is relevant, H.H. was consulted by the federal and some state plaintiffs prior to the trial).

22. See Chs. 6-8.

patronage remaining from their cumulative foreclosure might support additional and efficient producers but not enough of them to assure vigorous price competition. In these several variations, the obvious danger is that concentration in the tied market will enable the incumbents to coordinate their prices tacitly at supracompetitive levels. At least the nontied purchasers would be newly victimized by such pricing.

The likelihood of such anticompetitive pricing depends on (1) the degree of foreclosure relative to the minimum efficient scale of production and the magnitude of the cost penalty suffered when operating below that scale, (2) the resulting amount of concentration relative to the usual suppositions about which concentration levels are sufficiently dangerous, and (3) the usual factors impeding or aiding price coordination.

*1729e1.  Concentration threshold.*  In the spectrum from perfect competition to perfect monopoly, no single measure or level of concentration reveals the point at which tacit price coordination is likely to occur. Most commentators regard that danger as presumptively very substantial when only three firms inhabit a market and very low when ten significant firms do so.[23] With less consensus about intermediate levels of concentration, the level deemed dangerous varies with analysts and the particular legal context. For the prophylactic purpose of limiting mergers among competitors, some worry only when the number of significant competitors falls from four to three,[24] or from six to five.[25]

Similar concentration ranges seem appropriate for appraising tying. Whatever threshold is selected, should the presumption of dangerous concentration be rebuttable by showing low barriers to entering the tied market or other impediments to tacit coordination?

*Entry conditions.* Though few in number, market incumbents may perform competitively when other firms can readily enter their market. Nevertheless, there are two reasons for drawing inferences from concentration itself in most cases rather than litigating about entry conditions. *First* are the usual difficulties in practice of judging the presence and height of entry barriers. We

---

23.  See ¶¶925-927, 932.
24.  See, e.g., Robert Bork, The Antitrust Paradox 221-222 (1978).
25.  The 2010 Justice Department and FTC Merger Guidelines regard concentration as severe when the post-merger Herfindahl index (HHI) exceeds 2,500 (roughly four equal size firms) and minor when below 1,500 (the equivalent of six or seven or more roughly equal-sized firms). See ¶932.

have no ready criteria for measuring entry barriers with precision or for relating any particular entry barriers to the degree of price power that market incumbents collectively possess. *Second,* tying can itself create a barrier to entering the tied market. Entry that might otherwise be easy ceases to be so when tying leaves few customers free to patronize an entrant. Of course, tying need not do so. As discussed below, the foreclosure may be too small to affect entry. In that event, however, concentration would seldom be in issue. Even with a large foreclosure, moreover, simultaneous two-level entry into both tying and tied markets might be very easy. In all events, when we can see with confidence that entry barriers are very low, we should no longer indulge the presumption that concentration above a specified threshold creates a dangerous risk of supracompetitive pricing through tacit price coordination.

*Impediments to tacit coordination.* Concentration does not necessarily mean that supracompetitive prices through tacit coordination have occurred or will occur. For example, prices and profits at competitive levels would demonstrate that anticompetitive price coordination has not occurred, no matter how concentrated the market. Unfortunately, it has been very difficult to appraise price-cost margins and profits and to determine the competitive level to which they should be compared.[26] Without examining such performance data, we may still conclude that concentration is not dangerous if disparate cost structures among manufacturers prevent a consensus on the industry's profit-maximizing price, lumpy sales impose prohibitive risks on firms offering a high price, buyer power prevents exploitation by sellers, or market circumstances make it difficult for sellers to monitor each other's prices.[27] Nevertheless, it is doubtful that these matters can be satisfactorily judged, apart from an occasional clear-cut case. Although such performance data and structural factors are determinative in principle, they should ordinarily be weighed against high concentration only in clear cases.

*1729e2. Foreclosure threshold.* Unless we can judge a tie according to its actual results, we must examine the share of the market foreclosed.[28] Although the minimum share likely to be troublesome varies with market circumstances, it is not practicable

---

26. See ¶516.

27. See ¶1430.

28. This requires a market definition of the tied-product market. Thus, in *United States v. Microsoft Corp.*, 253 F.3d 34, 82-83 (D.C. Cir.), cert. denied, 534 U.S. 952 (2001), when the D.C. Circuit remanded the Windows/Internet Explorer tie claim for consideration under the rule

for antitrust tribunals to determine those circumstances — particularly, minimum efficient scale — in every case. Accordingly, working presumptions are necessary to simplify litigation as well as business planning. We tentatively propose that foreclosure be presumed unreasonable when it reaches 30 percent for any one firm or a total of 70 percent for five or fewer firms. These particular thresholds need not be accepted to rationalize tying law. A far lower "safe harbor" threshold — say, 10 percent of the tied market — will screen out as harmless the bulk of arrangements covered by expansive definitions of tying.

