Case 1:09-cv-00547-JFM   Document 205-40   Filed 03/21/14   Page 1 of 10

ASPEN PUBLISHERS

**Phillip E. Areeda**
*Late Langdell Professor of Law*
Harvard University

**Herbert Hovenkamp**
*Ben V. & Dorothy Willie*
*Professor of Law*
University of Iowa College
of Law

**Volume X**
**Third Edition**

# Antitrust Law

## An Analysis of Antitrust Principles and Their Application



**Wolters Kluwer**
Law & Business

lways want any purchased car
ut also want to decide for them-
everyone bought certain options
only as factory-installed "origi-
closes no rivals even though the
the car options and allows the con-
she wants.[67]

not prove separate products.[68]
ether the new-product rationale
plies variation and fixed propor-
uct-design conclusion.[69] If the
to vary the number or type of
rt of a bundled product, then it
ngement of components is an
esign.[70]

erson Parish cited, with evi-
er I that found separate prod-
ted items were provided by
son by separate corporations
d pricing. Other than that,
rrelevant to any of the issues

e-product issue would not be met.

because it is consistent with either

r example, that the community
the new-product rationale dur-
545, ¶1746a. That Jerrold varied
able used, which varied with the
ould not negate a new-product

.S. 2, 20 & n. 22 (1984) (quoting
95, 507 (1969).
(4th Cir. 1980), cert. denied, 451
were single product even
Grande, 517 F. Supp. 963, 969
duct although provided by
162,827, at 78,781 (S.D. Fla.
d, 459 U.S. 857 (1982) (fact
make the franchise and
e Tube Corp., 467 U.S. 752
unit); Ch. 17E-1.

## 17D-2
## Tied Together?

### ¶1752. Basic Rules and Preview

**1752a. Introduction and summary.** The antitrust tying provisions require that two products be tied together via a conditioned sale or agreement.[1] Nevertheless, we should understand that most vertical agreements are less involved with consent or coordination than with a response to the defendant sellers' unilateral power to withhold a desired product. The essence of this Subchapter is that a bundled transaction, even one embodied in a single contract, is not a tie under either Sherman Act §1 or Clayton Act §3 in the absence of an express or implied tying condition (¶b). A tying condition occurs when its "practical effect" is to foreclose, even partially, rival suppliers of the allegedly tied product (¶c). The plaintiff must both introduce evidence and persuade the tribunal that two products have been tied together (¶d). To decide that issue, the courts have often asked whether the plaintiff's purchase of the defendant's bundle was "coerced" and "forced" or merely "voluntary" (¶e). But these terms must be understood merely as shorthand for a more nuanced inquiry into whether the defendant has so acted as to constrain buyer choices illegitimately.

There are some differences in the coverage of Sherman Act §1 and Clayton Act §3 — mainly in their agreement-condition language and in the limitation of §3 to "commodities" for domestic use and resale (¶f). In the main, however, these differences have little practical effect. Also largely similar in application is Federal Trade Commission Act §5, while Sherman Act §2 applies in the limited circumstance of actual or prospective monopoly power (¶g). Finally, we preview the remainder of the Subchapter (¶h).

**1752b. Two products bundled not a tie unless...** Even when a defendant sells two distinct products and its customers buy them both, we must still ask whether the two products were tied together. The very concept of tying requires this additional element, as do the main statutes.

¶1752. n.1. See ¶1437. Unless the context indicates otherwise, "defendant" is the allegedly tying supplier; "sale" includes lease and other transfers and usually contracts for such transfers; "product" includes services and intangibles; "first product or item or product *A*" is the allegedly tying product; "second product or item or product *B*" is the allegedly tied product; and "tying or tied market" is the relevant market for the tying or tied product, respectively.

