IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| IT'S MY PARTY, INC. and | * | |
| IT'S MY AMPHITHEATER, INC., | * | |
| | * | |
| v. | * | Civil No. JFM-09-00547 |
| | * | |
| LIVE NATION, INC. | * | |
| | * | |
| | ****** | |

**OPINION**

Plaintiffs It's My Party, Inc. ("IMP") and It's My Amphitheater, Inc. ("IMA")
(collectively "plaintiffs") bring this lawsuit against Live Nation, Inc. ("Live Nation") under
sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2; and the Maryland Antitrust
Act, Md. Code Ann. §§ 11-201, 204 *et seq.*  Plaintiffs allege that Live Nation has unreasonably
restrained trade by exercising its market and monopoly power in the promotion and venue
services markets.[1]

Pending are numerous motions to exclude expert testimony, motions to strike various
exhibits, and cross-motions for summary judgment.  A hearing on these pending motions was
held on November 7, 2014.  For the reasons set forth below, the motions to strike exhibits are
denied; all motions to exclude expert testimony are denied except for the motion to exclude the
testimony of Einer Elhauge, which is granted in part; Live Nation's motion for summary
judgment is granted; and plaintiffs' cross-motion for summary judgment is denied.

---

[1] Plaintiff's complaint contains the following counts: Count I: per se tying arrangement of venues
with promotion services; Count II: rule of reason tying arrangement of venues with promotion
services; Count III: monopolization; Count IV: attempted monopolization of leasing/licensing
amphitheaters; Count V: monopolization of national promotion market; Count VI:
monopolization over critical input; Count VII: attempted monopolization over critical input;
Counts VIII, X, XI: state claims.

## BACKGROUND

### I.      Factual History.

This case involves three parties in the concert industry: artists, local promoters, and national or global promoters.  Artists who choose to showcase their music in live concerts have options for structuring their tours, namely how to schedule and book the individual venues for concerts that comprise the tour.  Artists often contract with promoters who select and book concerts at venues and provide advertising and marketing for the concert (or set of concerts) to draw attendance.  (ECF No. 279 at p. 9).  Some promoters are local and book concerts at specific venues.  In such a case an artist might contract with several promoters in different parts of the country to book sets of shows that make up the artist's national tour.  (ECF No. 255 at pp. 5–6).  Other promoters, fewer in number, have a national reach and contract with an artist to solely market, promote, and negotiate with venues across the country to develop a tour.  (*Id.* at p. 6).

The chief difference between contracting with several, locally-based promoters and a single, national promoter is the form of the artist's compensation.  Artists who contract with one or a few national promoters to organize their tours often receive a guaranteed payment from the promoter based on the number of shows organized by that promoter.  *Id.*  Artists who contract "locally" and book with several promoters in various parts of the country will often receive instead a percentage of the gross ticket sales from each concert.  *Id.*

Another difference is that for national, "exclusive" tours, promoters sometimes "cross-collaterize" the tour.  This means that the revenues from each individual concert are held in escrow by the promoter until the end of the tour.  This practice enables the promoter to cover losses from concerts that underperformed with revenue from concerts that met or exceeded

expectations.  *Id.*  This mechanism operates as a de facto insurance policy for the national promoter, enabling it to offer higher guaranteed compensation to artists.

Promoters book artists at venues, and accordingly arrange concerts with venue owners. Venues range in size, from small clubs to sports stadiums with over 60,000 seat capacities.  *Id.* As artists' popularity grows over time, they perform at correspondingly larger venues on their tours.  Thus an artist who performs at smaller clubs one year may perform at larger amphitheaters or indoor arenas years later.  (ECF No. 279 at p. 10).  Venues earn money through ticket sales (less the amount paid to the artist), concession sales of food and beverages, and parking.

Plaintiffs and Live Nation are both promoters, but vary in terms of size and scope. Plaintiff IMP has operated as a regional promoter for over thirty years, and it contracts with artists to perform at a variety of venues in the Baltimore and Washington, D.C. markets. (Hurwitz Decl., ECF No. 112 ¶¶ 10, 12).[2]  Live Nation's business operates on a global scale—as of 2012 Live Nation had promoted over 2,000 artists at venues throughout the United States and the world.  (Siwek Rep., ECF No. 217-3 ¶ 5.2).  Live Nation often serves as the exclusive promoter for artists on national tours, and uses cross-collaterization to offer artists higher guaranteed compensation.  (ECF No. 255 at pp. 6–7).  It has expanded its promotion capability over time through the purchase of other promoters, including Concert Productions International and House of Blues ("HOB") Entertainment.  (ECF No. 279 at p. 12).

IMA was formed in 2004 to operate the Merriweather Post Pavilion ("Merriweather"), an outdoor amphitheater venue in Columbia, Maryland that hosts a variety of concerts, including those by popular artists such as The Who and Led Zeppelin.  (ECF No. 112 ¶ 67).  Merriweather

---

[2] Seth Hurwitz is the co-founder and Chief Executive Officer of IMP, and is also the Chief Executive Officer of IMA.  (*Id.* ¶¶ 1–2).

has a 19,000 fan capacity, with 5,000 "fixed" seats.  (*Id.* ¶ 2; ECF No. 255 at p. 9).  Live Nation "owns, operates, leases or has exclusive booking rights at venues throughout the United States," including the Nissan Pavilion ("Nissan").  (ECF No. 255 at p. 4).[3]  Nissan is an outdoor amphitheater in Bristow, Virginia that is similar to Merriweather but has a slightly larger 25,000 fan capacity, with 10,000 "fixed" seats.  (ECF Nos. 217-3 ¶ 7.7; 255 at p. 9).[4]  In the Baltimore-Washington, D.C. area there are several arenas and amphitheaters of approximately the same size, including the Verizon Center (indoor arena, 19,000 fan capacity) and Filene Center at Wolf Trap (outdoor amphitheater, 7,000 fan capacity).  (ECF No. 255 at p. 9).

In addition to being uncovered, outdoor amphitheaters are different from indoor arenas because they typically contain both fixed seats and lawn space on which fans can sit or stand.  (ECF No. 279 at p. 9).  Some may consider amphitheaters to be superior to similarly-sized indoor arenas due to "better sight lines," equipment designed specifically for artist concerts, and overall flexibility.  *Id.*  The unpredictability of weather, however, is obviously a disadvantage of performing at outdoor amphitheaters.

## II.     Procedural History.

Plaintiffs filed their complaint on March 5, 2009, alleging several antitrust violations by Live Nation.  (ECF No. 1).  I denied Live Nation's motion to dismiss and (first) motion for summary judgment.  (ECF Nos. 35; 101).  The denial of Live Nation's motion for summary judgment was without prejudice and with leave to refile at the close of expert discovery.  Live Nation brought the pending motion for summary judgment on March 21, 2014.  (ECF No. 205).

---

[3] The Nissan Pavilion is currently named Jiffy Lube Live, but will be referred to as Nissan to reflect the motions and briefs in this case.
[4] Live Nation also acquired Ticketmaster in 2010, a national on-line ticket seller for varied events including music concerts.  That purchase, however, is not directly relevant to any of plaintiffs' allegations in this case.

Live Nation also filed motions to exclude four of plaintiffs' experts, and plaintiffs responded with motions to exclude two of Live Nation's experts.[5]   Plaintiffs also filed a pending cross-motion for partial summary judgment on July 31, 2014.  (ECF No. 279).

## STANDARDS

**I.  Admissibility of Expert Testimony under Rule 702.**

> Expert testimony is admissible under Rule 702 in the form of an opinion or otherwise if: (a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Rule 702 is broad and applies to subjects beyond the purely scientific. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).  In short, the question is whether an expert is qualified, and whether his opinion is reliable.  *E.g.*, *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 214 F. Supp. 2d 530, 534 (D. Md. 2002).  Courts should focus on the reliability of the expert's "principles and methodology," not the conclusions.  *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999).

By answering that question, district courts "play a gatekeeping function in deciding whether to admit" the testimony.  *United States v. Crisp*, 324 F.3d 261, 265 (4th Cir. 2003).  The gatekeeper judge must navigate two often competing principles: although Rule 702 was intended to liberalize the introduction of relevant expert testimony, expert witnesses "have the potential to

---

[5] Plaintiffs have also filed three motions to strike various exhibits and responses attached to Live Nation's briefs, (ECF Nos. 266, 270, 298), and a motion to supplement the record on summary judgment oral argument.  (ECF No. 309).  There also appear to be two pending motions to seal, filed by Live Nation.  (ECF Nos. 218, 265).  The motions to seal are granted.

be both powerful and quite misleading." *Westberry*, 178 F.3d at 261.  Courts often refer to a non-exhaustive list of factors to help decide whether the expert testimony is admissible. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593–94 (1993).[6]  District courts have broad discretion when exercising their gatekeeping function, and the precise factors and the manner in which they are applied depends on the factual circumstances of each case. *See generally Gross v. King David Bistro, Inc.*, 83 F. Supp. 2d 597, 598 (D. Md. 2000) (holding that district judges should assess expert testimony "based on the unique situations involved in each case"); *see also Kumho Tire Co.*, 526 U.S. at 142 (noting that a district court has "latitude when it decides *how* to determine reliability").  Finally, even expert testimony based on sound methodology should be excluded if it is based on unsound or incorrect assumptions. *E.g.*, *Tyger Const. Co. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994).