*Cumulative foreclosure.* High cumulative foreclosure by a few firms seems dangerous but is not necessarily so. To illustrate, consider marketwide tying by six or seven firms, each foreclosing around 15 percent. The danger of supracompetitive pricing through tacit coordination seems high. That is the reason for examining cumulative as well as individual foreclosures. Although tying may not have caused the concentration, it impedes the entry or expansion of other firms and makes that concentration more impregnable and more dangerous.

High cumulative foreclosure without concentration is altogether different. A cumulative foreclosure of 100 percent by 50, or even 20, significant firms does not portend oligopoly, higher prices, or reduced output or entry in the tied market. The same is true, a fortiori, of lesser levels of cumulative foreclosure by numerous significant firms.

Somewhat harder to judge are middle levels of cumulative foreclosure by relatively few firms. Suppose, for example, that three or six equivalent firms practice tying and achieve a cumulative foreclosure of 50 percent. Although not as dangerous as one 50 percent firm, this tying cannot be rejected as necessarily harmless.

In addition, tying by multiple firms forces the question whether tying was adopted because it (1) facilitates oligopoly, (2) is efficient, or (3) perhaps both. For example, while the automobile market is relatively concentrated and all manufacturers sell cars with engines installed, the most probable explanation is that it is cheaper to produce cars with engines than to add them later, and consumers prefer cars that they can drive away from the seller's lot. Indeed, the most likely inference to be drawn from similar ties

---

of reason but forbade the government from attempting to define a relevant market for Web browsers, it effectively made the claim impossible to prove.

imposed by each firm in a market, whether concentrated or unconcentrated, is that competition rather than oligopoly has forced the tie. Interestingly, that inference is much less clear when some but not all producers use the tie. If both the tying and non-tying firms seem equally viable, the inference is weakened that efficiency rather than oligopoly coordination is responsible for the tie.[29]

*1729e3. If minimum efficient scale is large.* When the minimum efficient scale for the tied product is relatively large, the market will presumably be oligopolistic regardless of any tying. For example, if a firm must produce enough to satisfy 20 percent of the tied market in order to operate at minimum efficient scale, there cannot be more than five efficient producers in any event.[30] In such a market, a foreclosure of less than 20 percent may not affect its structure at all. Similarly, if five tying sellers each foreclosed nearly 20 percent, the cumulative foreclosure would total nearly 100 percent, although there would still be five producers of the tied product. While such tying would not create a new oligopoly, it would guarantee that the oligopolists in the tied market would be the tying firms rather than anyone else. Of course, this market would become more concentrated when one or several firms each forecloses more than 20 percent, resulting in fewer than five efficient producers in the tied market.

The example raises two questions of policy. *First,* should a large cumulative foreclosure coupled with high market concentration be deemed harmless when the tying sellers show that substantial scale economies dictate an equally concentrated market in any event? Generally, no. Although such ties cannot cause concentration that would not otherwise exist, such a defense complicates litigation and makes it depend on facts that courts are not likely to learn with confidence. More important, such ties do dictate which firms survive. Although an affirmative answer to the first question

---

29. Elhauge would take a much harsher position, at least in the case of multiple firms using bundled discounts, and would generally aggregate the market shares of the bundlers. His analysis seems indifferent to whether the bundlers are behaving collusively or competitively vis-à-vis one another. See Einer Elhauge, Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory, 123 Harv. L. Rev. 397, 475 (2009), relying in part on the Supreme Court's decision in *Standard Oil & Standard Stations v. United States,* 337 U.S. 293, 295, 309, 314 (1949), which condemned exclusive dealing on a very small market share after observing that other firms did the same thing. In that case, however, single-brand gasoline stations were almost certainly more efficient than so-called "split pump" stations, which have entirely vanished from the landscape. Competition rather than collusion almost certainly forced widespread use of exclusive dealing. See ¶1821e.

30. There could be a larger number if several efficient firms charged high prices that allowed high-cost firms to operate under their price umbrella.

Case 1:09-cv-00547-JFM    Document 205-39    Filed 03/21/14    Page 78 of 91

may save the justifiable or inevitable package sometimes caught by an overbroad definition of "tying," definition and justification problems are independent of the minimum efficient scale and must therefore be addressed directly.