When buyers of one of the defendant's products independently choose to buy a second of its products, the latter market is untouched by any power that the defendant may possess in the alleged tying market.[2] Nor would there be any "foreclosure" beyond that which results from anyone's decision to patronize one supplier rather than another.[3] There is no tie for any antitrust purpose unless the defendant improperly imposes conditions that explicitly or practically require buyers to take the second product if they want the first one.[4] Were it otherwise, tying law would

2. See ¶¶1704-1705. Nor can independent buyer decisions help the defendant to increase its monopoly profits in the tying market by price discriminating among purchasers of the tying product (¶¶1710-1711) or by limiting input substitution, evading price ceilings, or deceptively understating prices (¶1712).

3. See ¶¶1706-1709. Of course, buyer agreements to buy their requirements of the second product only from the defendant could be scrutinized for exclusive dealing. See Ch. 18.

4. See, e.g., *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 670 (7th Cir. 1985), cert. denied, 475 U.S. 1129 (1986) ("[T]he voluntary purchase of two products together . . . is not a tie at all."); *Midwestern Waffles v. Waffle House*, 734 F.2d 705, 712 (11th Cir. 1984) (no unlawful tying if plaintiff franchisee voluntarily simply purchased its vending services from defendant franchisor; could be unlawful tying if plaintiff took these services from defendant only because defendant refused to approve them if given by anyone else; fact issue); *De Modena v. Kaiser Foundation Health Plan*, 743 F.2d 1388, 1395 (9th Cir. 1984), cert. denied, 469 U.S. 1229 (1985) (no tie where there is no allegation that the two products were tied together); *Sports Form v. United Press Intl.*, 686 F.2d 750, 754 (9th Cir. 1982) (no tie-in where plaintiff simply purchased as much of alleged tied product as it wished to buy); *Fido's Fences v. Canine Fence Co.*, 672 F. Supp. 2d 303 (E.D.N.Y. 2009) (defendant's advice letter to owners of electric dog fences that uses of unapproved batteries could lead to loss of warranty was not sufficient coercion); *Park v. Thomson Corp.*, 2007 WL 119461, 2007-1 Trade Cas. ¶75,552 (S.D.N.Y. Jan. 11, 2007) (defendant, who owned BAR/BRI, bundled multistate bar exam and New York state-law bar exam; this action was found to constitute tying of separate products, for which plaintiff was granted summary judgment on this element; however, coercion could not be established without a trial, because defendant offered the courses separately in other formats). And see *DSM Desotech, Inc. v. 3D Sys. Corp.*, 2009 WL 174989, 2009-1 Trade Cas. ¶76,485 (N.D. Ill. Jan. 26, 2009) (seller of lithography machine that used single-use resins did not tie the resins simply by telling customers that it would not maintain the machine or honor warranties if they used another's resins); *AVX Corp. v. Cabot Corp.*, 600 F. Supp. 2d 286 (D. Mass. Mar. 5, 2009) (a refusal to sell a product except under a long-term contract did not constitute tying; customer apparently alleged that it would have purchased less of a second product from the seller but for the long-term requirement); *Microbyte Corp. v. New Jersey State Golf Assn.*, 1986-2 Trade Cas. ¶67,228, at 61,164 (D.N.J. 1986) (no rule of reason review absent showing two products tied together); *Innovation Data Processing v. International Business Machines Corp.*, 603 F. Supp. 646, 648-649 (D.N.J. 1984) (same); *Electroglas v. Dynatex Corp.*, 497 F. Supp. 97, 106 (N.D. Cal. 1980) (same). See also *Krause v. General Motors Corp.*, 1988-2 Trade Cas. ¶68,163 (E.D. Mich. 1988) (no tie where defendant offered low-interest loans to purchasers of its cars but buyers were free to purchase the cars on other terms as well and court viewed credit as tied rather than tying product); *Levicoff v. General Motors Corp.*, 551 F. Supp. 98, 102 (W.D. Pa. 1982) (same).