The proponent of the expert testimony bears the burden of producing evidence supporting its contentions and demonstrating that the testimony is reliable, relevant, and based on sound methodology.  A proponent need not prove that the expert testimony is "irrefutable or certainly correct," because opinions based on reliable methodology can be tested through the adversarial process. *Westberry*, 178 F.3d at 261.

## II. Summary Judgment.

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P 56(a); *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine dispute about a material

---

[6] The factors are:  "(1) whether the particular scientific theory can be (and has been) tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has achieved general acceptance in the relevant scientific or expert community." *Crisp*, 324 F.3d at 266 (quoting *Daubert*, 509 U.S. at 593–94) (internal quotation marks omitted).

fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When reviewing a motion for summary judgment, the court must look at the facts and inferences drawn from there in the light most favorable to the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

Although the moving party bears the burden to demonstrate the absence of any genuine issue of material fact, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970), the non-moving party may not merely rest upon allegations or denials in pleadings, but must, by affidavit or other evidentiary showing, set out specific facts showing a genuine issue remains for trial.  Fed. R. Civ. P. 56(c)(1)(A).  A court should enter summary judgment where a non-moving party fails to make a sufficient showing to establish the elements essential to the party's claim and on which the party will bear the burden of proof at trial.  *See Celotex*, 477 U.S. at 322.

If there is insufficient evidence for a reasonable jury to render a verdict in favor of the non-moving party, there is no genuine issue of material fact, and summary judgment may be granted.  *See Anderson*, 477 U.S. at 248.  The court must not yield its obligation "to prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003).  Conversely, the motion should be denied if factual issues exist "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson*, 477 U.S. at 250.

**ANALYSIS**

Pending are three groups of motions filed by both sides: to strike exhibits, to exclude

expert testimony, and for summary judgment.  The admissibility of the six contested experts is

discussed first before determining whether summary disposition of plaintiffs' claims is proper.[7]

## I.     Motions to Exclude Expert Testimony.

Plaintiffs and Live Nation have each filed motions to exclude testimony of the opposing

party's proposed expert witnesses.  Live Nation moves to strike four of plaintiffs' expert

witnesses: Einer Elhauge (ECF No. 212), Joshua Baron (ECF No. 210), Chris Bigelow (ECF No.

211), and Stephen Siwek (ECF No. 214).  Plaintiffs move to strike the testimony of two of

defendant's witnesses: Benjamin Klein (ECF No. 221) and Michael Smith (ECF No. 219).

Elhauge, a Harvard law professor, is plaintiffs' key expert witness.  He defines the venue

and promotion markets that form the basis of plaintiffs' claims, and also analyzes Live Nation's

share and control of these markets.  Plaintiffs other witnesses testify about the history of, and

general practices in, the concert industry (Baron), food and beverage prices at concert venues

(Bigelow), and plaintiffs' damages (Siwek).  Live Nation's two experts that plaintiffs seek to

exclude are offered for the purpose of rebutting Elhauge's testimony (Klein) and plaintiffs'

damages calculations (Smith).

I find that portions of Elhauge's testimony are inadmissible under Federal Rule of

Evidence 702, and Live Nation's motion to exclude his testimony will be granted in part.  The

---

[7] Plaintiffs' motion to strike portions of Live Nation's reply in support of its motion to exclude
Elhauge (ECF No. 266) is denied.  The arguments that plaintiffs contend are new were
adequately briefed in Live Nation's initial motion to exclude.  Plaintiffs' motions to strike
various exhibits proffered by Live Nation (ECF Nos. 270, 298) are also denied.  Plaintiffs'
arguments are not without merit, but they go to weight and credibility, not admissibility.  Finally,
Plaintiffs' motion to supplement the record from the hearing held on November 7 is granted.
(ECF No. 309).  I am not, however, ruling on ultimate admissibility at trial, only that I am
considering the supplemental facts in light of their mention during the hearing.  (ECF No. 309).

remaining motions to exclude will be denied—I find that there are not significant grounds to exclude the other five witnesses.

**A. Portions of Einer Elhauge's Testimony Are Inadmissible.**

Elhauge's analysis is the foundation of plaintiffs' claims. He defines the venue and promotion markets and calculates Live Nation's market share of each. Live Nation challenges his testimony on three grounds: his qualifications, the methodology underpinning his definition of the market for venues, and his opinions and conclusions regarding Live Nation's alleged tying and foreclosure of those markets. After briefly discussing Live Nation's first challenge, I turn to the second objection. The third is more properly brought as a challenge to the merits of plaintiffs' claims, rather than the admissibility of Elhauge's testimony, and is discussed in the section of this opinion addressing the merits of plaintiffs' claims.

I deny the motion to exclude Elhauge based on his qualifications. The Federal Rules of Evidence state that experts are qualified as such based on their "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "The use of the disjunctive" in this rule "indicates that a witness may be qualified as an expert on any one of the five listed grounds." *Friendship Heights Assocs. v. Vlastimil Koubek, A.I.A.*, 785 F.2d 1154, 1159 (4th Cir. 1986). Elhauge has an extensive background in the study of antitrust law and regulation, and he has taught on the subject for more than a decade. (Elhauge CV, ECF No. 251-4). Although lacking a formal economics degree, Elhauge has a law degree, and he has taken relevant courses in economics, statistics and economic analysis of law. (Elhauge Rep., ECF No. 217-1 ¶ 11). Thus, the argument to exclude him based on his qualifications should not be accorded significant weight. It is unsurprising that seven prior courts have also reached this conclusion. *E.g.*, *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Intern., Ltd.*, No. 05-12024, 2009 WL 3053855, at *3 (D. Mass.

Sept. 21, 2009) (holding that "Professor Elhauge is qualified in the narrower field of antitrust economics").[8]

Elhauge's definition of the venue market, specifically its foundation in the concept that some artists "prefer amphitheaters," will be excluded.  According to Elhauge, the relevant product market for venues in this case is the market for "major amphitheaters."  This is defined by precise parameters—concerts by artists who "prefer amphitheaters," in amphitheaters having a capacity of 8,000 or more, which actually draw 8,000 or more fans, and that are performed only from May to September.  (ECF No. 111 ¶¶ 22, 27–32).  The only two venues that fit into this category in the Baltimore/Washington metro area are Merriweather and Nissan.  Filene Center, an amphitheater in Vienna, Virginia, with a reported capacity of approximately 7,000 seats, is excluded.  (Klein Reb., ECF No. 217-5 ¶ 38).  Also left out are non-amphitheater arena venues in the area, specifically the Verizon Center, 1st Mariner arena, and the Patriot Center, which together represented 39% of concert tickets sold from 2006–2010 in the Baltimore-D.C. area.  (ECF No. 263 at p. 2 n.1).  The fact that the market is so narrowly drawn is beneficial to plaintiffs, who, in order to succeed on any claim, must prove that Live Nation possesses market power.  This is much easier if the market is restricted to only Merriweather and Nissan.

Elhauge bases his market definition on a portion of the U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines (2010).  These provide that a market can be defined using a "targeted customers" approach.  Guidelines 4.1.4.  Thus, "[i]f a hypothetical monopolist could profitably target a subset of customers for price increases, the Agencies may identify relevant markets defined around those targeted customers."  *Id.*  In other words, if a specific group of customers so prefer the relevant product, to such an extent that even

---

[8] Plaintiffs cite the other six cases in their opposition motion.  (ECF No. 251 at p. 8).

if the price increased significantly they would still not substitute another product, the market can be defined around that specific product.  Here, the "customers" are the performing artists.

The crux of Elhauge's market definition is his claim that a subset of artists "prefer amphitheaters," and would not substitute different venues for them, even if the price to perform at them substantially increased (put differently, artists would receive lower compensation).  (ECF No. 217-1 ¶ 31) (stating that "artists generally have strong preferences either for amphitheaters or for non-amphitheaters").  (ECF No. 217-1 ¶ 27).  This allows Elhauge to exclude any venue that is not an amphitheater from the market definition—including the three nearby arenas. Elhauge offers both anecdotal and quantitative evidence to support this claim.  I find that neither is based on "sufficient facts or data" as required by Federal Rule of Evidence 702.  As a result, Elhauge's testimony is not "the product of reliable principles and methods" and must be excluded.

The basis of Elhauge's "preferring amphitheaters" category of artists is a U-shaped histogram that he constructs.  This shows that even when artists could choose between amphitheaters and non-amphitheaters, "just under 30% earned more than 90% of their ticket revenues at amphitheaters, and over 40% earned less than 10% of their ticket revenue at amphitheaters."  (Elhauge Rpt. 217-1 at 9).  In lay terms, Elhauge's analysis means that the majority of artists are situated at one extreme or the other—either they strongly prefer playing at amphitheaters or they strongly prefer playing at non-amphitheaters.  Thus, when graphed, the preferences form a U-shape, with few artists falling in the middle portion, i.e. not having a strong preference for amphitheaters or non-amphitheaters.