*Second*, should incremental concentration be deemed harmless when the market was previously so highly concentrated that tacit price coordination was already likely or a fact? Clearly not. Although a market is already highly concentrated, incremental concentration magnifies the risk, severity, and duration of supracompetitive pricing through tacit coordination. Moreover, we should avoid unnecessary inquiries into whether prevailing prices are actually supracompetitive.

If they do not redeem the ties presumed unreasonable under the ¶e2 criteria, substantial scale economies in the tied market need seldom be examined at all. Any tying made unreasonable by substantial scale economies would already be presumed unreasonable under those criteria. Moreover, the lesser ties deemed reasonable above would not typically worsen the structure of the tied market even when substantial scale economies are present.

*1729e4.   If no non-tied purchasers.*   Monopoly in the tied market is troublesome even when all purchasers in that market were already subject to the power of the tying seller. The reason was that monopoly in the tied market can impede entry into the tying market and reduce pressures to cut costs, improve quality, or innovate in the tied market. For example, suppose that Microsoft made the market's only computer operating system and Internet browser. Given the lack of competition, no tying arrangement is necessary for Microsoft to maintain shares of 100 percent in each product. But now, in response to new entry into the browser market, it ties its own browser to its operating system, thereby forcing all customers to purchase Microsoft's own browser, very likely ruining the new entrant.

**1729f.   Facilitate oligopolistic coordination.**   *1. Preliminary conditions.*   Whether created by tying or not, an oligopoly in the tied market might achieve or maintain higher prices with the help of tying.[31] We recount the several ways in which tying might facilitate tacit price coordination[32] and the necessary conditions for each type of facilitation. Although the conditions vary with the type of

---

31. The present discussion focuses on potential detriments. Whether tying might undermine oligopolistic coordination is analyzed elsewhere. See ¶¶1713-1715.

32. See ¶1707. The preceding Subparagraph emphasized ways in which tying might reduce the number of significant and efficient rivals, while the present Subparagraph

threat, two are universal. *First*, the plaintiff must show that concentration in the tied market exceeds a threshold that makes oligopoly coordination plausible. *Second*, oligopoly under tying must be more effective than oligopoly without it, whether as a result of higher prices or increased stability. Unfortunately, proving this second condition is ordinarily beyond the capacity of antitrust litigation. The tribunal can seldom know whether higher prices over time or greater stability resulted from the tie or from other forces, or whether stable or even declining prices were higher because of the tie than they otherwise would have been. Accordingly, the potential of tying to facilitate oligopolistic coordination should be judged presumptively, largely on the basis of structural evidence, without assessing actual performance.

The necessary condition in each of the following cases is foreclosure of a substantial share of a concentrated tied market — by one seller in eliminating disruptive buyers (¶f2) or by all tying sellers in monitoring each other's prices more effectively (¶f3).

*1729f2. Eliminating disruptive buyer.*[33]    Imagine that a highly concentrated market contains a disproportionately large buyer, whose patronage is so attractive as to tempt oligopolistic sellers to grant discounts, secret or otherwise, in order to win that buyer.[34] The buyer at least would enjoy prices closer to the competitive level, and the distrust and uncertainty generated by discounts to the large buyer might spill over into the market generally. Were that buyer to accept a tie obligating it to patronize a particular seller exclusively, it would no longer be an object of rivalry among the oligopolists, who could then maintain supracompetitive prices more effectively than before.

This is not a likely scenario. Ordinarily, such a buyer would have little incentive to cooperate in strengthening the oligopolists' ability to charge supracompetitive prices. But it might accept tying in exchange for a long-term contract at or near the competitive price, which could be accomplished by reducing the price of either the tying or the tied product. In that event the disruptive buyer would no longer provide this oligopolist with supracompetitive prices, but its disruptive presence in the market would be eliminated.

---

addresses the ways in which anticompetitive coordination among any given number of rivals might be perfected.

33. See ¶1707d.

34. Further, the large buyer might be able to integrate backward and produce the input for itself.

Our significant doubt that such situations are likely suggests that the test should be demanding, requiring a buyer accounting for a fifth or a quarter of the tied market, reserving to challengers the opportunity to prove in other ways that a disruptive buyer has been eliminated through tying.

A related case, though not involving a disproportionate buyer, is collective market stabilization. Imagine that the same oligopolists in both markets practice tying. For the duration of the tying agreements, they do not compete in either market for the patronage of each other's customers. While each of them may seek expanded sales when each contract expires, perhaps the fewer occasions for rivalry allow them to maintain oligopolistic discipline. If this is a danger, however, we need no special foreclosure rule to prevent it, for so large a cumulative foreclosure within the postulated oligopoly would usually exceed the presumptive threshold for unreasonable effects.