Cf. *Datagate v. Hewlett-Packard Co.*, 60 F.3d 1421, 1425 (9th Cir. 1995), cert. denied, 517 U.S. 1115 (1996) (fact that plaintiff's prices for hardware were lower than defendant's prices tended to show that buyer purchased defendant's product only because coerced into doing so as a condition of obtaining software); *Western Duplicating v. Riso Kagaku Corp.*, 2001-1 Trade Cas. ¶73,135 (E.D. Cal. Nov. 21, 2000) (refusing to dismiss claim that duplicating machine manufacturer's policy of not honoring its warranty unless its own repair parts had been used could be unlawful tying arrangement). See also *Schoenbaum v. E.I. DuPont de*

impair the ability of sellers to offer and expand their output of multiple products.

Moreover, Clayton Act §3 requires a "condition, agreement, or understanding" that the buyer would not buy a product from the defendant's competitors,[5] and Sherman Act §1 requires a "contract, combination, or . . . conspiracy."[6] Courts must thus inquire whether buyers have "agreed" to take the second product in order to get the first or whether the defendant improperly "conditioned" the sale of the first product on the buyer's purchase of the second.[7]

Distinguishing an agreement to buy the second product on its own merits from an agreement to take the second product in order to get the first product is sometimes clear. If the defendant offers to sell the two products separately and no factors (such as package discounts) exist to make the decision to take the two products interdependent, buyer decisions to take both products must have been independent. But if buyers purchase the second product only after the defendant refuses insistent requests to sell the first product separately, a paradigmatic tie exists.

The less clear situations are the subject of this Subchapter, as previewed at the end of this Paragraph. As we shall see, the main question is whether the defendant has made the first product effectively unavailable to those who do not buy its second product.

---

*Nemours & Co.*, 517 F. Supp. 2d 1125 (E.D. Mo. 2007), vacated in part, 2007 WL 3331291 (E.D. Mo. Nov. 6, 2007), which refused to dismiss a challenge on seed gene patentee's post-sale restrictions on patented seed:

> According to the complaint, beginning in the early to mid-1990s, and continuing to the present day, Monsanto, aided by its alleged co-conspirators (Defendants Pioneer and DuPont), devised and implemented a scheme to monopolize the GM corn seed and trait markets and the broad-spectrum-herbicide-resistant soybean and corn seed and trait markets. Between 1992 and 1996, in furtherance of the scheme to monopolize, Monsanto allegedly entered into a series of agreements with competing soybean and corn seed manufacturers, wherein Monsanto licensed the manufacturers to produce GM seeds incorporating Monsanto's patented traits. Monsanto allegedly imposed the following restrictions on the seed manufacturers who were granted a license: (1) prohibiting, without Monsanto's permission, "stacking" Monsanto's seed traits with non-Monsanto genes; (2) prohibiting the use of any glyphosate-containing herbicide other than Roundup, or promoting any broad-spectrum herbicide other than Roundup; and (3) imposing tying and exclusive dealing arrangements, consonant with the above requirements and restrictions.

5. For the broad concept of not buying from a competitor, see ¶c.

6. In certain other circumstances, an arrangement may be subject to Sherman Act §2 or Federal Trade Commission Act §5. See ¶g.

7. See, e.g., *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5-6 (1958) ("[A] tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier."); *Eastman Kodak Co. v. Image Technical Services*, 504 U.S. 461-462 (1992) (same).

We conclude with two possible ties that are very difficult to deal with. The defendant may design a desired product $A$ in a way that works best with its own version of product $B$ and thereby forecloses rival suppliers of the latter product (¶1757). More often, many defendants sell their $A/B$ packages for less than the sum of their charges for each product separately (¶1758).

## ¶1753. Express Tying Contract

**1753a.  Introduction and summary.**  In order to dispose of several pervasive matters that could complicate later issues, we begin by defining and examining the unambiguous instance of two products tied together and distinguishing an illusory tying condition (¶b). We then see that such a contract constitutes a tie even if buyers would have purchased the defendant's product without regard to the tie (¶c), do not consider the contract onerous or suffer rigorous enforcement(¶d), or do not actually buy anything from the defendant (¶e). However, an express tying contract that is proposed to buyers but rejected by them does not constitute a tie (¶f). Finally, contracts requiring compliance with certain specifications or purchase from numerous third parties in which the defendant lacks an economic interest do not constitute ties (¶g).