The central problem is that the histogram does not do what Elhauge promises it does— prove that certain artists "prefer amphitheaters" in such a significant way that they constitute a

distinct market.  The key question is whether amphitheaters and non-amphitheaters are

"reasonably interchangeable."  *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377,

395 (1956).  This means that consumers would switch from one to another in the event of a small

but significant change in price or other key attributes.  *Eastman Kodak Co. v. Image Technical*

*Servs.*, 504 U.S. 451, 469 (1992) ("[T]he extent to which consumers will change their

consumption of one product in response to a price change in another, i.e., the 'cross-elasticity of

demand.'").

Elhauge's analysis identifies only what percentage of revenue artists make from each

type of show.  His histogram does nothing to indicate whether a change in the price to artists for

amphitheaters (i.e., offering a lower guarantee) would induce greater demand for arenas or other

venues. *See, e.g., FTC v. Tenet Healthcare Corp.*, 186 F.3d 1045, 1052 (8th Cir. 1999); *Va.*

*Vermiculite Ltd. v. W.R. Grace &Co.-Conn.*, 98 F. Supp. 2d 729, 737-38 (W.D. Va. 2000), *aff'd*

*on other issues*, 307 F.3d 277 (4th Cir. 2002).  Accordingly, I find that using the histogram to

conclude that certain artists prefer amphitheaters is not following "reliable principles and

methods" as required by Rule 702.  This is exacerbated by the fact that the data used within the

histogram itself is questionable.[9]  As a result, I will exclude the histogram.

Elhauge's attempt to offer subjective proof of artist preference is similarly unreliable.

Elhauge argues that because amphitheaters "offer concert-specific advantages over multi-

purpose arenas, including better acoustics and lines of sight" (ECF No. 217-1 at 19), artists

actively seek out and "prefer" amphitheaters.  To support this claim, Elhauge relies on the

---

[9] As Live Nation points out, Elhauge included plays and musicals that were only performed on one occasion, such as Mamma Mia and Barbie Live, in his data. Given the single occurrence of these performances, they are unlike artists on tour and necessarily only perform at amphitheaters or non-amphitheaters. As such, these performances are "incapable of switching (in response to a price change or otherwise)," thus further skewing the data and creating more data points for the 100% and 0% sides of the U-shaped histogram.  (ECF Nos. 212 at p. 7 n.3; 263 at p. 8).

deposition of artist Trent Reznor, front man and creator of the heavy metal band Nine Inch Nails. It is true that Reznor stated that amphitheaters had significant advantages over arena venues. (ECF No. 264-2 at 19:8-9, 17-19) (stating that "an arena can feel like the same cement dungeon that you're in back stage all the time" and that, in contrast, an amphitheater is a venue that "feel[s] like it was meant to play music, it sounds better, the experience is better").

The fact that Reznor enjoyed performing in amphitheaters more than in non-amphitheaters, however, did not result in the type of "preference" that Elhauge argues artists have.  Reznor himself states that while he "personally enjoy[s] playing amphitheaters as opposed to arenas," this preference "plays a small factor, but not a huge one."  *Id.* at 18:5-7.  He also states that the advantages of amphitheaters "for me personally will sometimes make me lean towards an amphitheater if its appropriate businesswise."  *Id.* at 19:22-24.  This does not indicate that Reznor and his band would not substitute non-amphitheaters for amphitheaters.  Indeed, this conclusion defies reality—Nine Inch Nails performed only 35% of their "major venue" shows at amphitheaters.  (ECF No. 263 at p. 10) (citing Elhauge backup data file).

Additionally problematic is the fact that when Elhauge implements the results of his histogram, he changes how he defines that category of artists who "prefer amphitheaters."  While the U-shaped histogram determined "preference for amphitheaters" based upon the percentage of total revenue made by artists at amphitheater venues, in his market share calculation Elhauge categorizes artists as "preferring amphitheaters" based on the percentage of concerts, not revenue.  Elhauge does this without providing significant explanation.  I have serious qualms with this finding and its application.

Finally, categorizing any artist who plays more than 50% of their shows at amphitheaters is arbitrary.  In Elhauge's analysis, artists who perform just more than half of their shows at

amphitheaters are said to prefer amphitheaters in the sense that they would not substitute a non-amphitheater venue for an amphitheater, even if there was a substantial difference in price.  This assertion is contrary to artists' actual behavior—given that these very performers often played a substantial percentage of their shows in non-amphitheaters.  Furthermore, the way that the 50% is calculated is skewed in favor of plaintiffs.  To determine if an artist meets the 50% threshold, "observations" of performances, which Elhauge calculates by counting every venue where an artist performed, are considered.  The tally of "observations" does not take into account how many concerts the artist performed at each of the venues.  Therefore, several performances at the same venue around the same date count as a single observation, rather than three or four separate performances.  Live Nation suggests that this delineation increases the number of artists who "prefer amphitheaters" in Elhauge's market share calculations.

In response to Live Nation's arguments against the 50% threshold, plaintiffs contend that even if they changed the statistic, from 50% to 75% or even 90%, their calculations of market share would not change.  This may be accurate, but it misses the point.  The problem with the 50% threshold is not the corresponding findings of market share that accompany it.  The problem is that Elhauge purports to define artist preference based on the percentage of shows performed at an amphitheater in a given time period, and alters the rule for what constitutes "preference" depending on which calculation best serves him. The result is a defined market that suits the needs of plaintiffs and excludes potentially reasonable substitute venues within the vicinity.

Overall, I conclude that the methods utilized by Elhauge to create a category of artists who "prefer amphitheaters" is unreliable. Each piece of evidence that Elhauge uses has been rebuked, and more importantly, the methodology he employs to reach his conclusions is not based on sound logic or reasoning. Accordingly, I exercise my discretion under 702 to exclude

the "preferring amphitheaters" categorization.  This alone is sufficient to exclude the entire

"venue market" definition that Elhauge offers.  I recognize that Live Nation has challenged the

validity of other parameters Elhauge imposes on the market, including the limitations to venues

of 8,000 capacity or greater, to shows that actually attract more than 8,000 fans, and to shows

from May-September. I do not need to address these arguments because excluding the prefer

amphitheaters parameter renders the entire venue market definition defective.

### B.  Other Experts.

I deny the other motions to exclude the additional experts offered by plaintiffs (Baron,

Bigelow, Siwek) and Live Nation (Smith and Klein).  In so holding, I recognize that each

additional expert is qualified to testify and that their conclusions and analyses, appear, in my

discretion, to be sound.  I note, however, that several of the plaintiffs' offered witnesses,

specifically Bigelow and Baron, offered "expert" testimony through filed reports that went well

beyond the area of their expertise.[10]  If this case were to proceed forward, the subjects on which

these experts could testify would be strictly limited.

---

[10] For example, plaintiffs intend to rely on Joshua Baron to explain the "development, workings
and structure of the concert industry, and Live Nation's domination of that industry to the jury."
(ECF No. 243 at p. 1).  Specific opinions he provides include the difference between
amphitheater and non-amphitheater performances, and the category of artists who "prefer" the
former.  *Id.* at 11.  This testimony is well within his expertise on the concert industry.  Other
offered testimony, however, including antitrust conclusions such as "Live Nation's control of the
only network of amphitheaters gives it significant leverage over artists," *id.*, and "Live Nation
has engaged in anticompetitive conduct," *id.* at 12, is not, and would accordingly not be
permitted.
The same would apply to Bigelow, an expert on the food and beverage industry at concert
venues.  (ECF No. 248).  While permitted to testify on the pricing system at Nissan and
Merriweather, and to compare prices at these venues with those at peer venues, Bigelow could
not offer his opinion as to underlying market behavior that caused these prices, or use the price
data to make claims of anticompetitive or monopolist behavior.  (ECF No. 205-26).

II.     **Cross-Motions for Summary Judgment.**

Live Nation moves for summary judgment on all of plaintiffs' claims.  Plaintiffs oppose

that motion, and also move for summary judgment on certain claims and issues in their favor.

This section first discusses plaintiffs' tying claims under § 1 before addressing their

monopolization claims under § 2.  Because no genuine disputes of material facts exist and Live

Nation is entitled to judgment as a matter of law, its motion is granted and plaintiffs' cross-

motion is denied.

**A.  Plaintiffs' Tying Claims Under § 1.**

Plaintiffs allege that Live Nation violated § 1 of the Sherman Act by tying together its

promotion and venue services.  Live Nation moves for summary judgment on all of plaintiffs'

tying claims, Counts I and II of the complaint.  Plaintiffs move for summary judgment in their

favor on the question of whether Live Nation possesses market power in the promotion services

market, and also argue that genuine disputes of material facts preclude summary disposition of

their other allegations.

Conditioning the sale of one product—the tying product—on the sale of a separate and

distinct product—the tied product—can violate § 1 of the Sherman Act in certain contexts.  *See*

*generally Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 9 (1984), *abrogated by Illinois*

*Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) (overruling precedent regarding patent

owners and presumptive market power).  If a competitive market exists where buyers are free to

accept or decline the seller's tying arrangement, a § 1 violation is unlikely.  *See Northern Pac. R.*

*Co. v. United States*, 356 U.S. 1, 7 (1958) (noting that "if one of a dozen food stores in a

community were to refuse to sell flour unless the buyer also took sugar[,] it would hardly tend to

restrain competition in sugar if its competitors were ready and able to sell flour by itself.").  On

the other hand, a single seller's "*exploitation* of its control over the tying product to *force* the buyer into the purchase of a tied product" is likely unreasonably restraining trade. *Jefferson Parish*, 466 U.S. at 12 (emphasis added); *see also Nobel Scientific Indus., Inc. v. Beckman Instruments, Inc.*, 670 F. Supp. 1313, 1325 (D. Md. 1986) ("First, no tying arrangement exists if there is freedom to choose whether to buy the two products separately or as a unit.").