*1729f3.  More effective monitoring.*  Earlier we saw some ties with a "competitive-conditions" clause, which allows the tied customer to purchase the tied product from other suppliers who offer better terms that the tying seller does not choose to meet. By requiring the customer to notify its supplier of a lower price offered by a rival, the clause allows the tying seller to monitor a rival's prices and to learn quickly whether the rival has reduced prices generally or offered secret discounts to the seller's customers.[35] By guaranteeing the seller the opportunity to retain those customers by meeting the rival's prices, this tie reduces the likelihood that a rival can "steal" customers through a quick strike. Thus, a tie with a competitive-conditions clause helps stabilize supracompetitive prices by discouraging rival oligopolists from initiating general or secret price cuts.

What share of the tied market needs to be covered or foreclosed by such ties to aid such price stabilization among oligopolists in the tied market? For maximum effectiveness, the bulk of the market would have to be covered. In that event, the ties would satisfy the individual or collective thresholds already proposed.[36] However, relatively small foreclosures might possibly succeed in monitoring and dissuading rivals. Imagine that the tied users, though buying a total of only 10 or 15 percent of the market, are the most sought-after and price-sensitive buyers. Or imagine that

35.  See ¶1707e.
36.  See ¶e2.

Case 1:09-cv-00547-JFM    Document 205-39    Filed 03/21/14    Page 81 of 91

one or two leading sellers have numerous ties with a random sample of their customers who account in the aggregate for less than a fifth or sixth of the market, that all know of the practice, and that no oligopolist knows which buyers are tied by rivals. This could be enough for effective monitoring. If so, foreclosures below the usual threshold would be dangerous.

However, any such exception would be a narrow one. The conditions are oligopoly in the tied market, widespread tying with competitive-conditions clauses, foreclosure below the usual thresholds, and special circumstances — such as coverage of specially sought-after buyers or of a random sample of customers whose particular identity is unknown to rivals.

**1729g. Implementation: market definition.** The utility of any presumption based on foreclosure shares depends on the market in which that foreclosure is measured. The usual principles of market definition govern, although judges sometimes find them difficult to apply and delegate the task to juries instructed in only the most general terms. Although the usual principles may invite misapplication in defining the tied market, the particular detriments indicated by concentration and foreclosure shares point toward the correct definition.

A simple example illustrates one potential error. Suppose the alleged tie arises from a defendant's refusal to sell its repair parts to independent repairers, foreclosing them from repairing the defendant's machine and forcing owners of that brand of machine to purchase parts and repair services from the defendant. In this example, the machine accounts for a minor share of machines of this type.[37] We defer for the time being questions about tying market power[38] or even whether the arrangement should be characterized as a tie.[39] To measure the foreclosure, we must ask whether the repair parts or service on this one brand of machine constitute the relevant market. The answer is no.

The first mistaken argument for the opposite answer focuses on the machine buyer. Notwithstanding many rival machines, a buyer of the defendant's machine can maintain the machine only with the defendant's brand of repair parts and can therefore be charged a supracompetitive price for them and the accompanying

---

37. See, e.g., *Parts & Elec. Motors v. Sterling Elec.*, 826 F.2d 712, 714 (7th Cir. 1987) (1 percent or less of market for small electric motors).
38. On this particular question, see ¶1740.
39. See ¶¶1708, 1756.

401

service. Even if true, such exploitation of the tied customer is independent of the degree of foreclosure and is therefore not the rationale for measuring foreclosure in the first place. A 100 percent foreclosure of the market for repairing defendant's machines, which compete with many similar machines, cannot obstruct entry into the machine market, weaken any substitute for the defendant's machine, impair entry into the service or manufacture of parts generally, or affect any non-tied customer at all. To assess any of those impacts, a market for repairing the defendant's own machines is simply not relevant.[40]

The second mistaken argument for a single-brand repair market focuses on a would-be repairer. In one common situation, the plaintiff is one (or several) of the defendant's former employees who specialized in repairing the defendant's machine. Familiar with the defendant's machines, customers, and pricing structure, the plaintiff regards those customers as an attractive, accessible, and distinctive business opportunity. Less familiar machines, customers, and pricing practices may not provide a perfectly substitutable opportunity for the plaintiff. Nevertheless, servicing this defendant's machine is not a relevant market. As just seen in connection with a buyer's claim for a single-brand tied market, the plaintiff's choice of the customers that it would like to serve has nothing to do with evils that foreclosure analysis is designed to prevent. Moreover, consider the talents that the plaintiff claims that the tie precludes it from practicing: It is not the making of repair parts; the plaintiff is not excluded from that occupation; nor does the plaintiff propose to enter that occupation. The occupation in question is the installation of repair parts and the general servicing of machines. These functions are substantially interchangeable among different brands of similar machines. For example, installing a circuit board in one brand of personal computer does not differ significantly from installing a circuit board in a different brand. One way of testing this is to ask whether, in an unrestrained world in which all proprietary parts and materials were generally available, a servicer of one brand could fairly readily service another — that is, whether a servicer of one brand could