Except as discussed in ¶e, what is true of the unambiguous tying contract is also true of purchases after a clearly announced tying condition (or its equivalent) under both the Sherman and Clayton Acts.[1]

**1753b.  Unambiguous tying contract defined; multiple documents; illusory tying condition.**  Suppose a written contract provides for the sale of products $A$ and $B$ after a preamble stating that both parties understand that the allegedly tying product $A$ is not available separately on any terms. Given that preamble, an undoubted tying agreement exists even if separate contracts are simultaneously executed for each product.[2] Without such an

---

¶**1753.**  n.1.  See ¶1754. Of course, when the announced tying condition or its equivalent is itself ambiguous, some of the facts discussed below may help resolve the ambiguity. See ¶1756.

2.  See ¶1754e; and see *American Can*, 87 F. Supp. 18, 25-26 (N.D. Cal. 1949), where the contract stipulated:

> Lessee agrees that it will pay the rental as above provided, and that it will not use or permit the user of any of said machines or additional equipment, if any, for any purpose except therewith to close cans which the lessee shall have bought from the

express or implied preamble, a single contract might simply reflect the buyer's independent preference for the defendant's two products without any genuine tying condition. The Supreme Court well understood this in *Loew's*, where the Court affirmed lower court findings that only 25 out of 68 negotiated contracts licensing packages of many movies involved tying.[3] Absent more evidence of tying than explicit contractual coverage of both allegedly tying and tied products, the other 43 contracts were deemed non-ties. The lower courts are largely in accord.[4]

An occasional court erroneously holds otherwise.[5] Broad dicta by other courts suggest that a contract covering two products is a prima facie tie,[6] especially when the defendant hardly pretended

---

lessor and will not, directly or indirectly, use or permit the use of, the same except as herein expressly authorized.

3.   *United States v. Loew's*, 371 U.S. 38, 40-43 (1962).

4.   See, e.g., *Illinois Tool Works, Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 31-32 (2006) (defendant sold patented printhead and patented ink container as a package to printer manufacturers, and further made them promise that neither they nor their customers would refill the containers with their own ink); *Data General Corp. v. Grumman Systems Support Corp.*, 36 F.3d 1147, 1181 (1st Cir. 1994) (even assuming contract explicitly forbade purchasers of tying software from buying tied service from defendant's rival, no tying condition shown absent evidence that any buyer was unhappy, wanted to buy the tied product elsewhere, or was enduring an inferior or overpriced product); *Capital Temporaries v. Olsten Corp.*, 506 F.2d 658, 659-660, 661-662, 665-666 (2d Cir. 1974) (even if contract required the buyer to take two franchises, they were not tied together absent evidence of coercion beyond the two-product contract itself); *American Manufacturers Mut. Ins. Co. v. American Broadcasting-Paramount Theatres (American Manufacturers I)*, 388 F.2d 272, 276 (2d Cir. 1967) (contract selling advertiser access to 130 different television stations did not show tie-in absent evidence of coercion during negotiation); *Associated Press v. Taft-Ingalls Corp.*, 340 F.2d 753, 765 (6th Cir.), cert. denied, 382 U.S. 820 (1965) (contract that provided for sale of four wire services did not by itself show they were tied together, but such a tie could be deduced from the course of conduct).

5.   See, e.g., *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 716-717, 720, 722 (7th Cir. 1979), cert. denied, 445 U.S. 917 (1980). The plaintiff entered 16 form franchise contracts requiring it to buy allegedly tied photographic processing either from defendant or an approved supplier. The basic form contract was held not to be a tie because the plaintiff was not obliged to buy from the defendant. But because the plaintiff agreed to delete the approved-supplier option from 12 of these contracts, the court erroneously saw 12 tying contracts. Negotiating deletions in some but not other contracts indicates that the defendant did not require the deletion (creating the tie) as a condition of entering into a franchise contract.