A seller's "control" over a product is also referred to as its market power, as determined by its share of the market (often calculated by total revenue or sales). A seller can exert its market power in a tying product to "force the buyer into the purchase of a [separate] tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish*, 466 U.S. at 12; *see also Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 683 (4th Cir. 1992). The antitrust laws are designed to prevent a seller with market power from exerting that power to force buyers into accepting tying arrangements that "pose[] an unacceptable risk of stifling competition in the sale and purchase of a tied product or service." *Faulkner Adver. Assoc., Inc. v. Nissan Motor Corp. in USA*, 905 F.2d 769, 772 (4th Cir. 1990).

A plaintiff alleging an unlawful tying arrangement bears the burden to prove that: (1) the defendant linked two separate and distinct product markets; (2) the defendant conditioned the sale of one product on the purchasing of a different, "tied" product; (3) the seller possessed sufficient market power to "appreciably restrain market competition" through the tying arrangement; and (4) the tying arrangement affected a "not insubstantial" amount of commerce. *Eastman Kodak Co. v. Image Tech. Serv., Inc.*, 112 S. Ct. 2072, 2079 (4th Cir. 1992).[11]

---

[11] Courts sometimes distinguish between *per se* illegal tying arrangements, and tying arrangements reviewed under the rule of reason. *E.g., Montgomery Cty. Ass'n of Realtors, Inc. v. Realty Photo Master Corp.*, 783 F. Supp. 952, 959 (D. Md. 1992). I do not need to parse the

In this case, the first and fourth elements are not disputed. Live Nation concedes that "for purposes of this case only . . . promotion and venue services are 'separate products,'" (ECF No. 287 at p. 31 n.7), and the degree of commerce affected by Live Nation's alleged illegal conduct surpasses the low threshold set by courts as "not insubstantial." *See, e.g.*, *Fortner Enter., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 502 (1969) (holding that $200,000 of commerce was not insubstantial). The second and third elements, however, are disputed. Live Nation argues that the market definitions adopted by plaintiffs are defective, thus voiding their market share calculations, and also that plaintiffs do not cite necessary evidence of coercion by Live Nation.

Plaintiffs' two chief tying allegations under §1 are addressed in turn: that Live Nation tied its promotion services to performing in venues it owns (promotion-venue), and tied performing in venues it owns with performances in other such venues (venue-venue). Both claims suffer from the same two flaws: defective market definitions and no evidence of coercion.

### 1. Promotion – venue tying.

Plaintiffs allege that Live Nation conditioned its offer of national promotion services—namely an exclusive, national deal in which Live Nation promoted almost all of an artist's tour in exchange for a guaranteed (and often upfront) payment—on performing at Live Nation-owned venues, such as Nissan. Plaintiffs claim that artists who wanted to perform at non-Live Nation venues, like plaintiffs' Merriweather, were prevented from doing so at the risk of losing their national promotion deal with Live Nation. Live Nation argues that Elhauge improperly defined the promotion market as national rather than local, and that plaintiffs have not cited any evidence of coercion. Live Nation is correct on both arguments.

---

differences here, for the analysis is substantially similar. *See BookLocker.com, Inc. v. Amazon.com, Inc.*, 650 F. Supp. 2d 89, 97 n.2 (D. Me. 2009) ("In any event, the gap between a per se claim and a rule of reason claim in the tying context may not be wide.").

### a.   Promotion market is local, not national.

Antitrust claims require defining the relevant product markets.  *See generally E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011).  Each market definition is comprised of two elements: a product dimension and a geographic dimension.  *See Nobel Scientific Indus., Inc.*, 670 F. Supp. at 1327.  Defining markets is necessarily fact-bound, and typically requires expert testimony.  Here, the dispute is whether Elhauge correctly defined the promotion market nationally.  Live Nation argues that it is local, and both sides move for summary judgment on this issue.[12] After reviewing the briefing and (admissible) expert testimony, I conclude that the relevant promotion market is local, not national.

A market's geographic dimension should reflect the area "within which the defendant's customers . . . can practicably turn to alternative supplies if the defendant were to raise its prices or restrict its output."  *E.I. du Pont de Nemours and Co.*, 637 F.3d at 441.  Defining the geographic dimension of a market is a "fact-intensive exercise centered on the commercial realities of the market and competition" between entities in the market.  *Id.* at 442; *see also Heerwagen v. Clear Channel Comm.*, 435 F.3d 219, 228 (2d Cir. 2006) ("For example, historically, the geographic market for banking services is localized due to the local nature of the demand for such services.").

The proper perspective when defining a market is that of the consumer, which in this case is an artist seeking to contract with a promoter.  It is undisputed that broadly, an artist has two options on how to promote its concerts: a national promotion contract with a single promoter, such as Live Nation, or a series of contracts with local promoters in various locations throughout

---

[12] Plaintiffs, not Live Nation, move for summary judgment on the product dimension of the promotion services market.  I do not need to address this question because the geographic dimension is defective, therefore tainting the entire promotion services market definition relied upon by plaintiffs.

the country that together constitute a national tour.  (ECF No. 287 at p. 3).  Live Nation cites

evidence of several artists that book "locally" by contracting with several different promoters to

bolster their claim that the promotion market it local, not national in scope.  (*E.g.*, Harrington

Decl., ECF No. 205-18 ¶ 5).

Plaintiffs agree that the option to book several local promoters exists, but advance two

arguments to justify defining the market as national.  First, plaintiffs argue that local promoters

"must meet price and other competitive terms established nationally" by large competitors with a

national scope, such as Live Nation.  (ECF No. 279 at p. 26).  That argument, however, misses

the mark by sidestepping the core question: what are the artist's options?  Even if a local

promoter faces competitive pressure to match prices set by Live Nation, the fact remains that

artists cannot contract with local promoters on a national level.  Co-plaintiff IMP is an

illustrative example in that it admittedly only contracts with artists, and competes with Live

Nation, to promote concerts in the Baltimore-D.C. region.  (ECF No. 287-12 at p. 25) (stating

that "IMP competes to acquire one of [an artist's] appearance dates for the Baltimore and

Washington D.C. markets").

Moreover, promoting a concert requires contacting, contracting, and working with local

media outlets (newspapers, radio stations) to reach potential concertgoers who live proximate to

the venue.  For example, Live Nation books the majority of its television advertising locally,

with only about five percent spent on national advertising.  (ECF No. 287 at p. 37) (Live Nation

also characterizes its national promotion contracts as simply "aggregating a series of local

dates").  This too is indicative of the market's local character.

Second, plaintiffs cite Elhauge's testimony for the argument that because of modern

telecommunications, promotion services are "highly mobile."  (ECF No. 217-1 ¶ 61).  Elhauge

states there "does not seem to be any natural reason why a promoter in one locality could not also promote concerts in another locality." (*Id.* ¶ 75). As evidence, Elhauge lists several large promoters by the number of distinct localities they promote in. (ECF No. 217-1 ¶ 74, Table 9). For example, Live Nation promoted in the highest number of localities, 114, while Atlanta Worldwide Touring, Outback Concerts, and JAM Productions promoted in 21, 22, and 23 distinct localities, respectively, over the relevant time period. *Id.* Elhauge argues that this is evidence of a "highly mobile" market with "overlap" and a "chain of substitution" between promoters that justifies defining the promotion market nationally.

Plaintiffs' reliance on Elhauge's reasoning does not satisfy their burden to oppose Live Nation's motion for summary judgment. Elhauge argues that there is no "natural reason" why one promoter cannot promote anywhere, but has not cited evidence that demonstrates promoters beyond Live Nation and AEG Live can, and do, promote everywhere throughout the country. The facts of this case establish that an artist seeking a promoter in the Baltimore-D.C. region has at least two choices: plaintiff IMP and defendant Live Nation.[13]  But neither Elhauge or plaintiffs offer any evidence that the other promoters listed in Elhauge's Table 9 compete in Baltimore-D.C.  If an artist cannot turn to JAM Productions (promoted shows in 23 distinct localities) or Outback Concerts (promoted shows in 22 distinct localities), those promoters' alleged availability in some putative national market is irrelevant to the artist who actually needs a promoter for its shows in the Baltimore-D.C area.

---

[13] At one point, plaintiffs mischaracterize the national vs. local inquiry. (ECF No. 291 at p. 6) ("Artists reside throughout the country and are not seeking promoters where they reside."). Where artists reside is irrelevant, the question is where artists perform and whether promoters do in fact operate on a national scale, available in multiple locations.  As Live Nation argues, an artist seeking a promoter for the Baltimore-D.C. area "is not going to retain the services of a promoter based in Florida." (ECF No. 287 at p. 36).