40. See *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 29 (1984), where the Supreme Court held that the tied product alone could not be assumed to comprise a relevant market. Similarly, *Fortner Enterprises v. United States Steel Corp.* (*Fortner I*), 394 U.S. 495, 501 (1969), declared that if foreclosure shares needed to be addressed, market definition would be required. Because such definition would be superfluous if a particular brand were automatically to be the tied market, the Court impliedly called for more realistic market definitions.

charge supracompetitive prices for that work without causing an unprofitable switch in patronage to other servicers. That conventional method of market definition would also show that servicing a single brand is not a relevant market.

The Supreme Court's *Kodak* decision[41] is not in conflict with these propositions. First of all, we are speaking here of reformed tying analysis under a rule of reason, in which actual market foreclosure must be measured. *Kodak* itself proceeded under a per se rule, in which significant foreclosure was not required and, indeed, not even treated as relevant. The Court never considered whether the plaintiffs served a single brand of photocopiers or several brands. Second, although *Jefferson Parish* required that foreclosure be more than de minimis, it did not quantify the amount.[42] In *Kodak*, the defendant produced some 23 percent of the high-speed photocopiers at issue.[43] While this would not be sufficient under a rule of reason test, it was certainly more than *Jefferson Parish* seemed to require, assuming that repair technicians serviced only the high-speed photocopiers found to be the relevant market. Of course, if they serviced a wider variety of products, relevant foreclosure would be less.

**1729h. Implementation: foreclosure measurement.** Several earlier Paragraphs have suggested various ways to measure the foreclosure. We simply list them here with cross-references to the earlier discussion and a few additional comments.[44]

1. *Tied sales; pre-tie customers.* All of a defendant's tied-product sales covered by tying arrangements should be deemed foreclosed, including the volume of purchases

---

41. *Eastman Kodak Co. v. Image Technical Service,* 504 U.S. 451 (1992). See ¶1740.

42. On the amount of foreclosure that *Jefferson Parish* required, see ¶1722; on the types of cases failing to meet this requirement, see ¶¶1723-1725.

43. However, the foreclosure was significantly less than this for two reasons. First, some classes of users were permitted to purchase parts to do their own maintenance. Second, Kodak made only some 30 percent of its own parts, and an unspecified number of the remainder could have been obtained from other sources. See the Ninth Circuit decision on remand, 125 F.3d at 1205-1207, which also observed that an additional 20 percent of parts were made by others but subject to "tooling clauses" that apparently made it impossible for these manufacturers to sell parts to the independent service organizations (ISOs). For the remaining 50 percent, there were apparently no restrictions on sales by third parties to ISOs.

44. As the list shows, share-foreclosure tests eliminate many of the qualifications and complexities that arise under the per se rule's dollar-foreclosure test. In addition, a foreclosure share does not vary with inflation, the measurement period for a continuing tie, or the choice between price and value added. Compare ¶1721b.

that tied customers had previously made from the defendant before any tie-in,[45] unless excluded below.

2. *Non-tied sales; imminent ties.* A defendant's sales not covered by tie-ins are not counted as foreclosed, even though the defendant also makes tied sales to the same or other customers.[46] However, sales not yet covered by a tie are deemed foreclosed to the extent that additional coverage is proved to be imminent.[47]

3. *Purchases coerced or not.* When the existence of a tie is inferred from the defendant's clearly proved coercion of particular customers, it may be reasonable to assume that the defendant also coerced similarly situated customers.[48] However, non-coerced purchases should be excluded when they can be identified.[49]

4. *No rivals exist.* Tied sales do not count as foreclosed if rival sellers of the tied product do not exist and if their nonexistence cannot be attributed to the tie.[50]

5. *Completely unwanted tied product.* Tied sales do not count as foreclosed to the extent that tied purchasers did not desire the tied product at all.[51]

6. *New user.* Tied sales do not count as foreclosed to the extent that an alleged tying arrangement brings a new user into the market for the tied product; a user presumptively ceases to be new after six months.[52]

7. *Dealers tied.* Tied sales count as foreclosed even when the tied customers are mere dealers, provided that customers are also effectively foreclosed; however, the usual thresholds of dangerous foreclosure might be revised upward when entry into distribution is easy. Some ties foreclose dealers but not customers — such as when the customer is free to take or not take the second product from the dealer.[53]

---

45. See ¶¶1709d1 and 1721c2 & d2.

46. See ¶¶1709d, 1721d, and 1725i. Of course, if technical or economic factors prevent a purchaser from patronizing a second source for the tied product, a promise to purchase a portion of one's requirements of the tied product from the defendant amounts in practice to an undertaking to purchase it entirely from the defendant, particularly if selecting the particular tied product involves specialized commitments.