6.   See *Little Caesar Enters. v. Smith*, 895 F. Supp. 884 (E.D. Mich. 1995) (franchise agreement requiring Little Caesar pizza franchisor's permission to purchase from another source establishes tying condition, where Blue Line was a wholly owned subsidiary of Little Caesar; however, class certification denied because the clause did not appear uniformly in all franchisee contracts). The court subsequently certified the class. *Little Caesar Enters. v. Smith*, 172 F.R.D. 236 (E.D. Mich. 1997) (concluding that coercion need not be proven separately as to each franchisee; question is not whether franchisee would have purchased anyway but whether the franchisor's policy constrained choices that the franchisee might have made, and the latter can be established by common proof; quoting ¶¶1752, 1754b). A later decision dismissed the complaint for lack of power. 34 F. Supp. 2d 459 (E.D. Mich. 1998).

otherwise or when the two-product contract was a form contract.[7] But even some courts overreading the significance of a two-product contract recognize that such a contract is not necessarily a tie.[8]

The immediate point is that the unambiguous tying agreement is not just a contract that covers two products but a two-product contract reflecting the defendant's refusal to sell the allegedly tying product separately. Though it may seem odd, such an unambiguous condition is not shown by a contract's express clause conditioning the defendant's obligation to supply *A* on the customer's earlier or simultaneous purchase of *B* and payment for *B*.[9] It may look more threatening to competition than a contract merely to sell two products, but the absence of any firm obligation to buy the second product means that the threat of foreclosure is less. In fact, the apparent tying clause does not necessarily mean that the defendant refuses to supply *A* separately on conventional or otherwise appropriate terms. It might mean only that not buying or not paying is defined as a so-called material breach, which

7. See, e.g., *Response of Carolina v. Leasco Response*, 537 F.2d 1307, 1328 (5th Cir. 1976): "[W]here one product is sold on the express contractual condition that the purchaser purchase supplies for that product only from the seller defendant, the purchaser's future course of action is limited by that contract, and coercion is found in the agreement itself." Taken literally, this suggests that any contract involving two products, one of which the buyer agreed to take exclusively from the seller, involves a tie-in even if the contract was negotiated and the buyer asked to get both products from the seller. The statement was dicta both because the case involved no such contractual term but did involve the form contracts discussed in ¶1756d.); *Krehl v. Baskin-Robbins Ice Cream Co.*, 78 F.R.D. 108, 118 (C.D. Cal. 1978) ("When the tie is a term of the franchise agreement, the plaintiff does not need to show that he was coerced, coercion is implied."). See also *Ungar v. Dunkin' Donuts*, 531 F.2d 1211, 1224 (3d Cir.), cert. denied, 429 U.S. 823 (1976), where the court did not certify a class because the form contract contained no tying condition. It thus had no need to decide whether a form contract with such a condition would have sufficed, as it recognized. Accordingly, its general statement that "a formal agreement . . . is sufficient" to show a tie-in was dictum, although the opinion is often read to mean that express contractual coverage of two products itself establishes a tie. Accord *Cia. Petrolera Caribe v. Avis Rental Car Corp.*, 735 F.2d 636, 638 (1st Cir. 1984); *Waldo v. North American Van Lines*, 669 F. Supp. 722, 727 (W.D. Pa. 1987); Herbert Hovenkamp, Tying Arrangements and Class Actions, 36 Vand. L. Rev. 213, 221 (1983) ("[C]ircuits hold uniformly that if all members of a putative class can produce a written contractual provision requiring them to take the tied product, then the court will assume that the seller actually forced the arrangement upon them.").