There are no factual disputes on whether the promotion market is national or local because there is no affirmative evidence that artists enter into a national market with numerous promoters that can promote anywhere in the country, outside of Live Nation.  Indeed, the evidence in the record shows that promoting shows is highly localized, and that most promoters promote in specific locations.  The fact that Live Nation promotes in many localities throughout the country simply does not by itself justify defining the promotion market nationally.  *See Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 230 (2d Cir. 2006) (holding that "[l]ocal markets for tickets sales are not transformed into a national market simply because concert tours are coordinated nationally"), *abrogated on other grounds by Miles v. Merrill Lynch & Co., (In re Initial Pub. Offerings Sec. Litig.)*, 471 F.3d 24 (2d Cir. 2006) ("*In re IPO*").

Accordingly, the promotion market's geographic dimension is local, not national.  That conclusion renders Elhauge's calculations on Live Nation's market share in the alleged national promotion market inapplicable to this case, because they are based on a defective market definition.  As a result, plaintiffs' promotion-venue market tying claim cannot survive.

### b.  Plaintiffs have not cited evidence of coercion.

Even if Elhauge and plaintiffs are correct in defining the promotion market nationally, plaintiffs still bear the burden to prove that Live Nation conditioned (i.e., coerced) the sale of one product on the purchasing of a different, "tied" product.  *E.g.*, *Eastman Kodak Co.*, 112 S. Ct. at 2079.  Evidence of coercion is necessary because buyers may voluntarily choose to purchase the tied products together, perhaps to take advantage of a lower "package sale" price.  Live Nation argues that there is no evidence of coercion, while plaintiffs argue that genuine disputes of material facts exist that render summary disposition improper.  Live Nation is correct.

As a threshold matter, plaintiffs argue that evidence of actual "coercion" is unnecessary. (ECF No. 279 at p. 33).  In a narrow sense that is true, because when courts recite the elements of a tying arrangement they ask whether the seller "conditioned" the sale of one product or service on the purchase of another.  *See, e.g.*, *Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 683 (4th Cir. 1992).  Those same courts, however, further define that question as whether there is evidence that the seller "exploited" or "force[d]" buyers into accepting the tying arrangement.  *Id.* at 688.[14]  Plaintiffs claim that Live Nation has not cited a case "where proof of conditioning was held insufficient to establish a tie," (ECF No. 279 at p. 34), but the Fourth Circuit, in the very case cited by plaintiffs, affirmed summary judgment in favor of the defendant based in part on the plaintiffs' failure to prove that the defendant "force[d] customers" into purchasing the tied product.  *Serv. & Training, Inc.*, 963 F.2d at 688.  Relevant precedent holds, therefore, that regardless of the terminology—coerced, forced, exploited—plaintiffs must introduce evidence demonstrating unlawful pressure by Live Nation against artists to perform at Nissan as a condition of entering into a national promotion contract.

Plaintiffs argue that the record contains "compelling evidence" that Live Nation coerced artists into performing at venues it owned, such as Nissan, as a condition of signing a national promotion tour.  Plaintiffs' cited evidence can be grouped into three general categories: (1) regression analyses calculated by Elhauge; (2) statements by artists and managers that plaintiffs characterize as demonstrating coercion by Live Nation; and (3) Live Nation's practice of charging "co-promotion" fees if an artist on a national Live Nation contract performed at a non-

---

[14] *See also* Holmes and Mangiaracina, Antitrust Law Handbook § 2:18 ("It must be more specifically shown that the buyer was coerced into taking the tied item, not because he wanted it or was simply ignorant in his purchasing decision, but because this was a condition forced upon him directly or by the practical economics of the arrangement.").

Live Nation venue such as Merriweather.  None of the cited evidence, however, permits a reasonable fact-finder to infer coercion.

                i.   *Regression analysis by Elhauge.*

Plaintiffs first cite data and conclusions prepared by Elhauge, who claims that Live Nation conditioned its offer of promotion services, namely a nationally-organized, all-inclusive tour, on artists performing at Live Nation-owned amphitheaters to the detriment of independent venues like Merriweather.  (ECF No. 111 at ¶¶ 101–105).  One of his regression analyses calculates the impact that signing a national promotion contract with Live Nation had on an artist's appearances at Merriweather.  He concludes that the likelihood the artist performed at Merriweather fell from 74% to 14% over the relevant time period, a statistically significant difference.  (ECF Nos. 279 at p. 29; 217-1 ¶¶ 123–27 & Table 16).  This, argue plaintiffs, is evidence that signing a national promotion tour with Live Nation "induces artists to substitute Nissan for Merriweather."

Accepting that statistic as true for summary judgment purposes, it does not demonstrate that Live Nation *coerced* artists into substituting Nissan for Merriweather.  Artists may have elected to perform at Nissan while also on a national tour promoted by Live Nation for a variety of reasons, including increased financial compensation.  Inducing artists to perform at Nissan by increasing their compensation is akin to the "attractive package sale" that courts have upheld as lawful.  *See, e.g.*, *Jefferson Parish*, 466 U.S. at 11–12.

                ii.   *Individual instances of Live Nation trying to coerce artists.*

Plaintiffs also cite several statements by artists, their managers, and their agents that plaintiffs argue evidence coercion.  The cited examples, however, are either too innocuous to constitute coercion or are directly contradicted by the very same artist, manager, or agent.

First, plaintiffs cite an email from Live Nation's Jason Garner as evidence that he

"coerced . . . the Counting Crows and Goo Goo Dolls . . . Santana and Ashlee Simpson . . . to

forego appearing at Merriweather." (ECF No. 279 at p. 36). That email to fellow Live Nation

employee Ted Mankin, however, simply stated that Garner would "try to help" sign those artists

to perform at Nissan instead of Merriweather, while asking Makin to do the same with "Panic"

(presumably artist Panic! at the Disco). (ECF No. 118-1 at p. 8). That statement contains no

facial evidence of coercion, nor could a reasonable fact-finder infer coercion from Garner's offer

to "try to help." It only states the obvious—Live Nation tries to book artists at its own venues.

Next, plaintiffs cite instances where artists on Live Nation national promotion tours felt

coerced by Live Nation to perform at Nissan. For example, plaintiffs cite two tours in 2006:

Nine Inch Nails and John Mayer. First, plaintiffs argue that Nine Inch Nails (and booking agent

Marc Geiger) "yielded to [Live Nation's] conditioning" by performing at Nissan in 2006. (ECF

No. 279 at p. 36). Geiger's own deposition, however, explicitly denies any "force" or

"coercion," or that Live Nation "compelled . . . an artist to appear at Nissan over Merriweather."

(ECF No. 287-14). Indeed, Nine Inch Nails agreed to play at Nissan only after Live Nation

added an additional $150,000 to its compensation under the national promotion deal. (ECF No.

280-34).[15] As for John Mayer, he performed on a national Live Nation tour (along with Sheryl

Crow) that provided him with 100% of net ticket sales (less expenses). (Garner Dep., ECF No.

136-35). That offer was "contingent on Nissan and White River" (another Live Nation

amphitheater), which plaintiffs allege was coercive. Mayer's agent (also Geiger), however,

denied that Live Nation coerced John Mayer into not performing at Merriweather in 2006. (ECF

---

[15] James Guerinot, a manager, also confirms that with respect to Nine Inch Nails' decision to
perform at Nissan, "[t]here was no element in coercion in the booking process," the choice was
"based solely on business decisions." (Guerinot Decl., ECF No. 228-1 ¶ 8).

No. 287-14 at p. 40:22–41:7) (stating "it's not true").  Even if John Mayer initially wanted to

perform at Merriweather, the increased financial compensation offered by Live Nation (100% of

ticket sales, less expenses) is evidence of negotiation, not coercion.  *See id.* at p. 41:18–20

(Geiger explaining a decision to play at Nissan over Merriweather as based on "financial

incentives").

Plaintiffs also claim that Live Nation "coerced" the Jonas Brothers to forego an

appearance at Merriweather in August 2008.  The Jonas Brothers had signed a national

promotion contract with Live Nation in 2007, but plaintiffs submitted an offer for the artist to

perform instead at Merriweather in August 2008.  (ECF No. 287-6).  The Jonas Brothers

declined, and ultimately appeared at First Mariner (now the Baltimore Arena)—not Nissan—for

$12,000 more in guaranteed compensation.  (*Compare id.*, *with* ECF No. 287-11).  Plaintiffs

argue nonetheless that agent David Zedeck's testimony raises a disputed material fact from

which a reasonable fact-finder could conclude that the Jonas Brothers wanted to perform at

Merriweather but were coerced by Live Nation.  Zedeck does admit that he asked plaintiffs to

"hold" a date at Merriweather for a potential performance by the Jonas Brothers, but in the same

testimony also states that the Jonas Brothers never requested to perform at Merriweather.  (ECF

No. 280-17 at p. 93:1–3).  Instead of suggesting coercion, Zedeck's testimony simply

demonstrates that he was negotiating and shopping around for venue options on behalf of the

Jonas Brothers.   Plaintiffs have not cited any evidence that the Jonas Brothers were dissatisfied

with the outcome: performing at First Mariner for more money.