47. See ¶1709d.

48. See ¶1756b.

49. See ¶1721d3B-C.

50. See ¶1723.

51. See ¶¶1724b, 1769e.

52. See ¶¶1724d and 1709e2.

53. See ¶1725b.

8. *Tying defendant mere reseller of tied product.* Tied sales count as foreclosed for present purposes even when the defendant merely resells the tied product that it purchases from existing producers.[54] Although it is unlikely that such purchases would disturb the vitality of competition among those producers, a very large "foreclosure" might have that effect and should therefore be tested for reasonableness. Again, however, the usual thresholds of dangerous foreclosure might be revised upward in this circumstance, mainly to account for easy dealer entry and quick substitution.

9. *De facto exclusive dealer apart from tie.* Tied sales do not count as foreclosed to the extent that tied purchasers deal only in the defendant's brand for reasons unconnected with the tie.[55] Of course, if that purchaser agreed to purchase its requirements from a particular supplier, the resulting foreclosure is subject to antitrust scrutiny as exclusive dealing.[56]

10. *No economic interest in tied product.* Tied sales are counted as foreclosed for present purposes even though the tying seller lacks an economic interest in the tied product.[57] Hence, we need not decide what constitutes a relevant economic interest in order to measure the foreclosure.

11. *Defendant exiting tied market.* Tied sales incident to the defendant's exit from the tied market may be counted as foreclosed.[58] However, the foreclosure is most unlikely to be large enough to be troublesome, and the fact of exit would usually rebut any adverse inferences that might otherwise be drawn from the share of the market foreclosed.

12. *Indirectly foreclosed product.* Though neither the tying nor the tied product, a substitute to the tying product should

---

54. See ¶¶1727e and 1709e4.
55. See ¶1724c.
56. See Ch. 18.
57. See ¶1726. Such sales were excluded from the per se rule because of the low probability of any adverse effect on competition in the generality of cases in which such tying might occur and because reasonability tests could still be applied to the rare case in which a substantial enough share of the tied market was affected to impair its structure or performance. Nevertheless, the tie of a defendant who lacks an economic interest in the tied product is likely to serve a legitimate function.
58. See ¶1727f.

Case 1:09-cv-00547-JFM    Document 205-39    Filed 03/21/14    Page 86 of 91

be deemed to be a tied product in special circumstances.[59]

13. *Approved or disapproved suppliers; specifications.* There is no set rule for measuring or judging foreclosure when customers are free to buy the second product from several approved suppliers or from every supplier except specifically disapproved ones.[60] Many such cases will not be characterized as tie-ins at all, will be easily justified, or will cover too little of the market for the second product to cross the general threshold of dangerous foreclosures. But even if the alleged tie covers a substantial share of purchases in that market, such coverage is not equivalent to market foreclosure. Although the nonapproved or disapproved suppliers are foreclosed from the "tied" customers, the rest are not. Even if that market were concentrated, the smaller or even fringe incumbents may have access to the tied customers. That could also be true when most tying sellers have similar arrangements. Cumulating the covered sales of all allegedly tied customers would be especially misleading when the approved suppliers of the second product differ. Hence, these cases should be approved when industry sales covered by such arrangements fall below the usual threshold or when the allegedly tied market is not highly concentrated. Though not saved on such grounds, these arrangements should nevertheless not be presumed harmful without further analysis. In all such cases one must heed the basic principle that a firm ordinarily does not profit by giving a monopoly (or even the power to collude) to firms in a complementary market.[61] As a result, close parsing of a firm's reasonable motives is essential.