8. See, e.g., *Bell v. Cherokee Aviation Corp.*, 660 F.2d 1123, 1130-1131 (6th Cir. 1981). The court acknowledged that no tie would be found if it were proved that the buyer sought to include both products in the contract. Thus, it could not have meant literally the broad statement with which it deemed a negotiated contract to be a tie: "Where the tie-in is clear on the face of the contract . . . there is no need to inquire into coercion." Whether this statement referred to an express tying condition or merely to coverage of two products was not clear.

9. Such a clause appeared in *IBM v. United States*, 298 U.S. 131, 134 (1936). Although the Court suggested that any such "tying clause" is a tie, the lease was in fact a form contract. See ¶1756d.

allows the defendant seller to withhold or abandon further performance.[10] Such contractual conditions provide more certainty than the doctrine of material breach and provide a self-help remedy that is less costly and may be more effective than litigation. The condition might, therefore, make the contract more efficient and thus create joint gains that can be shared between both parties. It could then be merely the memorialization of mutually beneficial rules of breach negotiated under circumstances where product *A* could freely have been bought separately. The antitrust condition exists only if the buyers either could not have contracted to buy product *A* separately or were given the reasonable impression they could not have.[11]

**1753c.   Buyer would have purchased second product independently.**   A tying agreement is not defeated by evidence that a buyer would have purchased the defendant's tied product anyway.[12] This was established early by *United Shoe*, where the Supreme Court explained,

> It is true that the [lower] court speaks of the excellence and efficiency of the United Company's machinery as a sufficient inducement for its installation by the lessees, and, we may add that there is much testimony in the record tending to show that it was the excellence of the United Company's machinery and the efficiency of its service which induced lessees to acquire its machinery, but these considerations are apart from the pertinent issues which here confront us. No matter how good the machines of the United Company may be, or how efficient its service, it is not at liberty to lease its machines upon conditions prohibited by a valid law of the United States.[13]

10.   For example, suppose that a contract licenses a trademark and requires a franchisee to buy certain supplies from the defendant franchisor. Contract law is seldom clear on whether the buyer's breach is an insubstantial breach allowing the franchisor merely to sue for damages or is a material breach excusing the franchisor's contractual obligation to continue licensing the trademark. Because contract law generally allows parties to define what constitutes a material breach, an express contractual condition eliminates uncertainty — to the benefit of both parties, including sellers with no market power and no prospect of significant foreclosure.

11.   See ¶1754c.

12.   While the text statement is true of tying legality without any qualification, a plaintiff *buyer* might not be injured in fact if it purchased no amount of the tied product that it would not have purchased anyway, and thus it would not be able to obtain damages. See ¶¶335, 338. For that reason some courts hold that tying-arrangement purchaser class actions seeking damages cannot be certified if the class might include some purchasers who would have purchased the tied product in any event. See ¶1754e.

13.   *United Shoe Mach. Corp. v. United States*, 258 U.S. 451, 462 (1922).

Thus, once the requisite agreement or conditioned sale appears, whether the agreement or condition *caused* buyers to purchase the defendant's tied product rather than a rival's is not in issue.[14]

To be sure, *Jefferson Parish* said, "[t]ying arrangements need only be condemned if they restrain competition on the merits by forcing purchases that would not otherwise be made."[15] But the Supreme Court did not invite inquiries into what buyers would otherwise have done, for the Court made plain that sufficient "forcing" exists when buyers "might have preferred" to buy the tied product elsewhere.[16] Tying "occurs when the buyer must accept the tied item and forego *possibly* desirable substitutes."[17]

The policy rationale is simple. "[E]ven if some of the [buyers] would have selected [the defendant's tied product] regardless of the tying arrangement, the arrangement prevented them from making that choice freely."[18] As the Third Circuit explained:

> The antisocial conduct which the rule seeks to deter is the act of the seller conditioning sale of one product upon purchase of another. One can hardly imagine anything which would vitiate that purpose more than a requirement that a violation depends upon proof that the buyer . . . would not have purchased the tied product but for the tie requirement. The issue is whether the seller acted in a certain way, not what the buyer's state of mind would have been absent the seller's action.[19]

Speculation about what buyers would have done had the defendant allowed them to exercise independent judgment is often unreliable and involves the very sort of burdensome inquiry into actual market conditions the per se rule was meant to avoid. The

14.  See ¶1709d1 (foreclosure includes all sales of tied product even if buyer would have bought the product anyway); ¶1721d2 (same); ¶1442e2 (presumed compliance and causation from announced condition in tying cases).