Finally, plaintiffs cite an email sent by Live Nation employee Perry Lavoisne in reference

to artist Sublime's 2010 Summer Tour.  (ECF No. 280-20).  Lavoisne states that Sublime's

agent/manager "is in no position to tell us no.  I will get it done or no tour offer," the "it"

referring to performing at Nissan for the band's Baltimore-D.C. appearance.  *Id.*  In response, Sublime declined Live Nation's offer and the band performed at Pier Six Pavilion for the Baltimore-D.C. date on July 18, 2010.  (ECF No. 285-8).  Not only was Sublime not on a Live Nation national promotion tour—the alleged tying product in this case—the evidence only indicates that Sublime was free to perform at Merriweather and chose not to.  Although Lavoisne may have (mistakenly) believed that Live Nation had leverage over Sublime, the evidence does not demonstrate coercion in any form.

Overall, these individual instances of alleged unlawful behavior by Live Nation are not facial evidence of coercion, and they do not permit a reasonable inference of coercion.  The same artists, managers, and agents who make comments interpreted by plaintiffs as indicia of coercion often explicitly deny being coerced by Live Nation.  Plaintiffs' cited evidence demonstrates vigorous competition by Merriweather and Nissan in negotiating with artists to perform at their respective venues.  Courts have held that "sales pressure . . . .  strong persuasion, encouragement or cajolery to the point of being obnoxious" are *not* unlawful.  *Unijax, Inc. v. Champion Int'l, Inc.*, 683 F.2d 678, 684–85 (2d Cir. 1982).  Negotiating is not tying.

*iii.  Paying "co-promotion" fees to Live Nation.*

Finally, plaintiffs allege as coercive Live Nation's charging a "co-promotion fee" to the local promoter or artist if the artist choose to perform at a non-Live Nation venue (i.e. Merriweather) while on a national Live Nation tour.  Live Nation admits this practice, but offers a persuasive justification.

When Live Nation signs an artist to a national promotion contract and guarantees a certain payment, that payment is based (at least in part) on Live Nation's expected revenue and profit from the entire tour.  Live Nation earns greater profits when artists perform in venues that

it owns (due to vertical efficiencies), that permits it to pay artists more for the tour.  If, however, an artist substitutes a non-Live Nation-owned venue, like Merriweather, for a Live Nation-owned venue, like Nissan, Live Nation will earn less money than it anticipated when it signed the artist and calculated the overall guaranteed payment.  Accordingly, Live Nation either alters ("reformulates") the national contract and associated compensation, or asks for a portion of the revenue from the non-Live Nation concert to essentially make Live Nation "whole" on the national contract.  (ECF No. 205-2 ¶ 14) (Live Nation Co-President explaining co-promotion fees as covering "Live Nation's lost earnings potential resulting from the sell-off" of a particular performance, for example substituting Merriweather for Nissan).

Plaintiffs cite the 2009 Nine Inch Nails tour as evidence that Live Nation's "co-promotion" fees were coercive.  The band was on a Live Nation national promotion tour, but wanted to perform at Merriweather for its Baltimore-D.C. performance.  Plaintiffs characterize Live Nation as "relent[ing]" only after Nine Inch Nails paid $100,000 of its earnings from Merriweather into the "tour pot."  (ECF No. 118 at p. 79).  While plaintiffs argue that the $100,000 was unreasonable because Live Nation "contributed nothing" to promoting or hosting the concert, Live Nation justifies the payment as compensating for the profit Live Nation would have made if Nine Inch Nails had performed at Nissan.  Indeed, that "co-promotion fee" went to Nine Inch Nails' overall tour account, into which all tour revenue was deposited to offset unexpected losses from underperforming concerts.  Live Nation characterized it as "a fair solution that satisfied all parties," and thanked Nine Inch Nails' manager (Marc Geiger) "for being a great partner."  *Id.*  This episode illustrates the opposite of coercion: Nine Inch Nails performed where it wanted—Merriweather—in exchange for offsetting part of the "loss" in Live

Nation's overall revenue from the tour.  A reasonable fact-finder would be unable to infer coercion from these events.

Similarly, The Fray, a rock band, signed a multi-appearance national tour contract with Live Nation, but asked to perform at Merriweather for its Baltimore-D.C. appearance.  (ECF No. 287-9).  After negotiation, Live Nation agreed to "release" The Fray to perform at Merriweather in return for a $3.00 charge per ticket, paid for by reducing Live Nation's overall guaranteed payment to The Fray.  (ECF No. 119-1 at p. 220, ¶ 4(a)(i)).  Again, Live Nation offered a guaranteed payment contingent on The Fray performing at a certain number of venues it owned. When The Fray switched out one such venue for Merriweather, its compensation from Live Nation was accordingly reduced.

Fundamentally, plaintiffs have not cited evidence that demonstrates Live Nation coerced, unlawfully pressured, or forced artists to perform at Live Nation-owned venues while on Live Nation national promotion tours.  I cannot find any genuine disputes of material facts on this question despite sifting through the numerous depositions, affidavits, and emails cited by both sides.  Live Nation's offering higher compensation to artists who perform at Nissan and charging "co-promotion fees" when it "releases" artists on a national tour to perform in non-Live Nation venues are emblematic of a large competitor utilizing its vertical efficiencies to cajole artists, not coerce them.

Because plaintiffs cannot cite sufficient evidence from which a reasonable fact-finder could infer coercion, they have not met their burden to prove a necessary element of their promotion-venue tying claim.  Summary judgment for Live Nation on this claim, therefore, is appropriate.

### 2.   Venue – venue tying.

In addition to alleging promotion-venue tying, plaintiffs claim that Live Nation tied performances in venues it owned with performances in other venues under its control.  Put differently, plaintiffs allege that Live Nation would require artists to perform at Venue B as a condition of performing at Venue A.  This claim, however, suffers from the same two defects as plaintiffs' promotion-venue tying claim.  First, plaintiffs' venue market definition is defective, negating a necessary element of their claim.  Second, and independent, plaintiffs once again have not cited evidence that artists were coerced into performing at one Live Nation venue as a condition of performing at another.

### a.   Venue market definition is defective.

Every tying claim requires defining the relevant product market in which the defendant exerts its alleged market power.  *See generally E.I. du Pont de Nemours and Co.*, 637 F.3d at 441.  As stated above, each market is comprised of two elements: a geographic dimension and a product dimension.  The dispute over the promotion market, discussed above, centered on the geographic dimension: national vs. local.  Here, both sides dispute the product dimension of the venue market definition.  In short, Live Nation argues that plaintiffs and Elhauge impermissibly defined the venue market too narrowly, resulting in a "gerrymandered" market that excludes valid substitute venues and artificially inflates Live Nation's venue market share.

As discussed above in Section I.A., *supra*, Elhauge defined the relevant venue market in this case to only include outdoor amphitheaters.  His justifies that limitation by claiming that certain artists "prefer amphitheaters" and thus constitute a subclass with inelastic demand that can be targeted by Live Nation for its tying arrangements.  I conclude, however, that Elhauge's classification that some artists "prefer amphitheaters" is inadmissible under Rule 702.  Even if

Elhauge's U-shaped histogram is methodologically sound (which Live Nation and Klein dispute), and indicates that approximately 30% of artists earned more than 90% of their ticket revenue from shows at amphitheaters, Elhauge does not adequately link that finding to his conclusion—that certain artists so prefer amphitheaters to the extent that they would not perform at a non-amphitheater in response to an increase in the price to play at amphitheaters.

If the "artists who prefer amphitheaters" parameter is struck, Elhauge's entire definition of the venue market, which excludes non-amphitheaters such as indoor arenas, is defective. As the evidence indicates, artists regularly perform at both amphitheaters and non-amphitheaters. This fact is fatal to plaintiffs' venue-venue tying allegations, because an artist dissatisfied with Live Nation's conditioning of amphitheaters could simply perform at another venue.

Elhauge improperly defined the relevant venue market, excluding valid and reasonable substitute venues such as indoor arenas. Accordingly, his calculations of Live Nation's alleged market power in various markets are tainted. Without a defined market or market share calculations, summary judgment in favor of Live Nation on plaintiffs' venue-venue tying claim is warranted.

**b. Evidence of coercion is lacking.**

Even if plaintiffs' venue market definition and market power calculations are justified and admissible, plaintiffs' venue-venue tying claim would also suffer from the same defect as their promotion-venue tying claim: the lack of evidence that Live Nation coerced, forced, or compelled artists, their managers, or their agents. Such evidence is necessary, for an artist might voluntarily choose to perform at two or more Live Nation venues based on a myriad of factors, including increased financial compensation and venue availability on specific dates. Plaintiffs

cite only one unpersuasive instance of Live Nation supposedly coercing an artist to accept its venue-venue tie.

Plaintiffs argue that in 2006 Live Nation coerced the band 311 to perform at Nissan instead of Merriweather by threatening to eliminate performances at other Live Nation-owned venues.  The only evidence to support this argument is an email from the band's manager (John Harrington) to Seth Hurwitz in which Harrington stated that if the band switched from Nissan to Merriweather its "Virginia Beach date would go out the window."  (ECF No. 112-1 at p. 82).  At Harrington's deposition, however, he stated that "Live Nation has never used tactics that I would consider coercive," and further explained his email to Hurwitz as aimed at "getting Seth off [his] back" regarding whether the band would substitute Nissan for Merriweather.   (ECF No. 287-16 at pp. 43:4–5, 44:4).  Moreover, at the time of this email, 311 had already negotiated with Live Nation to appear at Nissan as part of their tour, a fact that Hurwitz was aware of when he asked 311 to perform at Merriweather instead.  (ECF No. 112 ¶ 97(j)).[16]

Because plaintiffs rely on an improper venue market definition, and cannot cite evidence that Live Nation coerced artists into accepting a venue-venue tying arrangement, they have not met their burden of proof.  Accordingly, summary judgment for Live Nation on this claim is appropriate.