14. *Aggregate tying sellers; relevance of contract duration.* The cumulative tied sales of all tying sellers might measure a kind of foreclosure, but they do not necessarily provide much information about anticompetitive effects.[62] For example, if the market contains a dozen gasoline station

---

59. See ¶c and ¶1705f.
60. See ¶1726e.
61. See ¶¶1727d and ¶758.
62. See ¶1709d2, which also counts foreclosures associated with requirements contracts and vertical integration. However, cumulative foreclosure must always be examined with caution, as in the preceding item.

owners and all of them deal exclusively in a single brand, it may be difficult for a rival refiner with no stations to sell its gasoline. Nevertheless, competition among the station owners might be robust. In any event, the cumulative total is relevant only when the tied market satisfies the concentration threshold.[63] But it must be kept in mind that parallel tying by noncolluding sellers is highly likely to indicate efficiency rather than anticompetitive foreclosure. For example, even in a highly concentrated market for automobiles, sales with engines or seats installed strongly suggests that (1) the costs of installing engines or seats at the factory, when the unfinished automobile is laid open and significant scale economies obtain, is lower than installing them later at the dealership; or (2) customers prefer the convenience of purchasing an automobile that they can drive away from the dealer without the need for additional purchases. In such cases the presence of competition, not the lack of it, forces the tying. Cumulation thus seems justified only when the tying sellers are coordinating their behavior.

Finally, if tying contracts are of reasonably short duration, then aggregate foreclosures at any given moment can exaggerate real foreclosure. For example, if a dozen sellers tie with one-year maintenance contracts, one contract on average comes up for bid each month, giving rivals an opportunity to bid for the market. This issue has come up frequently in the context of exclusive dealing, which has generally been addressed under a rule of reason, but not under tying.[64]

**1729i. Incremental social cost and other nonforeclosure effects.** Foreclosure and concentration address the core concern with tying but do not exhaust all possible concerns. We now review several arguable detriments that do not depend on increased or less competitive concentration or on any suppression of entry or rivalry in either market. Each of the following effects may occur even though foreclosure is trivial or even nonexistent. Several might raise prices and reduce output, thereby increasing

---

63. See ¶e1 and ¶1709e1.
64. Cf. ¶¶1802g, 1821d3 (relevance of contract duration and switching costs in exclusive dealing).

the social cost of preexisting power over the tying product by discriminating in price, limiting input substitution, and evading price ceilings. Other effects seem undesirable in various senses and may even be anticompetitive in special circumstances: evading price floors, cheating suppliers, concealing true prices, or impeding copying.

The discussion is very summary, with references to the earlier analysis of each possible detriment. One general point applies to all of them. Alone or together, they fail to support general condemnation of all ties that foreclosed too little of the tied market to affect its structure or performance. That failure usually rested on one or more of the following four reasons, with illustrations in parentheses. *First*, some effects (limiting input substitution or copying barriers that preserve monopoly) seem too rare to support any general rule. Of course, were a rare detrimental effect actually to be proved in the particular case, it should be counted against a challenged tie. *Second*, some frequent uses of tying (price discrimination) fail to support per se condemnation because they could not be said to be detrimental in the generality of cases. Again, that is no reason to save the particular tie once actual detrimental effects have been proven. Whether such effects can be proved satisfactorily enough to warrant the inquiry is a separate question. *Third*, some effects (misleading consumers about true prices or impeding copying) failed to support general condemnation of the tie-in because antitrust law generally regarded them as insubstantial apart from monopoly in the tying market. Such an effect would have the same insubstantial character here in the absence of monopoly. *Fourth*, other effects (evading government price controls or cheating suppliers) failed to support per se hostility because they fell outside antitrust law's domain. They belong instead to the world of regulation or contract. Any such effect remains equally outside the antitrust domain in rule of reason determinations.

*1729i1.  Incremental exploitation, price discrimination, and input substitution.*  An occasional lower court opinion or commentary objects that tying may enable a defendant to exploit its pre-tie power over the tying product more effectively through price discrimination.[65] Historically, however, tying was feared as a "lever" by which a patent monopoly could be "extended" to gain a

---

65. See ¶1710b.

monopoly over tied products outside the patent grant.[66] This fear of a second monopoly was then extended beyond the patent cases, most obviously in Clayton Act §3, which applies regardless of any patent. Even when the Supreme Court came to condemn ties without much proof of any effect, it regularly spoke of the foreclosure of rival sellers from the tied market as the evil rather than possible price increments paid by the tied customers.[67] Indeed, *Jefferson Parish* declared categorically that forcing a customer to take a completely unwanted product did not trigger the per se rule because no rival supplier was foreclosed from a sale it otherwise could have made.[68] Notwithstanding the deprivation of the customer's free choice or its payment for a product it did not want, the Court reasoned that such a tie had no "substantial potential for impact on competition."[69] Obviously, then, the Court defined the "competition" that anti-tying law was designed to protect as the structure of the tied market, with its possible implications for the competitiveness of that market and for entry into the tying market.