15.  *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 27 (1984) (rejecting plaintiffs' claim that defendant hospital's power could be inferred from insured patients' indifference to price or quality).

16.  Id. at 12.

17.  *Moore v. Jas. H. Matthews*, 550 F.2d 1207, 1217 (9th Cir. 1977) (emphasis added).

18.  *Tic-X-Press v. Omni Promotions Co.*, 815 F.2d 1407, 1417 (11th Cir. 1987). See also *Esposito v. Mister Softee*, 1980-1 Trade Cas. ¶63,089, at 77,420 (E.D.N.Y. 1980) (plaintiffs need not show that "they were required to purchase unwanted or unneeded merchandise" that they would not "have bought in any case").

19.  *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 449-450 (3d Cir. 1977), cert. denied, 434 U.S. 1086 (1978); *Anderson Foreign Motors v. New England Toyota Distributors*, 475 U.S. 973, 988 (D. Mass. 1979) (tying test focuses not on buyer's state of mind but on seller's actions).

tribunal would need to examine the buyers' state of mind at the time of the tying agreement and would need to know not only what buyers thought but what they would have thought in the absence of the tying condition. Moreover, the very existence of the tie prevents buyers from changing their minds and discourages rivals, including new entrants, from tying to woo the buyers from the defendant.[20] There is little reason to undertake that burden when the defendant itself doubted the outcome sufficiently to impose the restraint and when there is a better test. The best way to test whether buyers would otherwise have taken the defendant's tied product would be to offer the tying and tied products separately.[21] If the best the defendant can say about an otherwise unlawful tie is that it has no effect, there is little reason to tolerate it.[22]

**1753d.  Contract not onerous or not enforced rigorously.**   A tying contract is no less so though non-onerous to buyers. The Supreme Court has twice condemned as ties contracts requiring customers to take the tied item only when the defendant's terms were as good as or better than rivals' terms.[23] The Court correctly understood that such apparently non-onerous agreements gave the defendant a priority on the bound customers' patronage. For that and other reasons, such tying agreements might discourage rivals from cutting prices in the hope of winning such patronage.[24]

The Court has refused to require rigorous enforcement of a tying contract. Both *International Salt* and *Northern Pacific* held products tied together even though the contractual obligation to buy the tied product was often unenforced, waived, or leniently administered.[25] The reason is that the "overhanging threat of

---

20.  *Associated Press v. Taft-Ingalls Corp.*, 340 F.2d 753, 756, 759 (6th Cir.), cert. denied, 382 U.S. 820 (1965) (key evil of tying is that "it forces the buyer to give up his independent judgment").

21.  See, e.g., *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 725 (7th Cir. 1979), cert. denied, 445 U.S. 917 (1980).

22.   While the existence of a tying restraint does not depend on what buyers would otherwise have done, there would be no foreclosure (¶1724c) and perhaps no separate products (¶¶1743a, 1748) absent a reasonable *possibility* that buyers would purchase the tied product elsewhere. It is enough that buyers might have wanted to purchase the tied product elsewhere in the absence of the defendant's tying conditions. This conclusion and the cases that seem to require more are considered at ¶1754e.

23.  *International Salt Co. v. United States*, 332 U.S. 392, 396-397 (1947); *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 7-8 & n.6, 11-12 (1958) (customers also free to purchase superior quality elsewhere).

24.  See ¶1707e ("competitive condition" clauses).

25.  *International Salt*, 322 U.S. at 398; 356 U.S. at 11-12.