**B.  Plaintiffs' Monopolization Claims Under § 2.**

Plaintiffs initially alleged monopolization under § 2 of the Sherman Act in both the promotion and venue markets.  Plaintiffs have dropped the venue allegation and focus instead on

---

[16] Plaintiffs also cite regression analyses calculated by Elhauge which demonstrate that artists who perform at a Live Nation amphitheater in a town where it is the only amphitheater performed at Merriweather 26% of the time, in contrast to 84% when artists bypass Live Nation amphitheaters.  This calculation is insufficient for a reasonable fact-finder to infer coercion, however, because it does not address whether artists were coerced into bypassing Merriweather, or instead did so voluntarily.

Live Nation's power in the promotion market.[17]  For the purposes of this section, I will assume

that this market is national, even though I previously concluded that it is in fact local.  *See*

Section II.A.1.a, *supra*.

Under § 2 of the Sherman Act, a defendant is liable for monopolization when that

defendant: (1) possesses monopoly power; and (2) willfully acquires or maintains that power.

*Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.,* 748 F.3d 160, 173 (4th Cir. 2014) (internal

citation omitted).  Plaintiffs may not have satisfied the first prong, given that by their own

admission, Live Nation has only at maximum sixty-six percent of the market share in the

national promotion market.  (ECF No. 217-1 at p. 53, Tbl. 10).  Even assuming *arguendo* that

Live Nation does have monopoly power, plaintiffs have not sufficiently made a showing that

Live Nation has "willfully acquire[d] or maintains that power," under either a refusal to deal or

exclusive dealing theory.

### 1.  Live Nation does not have monopoly power.

"Monopoly power is the power to control prices or exclude competition." *Kolon,* 748

F.3d at 173 (citing *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391 (1956)).

As a result, "a defendant possesses monopoly power in the relevant market if it is 'truly

predominant in the market.'" *Id.* at 173–74 (quoting *White Bag Co. v. International Paper Co,*

579 F.2d 1384, 1387 (4th Cir. 1974)).  The level of market share required for monopoly power is

substantial.  *See Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 481 (1992)

("Monopoly power under § 2 requires, of course, something greater than market power under §

1.").

---

[17] Plaintiffs state that "none of plaintiffs' claims are based upon the finding that LN exercised monopoly power in the Baltimore/DC venue market."  (ECF No. 279 at p. 54).

The test to determine monopoly power is not rigid, indeed "there is no fixed percentage market share that conclusively resolves whether monopoly power exists." *Kolon,* 748 F.3d at 174.  It is also true, however, that "the Supreme Court has never found a party with less than 75% market share to have monopoly power." *Id.* (citing *Antitrust Laws & Trade Regulation: Desk Ed.* § 3.02[2][c][ii]).  Importantly, the Fourth Circuit has "observed that when monopolization has been found the defendant controlled *seventy to one hundred percent* of the relevant market." *Id.* (internal citations and quotations omitted) (emphasis added).

The inquiry, however, is not exclusively numeric.  In determining monopoly power, courts may look "beyond percentage market share" into the specific facts and context of the relevant market.  *E.g.*, *Kolon,* 748 F.3d at 174.  In this vein, courts are permitted to consider "the durability of the defendant's market power, done with an eye toward other firms (in)ability to enter the market." *Id.* (internal citation omitted) (modification in original).  Durability is, in essence, "the ability to maintain power over pricing and competition 'for a significant period without erosion by new entry or expansion.'" *Kolon Indus., Inc. v. E.I. du Pont De Nemours & Co.,* No. 3:11CV622, 2012 WL 1155218, at *11 (E.D. Va. Apr. 5, 2012), *aff'd sub nom. Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160 (4th Cir. 2014) (quoting 2B Phillip E. Areeda, et al., *Antitrust Law* P 501, at 111 (3d ed.2007)).

Plaintiffs and Live Nation do not significantly dispute the percentage of the national promotion market that Live Nation has.  Both parties rely on Elhauge's report for their figures.  In his report, Elhauge presents a chart calculating Live Nation's market share from 2006 to 2010.  For the five years in that time frame the shares are respectively: 64%, 64%, 62%, 66%, 60%.  Live Nation reads the case law to establish a "70% market share minimum . . . for monopoly

power in a section 2 case," and thus draws a simple conclusion from these numbers—their share is not sufficient to establish monopoly power.  (ECF No. 205 at p. 39).

Plaintiffs cite these same figures, but dispute how the law should be interpreted and applied to them.  According to plaintiffs, 70% is not an absolute minimum threshold required for monopoly power, but a figure that courts have found can serve as "an adequate basis to infer" such power.  (ECF No. 279 at p. 53).  To prove this point, plaintiffs cite other circuit courts of appeal that found monopoly power when a defendant had less than a 70% market share.  *See Reazin v. Blue Cross & Blue Shield of Kansas, Inc.,* 899 F.2d 951, 967-68 (10th Cir. 1990) (finding 60% sufficient); *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.,* 917 F.2d 1413, 1443 (6th Cir. 1990) (finding 58% sufficient).  Plaintiffs also emphasize the fact that from 2006 to 2009 Live Nation's share of the national market increased two percent: from 64% to 66%, to highlight dominance.  (*Id.* at p. 52) (citing Elhauge Rpt., ECF No. 217-1 at ¶ 85).  Perhaps conveniently though, plaintiffs do not accord the same weight to the decline in market share from 66% in 2009 to 60% in 2010.  *Id.*  ("[o]ne year does not establish a trend in any event.").

I find that plaintiffs have not met their burden to establish that Live Nation's power in the national promotion market rises to the level required for a monopoly.  Live Nation's share has fluctuated between 60–66% for the relevant time period.  Even at its peak, then, this is less than the guidelines set forth by both the Fourth Circuit and the Supreme Court.  And although these guideline figures are not absolutes, they still inform the analysis under § 2.  I am simply not prepared to conclude that a fluctuating market share, between 60–66%, constitutes monopoly power.  *See Kolon*, 748 F.3d at 174 (stating that a share below the 70% threshold "[q]uite simply . . . falls significantly short of where we have previously drawn the line for monopoly power").

This is also true because plaintiffs have not made a sufficient showing that the "durability" of Live Nation's market share is so strong as to warrant a finding of monopolization. To make this showing, plaintiffs argue that Live Nation has erected several "artificial barriers to entry," including: "(1) contracts that foreclose rival promoters from access to popular music artists by tying promotion to venues; (2) exclusive dealing promotion contracts that foreclose rival promoters from access to artists, and (3) Live Nation control of venues that make it difficult for rival promoters to book venues for artists."  (Elhauge Rpt., ECF No. 217-1 ¶ 89).  Plaintiffs also make much of statements by Live Nation executives regarding their market position— including Live Nation's CEO's statement of its "incredible market power around the world." (ECF No. 279 at p. 53).

These arguments are not relevant or persuasive.  Evidence of allegedly illegal tying arrangements go to violations of § 1, and exclusive dealing arrangements are considered under the second prong of a monopolization claim.  Neither address the durability of Live Nation's market share, or long-term ability to exclude competition and control prices, that is the central question in this inquiry.  And while plaintiffs do show that Live Nation has "strength" in the market, I am guided by the principle that a "showing of . . . 'market power' is not itself sufficient to prove that . . . [a defendant] possesses 'monopoly power.'"  *Kolon,* 748 F.3d at 174 (4th Cir. 2014) (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 481, (1992) ("Monopoly power under § 2 requires, of course, something greater than market power under § 1.").

Even when I examine the "durability" of Live Nation's market power, it is insufficient to meet plaintiffs' burden in opposing summary judgment.  Live Nation's market share declined six percent in the last year for which there is data, from 66% to 60%.  Other firms, primarily AEG,

participate in the national promotion market and compete against Live Nation.  (Elhauge Rep.,
ECF No. 217-1, Tbl. 10).  There is also evidence of promoters who work in specific areas, like
IMP, competing against Live Nation in particular regions of the country.  In fact, during the
relevant period, the number of concerts at Merriweather increased, and for four of the five years
analyzed by Elhauge the number of concerts at Merriweather has been greater than the number at
Nissan.  (Klein Rebuttal, ECF No. 217-5 at 51–55).  In short, I do not find that there is a basis to
conclude that Live Nation has become "truly predominant in the market," *White Bag,* 579 F.2d at
1387, and had power to completely "exclude competition."  *United States v. du Pont,* 351 U.S. at
391.  I also note that there is no evidence of Live Nation controlling prices, another indicator of
monopoly power.  Plaintiffs only claim that Live Nation overpays artists to perform at their
venues, thereby charging a lower, rather than a higher, price.  Since plaintiffs have not alleged a
predatory pricing scheme, this evidence does not support a finding of monopoly power.

### 2.  Live Nation did not willfully acquire or maintain any power.

Even if I were to assume, *arguendo,* that Live Nation did have monopoly power,
plaintiffs have not shown that Live Nation willfully acquired or maintains that power as required
under § 2.  "To violate this prong, a defendant must engage in conduct 'to foreclose competition,
to gain a competitive advantage, or destroy a competitor.'"  *Kolon,* 748 F.3d at 176 (quoting
*Eastman Kodak Co.*, 504 U.S. at 482–83).