To be sure, this portion of *Jefferson Parish* excluded application of the per se rule and did not expressly say that extracting higher prices from buyers or forcing unwanted products upon them would also be irrelevant under the rule of reason. However, the effect cannot be unreasonable for the kind of conduct that has no "substantial potential for impact upon competition." Nevertheless, the Court did not speak with utter clarity. It also mentioned the incremental social cost of a preexisting tying monopoly as a vice, although perhaps only when resulting from restraints foreclosing competition in the tied market.[70]

Beyond history and precedent is another reason for ignoring the price paid by the tied customers: the difficulty and inappropriateness of price regulation via antitrust tribunals.[71] To be sure, the courts' general refusal to supervise a firm's prices is not an affirmative policy in favor of maximum exploitation of lawful market power. Intervention under the antitrust laws may therefore be warranted to the extent that we can identify a restraint facilitating higher prices, with its usual accompaniment of lower output, and

---

66. See ¶1701a-b.
67. See ¶1720b.
68. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16 (1984).
69. Ibid.
70. See ¶1710b for analysis of the *Jefferson Parish* language.
71. See generally ¶720.

can control it without significantly impairing legitimate functions or involving the court in detailed supervision of prices.

Even so, the last proposition does not support categorical condemnation of tying on the basis of frequent price discrimination, for its effects can be beneficial.[72] Harmful effects cannot be said to be typical. Although a particular price discrimination can depress output or simply exploit some customers without benefitting others, there is no way an antitrust tribunal can sort this out in particular cases. And certainly no court could compare the price-output effects of price discrimination via tying with the situation that would exist were such tying forbidden in that case. Finally, the existence of many lawful routes for price discrimination suggests that society would seldom benefit by bearing the expense of litigating the pros and cons of such discrimination in each case. Except in the rare case of clearly harmful effects, antitrust tribunals would be best to ignore price discrimination in judging particular ties. Similar difficulties and the same conclusion apply to those ties that might limit the substitution of other inputs.[73]

*1729i2.  Disguise prices, evade ceilings or floors, cheat suppliers, deceive customers, or obstruct copying.*  When two products are tied together, the true price of each may be disguised, with varying results.[74] Evading price ceilings is a well-known example — for example, selling a price-controlled product only in conjunction with an overpriced second product. Such evasion is also relatively easy to detect. When a defendant sells one product that is subject to a government price ceiling only as part of a tie, a reasonable presumption is that the tie evades that ceiling unless a different function for the tie is clearly established. Supposing, moreover, that a government ceiling embodies the social interest, evading it increases the social cost of the defendant's preexisting power over the tying product.

Nevertheless, antitrust remedies and procedures are not usually appropriate. The agencies imposing price ceilings are the ones who should decide how intensely they wish to enforce them and by what remedies.[75] Accordingly, evasion of government price ceilings falls outside the antitrust domain. Even if this conclusion

---

72.  See ¶1711.
73.  See ¶1712c.
74.  Procompetitive results are also possible. See ¶¶1714-1715.
75.  See ¶1712d2.

were not accepted, antitrust law should not punish the evasion of any private price ceilings that might be lawful.[76]

There is even less reason to control a particular tie that evades a price floor. For example, a defendant might disguise a discount on the price-controlled product by selling it at the specified minimum price in conjunction with another product at a bargain price. Here, the tie provides more competitive pricing, which is generally procompetitive when the price floor is privately imposed (whether lawfully or not).[77] Even when the government is fixing minimum prices, the enforcement intensity and remedies should be those of the regulators.[78]

Another disguise can cheat one's suppliers. For example, a defendant might distribute its own less valuable product as part of a one-price package with its supplier's more valuable product and remit only half the proceeds to the supplier. Such cheating falls within the realm of agency, contract, or fiduciary obligations and outside the antitrust domain.[79]

*1729i3. Buyer choice and conclusion.* Tying interferes with buyer choice. Were this decisive, all tying would be unlawful, along with virtually all contracts. As the Supreme Court observed long ago, it is the nature of contracts to restrain freedom.[80] The Court has also made clear that interference with a buyer's freedom, as in forcing it to buy a product it does not want, is not the concern of anti-tying law.[81] We protect the buyer's choices to the extent necessary to preserve competition in the tied and tying markets. With few exceptions, as noted in this Paragraph, such competition is secure unless tying forecloses a substantial share of the tied market, which is, or is likely to become, highly concentrated.

## ¶1730. Per Se Rule Critique; Recommended Reform

The per se rule against tying is a peculiar one that differs dramatically from the usual per se rule against, for example, horizontal

---

76. See ¶1712e.
77. See ¶1715c.
78. See ¶1715b.
79. See ¶1718e.
80. *Chicago Bd. of Trade v. United States,* 246 U.S. 231, 238 (1918) ("Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence.").
81. See ¶1718c.