Plaintiffs argue that there is at least a genuine issue of material fact as to whether Live
Nation has engaged in anticompetitive conduct.  They primarily rely on two types of
anticompetitive conduct to support this claim.  First, plaintiffs argue that Live Nation's "forcing
artists to use it promotion services at its venues . . . [is actionable] as part of a scheme to
enhance, maintain and abuse monopoly power."  (ECF No. 279 at p. 40).  Plaintiffs initially

characterize this as a tying claim—and Live Nation argues it is actually a claim for refusal to deal. I will consider it as a refusal to deal claim. Second, plaintiffs argue that "LN obtains overly broad exclusivity clauses from artists" to further their monopoly scheme. *Id.*

Plaintiffs' theory is that Live Nation "refuses to provide venue services" to certain artists—meaning Live Nation will not allow an artist it does not promote to perform at one of its venues. (*Id.* at p. 41). According to plaintiffs, in so doing Live Nation is "forego[ing] the short-run profits it would earn form the concert to harm competitors and enhance its monopoly position," constituting anticompetitive conduct that unreasonably restrains trade. *Id.*

This does not constitute "refusing to deal" as defined by the Supreme Court. The primary case that upheld a finding of monopolization using a "refusal to deal" theory involved a defendant who previously cooperated with a competitor, but withdrew participation and refused to renegotiate, even when the competitor offered strong economic incentives to do so. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (2004). The Court found that "[t]he jury may well have concluded that [the defendant] elected to forgo these short term benefits because it was more interested in reducing competition . . . over the long run by harming its smaller competitor." *Id.* at 608. A later case has defined this decision as "at or near the boundary of § 2 liability." *Verizon Commc'ns Inc. v. Law Offices of Curtis v. Trinko, LLP*, 540 U.S. 398, 409 (2004). In so holding, the Court stated that a refusal to deal claim does not arise when the competitor had not "voluntarily engaged in a course of dealing with its rivals." *Id.* at 409. In sum, it is "clear that if a firm has no antitrust duty to deal with its competitors at wholesale, it certainly has no duty to deal under terms and conditions that the rivals find commercially advantageous." *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 450 (2009).

Given these guidelines, plaintiffs obviously cannot succeed on their "refusal to deal" claim. Plaintiffs have not indicated any theory under which their argument would align with the law. They have not shown that Live Nation previously engaged in a cooperative scheme with other promoters and allowed them to book concerts at its venues and later withdrew this support. Indeed, plaintiffs have not shown that they ever asked to promote a show at a Live Nation venue in an effort to cooperate and were rebuffed. (ECF No. 205 at p. 22). I therefore reject this claim.

Plaintiffs also argue that Live Nation has engaged in anticompetitive behavior in the form of exclusive dealing arrangements. The idea is that Live Nation "target[s] the most highly popular artists to which it submits 'all or nothing' tour deals that require the artist to work only with LN (or entities it designates) for extended periods." (ECF No. 279 at p. 43). These arrangements take the form of "express exclusivity clauses or overbroad radius clauses." *Id.* The latter are clauses that "prohibit artists from performing anywhere in the United States or North America, not just within the area of performance, for an extended period of any tour performance." *Id.*

While not "per se illegal, [exclusive dealing arrangements] may be an improper means of acquiring or maintaining a monopoly power." *Kolon*, 748 F.3d at 175 (internal quotations and citations omitted). According to the Supreme Court, such an agreement is not unlawful unless its probable effect is to "foreclose competition in a substantial share of the line of commerce affected." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961). The Fourth Circuit has echoed this idea and stated "[t]he market share foreclosed is important because, for the contract to adversely affect competition, 'the opportunities for other traders to enter into or remain in that market must be significantly limited[.]'" *Kolon*, 748 F.3d at 175 (internal citations and quotations omitted). After proving substantial foreclosure, a plaintiff must also

"demonstrate that the conduct had 'a negative impact on competition in the market as a whole.'"
*Id.* (quoting *Chuck's Feed & Seed Co. v. Ralston Purina Co.*, 810 F.2d 1289, 1295 (4th Cir. 1987)).

Plaintiffs have not demonstrated that the arrangements they identify have substantially foreclosed commerce.  Elhauge calculates that Live Nation's activities have foreclosed "between 23% and 30% of the North American promotion market from 2006 through 2010 and over $1.5 billion in ticket revenues during the same period."  *Id.*; (*see also* Elhauge Rpt., ECF No. 217-1 at Tbl. 22).  This figure, however, is based upon the proportion of the market that has been foreclosed through alleged tying arrangements *and* exclusive dealing.  It does not separately calculate the relevant figure—the share foreclosed only by the exclusive dealing contracts.  Even if this figure were accepted, it does not meet the Fourth Circuit's threshold for "substantial." *See, e.g.*, *R. J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 390 (M.D.N.C. 2002), *aff'd sub nom. RJ Reynolds Tobacco Co. v. Philip Morris USA, Inc.*, 67 F. App'x 810 (4th Cir. 2003) (finding that 34% market foreclosure was not substantial).

In conclusion, even if I concluded that Live Nation possessed monopoly power, plaintiffs still have not shown that Live Nation willfully acquired or maintained that power.  Both their refusal to deal and exclusive dealing theories fail.  Live Nation's conduct is not of the type that § 2 of the Sherman Antitrust Act seeks to restrain.  Accordingly, summary judgment is granted to Live Nation on Counts III, V, and VI of plaintiffs' complaint.

### C.  Plaintiffs' Attempted Monopolization Claims Under § 2.

Plaintiffs also bring a claim for attempted monopolization under § 2 in both the concert promotion and venue markets. (ECF No. 279 at p. 55).  "Attempted monopolization employs

methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it." *Kolon*, 748 F.3d at 177 (internal quotations and citations omitted).  To prevail on an attempted monopolization claim, a party must show: (1) a specific intent to monopolize a relevant market; (2) predatory or anticompetitive acts; and (3) a dangerous probability of successful monopolization.  *Id.* (citing *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456 (1993)).

This claim must necessarily fail because I have concluded that Live Nation has not engaged in anticompetitive acts, either through illegal tying arrangements, a refusal to deal, or exclusive dealing.  In short, without evidence of any wrongdoing, I will not uphold a claim of attempted monopolization.  For this reason, I also grant Live Nation's motion for summary judgment on Counts IV and VII of plaintiffs' complaint.

### D.  State Law Claims.

The last three counts of plaintiffs' complaint allege that Live Nation violated the Maryland Antitrust Act, committed Tortious Interference with Prospective Contractual Relationships, and committed Unfair Competition.  Live Nation's motion for summary judgment will be granted as to Counts VIII, X, and XI.[18]

### 1.  Maryland antitrust act

Live Nation's liability under the Maryland Antitrust Act depends on its liability under plaintiffs' federal claims.  *See, e.g.*, *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 223 F. Supp. 2d

---

[18] Plaintiffs' complaint does not contain an enumerated Count IX.

718, 741 (D. Md. 2002) (holding that the "Maryland Antitrust Act substantially mirrors its federal counterparts"). Because all of plaintiffs' federal claims fail as a matter of law, so too does its state antitrust claim.

### 2. Tortious interference with prospective contractual relationships.

A tortious interference with a prospective economic relationship claim requires wrongful conduct by the defendant. *E.g.*, *Berlyn, Inc.*, 223 F. Supp. 2d at 741. That conduct must be "independently wrongful or unlawful." *Id.* (quoting *Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260 (Md. 1994)). Here, because the only independently "wrongful" conduct cited by plaintiffs is Live Nation's alleged antitrust violations, this claim is also not viable because plaintiffs' federal antitrust claims are defective.

### 3. Unfair competition.

An unfair competition claim involves "simply the principles of old-fashioned honesty." *Elecs. Store, Inc. v. Cellco P'ship*, 732 A.2d 980, 991 (Md. Ct. Spec. App. 1999). Accordingly, a plaintiff normally bears the burden to prove some kind of deceit or deception. Here, because plaintiffs have not cited any evidence showing dishonest or deceptive acts by Live Nation, summary judgment in favor of Live Nation is warranted.

### CONCLUSION

For the reasons stated above, Live Nation's motion for summary judgment is granted and plaintiffs' cross-motion for summary judgment is denied. All pending motions to strike exhibits are denied, and all motions to exclude expert testimony are denied except for Live Nation's motion to exclude Elhauge's testimony, which is granted in part. Live Nation is undisputedly large, and utilizes its size and global reach to sign artists to exclusive contracts and steer them to perform in venues that it owns. With this lawsuit, however, plaintiffs are seeking only "the

profits they would have realized had competition been reduced." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488 (1977).  This is an injury the antitrust laws do not redress, because "they were enacted for the protection of competition, not competitors." *Id.*  Quite simply, plaintiffs in this case have failed to produce or cite evidence that Live Nation's conduct violates the antitrust laws.

 

 

<table>
<tr><td>        02/19/2015        </td><td>               /s/               </td></tr>
<tr><td>Date</td><td>J. Frederick Motz<br>United States District Judge</td></tr>
</table>